

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*26 Federal Plaza, 37ᵗʰ Floor*
*New York, New York 10278*

December 11, 2024

**BY EMAIL & ECF**
The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

The Honorable Lisette M. Reid
United States Magistrate Judge
Southern District of Florida
C. Clyde Atkins United States Courthouse
301 North Miami Avenue
3rd floor
Miami, Florida 33128

> Re:  *United States v. Alon Alexander, Oren Alexander, and Tal Alexander,* 24 Cr. 676 (VEC)

Dear Judge Caproni and Judge Reid:

The Government respectfully submits this letter in advance of the initial appearance of the Alon Alexander, Oren Alexander, and Tal Alexander (collectively the "defendants" or the "Alexander Brothers"), who were arrested earlier today in the Southern District of Florida.[1] The defendants were taken into custody after a grand jury sitting in the Southern District of New York returned a three-count indictment charging them with sex trafficking offenses. As alleged in the Indictment and described further herein, for approximately two decades, the Alexander Brothers have sexually assaulted, trafficked, and forcibly raped dozens of women. After relying on their substantial wealth and connections to carry out and conceal their crimes for years, all three defendants now face charges carrying potential sentences in prison of fifteen years to life.

For these reasons and as detailed below, there is no condition or combination of conditions that will reasonably assure the appearance of the defendants as required and the safety of others and the community. The defendants cannot overcome the statutory presumption in favor of

---

[1] Alon and Oren Alexander were arrested on state charges issued by the Miami Dade County State Attorney's Office and are presently in state custody. They will be transferred into federal custody after their initial appearance on the state charges.

detention in this case, and the Court should order them detained.  *See* 18 U.S.C. §§ 3142(e)(1), 3142(e)(3)(D).

## BACKGROUND

On December 11, 2024, a superseding indictment was returned by a federal grand jury sitting in the Southern District of New York (the "Indictment") was unsealed, charging: (1) Alon, Oren, and Tal Alexander with participating in a sex trafficking conspiracy from at least 2010 through at least 2021, in violation of 18 U.S.C. § 1594(c) (Count One); (2) Tal with sex trafficking Victim-1 in 2011, in violation of 18 U.S.C. §§ 1591(a) and (b)(1) and 2 (Count Two); and (3) Alon, Oren, and Tal with sex trafficking Victim-2 in 2016, in violation of 18 U.S.C. §§ 1591(a) and (b)(1) and 2 (Count Three).[2]

### A.    The Alexander Brothers' Sex Trafficking Scheme

The charged offenses span more than a decade of sex trafficking activity by the Alexander Brothers.  However, evidence from the Government's investigation goes well beyond the conduct charged and shows that for more than *20 years*, the Alexander Brothers have—together and alone—repeatedly and violently raped and sexually assaulted dozens of victims.  To date, law enforcement agents have interviewed dozens of women who reported being forcibly raped or sexually assaulted by at least one of the Alexander Brothers, often after being drugged.  This criminal activity spanned many years, both before and after Tal and Oren Alexander rose to prominence in real estate, first at a well-known international brokerage based in New York, and then at their own firm.

Evidence from the investigation, including multiple victim and witness accounts, shows that the Alexander Brothers began engaging in acts of sexual violence, including gang rapes, while still in high school in Miami, Florida.[3]  The Government has interviewed multiple women who report being raped by at least one of the Alexander Brothers in high school in the early 2000s, including victims who were raped by groups of boys including the Alexander Brothers.  Several of these victims were given alcohol by one of the defendants or other individuals who participated in the sexual assaults.  Each of the victims that the Government has interviewed from this period reported hearing that individuals involved—including Tal Alexander—talked about the assaults at school, boasting about "running train" on their victims and saying that they wanted to "do it again".[4]

---

[2] Because the investigation is active and ongoing, the Government is limited in the amount of information that it can publicly reveal at this time.  To the extent the Court has additional questions about the charged offense conduct or any other information set forth herein, the Government is prepared to proffer additional information on an *ex parte* basis.

[3] Alon and Oren Alexander turned 18 on July 2, 2005, while Tal turned 18 on July 5, 2004, shortly after each graduated from high school.

[4] As publicly reported, Oren bragged about doing so in his high school yearbook—writing that "riding my first 'choo choo' train" was his most memorable moment from high school.  *See*

As adults, the Alexander Brothers' serial sexual violence only escalated. After the defendants graduated from college, all three defendants moved to New York City, although they continued to also maintain homes in Miami and split their time between the two cities. Oren and Tal began working as real estate agents at a prominent New York City based real estate company. Alon attended New York Law School[5] then worked at Kent Security, a private security company run by his mother and uncle.

During this period and at all times relevant to the Indictment, the Alexander Brothers engaged in a persistent pattern of sex trafficking and sexual assault. This conduct included both pre-planned trips and events for which the defendants recruited women to attend and then raped and sexually assaulted them; as well as the opportunistic rapes and sexual assaults of numerous victims who they encountered by chance. For the planned encounters, the Alexander Brothers lured women to various locations with the promise of material benefits, such as travel, luxury accommodations, and events or parties in various locations, including the Hamptons, Tulum, and Miami. In many cases, the Alexander Brothers arranged travel for the women—purchasing flights or arranging other transportation to their vacation destinations. The Alexander Brothers also promised and provided accommodations for the women at high end hotels or luxury vacation rentals.[6] At times, the Alexander Brothers worked with party promoters to arrange to have women attend parties at their vacation properties. On many occasions, the Alexander Brothers invited their friends and Oren and Tal's real estate clients to also stay at these properties. Then, during these trips and events, the Alexander Brothers, alone, together, and with others, drugged and forcibly raped or sexually assaulted their victims. Some victims reported symptoms consistent with being drugged after consuming a drink provided by one of the defendants—several were unable to move or even speak and some suffered significant gaps in their memories.

The Alexander Brothers used a similar playbook to commit rapes and sexual assaults after chance encounters with women at nightclubs, parties, or other social events. After the initial meeting, the defendants lured the woman to a second location, and then forcibly raped her. Each of the defendants did this separately, and on some occasions, with the assistance of or together with another defendant. On some occasions, one of the defendants would meet a woman on a dating application or on social media and, under the guise of exploring a potential relationship, invite the woman to his apartment before forcibly raping her. In most instances, victims reported that one of the defendants gave them a drink—either at the club or social event or back at the defendants' shared apartment in New York City. After imbibing the drink, the victims experienced symptoms consistent with being unwittingly dosed with a substance that impaired their physical capacity, including their ability to move, and/or memories. Many victims told the brothers "no" or even screamed while the rapes were happening but, on each occasion, the defendants ignored

_____

"Everyone Knew About the A Team", New York Magazine (available at https://www.curbed.com/article/oren-alexander-tal-alexander-brothers-luxury-real-estate.html). "Running train" is a term used to refer to a group of males having sex with the same female, one after another.

[5] Alon graduated law school in 2012 and was admitted to the New York bar in 2016. His bar membership is currently delinquent. Alon does not appear to have ever practiced law.

[6] These vacation properties were typically rented by the Alexander Brothers and/or their friends.

any verbal resistance.  The Government has spoken to dozens of women who reported being similarly raped by one or more of the Alexander Brothers between 2005 and 2021.

a.    *Sex Trafficking of Victim-1 (Count 2)*

In or around the summer of 2011, a friend invited Victim-1 to travel to the Hamptons to stay with her friends.  Victim-1 accepted the invitation.  She was living in Manhattan at the time and traveled by Long Island Railroad from Penn Station to the Hamptons.  Tal Alexander and another man were waiting for Victim-1 and her friend at the train station and drove the women to their vacation house.  Victim-1 had never met Tal Alexander before.  After arriving at the house, Victim-1 was given a glass of wine and drank about half of it before she began to feel unwell in a way inconsistent with drinking that amount.  Victim-1's memory thereafter became hazy but she has several distinct memories of the night.  Specifically, Victim-1 remembers being held down by Tal while another man entered the room.  Victim-1 also remembers being in a second location with Tal and the other man and that a camcorder was set up.  Victim-1's next memory is of waking up in the grass outside of the vacation house with a physical sensation indicating recent vaginal penetration.

b.    *Sex Trafficking of Victim-2 (Count 3)*

In or around August 2016, Victim-2 and her friend ("Individual-1") matched with Alon and Oren Alexander on a dating application.  Victim-2 primarily communicated with Oren, while Individual-1 primarily communicated with Alon.  Alon and Oren invited Victim-2 and Individual-1, who were located in Illinois, to travel to stay with them in the Hamptons over Labor Day weekend and offered to pay for flights for Victim-2 and Individual-1.  Individual-1 and Victim-2 agreed to go and on September 1, 2016, the Alexander Brothers purchased early morning flights for the women to fly to New York on the following day.  Messages located on Oren's iCloud account reflect the Alexander Brothers exchanging messages about purchasing flights for Victim-2 and Individual-1, around the time the Alexander Brothers were booking the tickets on September 1, 2016:

ALON (11:04 PM):    Are we booking flights? First 3 on left

ALON (11:12 PM):    We split and try to orgy then out?

TAL (11:27 PM):     For sure

TAL (11:27 PM):     Last weekend

TAL (11:27 PM):     Throw it up

ALON (11:39 PM):    I agree. Oren?

OREN (11:50 PM):    All 4? Why not

A few days prior, Tal exchanged messages with two party promoters on a group chat entitled "Hamptons Hot Chicks", arranging for "hot" women to stay at the Alexander Brothers'

Hamptons house that same weekend.  At the end of the exchange, one of the promotors said, "I want photos of the girls naked."  Tal responded, "Lol guys were [sic] going to have a lot of fun."

After Victim-2 and Individual-1 arrived in New York, the Alexander Brothers transported the women to their Hamptons house by car and provided them with beds in a space shared with other women.  The following day, the Alexander Brothers hosted a party.  During the party, Oren gave Victim-2 a cocktail and shortly thereafter, Victim-2 began feeling strange and struggled to walk.  Alon assisted Victim-2 inside the house and took her to a bedroom to lie down.  Some time later, Victim-2 woke up when Oren entered the room.  Oren put on a condom, pulled down Victim-2's bathing suit, and climbed on top of her.  Victim-2 was physically impaired and could not move; she also struggled to speak.  Oren raped Victim-2 and left the room, leaving her lying on the bed. When Victim-2 woke up the next morning, she was still lying on the bed and her bathing suit was pulled down around her legs.  Victim-2 disclosed the rape to Individual-1 and they left the Alexander Brothers' house that same day.

      c.      *Other Evidence of Sex Trafficking and Transportation for Illegal Sexual Activity*

The evidence in this case also establishes that the defendants planned and paid for trips involving the interstate and international transportation of women on multiple other occasions. This evidence includes electronic communications, including from the defendants' own accounts. In one example from October 2016—just weeks after the Alexander Brothers sex trafficked and raped Victim-2—they, along with a number of other individuals, arranged to transport multiple women to Tulum.  In a group WhatsApp chat entitled "Lions in Tulum", the Alexander Brothers and other men attending the trip discussed "imports" of women to Tulum for the upcoming trip and discussed, among other things, splitting the cost of lodging and flights for the women that they planned to "import" and providing drugs to the women that would make them more likely to engage in sex, including "coke, shrooms, and G."  Based on the investigation, the Government understands "G" to be a reference to "GHB," which is defined in 21 U.S.C. § 841 as a "date rape drug."  Below are select messages from that chat:

*October 3, 2016*

| | |
|---|---|
| Male-1 (4:17 PM): | Going to start collecting for the pot to fly bitches down. |
| ALON (4:20 PM): | There should be a fee per bang and after bang |
| … | |
| Male-1 (8:23 PM): | Starting to collect venmo for girls flights |
| OREN (8:23 PM): | O yea. What's the lineup. Need to pick winners. |
| OREN (8:24 PM): | Can't be sponsor girls like Isis |
| Male-1 (8:24 PM): | Lol. It's gonna be hard to get girls up to your standard |

…

OREN (8:27 PM):  Just warn him ur boys are hungry

TAL (10:23 PM):  Girls look fresh

*October 4, 2016*

ALON (6:00 PM):  I think we should all bring chicks and not rely only on promoter since we never met the girls. We need fun girls with good attitude, I'm sure we all met many recently this summer. Male-2. I know you know some winners.

ALON (6:01 PM):  Hail mary pass. Should be overload.

…

ALON (6:07 PM):  I say yes chip in and yes bring others

Male-1 (6:07 PM):  I don't want anyone being upset if they don't run a 10 man train

ALON (6:07 PM):  I'm trying to cover all bases

…

Male-1 (6:12 PM):  I just need to handle drugs

TAL (6:12 PM):  Yes

Male-1 (6:12 PM):  I don't want X around too much

Male-1 (6:12 PM):  Nothing gets done with that

Male-1 (6:13 PM):  Coke, shrooms and G

Male-1 (6:13 PM):  X makes the girls wanna chase the fucking party

*October 13, 2016*

TAL (1:38 PM):  Photographers? Drugs?

Male-1 (1:50 PM):  All getting worked on

OREN (3:46 PM):  Are all girls getting shipped out on Sunday?

Male-1 (3: 48 PM):  Yeah

| Male-1 (3:48 PM): | Feel free to extend a piece you like |
| ALON (3:50 PM): | Nut returns end of trip |
| OREN (3:50 PM): | Just trying to make sure I get max returns. Was going to come for that Sunday night tax and make sure all girls make quota |
| Male-1 (3:50 PM): | Lol. The whole $500 dollars on a flight? |
| OREN (3:50 PM): | No free rides under my watch |
| OREN (3:51 PM): | That's more than most of us ever spent on girls. Just want to make sure we get a good ROI. |

### d. The Defendants' Efforts to Conceal Their Criminal Conduct

Despite engaging in the offense conduct and other acts of sexual violence for decades, until earlier this year, the defendants' conduct went largely unchecked. Indeed, the Alexander Brothers knew that it was critical to ensure that none of their victims went public. For example, in January 2021, Oren and Tal Alexander had the following exchange:

| OREN: | Start to think about reputation you want out there. We are on top of the game and only thing can bring us down is some Hoe complaining. |
| TAL: | understood, did someone complain? |

And even when victims did complain, the defendants took steps to stop victims from reporting. The Government is aware, for instance, of at least one occasion in which Tal and Oren filed a police report alleging harassment against a woman who has described being forcibly digitally penetrated by Tal while Oren was in the room. Tal also threatened that victim with a defamation lawsuit if she did not stop telling people that he and Oren had sexually assaulted her. And at least one other victim reported that Tal made threatening statements to her after she told other people that he drugged her.

In March 2024, multiple lawsuits alleging sexual misconduct and assault against the Alexander Brothers were publicly reported. In response to the public accusations, Alon Alexander began compiling files on each publicly identified victim (and several who had not made public accusations) as part of an apparent attempt to discredit their accusers. The Government's investigation of the defendants' obstructive conduct is ongoing.

### B. The Defendants' Wealth and Foreign Ties

The defendants each have access to significant financial resources. Oren and Tal Alexander are real estate agents who focus on ultra-luxury markets in Miami and New York City. In the early 2010's Oren and Tal founded the Alexander Team at their former brokerage. The Alexander Team was responsible for securing significant brokered deals, including a nearly $240

million sale of a penthouse in 2019 which, at the time, was the most expensive residential sale in United States history. Shortly after the historic deal—and associated historic brokerage fee—Oren and Tal opened their own ultra-luxury real estate firm. As recently as May 2024, that firm was involved in brokering a $14.3 million deal in Bay Harbor. All three defendants reside in high-value properties in Miami Beach and New York. Since about 2019, Tal Alexander has rented an apartment in a building that is part of "billionaires' row"—a term referring to ultra-luxury skyscrapers near Manhattan's Central Park. Alon and Oren Alexander's properties in Miami Beach have direct water access and private docks.

The defendants' family also has significant foreign ties, particularly to Israel. Their parents are from Israel, and the Alexander Brothers frequently travel to Israel to visit family, conduct business, and for vacation. They also travel frequently outside the United States to other locations, often booking flights at the last minute or traveling by private jet or yacht.

## ARGUMENT

### I.        Applicable Law

Under the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, the Court may order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e). A finding of risk of flight must be supported by a preponderance of the evidence. *See, e.g.*, *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). A finding of dangerousness must be supported by clear and convincing evidence. *See, e.g.*, *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995); *Patriarca*, 948 F.2d at 792; *Chimurenga*, 760 F.2d at 405.

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, including whether the offense is a violation of section 1591; (2) the weight of the evidence against the person; (3) the history and characteristics of the defendant, including the person's "character, . . . past conduct, . . . [and] financial resources"; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." *See* 18 U.S.C. § 3142(g). The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" *United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

Evidentiary rules do not apply at detention hearings, and the Government is entitled to present evidence by way of proffer, among other means. *See* 18 U.S.C. § 3142(f)(2); *see also* *LaFontaine*, 210 F.3d at 130-31 (Government entitled to proceed by proffer in detention hearings).

Where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1). Additionally, where, as here, a defendant is charged with sex trafficking in violation of 18 U.S.C. § 1591—in other words, an offense under chapter 77 of Title

18—it shall be presumed, subject to rebuttal, that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community. 18 U.S.C. § 3142(e)(3)(D).

## II.    Discussion

For the reasons set forth below, the defendants pose a significant danger to the community as well as a serious risk of flight. This is especially true given the nature of the criminal conduct and the strong weight of the evidence. The defendants therefore cannot overcome the statutory presumption in favor of detention in this case.

### A.    Weight of the Evidence

In considering the danger and risk of flight presented by the defendants, the Court is required to consider the weight of the evidence against the defendant. 18 U.S.C. § 3142(g)(2). The Alexander Brothers are charged with serious and violent crimes. As alleged in the Indictment, the defendants have participated in a sex trafficking conspiracy using force, fraud, and coercion over a period of at least 11 years. In addition, they are each charged with at least one substantive count of sex trafficking and all of the counts in the Indictment carry a presumption of detention. *See* 18 U.S.C. § 3142(e)(3)(D). As detailed in this letter, the evidence in support of those charges is strong. It includes the anticipated testimony of numerous victims and witnesses, electronic evidence, physical evidence, and documentary evidence, among other things. In particular, many of the victims' accounts strongly corroborate each other, recounting similar experiences of sexual violence from the Alexander Brothers despite occurring in different settings, states, and even different decades. The Government only expects the number of victims and witnesses to continue to grow, given that the investigation, which is now public, is ongoing.

The electronic evidence in this case also provides powerful proof of the defendants' guilt. The Government has obtained evidence from the Alexander Brothers' iCloud accounts, social media accounts, and dating applications. Just today, during the execution of search warrants at the residences of each of the Alexander Brothers, law enforcement agents seized numerous electronic devices, including cellphones, cameras, computers, and electronic storage devices. The electronic evidence reviewed to date includes messages in which the Alexander Brothers arrange travel for victims, discuss providing drugs to women, and discuss group sex. The electronic evidence also includes photos and videos, many of them sexually explicit, and some depicting some of the Alexander Brothers engaging in sexual activity with victims. Such evidence strongly corroborates the victims' accounts.

Together with the other records in the case, including social media records, travel records, and financial records, the weight of the evidence counsels powerfully in favor of detention.

### B.    Dangerousness

The defendant's danger, along with Alon and Oren Alexander's, has been demonstrated repeatedly and goes well beyond the charged offense conduct. As set forth above, the Alexander Brothers' serial sexual violence began far earlier than the period of the charged conspiracy—the Government's evidence shows that they have been raping girls and women alone, together, and

with other men, over a period of at least 20 years. Already, the Government has identified dozens of victims of the Alexander Brothers' sexual violence, and the evidence indicates that there are more.

To commit the charges offenses, as well as other serial acts of sexual violence, the Alexander Brothers drugged victims, rendering them incapable of either consenting or resisting. Then, when the victims were physically compromised or incapacitated, the defendants held them down and forcibly raped them. Some victims said "no" or "stop"; others screamed. But the defendants did not stop. They ignored their victims' distress, their obvious unwillingness to engage in sexual activity. Numerous victims describe being physically restrained or held down while being raped by the defendants, and likewise describe the rapes as aggressive and violent. Multiple women described being terrified that the Alexander Brothers were going to hurt or even kill them—these victims' only goal in that moment became to survive. Further, drugging unwitting victims is in and of itself incredibly dangerous; the defendants had no way of knowing how a particular victim might react to the drugs. Indeed, multiple victims required medical assistance in the hospital after their encounters with the Alexander Brothers. In short, this conduct is inherently dangerous, involved numerous victims, and underscores why the safety of others and of the community cannot possibly be ensured without the defendant's detention. *See* 18 U.S.C. § 3142(g)(1).

The fact that the Alexander Brothers' sexual violence continued for so long despite several victims' attempts to report their assaults to others demonstrates that the Alexander Brothers cannot be trusted to stop their violent assaults even in the face of criminal charges. The evidence demonstrates that for decades the Alexander Brothers have acted with apparent impunity—forcibly raping women whenever they wanted to do so. In short, the defendants' propensity to sexual violence, and to facilitating the sexual violence of each other, cannot reasonably be prevented through bail conditions. The sexual violence alleged occurred behind closed doors—in the defendants' apartments and homes, hotel rooms, and other private settings. This is precisely the kind of violence that even strict conditions such as home incarceration cannot prevent.

In sum, the Alexander Brothers' long history of violent conduct makes clear that even the most stringent bail conditions will not suffice to ensure the safety of the community. The Alexander Brothers are serial violent rapists who have been drugging and forcibly raping women alone and together for years. They have used their power and wealth to identify victims, carry out their sadistic sex trafficking scheme, and to conceal their sexual violence and prevent victims and witnesses from coming forward. *See* 18 U.S.C. § 3142(g)(3). Based on danger alone, the defendants must be ordered detained.

## C.    Risk of Flight

In addition to the defendants' significant danger to the community, they also present an extraordinary flight risk. The crimes with which they are charged carry significant penalties, including on Counts Two and Three a mandatory minimum sentence of 15 years' imprisonment and a statutory maximum sentence of life imprisonment. *See* 18 U.S.C. § 3142(g)(1). The possibility of a substantial sentence is a significant factor in assessing the risk of flight. *See United States v. Green*, No. 20 Cr. 357 (VM), 2020 WL 5814191, at *2 (S.D.N.Y. Sept. 30, 2020) (noting that substantial sentence defendant may face weighed in favor of finding that defendant was a

flight risk); *see also United States v. Moscaritolo*, No. 10 Cr. 4 (JL), 2010 WL 309679, at *2 (D.N.H. Jan 26, 2010) ("[T]he steeper the potential sentence, the more probable the flight risk is, especially considering the strong case of the government . . .") (citation omitted). Here, each of the Alexander Brothers are facing *at least* 15 years' imprisonment if they are convicted. Moreover, the incentive to flee is especially strong here because of the strength of the evidence in this case, including the accounts of dozens of similarly situated victims. As a result, the Alexander Brothers face the very real prospect of spending a substantial portion of the rest of their lives in prison.

The prospect for reputational harm also augments the risk of flight in this case. The nature of this case has the potential to significantly and negatively impact the defendants' reputations, in particular of Oren and Tal Alexander, who have carefully curated and protected their reputations through positive press and promotional campaigns. For example, the Government is in possession of multiple video recordings created by Oren Alexander depicting Oren and Alon engaging in sexual activity with at least one identified victim. Given the potential penalties here, both incarceration and reputational harm, the defendants have every incentive to flee to avoid prosecution and a public trial. *See, e.g.*, *United States v. Madoff*, 316 F. App'x 58, 59 (2d Cir. 2009) ("[I]ncentive to flee . . . naturally bears upon and increases the risk of flight."); *United States v. Sammons*, No. 19 Cr. 107, 2020 WL 613930, at *5 (S.D. Ohio Feb. 10, 2020) ("The shame of the allegations that he is facing is also an immense incentive to flee.").

The defendants' ample financial resources also create significant risk of non-appearance. As discussed above, Tal and Oren are successful real estate agents in the luxury market, have significant professional and social ties to other high-powered individuals, and regularly close large transactions that result in significant commissions. And each of the defendants lives a lifestyle supported by their extensive financial resources. Alon and Oren even live in private residences with direct water access to the Atlantic Ocean. All three defendants regularly fly on private jets, a means of travel that is more difficult for law enforcement to track. In short, if the defendants wanted to flee, they have the means to do so quickly and without detection.[7]

Finally, the Alexander Brothers' strong foreign ties demonstrate their flight risk. The Alexander Brothers have close family ties to Israel. While the current extradition treaty between the United States and Israel states, in sum and substance, that an Israeli national may be extradited for an offense committed prior to becoming a national, extradition from Israel is frequently a multi-year, drawn out process, at the end of which extradition to the United States is not guaranteed. If the defendants were to flee to Israel, they could attempt to significantly delay or even avoid extradition back to the United States. Based on the defendants' call history in recent weeks, the Government is further aware that Oren Alexander has been in contact with another United States citizen who fled to Israel after being accused of sexual misconduct. These foreign ties further support the need for the defendants' pretrial detention.

---

[7] Based on the Government's review of messages between the Alexander Brothers, it appears that the brothers purchased a private airplane in or about 2021. The location of this airplane is unknown.

### III.        Conclusion

As set forth above, Alon, Oren, and Tal Alexander pose an ongoing and significant danger to the community and present a serious risk of flight.  The Government respectfully submits that the defendants cannot meet their burden of overcoming the statutory presumption in favor of detention.  There are no conditions of bail that would assure the appearance and compliance of the defendants, or the safety of others.  Accordingly, any application for bail should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:  ___/s_____
Kaiya Arroyo
Elizabeth A. Espinosa
Andrew W. Jones
Assistant United States Attorneys
(212) 637-2226/-2216/-2249