IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO:  24-mj-4616-

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )          December 30, 2024
v.                                 )
                                   )
ALON ALEXANDER,                    )
                                   )          Pages 1 - 126
          Defendant.               )
_____/

DETENTION AND IDENTITY HEARING

BEFORE THE HONORABLE EDUARDO I. SANCHEZ
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

Counsel on behalf of the Plaintiff:

              UNITED STATES DEPARTMENT OF JUSTICE
              99 NE 4th Street
              Miami, FL 33132
              BY:  ELIZABETH ESPINOSA, AUSA

APPEARANCES CONTINUED:

Counsel on behalf of the Defendant:

                BLACK SREBNICK, P.A.
                201 South Biscayne Boulevard
                Suite 1300,
                Miami, FL 33131
                BY:  HOWARD M. SREBNICK, ESQ.
                BY:  RAYMIE E. WALSH, ESQ.




                WALDEN MACHT HARAN & WILLIAMS LLP
                250 Vesey Street, 27th Floor,
                New York, New York 10281
                BY:  DEANNA M. PAUL, ESQ.
                Appearing *pro hac vice*



ALSO PRESENT:

RICHARD C. KLUGH, ESQ.
Counsel on behalf of Defendant Oren Alexander



Transcribed by:

                BONNIE JOY LEWIS, R.P.R.
                7001 SW 13 Street
                Pembroke Pines, FL  33023
                954-985-8875
                caselawreporting@gmail.com

I N D E X

THE WITNESS:                                                PAGE:

**FBI SPECIAL AGENT AUDRA HAMPSCH**

Cross Examination by Mr. Srebnick:                          22

Redirect Examination by Ms. Espinosa:                      48


**ORLY ALEXANDER**

Direct Examination by Mr. Srebnick:                        55

Cross Examination by Ms. Espinosa:                         61

Redirect Examination by Mr. Srebnick:                      62


**SHANI ALEXANDER**

Proffer by Ms. Walsh:                                      64

Cross Examination by Ms. Espinosa:                         68

Redirect Examination by Ms. Walsh:                         71


**DANIELLE EPSTEIN**

Direct Examination by Mr. Srebnick:                        74

Cross Examination by Ms. Espinosa:                         76

1      (Thereupon, the following proceedings were held:)

2      THE COURTROOM DEPUTY:  All rise.

3      The United States District Court in the Southern

4  District of Florida is now in session.  The Honorable Eduardo

5  Sanchez presiding

6      THE COURT:  Good morning.  Please be seated.

7      Okay.  Before we call the first case, I am going to

8  give the *Brady* admonition and that applies to all the

9  Defendant's here who are charged with a criminal offense.

10      Pursuant to the due process protection act in Rule

11  5(f) of the Federal Rules of Criminal Procedure, the Court

12  hereby confirms the United States obligation to disclose to the

13  Defendant any evidence falling within the scope of *Brady v.*

14  *Maryland* and its progeny.

15      That includes any exculpatory evidence tending to show

16  that the Defendant is not guilty, any evidence that could be

17  used to impeach the Government's witness, or any evidence that

18  could be used to mitigate a Defendant's potential sentence.

19      The Government must disclose this evidence even

20  without a request from the Defendant.  Failure to timely

21  disclose this evidence could result in sanctions, including but

22  not limited to the exclusion of evidence, adverse jury

23  instructions, dismissal of charges, contempt proceedings,

24  disciplinary action, or other sanctions by the Court.

25      Okay.  You can call the first case.

1          THE COURTROOM DEPUTY:  Page 2, Alon Alexander;
2    24mj-4616.

3          Government counsel, announce your appearance.

4          MS. ESPINOSA:  Good morning, Your Honor.

5          Elizabeth Espinosa for the Government.  I am an AUSA
6    in the Southern District of New York appearing here for this
7    particular proceeding under local Rule 4(f) that allows AUSAs
8    from other districts to appear.

9          THE COURT:  Okay.  Very good.  Good morning, Miss
10   Espinosa.

11         MR. SREBNICK:  Good morning, Judge.

12         Howard Srebnick on behalf of Alexander together with
13   my colleagues Raymie Walsh and from New York Deanna Paul who
14   was admitted *pro hac vice* last week on behalf of Mr. Alon
15   Alexander's brother.

16         THE COURT:  Okay.  All right.  Very good.

17         Good morning, Mr. Srebnick.

18         MR. SREBNICK:  Good morning, Judge.

19         THE COURT:  Okay.  We are here this morning in this
20   case for a detention and removal hearing?

21         MR. SREBNICK:  Yes, Judge.

22         THE COURT:  Are the parties ready to proceed?

23         MS. ESPINOSA:  Yes, Your Honor.

24         MR. SREBNICK:  Your Honor, one moment.  I think there
25   may a technical issue.

         So we had asked to have access to electronics or power

point presentation.  I understand there may be some logistical

delay with the IT person.

         THE COURT:  Yes, I heard something about that.

         Do we know what the status of that is?

         THE COURTROOM DEPUTY:  Yes, sir.

         A request was made this morning and IT is on its way

for the ELMO projector to take place.

         MR. SREBNICK:  I would like to proceed, Judge.

         THE COURT:  Well, I suspect that they will be arriving

shortly to proceed.  We could start with -- the Government does

not need that?

         MS. ESPINOSA:  No, Your Honor.

         THE COURT:  Okay.  And we will start with the

Government and see where we are in terms of the --

         MR. SREBNICK:  May we occupy the area for lawyers for

this proceeding?

         It is going to be -- so I could take notes while they

speak.  If I could just talk to my colleagues there.

         THE COURT:  Okay.

         MR. SREBNICK:  Is that a nice way of saying move over.

         Can Mr. Alexander be seated for the proceeding?

         THE COURT:  I give that to the Marshals in terms of

security how they --

         THE U.S. MARSHAL:  Yes, Your Honor.  He can be seated.

1          THE COURT:  Okay.  Let me take something up with you

2     folks before we get to the part of the detention and the

3     removal proceedings.

4          The Government filed this morning a motion for limited

5     protective order regulating disclosure of *Jencks* material.

6          MS. ESPINOSA:  That's right, Your Honor.

7          THE COURT:  And Mr. Srebnick, my understanding has

8     agreed to it.  Except for the Defense is objecting to the

9     return of the *Jencks* material at the end of the hearing.

10         MR. SREBNICK:  Only because co-Defendant Oren

11    Alexander, represented by Mr. Klugh who is present in the

12    courtroom, asked that it be available for examination on Friday

13    for the continued hearing of Alon Alexander.

14         THE COURT:  But my understanding was there wasn't

15    going to be an evidentiary presentation of cross-examination on

16    Friday.

17         MR. SREBNICK:  Correct.  But Mr. Klugh may want to use

18    that material to make some presentation to you on Friday.

19         It is the *Jencks* material may have inconsistencies.

20    We don't even know what it says yet.  We just got the report a

21    minute ago.

22         THE COURT:  Okay.  I am going to grant the motion to

23    return.  If there is something that is required after, you

24    could file a motion asking for -- but I am going to grant the

25    limited protective order that has been proposed by the

1  Government at this time.

2      MR. SREBNICK:  So at the end of the hearing today, we

3  will give it back and if you could give us just a few minutes

4  to read it.

5      THE COURT:  Yes.  You will have the opportunity to

6  read it and if there is something that necessitates something

7  else you could file a motion asking to do something else.

8      MR. SREBNICK:  May I make a suggestion?

9      We just got the *Jencks* material.  It seems that we

10 have some IT issues.  We have a few minutes to read it now so

11 we are not holding anybody up after the proffer.

12      Does that make sense?

13     THE COURT:  Do you want to take a few minutes and we

14 can recess for a few minutes and we can try to see what is

15 going on with IT during that time period as well.

16     MR. SREBNICK:  Thank you, Judge.

17     THE COURT:  So we will take a ten-minute recess.  Will

18 that be enough time?

19     MR. SREBNICK:  Very good.

20     THE COURT:  Okay.

21     THE COURTROOM DEPUTY:  All rise.

22 (Recess.)

23     THE COURTROOM DEPUTY:  All rise.

24      The Honorable Eduardo Sanchez presiding.

25     THE COURT:  Good morning, again.  Please be seated.

1    THE COURTROOM DEPUTY:  Alon Alexander; 24-mj-4616.

2    MR. SREBNICK:  Your Honor, we are ready to proceed.

3    Howard Srebnick on behalf of Alon Alexander together

4  with Deanna Paul to my left and Raymie Walsh to my further

5  left.

6    MS. ESPINOSA:  Good morning, Your Honor.

7    Elizabeth Espinosa on behalf of the Government and we

8  are also ready to proceed.

9    THE COURT:  Okay.  Very good.  Let's go ahead and

10  proceed.  I understand that all the technological issues are

11  resolved?

12    MR. SREBNICK:  Of course.

13    THE COURT:  In other words, everyone is ready to

14  proceed with that, right?

15    MS. ESPINOSA:  Yes, Your Honor.  And the Government

16  will proceed by factual proffer.

17    THE COURT:  Very good.

18    MS. ESPINOSA:  The evidence in the Government's case

19  demonstrates that at least from 2010 to 2021 the Defendant and

20  his brothers, who are all charged in this case, conspired

21  together to sexually assault, traffic, and forcibly and

22  violently rape dozens of women.

23    Multiple of those women -- there are at least several

24  women who were minors at the time that they were assaulted.

25    Now while the charged conspiracy spans eleven years at

this time, the evidence in this case shows that the conduct has

been ongoing for approximately 20 years.

Here, the substantive sex trafficking offense that the

Defendant is charged in carries a fifteen-year mandatory

minimum. At this time, the Government's estimated guideline

range is life imprisonment.

Now, while the indictment identifies two specific

victims, one of whom is listed in an offense charged against

the Defendant and his twin brother in Count Three, the

conspiracy charged and includes that the Defendant and his

co-Defendants engaged in this type of conduct against many more

victims.

As of today the FBI has interviewed more than 50

witnesses and including at least approximately 42 who reported

being raped or sexually assaulted by at least one of the

Defendants.

And the Government continues to receive tips from

additional people -- dozens of additional potential victims

have reached out to the FBI since the Defendants were arrested.

Evidence from the investigation shows that the

Defendants began engaging in acts of sexual violence, including

gang rapes, while they were still in high school here in Miami,

Florida.

The Government interviewed multiple women who reported

being raped by at least one of the Alexander brothers,

1 including the Defendants when they were all in high school.

2 Including victims who were assaulted in a gang rape by

3 the brothers and others.

4 Victims have reported that the Defendants boasted

5 about these sexual assaults at school talking about running

6 train on their victims and their brother Tal said that he

7 wanted to do it again.

8 Now running a train is a phrase known to law

9 enforcement to refer to multiple individuals, usually men,

10 having sex with the same person one after another, usually a

11 woman can also refer to a gang rape.

12 And the Defendant's twin brother, according to public

13 reporting, published in his high school yearbook that his most

14 memorable moment in high school was riding his first choo-choo

15 train.

16 As adults in the period of the charged conspiracy, the

17 Defendant and his brothers' serial sexual violence only

18 escalated.

19 This investigation has uncovered that Defendants and

20 his brothers would find female victims through a variety of

21 means.  Including promoters bringing women to parties, dating

22 apps, and chance meetings.

23 However, the evidence in this case shows that the

24 Defendants carried out sexual violence using a fairly

25 consistent MO and pattern.

1    The Defendant and his brothers would invite the

2 victims to parties or events luring them with the promise of

3 travel to popular vacation destinations, luxury accommodation

4 and experiences.  Often they would buy flights for women to

5 bring them to these events.

6    On other occasions they would meet women at social

7 events or through a dating app and encounter them that way.

8    Once they were alone with the victims or in private

9 with the victims, they would provide them with alcohol laced

10 with drugs to physically incapacitate them and forcibly rape

11 the victims.

12    Sometimes alone, sometimes with each other, and

13 sometimes with other men.

14    Now many victims have reported symptoms consistent

15 with being drugged by GHB or a date rape drug, including an

16 inability to move or losing control of their bodies, difficulty

17 speaking and gaps in their memories.

18    In drugging their victims, the Defendant and his

19 brothers used cocaine, mushrooms, and a date rape drug.

20    Many victims have also reported to law enforcement

21 that they told the Defendant and his brothers, no, or even

22 screamed while the rapes were happening and that on each

23 occasion the Defendant and his brothers ignored their pleas to

24 stop.

25    Many victims reported being terrified that the

1 Defendant or his brothers would hurt them or even kill them

2 because they were aggressive and forceful during these

3 assaults.

4 Numerous victims recall being physically held down by

5 one or more of the Defendants during the assaults.

6 And these accounts are consistent with dozens of women

7 who have come forward to report their sexual assaults, despite

8 women coming from different states, different time periods,

9 different social circles and their stories have remarkable

10 similarities across all of that time.

11 Now, the Defendant has also been charged for his

12 conduct against one substantively charged victim.  So I will

13 speak a bit more about that particular count.

14 Now as it relates to Victim Two, which is charged in

15 Count Three of the indictment, in August 2016, Victim Two and

16 her friend, who we will refer to as Individual One, each

17 matched with one of the twins on a dating application.

18 Victim Two primarily communicated with Oren and

19 Individual One primarily communicated with Alon.  Victim Two

20 and Individual One eventually traveled to stay with the

21 Defendants in the Hamptons in New York over Labor Day weekend.

22 The co-Defendants paid for their travel and provided

23 accommodations for Victim Two and Individual One.

24 Messages located on Oren Alexander's iCloud account

25 reflect that the Alexander brothers exchanged messages about

purchasing these flights for Victim Two and Individual One around the time that they, in fact, purchased those tickets.

Those messages read from Alon:

"Are we booking flights first three on left?"

ALON:  "We split and try to orgy them out."

Tal responds:  "For sure, last weekend.  Throw it up."

ALON:  "I agree.  Oren?"

And Oren responds:  "All four, why not."

Now around that same time of the Hamptons weekend, the Defendant's brother Tal was exchanging messages with a party promoter in a chat entitled Hamptons' Hot Chicks.

At one point one of the promoters said to Tal:

"I want photos of the girls naked."

And Tal responded:

"LOL, guys.  We're going to have a lot of fun."

Now, Victim Two and Individual One eventually arrived in the Hamptons' home and the Defendant and his brothers hosted a party the following day .

During the party Oren Alexander gave Victim Two a cocktail and shortly thereafter Victim Two began to feel strange and struggled to walk.

Alon Alexander assisted Victim Two inside the house and took her to a bedroom to lie down.  Some time later, Victim Two woke up when Oren entered the room.

He then pulled down Victim Two's bathing suit and

climbed on top of her.  Victim Two was physically impaired and

could not move.  She also struggled to speak.  Oren raped

Victim Two and left the room leaving her lying on the bed.

When Victim Two woke up the next morning.  She was

still lying on the bed and her bathing suit was pulled down

around her legs.

Now, the Government's evidence has shown that the

Defendants engaged in similar trips on other occasions where

they arranged travel for women to various luxury vacation

destinations.

In a What's App chat entitled Lions in Tulum, all

three Defendants and other men discussed attending a trip where

they would import women to Tulum and discuss splitting the cost

of lodgings and flights for the women that they planned to

import and providing drugs to the women that would make them

more likely to engage in sex.

In the group chat, one of the participants said that

he was going to start collecting for the pot to fly bitches

down.

Alon Alexander responded:

"There should be a fee per bang and after bang."

And Tal said that the girls looked fresh.

The chat made clear that the Defendants and others

wanted to be sure that certain kinds of drugs, like cocaine,

mushrooms, and a date rape drug were present at their

festivities.

The Defendants brother Tal explicitly asked about drugs in the group chat. And the group discussed that they didn't want Ecstasy to be present because nothing gets done with that and it just makes the girls want to party.

Now in January of 2024, Oren Alexander messaged Tal Alexander and told him:

"Start thinking about the reputation that you want. We're out there. We are on top of the game and the only thing that can bring us down is some ho complaining."

To which Tal Alexander agreed and responded:

"Understood. Did someone complain?"

Now the brothers have a long history of attempting to silence any women who do complain and took steps when they did to interfere and intimidate and stop victims from reporting.

Prior to this case and in instances when a victim stated that she had been forcibly digitally penetrated by Tal while Oren was in the room.

And Tal and Oren filed a police report alleging harassment against that victim. Tal Alexander also threatened that victim with a defamation lawsuit and threatened other victims if they continued to tell people about their experience with the brothers.

Now, just this past weekend, the New York Times reported that the twins took legal action to scrub a blog post

accusing them of rape from the Internet when it was published back in 2009.  That they used aggressive tactics to identify and silence the person who posted the story hiring a private investigator, sending threatening messages, and taking legal action.

The New York Times also reported that shortly after the blog was published another website was posted containing favorable stories about the brothers.  And the Defendants are continuing to follow their same playbook to silence and intimidate victims now.

In March of 2024, multiple lawsuits alleging sexual misconduct and assaults against the brothers were publically reported.

In response to these public accusations Alon began compiling files on each publically identified victim, as well as several that had not yet made public accusations as part of an apparent attempt to discredit his accusers.

And at least one website claiming that the brothers are being extorted has appeared.  Including photographs of people who are purportedly involved in the alleged extortion.

The Government's investigation into the Defendant's obstructive conduct is ongoing.

I will now turn to risk of flight.  Your Honor, the Defendants are multimillionaires who have access to resources to flee and live comfortably outside of the United States.

1    The Defendant and his family have access to

2 significant wealth.  Oren and Tal Alexander own a luxury real

3 estate brokerage with a real estate portfolio valued at

4 hundreds of millions of dollars.

5    They are well-known in the real estate community for

6 selling high-end luxury homes to celebrities and the ultra

7 rich.

8    Alon works for his family's successful private

9 security company.  The Defendant and his family have

10 significant foreign ties.  Particularly to Israel as well as to

11 Brazil.

12    The brothers' parents are from Israel and the brothers

13 have regularly and frequently traveled to Israel to visit

14 family, conduct business, and for vacation.

15    Additionally, this Defendant's wife is originally from

16 Israel and has ties to that country as well.

17    The Government has conferred with the Office of

18 International Affairs who have indicated that despite an

19 extradition treaty, we cannot ensure the Defendant's

20 extradition back to the United States should they flee there.

21    Given, in particular, Alon's strong ties both through

22 his own family and his wife's family to Israel, he would be

23 able to relocate there and start again.

24    Oren's wife is a Brazilian national who is also a

25 legal permanent resident.  Her family lives in Brazil.  So the

brothers have significant ties to both of those countries.

Further, the brothers all travel frequently to international locations often at the last second. They use methods of travel that are difficult to detect in advance, including a private jet and a yacht.

The Government does not receive significant advance notice for International private jet travel and receives none for travel by yacht.

As recently as this summer, the Defendants were in the Bahamas on a yacht. And just this year Alon has traveled to Costa Rica, Saint Martin, Saint Bart, and Bahamas several times and Italy.

And the twins' brother Tal, also a co-Defendant, flew to Miami on a private jet the night before he was arrested, an event that the Government had little notice of, which is why he was also arrested here in Miami.

Now, at least in 2021, the Alexander brothers got a loan to buy a Cessna aircraft and arranged a lease agreement with a particular private airway company in Miami. They arranged for the finances to purchase that plane and arranged the loan agreement within a short period of time in 2021.

And that concludes the Government's proffer on the detention portion, Your Honor. I also have a factual proffer as I understand that the Defendants are seeking to have an identity hearing as well.

1          THE COURT:  Okay.  Is that right?

2          MR. SREBNICK:  Yes.

3          THE COURT:  Okay.  Do you want to proceed at this time

4    with that, too?

5          MS. ESPINOSA:  I am happy to, Your Honor.  Unless you

6    want me to wait on the identity portion.

7          THE COURT:  No, let's go ahead.

8          MS. ESPINOSA:  All right.  Now here, the Defendant is

9    the same individual charged in the SDNY indictment.

10         Alon Alexander was arrested at his home at an address

11   associated with him in law enforcement databases, listed on

12   bank records, and other records.

13         At the time of Alon Alexander's arrest, the FBI had a

14   cell phone location warrant on his cell phone, which is

15   subscribed in the name of Alon Alexander.

16         That cell phone was pinging at the location of his

17   home at the time of arrest and Alon Alexander had that cell

18   phone on him when he was arrested after being called out of his

19   house by name.

20         Alon Alexander was initially arrested on state charges

21   out of Miami-Dade County where he has had his initial

22   appearances in that matter.  He did not contest his identity

23   during those state court proceedings.  He was then writ'ed into

24   federal custody to attend this proceeding before Your Honor.

25         Now a Federal Grand Jury in the Southern District of

New York has returned an indictment charging Alon Alexander

with sex trafficking conspiracy and substantive sex trafficking

and aiding and abetting the same.

The Grand Jury was shown a photograph of Alon

Alexander and returned an indictment charging him in both of

those counts.  And that individual is the same individual

present in the courtroom who was arrested on the warrant in

this matter.

And that concludes the Government's proffer on

identity.

THE COURT:  Okay.  Very good.

Mr. Srebnick.

MS. ESPINOSA:  At this time, Your Honor, Special Agent

Audra Hampsch is available for cross-examination.

THE COURT:  Okay.

MR. SREBNICK:  Judge, let me just test the ELMO.

THE COURT:  Sure.

THE COURTROOM DEPUTY:  Please raise your right hand to

be sworn.

THE WITNESS:  (Complied.)

(Witness sworn.)

THE COURTROOM DEPUTY:  Please speak into the

microphone and state your full name.

THE WITNESS:  Audra Hampsch.

THE COURTROOM DEPUTY:  Spell your last name.

1    THE WITNESS:  H-A-M-P-S-C-H.

2    THE COURTROOM DEPUTY:  Your title, please.

3    THE WITNESS:  I am a special agent with the FBI.

4    THE COURTROOM DEPUTY:  Thank you.

5         FBI S/A AUDRA HAMPSCH, GOVERNMENT'S WITNESS SWORN

6                       CROSS EXAMINATION

7    BY MR. SREBNICK:

8    Q.   Agent Hampsh, good morning.

9    A.   **Good morning, sir.**

10   Q.   Did you testify before the Grand Jury that accused Alon and

11   Oren Alexander?

12   A.   **No.**

13   Q.   Have you reviewed the Grand Jury testimony that was

14   presented before the Grand Jury that indicted Alon and Oren

15   Alexander?

16   A.   **No.**

17   Q.   Do you know who testified before the Grand Jury?

18   A.   **I believe my colleague on this case, the lead investigator**

19   **on this case, testified in the initial Grand Jury indictment.**

20   Q.   And the lead investigator, did she ever observe with her

21   own eyes either Alon or Oren Alexander committing a crime?

22   A.   **I can't speak to what she knows, but I don't believe so,**

23   **no.**

24   Q.   And did you ever observe Alon or Oren Alexander committing

25   a crime with your own eyes?

1  A.  **No, no.  Not in person, no.**

2  Q.  Have you ever even met Alon or Oren Alexander?

3  A.  **No.**

4  Q.  Do you know which one is which?

5  A.  **Yes.**

6  Q.  Is it because one is seated one place and one is seated in

7  another?

8  A.  **No.**

9  Q.  How do you know the difference?

10  A.  **Because I have been investigating this case for several**

11  **months and I have reviewed items in this case that help me tell**

12  **the difference between the two Defendants.**

13  Q.  Okay.  Well, who identified Alon Alexander before the Grand

14  Jury?

15  A.  **I don't know.  I wasn't at the Grand Jury indictment.**

16  Q.  So how do we know that Alon Alexander was adequately

17  identified before the Grand Jury if you don't know who testify

18  before the Grand Jury?

19  A.  **I know my colleague had testified before the Grand Jury**

20  **but --**

21  Q.  But what?

22  A.  **I don't know what else took place during the identity**

23  **discussions during that Grand Jury indictment.**

24  Q.  Now, I heard the Government proffer that at least one or

25  more of the Alexander brothers went to the police to report

1  that they were being harassed and defamed by some accusers.

2      Did you hear that proffer?

3  A.  **Yes.**

4  Q.  And when someone feels like they are being a victim of a

5  crime they typically go to the police, right?

6  A.  **In some situations, yes.**

7  Q.  The Alexander brothers went to the police because they felt

8  they were being wrongly accused, correct?

9  A.  **I don't know why they went to the police.**

10 Q.  They reported that to the police, didn't they?

11 A.  **I'm sorry.  Can you clarify?**

12 Q.  Didn't the Alexander brothers report to the police that

13 they were being defamed and wrongly accused?

14 A.  **I don't know the details of their police report.**

15 Q.  Well, the prosecutor just proffered the testimony and you

16 are supposed to be the one with knowledge.

17     Do you have any knowledge of that?

18 A.  **I know that there was a police report filed against**

19 **harassment on a particular victim.**

20 Q.  The Alexander brothers went to the police to tell the

21 police that the Alexander brothers were being harassed and

22 defamed by accusers making false accusations against them,

23 right?

24          MS. ESPINOSA:  Objection; asked and answered and lack

25 of personal knowledge.  I also believe that does not fully

1 accurately state my proffer.

2 BY MR. SREBNICK:

3 Q. Do you have any knowledge one way or another?

4 A. **I'm sorry. Could you repeat your question?**

5 Q. Let's move on.

6 Prior to 2024, did any of these accusers report that they

7 had been sexually assaulted by Alon Alexander?

8 A. **To the FBI or to any law enforcement agency?**

9 Q. To the FBI. Let's start there.

10 A. **The FBI did not collect any interviews from victims prior**

11 **to 2024.**

12 Q. Well, I heard the prosecutor today say that there is an

13 accuser listed in Count Three of the indictment from 2016.

14 You know that count, Count Number Three?

15 A. **About the incident that occurred in August and September of**

16 **2016?**

17 Q. Yes.

18 A. **Yes.**

19 Q. That was an accusation brought by a person who had traveled

20 to a party in the Hamptons, right?

21 A. **Yes.**

22 Q. The Government has identified that person in the courtroom

23 today as Victim Number Two, correct?

24 A. **Yes.**

25 Q. To be distinguished from Victim Number One who is in Count

1  Number Two of this indictment, right?

2  A.  **They are different victims, yes.**

3  Q.  And Count Number Two does not accuse Alon Alexander of

4  anything; am I correct?

5  A.  **I don't -- I can't say specifically because I don't have**

6  **the indictment in front of me.**

7  Q.  There are three counts in the indictment.  Do you know what

8  the indictment says?

9       THE COURT:  Mr. Srebnick, I need for you to be by the

10  microphone or you are not going to have a record.

11  BY MR. SREBNICK:

12  Q.  Do you know what the indictment says?

13  A.  **I have reviewed the initial indictment several weeks ago.**

14  Q.  Who is accused in Count Number Two?

15  A.  **I don't have the indictment in front of me.  So I wouldn't**

16  **be able to speak to the specifics of the name clearly.**

17       MR. SREBNICK:  Does someone have a copy of the

18  indictment for the agent who us testifying?

19       Thank you.

20  BY MR. SREBNICK:

21  Q.  Are you referring to the initial indictment or the

22  superseding indictment that you are familiar with?

23  A.  **The only indictment that I have read is the initial**

24  **indictment.**

25  Q.  So you are not even familiar with the superseding

1  indictment that we are here on today?

2  A.  **I understand that it was part of the case file, but the**

3  **only one I personally reviewed was the initial indictment.**

4  Q.  Okay.  Well, let me show you Count Number Two.

5        MR. SREBNICK:  If I may approach?

6  BY MR. SREBNICK:

7  Q.  Do you see Count Number Two says it does not charge Alon

8  Alexander with anything?

9  A.  **If you give me a moment to read this.**

10  Q.  Yes.

11  A.  **Yes.  In the section that says Count Two, I do not see Alon**

12  **Alexander's name.**

13  Q.  Alon Alexander is accused in only Count Number Three in

14  terms of subjective counts.  Do you see that?

15       I'll give you the front of the indictment.

16  A.  **Thank you.**

17       **I do see his name referenced in Count Three.**

18  Q.  Now Count Three --

19  A.  **His name is also in Count One.**

20  Q.  Count One is the conspiracy count, right?

21       Count Three is the substantive count regarding this event

22  described by the prosecutors in the Hamptons in 2016,

23  September, correct?

24  A.  **Yes.**

25  Q.  Now, who is accused in Count Number Three based on the

1  proffer that we have heard today of having had a sexual contact

2  with the so-called Victim Number Two?  Do you know?

3  A.  **It was Oren Alexander.**

4  Q.  Okay.  There was no allegation against Alon Alexander of

5  having participated in any sexual activity with Victim Number

6  Two as described by the Government, correct?

7  A.  **I'm sorry.  Can you clarify your question?**

8  Q.  Yes.  Have you ever interviewed Victim Number Two the

9  person --

10  A.  **No.**

11  Q.  Do you even know who she is?

12  A.  **Yes.  I know of her identity, yes.**

13  Q.  Did she ever report that she had been a victim of sexual

14  assault in 2016 to any police?

15  A.  **She reported it to the FBI.**

16  Q.  In 2024?

17  A.  **Yes.**

18  Q.  Okay.  In 2016 did she tell the police I am a victim of a

19  sexual assault?

20  A.  **I don't know.**

21  Q.  How about 2017?

22  A.  **I don't know.**

23  Q.  How about 2018?

24  A.  **I don't know.**

25  Q.  2019?

1  A.  **I don't know.**

2  Q.  2020?

3  A.  **I don't know.**

4  Q.  2021?

5  A.  **I don't know.**

6  Q.  2022?

7  A.  **Again, sir, I don't know.**

8  Q.  Okay.  Well, who does know if not you the FBI agent on the

9  case?

10     Haven't you researched whether your witness, this accuser

11 Victim Number Two, ever reported these events to the police

12 prior to 2024?

13 A.  **My role in the case is to assist the lead investigator with**

14 **miscellaneous tasks related to the investigation and I was not**

15 **a part of the interview of Victim Two.  So I don't know.  I**

16 **can't speak to that personally.**

17 Q.  Now, isn't it true that -- and I am going to use the word

18 Victim Two because that is the words that the Government chose.

19     But this person has a name; a first name and a last name,

20 right?

21 A.  **Yes.**

22 Q.  Okay.  And you know what it is, right?

23 A.  **At this moment I can recall her first name, yeah.**

24 Q.  Okay.

25         MR. SREBNICK:  One moment.

1  BY MR. SREBNICK:

2  Q.   And so did you investigate contact that Victim Number Two

3  continued to have with the Alexander brothers after this

4  weekend in the Hamptons?

5  A.   **Personally, no.**

6  Q.   Did anyone at the FBI investigate contact that Victim

7  Number Two may have had with the Alexander brothers after the

8  weekend at the Hamptons?

9  A.   **As part of our investigation, we are investigating**

10 **communications that corroborate Victim Two's story.**

11 Q.   Okay.  And do you have any here?  Do you have any evidence

12 corroborating anything Victim Two said?

13 A.   **Yes.**

14 Q.   What do you have?

15 A.   **I have seen I images of Victim Two at this party.**

16 Q.   Okay.  She came to the party, right?

17 A.   **Yes.**

18 Q.   She was on a boat, right?

19 A.   **Yes.**

20 Q.   She was wearing a bathing suit, right?

21 A.   **Yes.**

22 Q.   She was drinking, right?

23 A.   **I did not witness that in any of these I images, but I know**

24 **based off of her interview that she did consume a beverage.**

25 Q.   Okay.  And she was there with a friend of hers identified

1 as, by the Government, Individual Number One?

2 A.  **Yes, that's correct.**

3 Q.  Now, what information do you have about whether Victim

4 Number Two or Individual Number One had consensual sexual

5 activity with either of the Alexander brothers?  Any of the

6 three Alexander brothers, I should say.

7 A.  **I'm sorry.  Could you repeat that question?**

8 Q.  Yes.  Did Victim Number Two tell you that she had any

9 consensual sexual activity with any of the Alexander brothers?

10 A.  **I don't recall specifically because I don't have her**

11 **interview notes, or the interview right up in front of me, but**

12 **from my recollection of reviewing that interview is that the**

13 **encounter was while she was incapacitated.**

14 Q.  Did she ever admit to having any consensual sexual activity

15 with any of the Alexander brothers?

16 A.  **I don't know.**

17 Q.  Okay.  But there is a report that reflects what she has

18 told the FBI?

19 A.  **I don't know.  I have only reviewed the write-up of her**

20 **interview with the FBI.**

21        MR. SREBNICK:  And Judge, I would renew a request for

22 *Jencks* material about the report of that incident that is what

23 this witness, as a hearsay witness, is trying to offer the

24 Court to persuade the Court.

25        I believe it falls within *Jencks* and she is acting as

1  the hearsay witness for the declarant who is not here.  So

2  under *Jencks* I would request production of that report.

3        MS. ESPINOSA:  Your Honor --

4        MR. SREBNICK:  And let me just say we had made this

5  request a week ago, of the Government, so they would have time

6  to bring it to court.

7        MS. ESPINOSA:  Your Honor, that report, in the

8  Government's view is not *Jencks* as to this witness.  She did

9  not prepare the report.  She was not present at the interview.

10       It does not in any way memorialize her statements.

11  That report is hearsay.  The Government is entitled to proceed

12  by hearsay, but there is no obligation that we provide *Jencks*

13  material for hearsay declarants at a preliminary detention

14  hearing.

15       MR. SREBNICK:  If I could respond, Judge?  There is no

16  way to confront the accusation unless --

17       THE COURT:  I agree, Mr. Srebnick.

18       I don't believe that that is *Jencks* active this

19  witness.  She did not author it.  She did not author the

20  document.  She didn't adopt it.  There is nothing to indicate

21  that she has.  The fact that she has read it does not make it

22  her *Jencks* statement.

23  BY MR. SREBNICK:

24  Q.  Are you disavowing reliance on her interview report to the

25  FBI?

1          MS. ESPINOSA:  Objection.

2          THE COURT:  Mr. Srebnick, you can't get her to adopt

3 it now here.  I mean, how could she adopt something that she

4 read and say that it is her own statement?  That is just

5 something I am going to allow for *Jencks*.

6 BY MR. SREBNICK:

7 Q.  What is your source of any information about that event in

8 September of 2016 in the Hamptons?

9 A.  **Pertaining to Victim Two or that event in the Hamptons?**

10 Q.  Victim Two?

11 A.  **What is my knowledge pertaining to that?**

12 Q.  Yes.  You came to court and you are here to testify to

13 support the Government's proffer.  What is your source of

14 anything about that event?

15 A.  **I have seen the documents that were submitted to our case**

16 **file in relation to that victim's interview by the FBI.  In**

17 **addition to conversations that I have reviewed as part of**

18 **search warrant returns.**

19 Q.  And so you are relying on other people's reports to be here

20 today, right?

21 A.  **I have reviewed on my own the excerpt of text messages**

22 **related to Victim Two that we have reviewed.**

23 Q.  Now did Victim Two tell law enforcement in 2024 that she,

24 Victim Two, told her friend, Individual Number One, that she

25 had been raped by Oren Alexander?

A. **I don't recall the specific language that Victim Two told to Individual One. I don't have -- I don't recall it specifically.**

Q. Do you remember the detention hearing or do you remember that the Government submitted a letter to the Court in the detention hearing of Tal Alexander in which the Government claims that Victim Two reported to Individual Number One that she had been sexually assaulted by Oren Alexander?

A. **No, I was not familiar with that. I have not read that document.**

Q. Now do you know anything about Individual Number One's contact with the Alexander brothers after this Hamptons weekend in September of 2016?

A. **After the incident? After the event? No, I am not aware of any contact related to Individual One.**

Q. Well, isn't what happened is that Victim Two and Individual Number One got to the Hamptons, according to the Government and according to the proffer, do you know what day it was that they arrived in the Hamptons?

THE COURT: Mr. Srebnick --

MR. SREBNICK: Oh, sorry.

THE COURT: Remember, we have no court reporter and this is being recorded. So if you are not by the microphone you are not going to make your record.

MR. SREBNICK: It will be lost. Thank you, Judge.

1  A.  **Sir?**

2       THE COURT:  They have a set.

3  BY MR. SREBNICK:

4  Q.  So according to the Government's proffer, I heard her say

5  they received plane tickets and they flew to New York and went

6  to the Hamptons the following day?

7  A.  **Yes.**

8  Q.  What date is that?

9  A.  **It was in or around I believe that I said they went to the**

10 **Hamptons and there was a party the following day.**

11 Q.  What date was that party?

12 A.  **I know that the victim had arrived in New York in or around**

13 **September 2nd of 2016 and I believe the party did occur on**

14 **September 3rd of 2016.**

15 Q.  Okay.  So the alleged sexual assault would have happened

16 overnight from September 3rd to the morning of September 4th?

17 A.  **That's my understanding.**

18 Q.  Okay.  And September 4th was a Sunday, wasn't it?

19 A.  **I don't know specifically.  I would need to look at a**

20 **calendar.**

21 Q.  And isn't it true that after this supposed sexual assault,

22 Victim Two stayed in the Hamptons at the same house where you

23 now say she claims to have been raped, for yet another day?

24 A.  **After the assault, yes, she did remain at the house for**

25 **some time.**

1  Q.   And isn't it true that after supposedly being sexually

2  assaulted, she went on boat rides with the Alexander brothers,

3  right?

4  A.   **I don't recall the timeline specifically, but I do believe**

5  **during that weekend she was on a boat with the brothers, but I**

6  **don't have the interview in front of me.  So I don't know the**

7  **exact timeline.**

8  Q.   Meanwhile, Individual Number One, her friend who supposedly

9  had heard that Oren Alexander had raped Victim Two, was

10  waterskiing on the shoulders of Alon Alexander, right?

11       MS. ESPINOSA:  Objection, Your Honor.

12       This is outside the scope of the issue of detention

13  and is going beyond the witness' personal knowledge.

14       THE COURT:  I am going to allow this one question and

15  then we will -- if she knows.  If she doesn't know.

16       MR. SREBNICK:  Let me show you a photograph then.

17  This is in our PowerPoint, Judge.  We have a courtesy copy for

18  the Government we tendered.

19       May I approach, Your Honor?

20       THE COURT:  Sure.

21       MR. SREBNICK:  This is our PowerPoint.

22       THE COURT:  Thank you.

23  BY MR. SREBNICK:

24  Q.   Take a look at PowerPoint, Page number 6.  We blanked out

25  the face of Individual Number One for privacy reasons.

1   But do you remember that Individual Number One -- and we
2   have the original if you need to see it -- is a blond female?
3   A.  **I don't know that and I don't recognize this photo.**
4   Q.  Okay.  Do you recognize one of the Alexander brothers in
5   the photo?
6   A.  **It is a bit hard to see.  It is a bit --**
7   Q.  Let me present you with the copy.  Is this Alon Alexander
8   or Oren Alexander?
9   A.  **I don't recognize this photo.  I'm sorry.  I apologize.  I**
10  **don't recognize the photo.**
11  Q.  Do you recognize the man in the photo?
12  A.  **It appears to resemble one of the twins.**
13  Q.  I thought you said that you looked at enough pictures that
14  you could tell them apart?
15  A.  **I have and oftentimes in order to tell them apart, it is**
16  **comparing two photos.**
17  Q.  Okay.  Well, let me show you another photo from that
18  waterski trip and maybe this will be better.
19      Do you recall that Individual Number One -- and focus on
20  the top of her bathing suit -- removed the top of her bathing
21  suit while waterskiing on the shoulder of --
22          MS. ESPINOSA:  Objection, Your Honor.
23          This is nothing more than an attempt to victim blame
24  Individual Two.
25          MR. SREBNICK:  I am going to tie up the bathing suit

1  in one more question, Judge.

2         THE COURT:  I am going to allow it.

3  BY MR. SREBNICK:

4  Q.  We have, for privacy reasons, we have redacted out any

5  nudity, but do you see that individual number on the shoulders

6  of someone, who you can't identify, is holding up her top?  Do

7  you see it?

8  A.  **I am not familiar with this photo.**

9         MS. ESPINOSA:  Your Honor, objection.  The witness has

10 never seen this photograph before.

11        THE COURT:  Okay.

12        MS. ESPINOSA:  This is outside her personal knowledge.

13        THE COURT:  If you have a question, Mr. Srebnick, move

14 on.

15        MR. SREBNICK:  Understood.

16 BY MR. SREBNICK:

17 Q.  And isn't it true that Individual Number One, six months

18 later, came to Miami, Florida and socialized with one of the

19 Alexander brothers?

20 A.  **I don't know that.**

21 Q.  Well, have you interviewed Individual Number One?

22 A.  **I have not, no.**

23 Q.  Has anybody interviewed Individual Number One --

24 A.  **I --**

25 Q.  -- from the FBI or any law enforcement?

1  A.  **I personally have not and I don't know.**

2  Q.  Okay.  Let me show you a picture.

3       MR. SREBNICK:  Which we will tie up, Judge, with the

4  witness proffer.

5  BY MR. SREBNICK:

6  Q.  And for privacy reasons, I would like you to focus not so

7  much on the blond hair, but on the bathing suit top of the girl

8  in the photograph, which I will mark as PowerPoint, Page number

9  8.

10      Doesn't that bathing suit top look familiar to you, at

11  least now that you have seen the picture of the girl on the

12  shoulders of a waterskier?

13  A.  **Again, sir, I am not familiar with this photo or the photo**

14  **of the bathing suit before that.**

15  Q.  If you can't compare the two Alexander brothers, maybe you

16  can at least compare the bathing suit tops.

17      MS. ESPINOSA:  Objection, Your Honor.

18      THE COURT:  Mr. Srebnick, I mean, where are you going

19  with this?  This is not the victim, the charged victim.  This

20  is --

21      MR. SREBNICK:  Understood.

22  BY MR. SREBNICK:

23  Q.  According to the Government's detention letter, Individual

24  Number One was told by Victim Number Two in the Hamptons in

25  September of 2016 that she had been raped by Oren Alexander?

1    MR. SREBNICK:  And here is Individual Number One,

2  Judge, socializing --

3    THE COURT:  I understand that, but that neither proves

4  or disproves whether or not she was told any of that

5  information.

6    MR. SREBNICK:  It goes to the weight of the evidence

7  of that --

8    THE COURT:  Okay.  And I think you have made your

9  point.

10    MR. SREBNICK:  Very well.  Thank you.

11  BY MR. SREBNICK:

12  Q.  And so with regard to Count Number Three accusing Oren

13  Alexander of having participated in a sexual assault, what

14  physical evidence do you have to corroborate that claim?

15    Do you have any toxicology reports that she had been

16  drugged?

17  A.  **I don't know.  I can't speak to that individually because I**

18  **-- my role in the case has been -- has been on duties and**

19  **responsibilities for this investigation.**

20  Q.  The answer is, no, you have nothing, right?

21    MS. ESPINOSA:  Objection, Your Honor.  It

22  mischaracterizes the witness' testimony.

23    THE COURT:  Sustained.

24  BY MR. SREBNICK:

25  Q.  Do you have any physical evidence?

1  A.  **I personally have reviewed a video from that party.**

2  Q.  Okay.  What does the video show?

3      Does it show somebody being sexually assaulted or just

4  socializing on boats?

5  A.  **It does not appear to show anyone being sexually assaulted.**

6  Q.  Victim Two claims that she was drugged.

7      Do you have any toxicology evidence to substantiate her

8  claim that she was drugged?

9  A.  **Personally, no.  I have not reviewed any documents of the**

10  **sort.**

11  Q.  The Government -- and I will move on from this Count Number

12  Three.  The Government also proffered about a trip that the

13  Alexander brothers were attending in Tulum, Mexico.

14      Have you heard the proffer?

15  A.  **Yes.**

16  Q.  Has anybody -- and the Government pointed out that there

17  was a text message where some other male talks about bringing

18  drugs to -- or having drugs in Tulum, Mexico.

19      You heard about that?

20  A.  **Yes.**

21  Q.  G, cocaine, what was of the other one?

22  A.  **Shrooms.**

23  Q.  Shrooms, but no Ecstasy.  That's not the kind of drug that,

24  according to that writer, he favors, right?

25  A.  **Yeah.**

1  Q.   Okay.

2  A.   **Yes.**

3  Q.   Any evidence that drugs were actually in Tulum?

4  A.   **I have not -- I have not -- I won't be able to speak to**

5  **that personally.**

6  Q.   Any evidence that anybody was sexually assaulted in Tulum?

7  A.   **I don't know.  I can't speak to that personally.**

8  Q.   Does it surprise you, as an FBI agent, that kids,

9  college-aged kids and maybe even older sometimes use drugs?

10  A.   **Does it surprise me that --**

11  Q.   Yes.

12  A.   **-- college-aged kids use drugs?**

13  Q.   Yeah.

14  A.   **No.**

15  Q.   Okay.  Is there an FBI mandate now that is going to

16  investigate people in their 20s who use drugs and have sex?

17  A.   **No, but it is mandated to investigate when someone has been**

18  **sexually assaulted while drugs were being used to facilitate**

19  **that assault.**

20  Q.   I agree.  That's why I asked you what is the evidence that

21  you have collected that Victim Number Two, physical evidence

22  that she was physically assaulted?

23  A.   **The FBI, we have her interview and --**

24  Q.   Anybody corroborate it?  Anybody say that they witnessed

25  her being assaulted?

1      Did her friend, Individual Number One, report that she had

2 been assaulted?

3 A.   **I can't speak to that personally because I am not as**

4 **familiar with that portion of the case.**

5 Q.   And that is the only victim, Victim Two, identified by the

6 Government and by the Grand Jury in this indictment, correct,

7 as to Alon Alexander?

8 A.   **In addition to the conspiracy, yes.**

9 Q.   Okay.

10 A.   **But the FBI has interviewed dozens of other victims who**

11 **recount being sexually assaulted and raped by Alon.**

12 Q.   Dozens, you are saying, accused Alon?  There are literally

13 dozens who have accused Alon?

14 A.   **As part of the conspiracy and --**

15 Q.   Well, let's be specific now.  Even though they are twins

16 and even though they have a brother, each is entitled to their

17 own trial and their own hearing.

18      How many accusers are there that claim that Alon sexually

19 assaulted the accuser as part of your conspiracy charge?

20 A.   **I don't know the number specifically, but I know it has**

21 **been several.**

22 Q.   Well, you have said dozens.  So I want to know is it two,

23 three?

24 A.   **I -- I haven't been part of those interviews.  I have only**

25 **reviewed documents that have been submitted to the case file**

1 **related to those interviews.**

2 Q.   But the one we do know about is Victim Two that we have

3 already talked about, right?

4 A.   **Yes.**

5 Q.   Now, as to these others, the number you can't tell us, what

6 physical evidence supports the claims of these other accusers?

7 A.   **I can't speak to that because I wasn't part of those**

8 **interviews.**

9         MR. SREBNICK:  One moment, Your Honor.

10 BY MR. SREBNICK:

11 Q.   Let me ask if any of the accusers, the number of which you

12 don't know as against Alon, have testified before the Federal

13 Grand Jury?

14 A.   **I don't believe so, but I don't know for certain because I**

15 **wasn't part of any of the Grand Jury testimonies or events.**

16 Q.   So that means that the Grand Jury that indicted Alon was

17 presented only a FBI agent with no personal knowledge?

18         MS. ESPINOSA:  Objection, Your Honor.  That is not

19 what she said.

20 BY MR. SREBNICK:

21 Q.   You tell us.  What is the evidence that was presented to

22 the Grand Jury to accuse Alon Alexander of committing in this

23 unidentified number of sexual assaults?

24 A.   **I don't know what the evidence was because I was not part**

25 **of the discussions around the Grand Jury indictment and I don't**

1   **charge.  I just investigate.**

2   Q.   Now, was the Grand Jury informed that many of these

3   accusers, the number of which we don't know, have sued Alon

4   Alexander to get money out of this?

5         MS. ESPINOSA:  Objection; asked and answered.

6         THE COURT:  I am going to sustain it.  She said she

7   doesn't know what was before the Grand Jury.

8   BY MR. SREBNICK:

9   Q.   Has the FBI looked into the lawsuits that have been filed

10   against Alon Alexander trying to monetize these claims that

11   were never made years ago?

12   A.   **I personally have not looked into those.**

13   Q.   You haven't seen the lawsuits that have been filed against

14   the Alexander brothers?

15   A.   **I am aware of them based on public reporting, but I have**

16   **not personally investigated those.**

17         MR. SREBNICK:  One moment, Your Honor.

18   BY MR. SREBNICK:

19   Q.   Do you know anything about this blog take-down that the

20   Government brought up in the proffer?

21   A.   **Are you referring to the article that was released this**

22   **weekend related to a blog post?**

23   Q.   Yes.

24   A.   **I only know about it from public reporting.**

25   Q.   You haven't investigated it?

A.   **Personally, no.**

MR. SREBNICK:  Let me just go through my notes.  I think I may be done.

BY MR. SREBNICK:

Q.   When is the last time, date wise, any accuser has said anything about Alon Alexander participating in a sexual assault?  How many years ago did that event that these nameless accusers have accused Alon?  When did it happen most recently?

A.   **I don't recall specifically, but I believe it is around 2022 or 2021; in or around then.**

Q.   That Alon Alexander was involved in a sexual assault in 2022?

A.   **Apologies.  It is part of the conspiracy that it is the last known timeframe we have of a victim who has come forward to the FBI.**

Q.   I am asking you about Alon Alexander.  We know that somebody is accusing him in 2016 in the Hamptons.

Any other accusers surface claiming that they were sexually assaulted by Alon Alexander after 2016?

A.   **I don't know specifically because I don't have the case file in front of me.  So I don't know.**

Q.   I would like to ask you some questions, now, about Alon Alexander keeping files on -- I think the Government said that he was either intimidating or doing something wrong by compiling files of these accusers.

1  Did you hear the proffer?

2  A.  **Yes, that's correct.**

3  Q.  Do you consider a person who is being accused and believing

4  that he is being falsely accused that there is something wrong

5  in that person hiring a lawyer?

6  A.  **It is not wrong to hire a lawyer if you are being accused**

7  **of a crime**.

8  Q.  Anything wrong with compiling information about the

9  accusers in order to prepare to defend yourself in a lawsuit?

10 A.  **No.  As a law enforcement officer, however, it is**

11 **concerning because we have an obligation to protect victims.**

12 Q.  Yeah, but don't you compile information about the Alexander

13 brothers so that you can try to accuse them?

14 A.  **No.  We investigate crimes.**

15 Q.  You don't compile information in your files about the

16 Alexander brothers?

17 A.  **We compile information that helps us and works towards the**

18 **investigation of crimes that occur.**

19 Q.  And what do you expect the Alexander brothers and their

20 lawyers to do to defend themselves if they believe they have

21 been falsely accused by these kinds of accusers?

22 A.  **I can't speak to that because my job is only to investigate**

23 **the crimes.**

24 Q.  But isn't your job also to seek the truth?

25 A.  **And investigate the crimes.**

1  Q.  And shouldn't you investigate the accusers to make sure

2  they are telling the truth?

3  A.  **Yes.**

4  Q.  Check their backgrounds?

5  A.  **To corroborate the claims --**

6  Q.  Yes.

7  A.  **Yes.**

8  Q.  Do a background check on the accuser and see if they have

9  ever made a false accusation before?

10 A.  **We don't always do that in cases that I have worked on**

11 **personally.  But, yes, that is something that some**

12 **investigators can do as part of any case.**

13 Q.  Did you do that in this case?

14 A.  **I personally have not, no.**

15     MR. SREBNICK:  That's all, Judge.  Thank you.

16     THE COURT:  Miss Espinosa, any redirect?

17     MS. ESPINOSA:  Briefly, Your Honor.

18                    REDIRECT EXAMINATION

19 BY MS. ESPINOSA:

20 Q.  Special Agent Hampsch, do you recall that you were asked

21 about the number of substantive counts charging Alon Alexander

22 in the indictment?

23     Do you recall that?

24 A.  **Yes.**

25 Q.  Now, and how many victims has the FBI spoken to in the

1  course of its investigation?

2  A.  **Approximately 42.**

3  Q.  And have those victims made any reports about feeling

4  symptoms consistent with being drugged?

5  A.  **Yes.**

6  Q.  What sort of things have they said?

7  A.  **Several of these victims have reported feeling dizzy,**

8  **feeling woozy, drinking a certain amount of alcohol that was**

9  **not consistent with their knowledge of how much alcohol they**

10  **consume in order to feel drunk.**

11  **In several instances in interviewing victims, victims have**

12  **stated that they only had a couple of sips of a drink before**

13  **they feel extremely intoxicated.**

14  **And in many instances victims have reported feeling like**

15  **they are paralyzed.  Like they can't move and that they don't**

16  **have control over their body.**

17  Q.  And just to make sure that we are clear.  You have said

18  that the FBI has identified approximately 42 victims in this

19  case?

20  A.  **From the last time I reviewed the case file it is**

21  **approximately 42.**

22  Q.  Okay.  And are these victims' stories consistent with one

23  another?

24  A.  **Yes.**

25  Q.  Now, based on your involvement in the investigation, is

1 there evidence that multiple Defendants were present in the

2 room during at least some of these assaults?

3 A. **Yes.**

4 Q. Now based on your review of the evidence in the case, what

5 is your understanding of how many rapes or sexual assaults

6 victims reported that both twins were in the room at the time?

7 A. **I believe it is approximately six.**

8 Q. And what is that based on?

9 A. **Based on my review of the documents submitted in our case**

10 **file of those victims' interviews.**

11 Q. And are there also victims who accuse Alon of committing a

12 rape or sexual assault on his own?

13 A. **Yes.**

14 Q. Are there also victims that accuse Alon of committing a

15 rape or sexual assault with his brother Tal?

16 A. **I don't -- I don't know specifically because I don't have**

17 **the case file in front of me.**

18 Q. Okay. Now, you were also asked some questions about

19 whether or not you personally witnessed the Defendant commit a

20 crime.

21 Do you remember that?

22 A. **Yes.**

23 Q. And you said you had not, correct?

24 A. **That's correct,** I have not.

25 Q. Now, in the course of your involvement in this case, have

you reviewed other evidence related to the Defendants, besides

the victims' statements?

A.  **Yes.**

Q.  What types of evidence have you reviewed?

A.  **I have reviewed extractions from search warrant returns**

**from social media companies and service providers.**

Q.  And have you reviewed any photographs or videos?

A.  **Yes.**

Q.  And what kind of photographs and videos have you reviewed?

A.  **I have reviewed several photographs and videos depicting**

**several individuals engaging in sexual conduct with multiple**

**women.**

      MS. ESPINOSA:  One moment, Your Honor.

      Nothing further, Your Honor.

      THE COURT:  Okay.  Thank you.  You may step down.

      MR. SREBNICK:  Your Honor, I have a motion or an

inquiry.  The agent and the prosecutor have revealed that the

Government has been looking at the witness files that Alon

Alexander was compiling as part of his defense of, back then,

the civil cases.

      It sounds to me like there is an attorney/client

privilege work product issue that has just surfaced here and I

am concerned about it.

      So I am filing a motion for a hearing on what it is

that the FBI has been doing to access the witness files

1  compiled by Alon Alexander who, incidentally, Judge, is a

2  lawyer.  He went to law school and --

3           THE COURT:  I understand, but I also understand that

4  he does not practice and has not practiced as a lawyer.

5           MR. SREBNICK:  But he was a litigant being sued and so

6  he was conferring --

7           THE COURT:  I understand.

8           This is not a substantive case that is here before

9  this Court.

10          MR. SREBNICK:  Got it.

11          THE COURT:  We are here on out-of-district arrest

12  warrant.

13          I don't think that that implicates what is before this

14  Court.  If that is something that is appropriate, that is

15  something that needs to be filed --

16          MR. SREBNICK:  We will do that.

17          THE COURT:  -- in the case in New York.

18          MR. SREBNICK:  And so it is clear we are making the

19  request that the Government do not do any further access of

20  privileged materials.

21          THE COURT:  Okay.  And I am not sure that anything has

22  been said establishes that it is privileged material.

23          MR. SREBNICK:  We don't know.  We haven't been told.

24          THE COURT:  But I haven't heard anything that that was

25  information that was communicated to a lawyer that was

1  requested by a lawyer.  I have only heard evidence that the

2  Defendant compiled it.

3          A Defendant compiling information does not implicate

4  attorney/client privilege by itself.  But you have alerted the

5  Government and the Government needs to be aware and is on

6  notice that that is potentially an issue in this case and I

7  expect the Government would address the issue appropriately.

8          MR. SREBNICK:  Very well.  Thank you, Judge.

9          THE COURT:  Okay.

10         MR. SREBNICK:  Judge, we are prepared to put on

11 witnesses on the issues of flight risk and --

12         THE COURT:  Well, let me ask first if the Government

13 has concluded its presentation.

14         MS. ESPINOSA:  Yes, Your Honor.

15         THE COURT:  Okay.  Very well.  Mr. Srebnick.

16         MR. SREBNICK:  Thank you, Your Honor.

17         So you have heard about the one factor the strength of

18 the evidence, but at this time, though, we would like to

19 present to the Court the bond conditions and the people who are

20 going to support them.

21         If I could just preview what we are proposing and then

22 the support I am going to offer by way of testimony and

23 proffer.

24         We are proposing a bond, as indicated in the

25 memorandum we filed yesterday with the Court, a bond in an

1   amount to be decided by you, Your Honor, in any amount.  No

2   limit on the amount.  It could be a hundred dollars.  It could

3   be a hundred million.  It could be a billion.

4           It makes no difference to us because Alon Alexander,

5   his two brothers, Alon Alexander's mother and Alon Alexander's

6   father all will sign the bond.

7           If any one of the brothers breaches their obligation

8   to appear in court as ordered, the bond would be forfeited.  It

9   would render the entire family destitute.

10          We have provided today, to the Government, a financial

11  statement of the family, the parents, and Alon Alexander.  If I

12  could -- I have submitted it to the Government with the request

13  that it be presented to you and to them *in camera*.  The

14  Government has it under seal so as not to reveal confidential

15  financial information of the family.

16          It would typically go to the Pretrial Services Report,

17  which is supposed to remain confidential.  So, at this time, I

18  would like to tender that as a sealed Exhibit Number One in

19  terms of the finances of the company.  And it is going to be

20  authenticated by Alon Alexander's mother, who I would call to

21  the podium, Orly Alexander.

22          THE COURT:  The Government's position?

23          MS. ESPINOSA:  The Government does not object to the

24  sealing request.

25          MR. SREBNICK:  Your Honor, let me introduce you to

1  Orly Alexander.

2          And if you could state your name and --

3          THE WITNESS:  Orly Alexander.

4          MR. SREBNICK:  Spell your first name.

5          THE WITNESS:  O-R-L-Y.

6          THE COURT:  Okay.  I am going to need Miss Alexander,

7  if she is going to be testifying, she needs to be sworn.

8          MR. SREBNICK:  No problem.

9          THE COURTROOM DEPUTY:  Please raise your right handled

10  to be sworn.

11          THE WITNESS:  (Complied.)

12  (Witness sworn.)

13          THE COURTROOM DEPUTY:  State your full name, again,

14  please.

15          THE WITNESS:  Orly Alexander.

16          THE COURTROOM DEPUTY:  Thank you.

17              ORLY ALEXANDER, DEFENSE WITNESS SWORN

18                      DIRECT EXAMINATION

19  BY MR. SREBNICK:

20  Q.  Good morning, Miss Alexander.

21      If you could introduce yourself to Judge Sanchez and tell

22  the Judge a little bit about yourself and your background.

23  A.  **Orly Alexander.  I am originally from Israel.**

24      **I came here at the age of 17 and started my life here with**

25  **my husband.  I went to college here.  I paid college loans.  I**

1  **started a business. I started a family that I am mostly proud**

2  **of, four sons. And a big business that we run and investments**

3  **and we did it all ourselves.**

4  Q.   So tell the Judge where did you go to college here in South

5  Florida?

6  A.   **We started two years in Miami-Dade Community College and**

7  **then went to the University of Miami and graduated there.**

8  Q.   What degree did you obtain from the University of Miami?

9  A.   **Bachelor of Science and Computer Science.**

10  Q.   What employment did you have while you were in school as a

11  college student?

12  A.   **I was a Hebrew teacher and then a Hebrew school principal**

13  **and then I started our business that I am working until today.**

14  Q.   Okay. What is the name of that business?

15  A.   **Kent Security.**

16  Q.   What does the business do?

17  A.   **We provide security services all over the United States.**

18  Q.   I am going to stand here for the microphone.

19      And when did Kent Securities begin its business?

20  A.   **1982.**

21  Q.   And who are the principals of Kent Securities?

22  A.   **My husband and I started it in 1982 and now we are partners**

23  **with my brother Gil and Alon also with us.**

24  Q.   Okay. I am going to ask your husband to stand up. Is

25  Shlomy in the courtroom? You obviously can identify your

1  husband Shlomy?

2  A.  **Yes, that is my husband Shlomy Alexander of 49 years.**

3  Q.  And can you spell his name for the record?

4  A.  **S-H-L-O-M-Y.**

5  Q.  Okay.  And is your brother here in the courtroom?

6  A.  **Yes, my brother is here; Gil Neuman.**

7  Q.  And if you could spell his name?

8  A.  **G-I-L  N-E-U-M-A-N.**

9  Q.  When did you become a United States citizen, Orly?

10 A.  **I believe in the late '70s; six or seven.  I gave a**

11 **naturalization certify.**

12 Q.  Let me show you to refresh your memory.

13 A.  **I don't have my glasses.**

14 Q.  Do you recall you gave me copies?

15      MR. SREBNICK:  Which we have, Judge, and we will put

16 it on the ELMO.  So the Judge can see it.

17 BY MR. SREBNICK:

18 Q.  Take a look and tell us.  Is it 1983?

19 A.  **1983.**

20 Q.  You became a United States citizen in 1983?

21 A.  **Yes.**

22 Q.  And you have pledged allegiance to our flag?

23 A.  **Yes, I did.**

24 Q.  Do you also hold an Israeli passport?

25 A.  **Yes, I do.**

1 Q. Is that because you were born there?

2 A. **Exactly.**

3 Q. And do you travel to Israel from time to time?

4 A. **Yes, I do.**

5 Q. And have you always come back?

6 A. **Yes, I do.**

7 Q. And do you reside here in South Florida?

8 A. **Yes.**

9 Q. And don't tell us the address, but in what neighborhood do

10 you reside?

11 A. **Bal Harbor.**

12 Q. Okay.  I am going to show you your husband.  Is he a United

13 States citizen?

14 A. **Yes, he is, in 1983.**

15 Q. And you all have been married for how many years now?

16 A. **49 years.**

17 Q. Your sons, were they born in the United States?

18 A. **All Mount Sinai babies.**

19 Q. Okay.  Are any of them Israeli citizens?

20 A. **None.**

21 Q. Okay.  Do you see -- well, your son, Alon, did he go to law

22 school?

23 A. **Yes, he did.**

24 Q. What law school did he go to?

25 A. **New York Law.**

```
 1  Q.   And did he graduate?
 2  A.   Yes, he did.
 3  Q.   And did you go to the graduation?
 4  A.   Yes, we all did.
 5  Q.   And what business has your son Alon been in since he
 6  graduated law school?
 7  A.   Kent Security.
 8  Q.   Has Alon ever been part of the real estate group known as
 9  the Alexander Team, the real estate brokers?
10  A.   No, none.
11  Q.   Are those your other sons Oren and Tal?
12  A.   Oren and Tal.
13  Q.   Now, as part of your appearance here today, did you work
14  with my colleague Raymie Walsh?  Do you see Raymie?
15  A.   Yes, I did.
16  Q.   To prepare for the Court a schedule of your assets?
17  A.   Yes, I did.
18  Q.   And the equity that you have in the assets --
19  A.   Yes.
20  Q.   -- as best as you can estimate?
21  A.   Yes, I did.
22  Q.   Did you provide Miss Walsh tax returns for the company?
23  A.   Everything.
24  Q.   Did you provide financial records of the company?
25  A.   Everything.
```

1    MR. SREBNICK:  Judge, at this time we already provided

2  a copy to the Government and we tender sealed Exhibit

3  Number One.

4    THE COURT:  Very good.  I will accept it and it shall

5  be maintained under seal.

6  BY MR. SREBNICK:

7  Q.  And does that also include a schedule of the assets of your

8  son Alon?

9  A.  **Yes.**

10 Q.  By the way, what is your title at Kent Securities?

11 A.  **I am the CFO.**

12 Q.  And CFO means Chief Financial Officer?

13 A.  **Yes.**

14 Q.  Okay.  And so you and Miss Walsh, from my office, worked so

15 that Judge Sanchez could have a picture of your family's

16 assets, right?

17 A.  **Yes.**

18 Q.  Do you understand that if you sign a personal surety bond

19 in an amount set by the Judge, that should your son not appear

20 in court as ordered, you could lose everything up to the amount

21 of whatever bond the Judge sets?

22    Do you understand that?

23 A.  **Yes, I do.**

24 Q.  And if he says the bond is a billion dollar that would

25 leave you completely destitute, wouldn't it?

```
1  A.   Yes.

2  Q.   And has your husband agreed to sign on the bond as well?

3  A.   Yes.

4         MR. SREBNICK:  I tender the witness.

5         THE COURT:  Miss Espinosa.

6         MR. SREBNICK:  She is going to ask you some questions.

7                        REDIRECT EXAMINATION

8  BY MS. ESPINOSA:

9  Q.   Just briefly, Miss Alexander.

10      You said that you moved to the U.S. when you were 17; is

11 that right?.

12 A.   (No audible response.)

13 Q.   And you are a U.S. citizen?

14 A.   Yes.

15 Q.   But you are still an Israeli citizen as well --

16 A.   Yes.

17 Q.   Is that right?

18      And your husband is also?

19 A.   Yes.

20 Q.   And you still have family in Israel, right?

21 A.   Yes.

22 Q.   And you travel regularly to Israel, right?

23 A.   Sometimes, yes.

24 Q.   And your son also travels to Israel regularly, right?

25 A.   When we can.
```

1  Q.  And all of your sons have traveled to Israel regularly,

2  right?

3  A.  **Yes.**

4  Q.  And in fact, your sons travel regularly to many countries,

5  right?

6  A.  **Wherever they go, yeah.**

7  Q.  Is that a yes, ma'am?

8  A.  **Yes.**

9       MS. ESPINOSA:  No further questions, Your Honor.

10      THE COURT:  Okay.  Thank you.

11      Any redirect, Mr. Srebnick?

12      MR. SREBNICK:  Yes, Judge.

13                  REDIRECT EXAMINATION

14  BY MR. SREBNICK:

15  Q.  What family do you have in Israel?

16  A.  **An old mom.**

17  Q.  How old is your mom?

18  A.  **89.**

19  Q.  My mom turned 85.  That is not that old?

20      MR. SREBNICK:  I don't have any further questions, but

21  one moment.

22  BY MR. SREBNICK:

23  Q.  Have either of your sons traveled to Israel in 2024?

24  A.  **No.  I don't think in '23 either.**

25  Q.  Okay.  We'll say, but certainly not in 2024?

1  A.  **No.**

2  Q.  Not since the accusations have been --

3  A.  **No.**

4  Q.  -- levied by the accusers in this case, right?

5  A.  **No.**

6  Q.  And one last thing.

7      Did you read the accusations in the newspapers dating back

8  to this summer of 2024 against your son, lawsuits being filed?

9  A.  **I saw headlines.**

10  Q.  And that the FBI was investigating it?

11  A.  **(No audible response.)**

12  Q.  Did any of your sons say to you now that the FBI is

13  investigating, we are going to go and make ali ali Israel?

14  A.  **No.**

15       MR. SREBNICK:  Thank you, Orly.  Those are all the

16  questions I have.

17       THE WITNESS:  Thank you.

18       MR. SREBNICK:  Your Honor, our next witness will be

19  presented by Miss Walsh.

20       THE COURT:  Miss Walsh, I know this is a little

21  inconvenient, but it is probably easier -- and I did not do it

22  because I didn't know the extent of it.

23        If we are going to take testimony if we do it from the

24  witness stand just because it will record better and more

25  easily.

1          MS. WALSH:  Certainly, Your Honor.

2          The witness has asked that we are going to make a

3    proffer and then tender her for any additional questions and

4    follow up and I will do the bulk of speaking, initially, Your

5    Honor.

6          THE COURT:  Okay.  Let's do the proffer and if there

7    are any questions or any redirect, we may ask her to take the

8    stand at that point.

9          MR. SREBNICK:  Your Honor, one moment.

10         The Public Defender, asks permission to exit courtroom

11   while we proceed.

12         THE COURT:  Yes, the Public Defender could -- frankly,

13   I wasn't sure that you were in the crowd anymore.

14         THE PUBLIC DEFENDER:  Thank you, Your Honor.

15         THE COURT:  Okay.

16         MS. WALSH:  Your Honor, I am here with Shani

17   Alexander.  She is the wife.  She is 28 years of age.

18         She was born in Israel back in January 6th of 1996.

19   She graduated high school in Israel.  She is fluent in Hebrew

20   and proficient in English.

21         And after graduating high school she served her

22   mandatory two-year requirement, her national requirement in the

23   Israeli army.

24         After passing basic training she went through a series

25   of exams to determine aptitude and qualifications.

1    And based upon her achievements on those exams was

2 identified and served as an assistant to a brigadier general

3 where based upon her acumen and her demeanor, she was given

4 security clearance along with special requirements to handle

5 sensitive correspondence consistent with what a brigadier

6 general in the Israeli army you would expect to be exchanged in

7 that post.

8    And I would like to point out that she served in the

9 military.  Even at the age of 16 she was given a modeling

10 contract with an agency.  During her time as a model, she

11 traveled the world with her father where he was at her side

12 keeping her safe.

13    And then, after she served her duty in the military,

14 she traveled a bit.  She spent a brief time in Australia.  She

15 then returned to Israel where at that time she met Alon.  They

16 dated briefly.

17    And as she was moving back to New York, they continued

18 to date.  And at that time she had the opportunity to move into

19 an apartment, which was the apartment of one of Alon's former

20 girlfriends that they continued to maintain a friendship, who

21 is here today, Your Honor, Miss Epstein who is also an

22 attorney.

23    And Shani has shared with me, based upon my interview

24 of her, that she has witnessed her husband in many, many social

25 occasions for the entirety of the time that they dated.  He is

1 not a drug user and nor is she and she has never seen him

2 impose or provide drugs to any woman.

3     She also shared with me that during the time that they

4 were dating and during the time that they were engaged that she

5 was present when there were parties where there were other

6 women who were all voluntarily arriving at the Alexander

7 brothers' apartment and they would walk in voluntarily.

8     Again, she has never witnessed any drugs being

9 provided.  Nor has she ever witnessed any of the Alexander

10 brothers, especially since we are here today on Alon, forcing

11 anyone to do anything.

12     She has never witnessed any woman screaming for help

13 or accusing anyone of any sexual assault.  She did describe to

14 me an event in Miami, Florida, where she witnessed two girls

15 coming into the apartment taking off their swimsuit tops,

16 again, voluntarily.

17     She then shared with me that on the day of the arrest,

18 on December 11th, what transpired early that morning at

19 approximately 5:00 a.m. or 6:00 a.m., whereas the team of law

20 enforcement agents came into her home there were loud sirens

21 from everywhere.

22     She had two young children, babies in the house, and

23 she went through the ordeal of having a red dot on her

24 forehead, a laser and the overwhelming and emotional fear is

25 something that she explained to me and shared with me.

1          And I share that with you, Your Honor, in terms of

2    understanding the intensity of the situation, but also the

3    aggressiveness with which her husband was arrested as well as

4    she was forcibly removed from her home with her small children.

5          And to get a sense of what she is going through, Your

6    Honor, I present that information.

7          Shani, the conversations that we have had, everything

8    that I have said today, is it an accurate representation of

9    what you have shared with me?

10         MRS. S. ALEXANDER:  Yes.  The thing was in a house and

11   not in -- the only thing that was in the house and not in the

12   apartment of the --

13         THE COURT:  Okay.

14         MRS. S. ALEXANDER:  -- with the girls.

15         MS. WALSH:  I apologize, Your Honor.

16         I misspoke when I described the incident where people

17   were taking off their swimsuits and it was in a house and not

18   in an apartment.

19         At this time, I tender the witness.

20         MS. ESPINOSA:  Cross-examination.  So if it is easier

21   or if --

22         THE COURT:  Okay.  Depending on what you have, I think

23   it is just easier.

24         MS. ESPINOSA:  It won't be very long, but I think it

25   might be easier since she is going to have to stand to see me

1  and the microphone won't be in front of her face.

2          MS. WALSH:  Your Honor, one more thing.

3          I also wanted to mention that Shani and Alon were

4  married in 2020.

5          THE COURT:  Okay.  Miss Alexander, I am going to ask

6  you to take the witness stand.

7          The prosecutor will be asking you some questions now.

8  So just take a seat and --

9          THE COURTROOM DEPUTY:  Please raise your right hand to

10  be sworn.

11          THE WITNESS:  (Complied.)

12  (Witness sworn.)

13          THE COURTROOM DEPUTY:  Please speak into the

14  microphone and please state your full name.

15          THE WITNESS:  Shani Alexander.

16          THE COURTROOM DEPUTY:  Thank you.

17              SHANI ALEXANDER, DEFENSE WITNESS SWORN

18                        CROSS EXAMINATION

19  BY MS. ESPINOSA:

20  Q.  Good afternoon, Miss Alexander.

21      Now you testified that you are an Israeli citizen?

22  A.  **Yes.**

23  Q.  And you have family in Israel still?

24  A.  **Yes.**

25  Q.  And you travel regularly to Israel to visit your family,

1  right?

2  A.  **Yes, in the summers.**

3  Q.  And your husband travels with you sometimes, right?

4  A.  **We have kids.  We go together, yes.**

5  Q.  And now at this time you are not a U.S. citizen, are you?

6  A.  **No.  My kids are.**

7  Q.  Understood.

8      Now you testified that you have never seen Alon Alexander

9  force any woman to have sex; is that right?

10 A.  **Yes.  Alon?**

11 Q.  Your husband, yes.

12 A.  **Yes.**

13 Q.  What year did you meet your husband?

14 A.  **2017.**

15 Q.  And so before you met your husband you have no idea what he

16 was doing in his bedroom, do you?

17 A.  **No.**

18 Q.  You weren't present at any of his sexual encounters prior

19 to 2017, right?

20 A.  **No.**

21 Q.  And you are not aware of all of the circumstances under

22 which your husband had sexual encounters before you met him,

23 are you?

24 A.  **No.**

25 Q.  Now, after you met your husband you were not with him 24/7,

1  were you?

2  A.   **I wasn't but -- yeah.**

3  Q.   There were times that you were not in the same place?

4  A.   **Yeah.**

5  Q.   And you do not know what he was doing when you were not

6  with him, do you?

7  A.   **No.**

8  Q.   And during the proffer that your attorney made, she

9  testified that you had traveled the world previously in your

10  life; is that right?

11  A.   **Yes.**

12  Q.   And you have traveled since you met your husband as well,

13  right?

14  A.   **Yes.**

15  Q.   And you traveled to the Bahamas together?

16  A.   **Yes.**

17  Q.   And to other locations in the Caribbean?

18  A.   **Yes.**

19  Q.   And sometimes you travel by private jet, right?

20  A.   **Yes.**

21  Q.   And sometimes by yacht?  Sometimes you go on a boat?

22  A.   **Yacht -- boat, yes.**

23  Q.   So you have spent time in a lot of other countries in

24  addition to Israel, right?

25  A.   **Yeah.**

1 Q. And you have traveled to those places with your husband?

2 A. **Yes. And for work, yes.**

3 Q. And for work as well?

4 A. **Yes.**

5     MS. ESPINOSA: All right. No further questions, Your

6 Honor.

7     THE COURT: Okay. Any redirect?

8     MS. WALSH: Just briefly, Your Honor.

9                REDIRECT EXAMINATION

10 BY MS. WALSH:

11 Q. Shani, the travels that you have just been asked about, you

12 have always returned to Miami, correct?

13 A. **Yes.**

14 Q. Those travels where you have been on a plane or a boat

15 those were vacations?

16 A. **Vacations.**

17 Q. Have you had any conversation with your husband about

18 leaving the United States --

19 A. **Never.**

20 Q. -- since these accusations have been made?

21 A. **Never.**

22     MS. WALSH: That's all at this time, Your Honor.

23 Thank you.

24     THE WITNESS: And I am willing to bring the passport.

25     MS. WALSH: Say that again?

1              THE WITNESS:  And I am willing to bring my passport.

2              MS. WALSH:  Yes.  Thank you.

3              MS. ESPINOSA:  Nothing further, Your Honor.

4              THE COURT:  Okay.  You may step down, Mrs. Alexander.

5              MR. SREBNICK:  Judge, I present Danielle Epstein as a

6    character witness.  If you could introduce yourself to the

7    Judge.

8              THE WITNESS:  Good morning, Your Honor.

9              My name is Danielle Epstein.  I have known Alon and

10   his family for just about 20 years at this point.

11             We met freshman year in college.  We went to the law

12   school.  Not at the same law schools, but at the same time in

13   New York.

14             And you know, I am just here today to present a little

15   bit of the other side of things other than what is out there in

16   the media.  I think I speak for --

17             THE COURT:  Just for --

18             MS. ESPINOSA:  Your Honor, the Government objects to a

19   character witness in this context.

20             This is not a trial.  This is not -- I have no reason

21   to think this witness has any personal knowledge of the

22   allegations contained in the indictment.

23             So we don't think that this is an appropriate topic of

24   testimony at this setting.

25             MR. SREBNICK:  Your Honor is here to decide the

character of whether the Defendant will appear as ordered by the Court and Miss Epstein, who has known the Defendant for 20 years.

And they had a romantic relationship, she knows him well from that time. They were students together at the University of Maryland and they were law students at the same time.

She attended a different law school and one that I am quite proud of, I might add. But, in any event, she is here to testify to his character.

THE COURT: Okay. I am going to allow it, but if we are going to have testimony let's do it -- because I think -- I don't know if the Government -- so Miss Epstein, I am going to --

THE WITNESS: I'll be brief.

THE COURT: Well, I am going to ask that you be sworn because I think they are going to want to cross you and --

THE WITNESS: No problem.

THE COURT: And if we are going to do this, let's do it so -- why don't you take the stand and let's just do it, yeah.

THE COURTROOM DEPUTY: Will you please raise your right hand to be sworn.

THE WITNESS: (Complied.)

(Witness sworn.)

1        THE COURTROOM DEPUTY:  Please speak into the

2   microphone and state your full name.

3        THE WITNESS:  Danielle Clara Epstein.

4        MR. SREBNICK:  You can put your hand down.

5          DANIELLE EPSTEIN, DEFENSE WITNESS SWORN

6                    DIRECT EXAMINATION

7   BY MR. SREBNICK:

8   Q.  Miss Epstein, just briefly, where were you born and where

9   did you go to school and what do you do for a living?

10  A.  **I was born in northern New Jersey.**

11      **I went to Maryland as a freshman where I met Alon.  I**

12  **believe I was about 18 years old at the time.  I transferred**

13  **and graduated from Georgetown University and I went to get my**

14  **JD MBA from Florida where Alon and I studied together.  He was**

15  **at a different law school, but throughout that time.**

16  Q.  And did you obtain your JD MBA?

17  A.  **I did.**

18  Q.  Okay.  And what year was that?

19  A.  **2012.**

20  Q.  Okay.  And did you have a relationship with Alon?

21  A.  **I did.**

22  Q.  More or less what timeframe was that?

23  A.  **We started dating towards the end of 2008, I believe, and**

24  **we ended our romantic relationship some time I think in 2011.**

25  Q.  And you stayed friends beyond that time?

1  A.   Yes.

2  Q.   And how did you come to be here today?  What prompted you

3  to reach out to come here today?

4  A.   I felt very strongly that somebody be heard to just, you

5  know, let the Court know that in the many, many, many years I

6  have known the Defendant and his family, I know him to be a

7  very honest man, a kind person, and hard working.

8       I say during those formative years of my life, he taught me

9  a lot.  He introduced me to a lot of people who remain my best

10 friends today.  I spent a lot of time with these boys, with

11 Alon.

12      During our first year of law school we practically lived

13 together.  And again, this is sort of -- especially because

14 this was in 2010.  So during the times a lot of these claims

15 are being alleged.

16      And we practically lived together for over a year.  I had

17 my own apartment and he had his own apartment, but I spent a

18 lot of time with him and never did I witness anything even

19 remotely close to what is being alleged here.

20 Q.   And where do you live now?

21 A.   I live part-time with my parents in New Jersey and

22 part-time in my apartment in Manhattan.

23 Q.   So you are not living in Miami now, are you?

24 A.   No.

25 Q.   So you are down here and you have taken the time out of

1  your schedule to come here and speak on behalf of Alon?

2  A.  **That's correct.**

3      MR. SREBNICK:  I have no other questions.

4      THE COURT:  Okay.  Miss Espinosa.

5                  CROSS EXAMINATION

6  BY MS. ESPINOSA:

7  Q.  Now, Miss Epstein, you stated that you dated Alon between

8  2008 and 2011; is that right?

9  A.  **About.**

10 Q.  And that you spent a considerable amount of time together

11 after that; is that right?

12 A.  **Yeah.**

13 Q.  But, you weren't with Alon and during every single one of

14 his sexual encounters, were you?

15 A.  **Not every single one.**

16 Q.  You didn't watch him have sex with other women on a regular

17 basis?

18 A.  **I can't recall.  It's possible.**

19 Q.  But you certainly were not present when he had sex with

20 other women all the time; is that right?

21 A.  **Not all the time.**

22 Q.  So you don't know what he was doing when you were not in

23 the room, right?

24 A.  **No.**

25     MS. ESPINOSA:  No further questions.

1          THE COURT:  Okay.

2          MR. SREBNICK:  No other questions.  Thank you.

3          THE COURT:  Okay.

4          MR. SREBNICK:  One moment, Your Honor.

5          Judge, the next person I would like to introduce you

6     to is Alon's uncle, Gil Neuman.  And I am just happy to stand

7     here because I wanted the Court to know that he is someone who

8     is willing to sign on a personal surety bond on behalf of his

9     nephew; all of the nephews.

10         Moreover, he resides in Broward County and without

11    getting into specific addresses, he lives in a home that is not

12    a waterfront home.  And to the extent that the Court is

13    persuaded by the Government's argument that a waterfront home

14    presents a greater or insurmountable risk of flight in that the

15    Government would persuade you that a non-waterfront home would

16    be a more appropriate location for detention.

17         Gil Neuman, the uncle, is prepared to welcome Alon's

18    family, the wife, the two children, to reside with him during

19    the period of pretrial release.

20         So I wanted you to meet him and to the extent that --

21    and I should clarify.  His house is not -- it is on a manmade

22    lake, but there is no Intercoastal access.

23         Further, and that is all I have for now, Your Honor.

24    And if even that is too much of a risk in the minds of the

25    Government and persuades the Court of that, the Alexanders are

thankfully in a position where they can rent a different

residence here in South Florida, or if necessary for the Judge

in New York, it could even be a condominium.  It could be a

condominium high-rise of a sufficient height that no one would

suggest that Alon would jump from the building in order to

escape.

But even if that was too much of a risk in the minds

of the Government, I would like to present our witness which is

Don Deluca of V2 Global.  We have contacted V2 Global because

that company, which consists of former law enforcement officers

and Mr. Deluca will explain.

He is really here just as an option for the Court in

terms of monitoring home detention.  He is not a personal

friend of the family or anything like that.

But if you could introduce yourself to Judge Sanchez

and explain what V2 Global does to assist courts in terms of

monitoring home detention.

THE WITNESS:  Good afternoon, Your Honor.

Don Deluca, retired police chief out of South Florida

here.  V2 Global does risk mitigation and investigations and

provides security.

We have in the past under circumstances by the Court

have watched over folks for up to two years while they are

under indictment and help with transportation and getting them

to and from court and what they do on a daily basis with our

1 counterparts. The FBI or whatever the agency may be.

2      MR. SREBNICK: Don, could you tell the Judge who the

3 leadership of your company is.

4      THE WITNESS: Sure. As I mentioned, I'm a retired

5 police chief, City of Miami Beach, Golden Beach in Doral. I am

6 past president of the International Association of Chiefs of

7 Police represented 33,000 executives, 170 countries.

8      My colleague over here is DC Page, our managing

9 partner, a former Customs Border Patrol and our third partner

10 is Jim Milford. He was a deputy administrator for the DEA

11 worldwide.

12      MR. SREBNICK: And the three of you are the leadership

13 of V2 Global?

14      THE WITNESS: Owners leadership of V2 Global.

15      MR. SREBNICK: And do you all supervise the people

16 that work with you to monitor folks that are on electronic

17 monitoring, house arrest?

18      THE WITNESS: Absolutely.

19      MR. SREBNICK: And Judge, I could save the Court time.

20      In our memo we cited the case as one example.

21      You had a case actually in New York, the Eastern

22 District of New York?

23      THE WITNESS: Yes, we did. And for a year and-a-half,

24 two years back and forth we took care of business and no

25 incident. We always showed up at the time of trial they were

1 there.

2       MR. SREBNICK: And if a Court orders you to conduct

3 that monitoring and you are to immediately report if there is

4 any kind of violation, you would assure Judge Sanchez that you

5 would abide by that commitment to the Court under penalty of

6 contempt even?

7       THE WITNESS: Without question.

8       MR. SREBNICK: Any questions from the Government?

9       MS. ESPINOSA: Yes, Judge a few.

10       Now, sir, you are not connected to the Court, right?

11 You don't work for the Court?

12       THE WITNESS: No.

13       MS. ESPINOSA: And you don't work for the Government?

14       THE WITNESS: No.

15       MS. ESPINOSA: And you don't work for Pretrial

16 Services?

17       THE WITNESS: No.

18       MS. ESPINOSA: So you would be paid by the Defendant,

19 right?

20       THE WITNESS: By the attorney.

21       MS. ESPINOSA: The money would come from the

22 Defendant, though, right? It wouldn't come from the attorney?

23       THE WITNESS: Yes.

24       MR. SREBNICK: By the way, we would have no objection

25 if the Government wants to pay for it. It is not a problem.

1          MS. ESPINOSA:  And you are familiar with Kent

2   Security, right?

3          THE WITNESS:  Everybody is.

4          MS. ESPINOSA:  Nothing further.

5          THE WITNESS:  Thank you.

6          MR. SREBNICK:  Thank you.

7          Judge, the only other thing that I have in terms of

8   proffer, the neighbors who reside in the Miami Beach

9   neighborhood with Alon Alexander, several of them are here and

10  I would ask them to stand up.

11         Justin, another neighbor here since 10:00 a.m. in the

12  morning and he had to go.  Justin Thorton.  And they have

13  written a letter to the Court to describe the Alexander family

14  is.  And so I will make a copy and give it to the Court for

15  whatever weight you want to give it.

16         Basically, he is a good neighbor and he is the person

17  that organizes the neighborhood and makes sure that it is safe

18  and a good place for people to live here in Miami Beach.

19         One moment.

20         Your Honor, we have with the Court the passports of

21  the parents, the wife, the children that we are prepared to

22  tender.  I think the Government, if not, have already taken

23  Alon's and we will make sure that Court has all of the

24  passports .

25         Let me say that, again, if a personal surety bond in

1    any amount you set, plus home detention with electronic

2    monitoring by Pretrial Services and the private security

3    company we brought you V2 Global.

4          But if the Government has another company, no

5    disrespect to Mr. Deluca and Mr. Page if the Government thinks

6    that the former chief of police of Miami and a former customs

7    agent and a former administrator for the DEA isn't qualified,

8    we will accept any security company that the Government

9    proposes.

10         Naturally, we would expect that we have to pay for it,

11   but again if the Government wants to pay for it, no problem.

12         And if that is not enough, Judge, the Court can set

13   what we have proposed is a more modest corporate surety bond

14   and perhaps $100,000 or $200,000 so that a bondsman would also

15   be on the hook in supervising compliance with conditions of

16   release.

17         And to the extent that the family will have pledged

18   everything, I know there are members of the community that if

19   the amount is $100,000 or $200,000 we could round up community

20   members to secure the bond for the corporate surety bond.

21         Of course the bondsman charges a fee and so we would

22   like to keep that relatively modest if possible.  We don't

23   think it is necessary given all the other conditions.

24         Now, that is the testimony.  We also have an argument

25   to make whenever you are ready.

1    THE COURT:  Okay.  All right.

2    MR. SREBNICK:  And I forgot one other thing.

3    We reached out to the plane company.  The Government

4  is talking about a private plane.  There is a seaplane that the

5  Alexander family -- and it is not a loan, but other members of

6  the family invested in a seaplane.  It is at a company called

7  Tropic Air.  It is all laid out in the memorandum that we filed

8  yesterday.

9    We reached out to that company.  The Alexander

10 brothers would all be on a no-fly list.  No access to the

11 plane.  None of them are pilots.  So they can't fly it on their

12 own, but we would do whatever is necessary to lock down that

13 plane so the Government would not fear that they could run off

14 in a seaplane.

15    The idea that they can use private jets, the law is

16 clear.  A pilot of a private jet has to fill out a manifest and

17 there are things that have to happen before a private jet takes

18 off from an airport.

19    But you don't need to worry about that, because we

20 have proposed in 24 hours/seven days a week house arrest.  I

21 mean, I trust Don Deluca enough.  I would authorize them to

22 shoot to kill if the Alexander boys violate the bond and they

23 are not going to do that.

24    THE COURT:  Well, Mr. Srebnick, and that is one of the

25 concerns that obviously they cannot do things like that because

1  they are not law enforcement.

2       MR. SREBNICK:  Law enforcement couldn't do that

3  either.

4       THE COURT:  Well, no, but you know --

5       MR. SREBNICK:  But, in any event, we are giving as

6  many conditions as the Court thinks is necessary, including

7  electronic surveillance of the place; video/audio, ankle

8  bracelets, alarms.

9       This is the proposals, but I do have some other legal

10  arguments to make, including rebutting the Government's claim

11  about extradition from Israel.

12       Would you like to hear that now?

13       THE COURT:  Oh, wait.  Let me hear argument, first,

14  from the Government.  I just want to make sure that concludes

15  your presentation as --

16       MR. SREBNICK:  As evidence is (inaudible).  That's it,

17  Judge.

18       THE COURT:  Okay.  Is there anything that the

19  Government wants to offer in rebuttal, or anything like that,

20  or are we just looking at argument at this point?

21       MS. ESPINOSA:  No, Your Honor.  Just argument.

22       THE COURT:  Okay.  Very well.  You may proceed.

23       MS. ESPINOSA:  Thank you, Your Honor.

24       Your Honor, can we see counsel.  Can we try to lower

25  this monitor?

1    THE COURT:  I can see him okay.

2    MS. ESPINOSA:  Your Honor, the Government is joining

3  in the recommendation of Pretrial Services here that the

4  Defendant be detained because there are no conditions or

5  combination of conditions that can ensure the safety of the

6  community and his appearance in court as required.

7    As we have made clear here today, the Government's

8  evidence shows that for 20 years the Defendant and his brothers

9  were engaged in a violent pattern of sexual assault and rape

10  where they drugged and raped dozens of women during that time

11  that we have identified so far.

12    And here I also want to emphasize that this is a case

13  where the presumption of detention applies.  There is a

14  presumption of detention on both danger and risk of flight

15  because the Defendant is charged with substantive sex

16  trafficking, as well as sex trafficking conspiracy, which are

17  charged under Chapter 77 of Title 18 and that carries a

18  presumption of detention.

19    Here the Government's evidence and the nature of the

20  offense makes clear that the Defendant is an extreme danger to

21  the community.  And I recognize that Judge Reid only found on

22  flight risk, but we respectfully disagree and believe strongly

23  that the evidence makes clear that the Defendant is an extreme

24  danger based on his own conduct and his involvement in this

25  case.

1    The Defendant and his brothers participated in

2 extraordinarily violent rapes and sexual assaults of woman

3 after woman after woman throughout the course of the charged

4 conspiracy.

5    Now Defense counsel tried to make much of the fact

6 that the Defendant is only charged in one substantive count.

7 But I want to be clear that he is also charged in the

8 conspiracy and there are countless additional victims that are

9 a part of that conspiracy.

10    And the Government's investigation is ongoing.  Since

11 the time of arrest we have identified approximately twelve

12 additional victims and we are continuing to investigate

13 actively now.

14    Now, the Defendant's dangerous and violent conduct

15 began all the way back when he was, himself, a minor in high

16 school here in Miami.  He and his brothers and their friends

17 participated in violent gang rapes of girls who they knew

18 through school, providing them with alcohol, and when they were

19 incapacitated raping them one after another.

20    And they joked about their conduct in school.  They

21 joked about running train on their victims.  Ignoring the

22 distress that they had caused and that violence only escalated

23 as they grew up.

24    When they became adults, when they were all living in

25 New York after college, their sexual violence became more

sophisticated and there was a layer of planning that wasn't necessarily there before.

Now as part of the conspiracy the Defendants met women in a variety of ways. Sometimes at a social event. Sometimes on a dating app and sometimes they arranged to transport women to them for the purpose of drugging and raping them.

They would induce those women to travel by offering them luxury experiences and travel to exciting places, to the Hamptons, to Tulum, and to other locations and would give them accommodations when they arrived.

They would buy tickets for their victims. And when the victims reached those locations at some point after arrival they would give them a drugged drink and when they were incapacitated would rape them.

Often while these victims screamed often physically restraining them. And victim after victim after victim has reported consistent accounts to the Government of suffering symptoms that are consistent with being drugged with a date rape drug like GHB.

They have reported feeling disproportionately incapacitated relative to the amount they had drunk. Feeling that they had lost control of their body. That they were unable to move their limbs. Some struggled to speak. They were utterly unable to stop what the Defendants were doing.

Now, the case of Victim Two, while it is only one

named victim is a particularly illustrative account and is an

egregious example of the Defendant's conduct here.

Now all three of the Defendants engaged in planning to

transport Victim Two and Individual One to the Hamptons for

this party. Their explicit agreement in advance was to orgy

the women that they were bringing after they bought them the

flights and transported them to the Hamptons.

And their brother Tal was engaged in communications

with a promoter to make sure that there were other hot girls

present for them that weekend.

Now during that trip, Alon assisted his brother Oren

to isolate Victim Two in another location of the house where

Oren violently raped her. And Victim Two reported being unable

to move and struggling to speak and unable to stop the

Defendant.

Now, Defense counsel spent a considerable amount of

time during his cross-examination talking about how Individual

One may or may not have still been in touch with the Defendant

after-the-fact.

That is irrelevant to whether or not Victim Two was

raped during this encounter. And there are countless reasons

why people -- and it is a well established phenomenon that

victims of various sexual assaults may remain in contact with

their abuser.

But I want to be clear that the messages that they put

1  forward that agent did not recognize are the photographs

2  after-the-fact are all with Individual One and they are not

3  with Victim Two.

4          And I want to be clear that that has absolutely

5  nothing to do with whether or not Victim Two consented to a

6  sexual encounter with Oren Alexander.

7          I also want to be clear that in these cases, the

8  Defendants didn't give their victims the opportunity to consent

9  to sex.  They gave them drugs and incapacitated them before

10  they got to that point.

11          They took the choice out of their victims' hands and

12  they did not even give them the opportunity to do so.  And it

13  is clear here that what the Defendants wanted to do throughout

14  that conspiracy was engage in these violent rapes of

15  incapacitated women.

16          That conduct is extraordinarily dangerous.  It is

17  violent in and of itself.  They physically restrained and held

18  down victims some of whom were screaming during these attacks

19  and they were doing this together.  They were doing it with

20  other men.

21          And we have absolutely to reason to think that their

22  danger to the community is abated by any conditions here.

23          Throughout the course of the conspiracy, as we

24  proffered earlier, there are certain victims who attempted to

25  speak up and the brothers hit back hard.

1           They threatened them.  They threatened defamation

2      lawsuits.  They frightened people who did not feel comfortable

3      coming forward until recently.

4           And Your Honor, I think that our view is this was a

5      crime where the evidence makes clear, this was a crime that was

6      committed in their homes.  It was a crime that was committed in

7      the places where they lived.  It was a crime that was committed

8      around their brothers.  Around their co-Defendants who

9      participated in these crimes.

10          We do not think that home incarceration, even under

11     the most stringent conditions, is truly sufficient to ensure

12     that the community is safe here.  The Defendants have acted

13     with impunity for most of their adults suffering absolutely no

14     consequences for their horrible actions.

15          And we have no reason to think that they would now

16     feel bound by this Court's rules and restrain themselves.

17          And I will also talk that the Government is also

18     seeking detention on the basis of risk of flight.  And I want

19     to be clear that the Government is not saying that it is

20     impossible to extradite people from Israel.

21          The Government is saying that it is difficult and it

22     is not guaranteed.  That we have consulted with the Office of

23     International Affairs who deal with extraditions from Israel

24     all of the time.  That is their function and that is what we

25     were advised.

1    But I also want to be clear.  If the difficulty of

2  extraditing these Defendants from Israel is, in fact, the key

3  consideration then we have already conceded that they are a

4  flight risk.  Extradition only matters once they fled and here

5  the Defendants have every incentive to flee.

6    Now counsel has made much of the fact that they didn't

7  flee after the accusations broke.  Those were civil lawsuits.

8  There was no possibility of jail time attached to that.

9    Now these Defendants have been charged with crimes

10 carrying a 15-year mandatory minimum sentence and looking at

11 the possibility of life imprisonment.

12    The Government's guideline calculation at this stage

13 indicates that the guidelines range is going to be life and we

14 continue to find more evidence and we continue to find more

15 victims.

16    And that case is only getting stronger and stronger as

17 time goes on.  The Defendants have every incentive to flee

18 rather than to face those charges.

19    And counsel made clear in their presentation that

20 money is no object.  Set a bond in any amount.  Whatever amount

21 the Court chooses.

22    That makes clear the depth of the resources that these

23 Defendants have if they are prepared to flee.  If money is

24 truly no object for a bond, money is no object to secure your

25 freedom to avoid spending 15 years at minimum in jail.

1        And this Defendant, in particular, has extremely

2    strong ties to Israel in particular.  His family is from that

3    country.  His grandmother still lives there.  His wife is a

4    citizen of Israel.

5        His wife's proffer of her evidence made clear that she

6    not only has deep family ties to that community, she spent a

7    considerable amount of time in a sensitive military position

8    and has military connections as well.

9        And in particular, it would be easy for this Defendant

10   to relocate to Israel and start over his life with very little

11   impact whatsoever.

12       And it is not just Israel that these Defendants could

13   flee to.  They travel internationally regularly.  Just this

14   year this Defendant has traveled to multiple locations in the

15   Caribbean by yacht.

16       Now, the Government does not get advance notice of an

17   individual getting on a private jet or by boat.  Does not get

18   advance notice of an individual getting on a private boat to

19   travel outside of the United States.

20       Particularly in a location like Miami where there are

21   countless ways to quickly access the water, a Defendant could

22   easily be away before the Government is in a position to stop

23   him.

24       Similarly with private jets we get very little advance

25   notice for international flights and effectively no advance

1  notice for domestic flights.

2       As we proffered earlier, the Defendant's brother Tal

3  was arrested in this district rather than in New York because

4  the night before the arrest he unexpectedly took a private jet

5  down to Miami.

6       The Government did not have advance notice and was

7  aware of that because it was tracking his cell phone.  And as a

8  result, it would be incredibly difficult for the Government to

9  prevent the type of travel that these Defendants very regularly

10 engage in.

11      They also plan their travel last second which means

12 additionally we do not get considerable advance notice even if

13 they are traveling through commercial channels.

14      Now, the Defendants have proposed putting up the

15 family's entire wealth for all three of the Defendants

16 collectively and we simply do not think that that is

17 sufficient.

18      Now, first of all, because the numbers certainly

19 appears inflated, given that it would be shared among the three

20 brothers here.

21      And it is additionally somewhat unclear and I will

22 have to speak to Defense counsel because I have not yet had the

23 opportunity to review the underlying documents here and if

24 there are any additional assets or this is the sum total of

25 their available resources.

1       Now and at least some of these properties are

2 mortgaged or shared with non familial investors.

3       Additionally, I think that the suggestion that a

4 private security company could allay the Court's concerns is

5 simply inadequate.

6       I want to be clear that a Court in the Southern

7 District of New York rejected just exactly this proposal in the

8 Sean Combs case very recently.

9       Sean Combs also proposed paying private security to

10 allow him to be released on bond pending trial and the Court

11 decided that that was inadequate to ensure the safety of the

12 community, to prevent him from engaging in obstruction of

13 justice, and to ensure his appearance in court.

14       I think Your Honor struck on the key issue with that

15 before that these individuals are not law enforcement officers.

16 They are not authorized to take all necessary means to ensure

17 that a Defendant does not flee.

18       And further, any private security company is going to

19 be provided by the Defendant.  The Defendant is the person who

20 is going to be paying that company.  And there is certainly a

21 conflict there in ensuring that those individuals feel

22 empowered to stop the Defendant should he engage in any

23 activity that violates the Court's conditions.

24       And Your Honor, here the nature of the charged crime

25 makes clear that these Defendants, and this Defendant in

1  particular, has never respected rules and boundaries throughout

2  his life.

3          He has never respected consent.  He has never

4  respected bodily autonomy.  We have no reason to think that he

5  will suddenly start respecting this Court's orders.

6  Particularly when flight from this jurisdiction could help him

7  to avoid an incredibly lengthy period of incarceration.

8          And just going back briefly to the issue of paying

9  private security, the Second Circuit and the case of *United*

10 *States v. Bustomi* (phonetic), it has made clear that if an

11 indigent Defendant would be detained for risk of danger under

12 similar circumstances, it is not appropriate.  And the Court

13 should not allow a wealthy Defendant to buy himself a private

14 jail rather than being incarcerated.

15         We do not treat wealthy Defendants differently than we

16 treated indigent Defendants.  And to allow this Defendant to

17 build a private security facility would simply be contrary to

18 the practices frequently engaged in, in the Southern District

19 of New York and in the Second Circuit.

20         So with that, Your Honor, the Government respectfully

21 requests that the Defendants be detained pending trial because

22 they are both a danger to the community and a severe risk of

23 flight.

24         THE COURT:  Okay.  Thank you, Miss Espinosa.

25         Mr. Srebnick.

1    MR. SREBNICK:  Your Honor, I don't know if you had a

2 chance because we did submit it late.  I submitted a memorandum

3 yesterday that addresses most of these points with case law.

4 If you haven't had a chance and wanted to review that, if you

5 wanted to perhaps break for lunch and --

6    THE COURT:  I did have a chance to take a look at

7 that, yes.

8    MR. SREBNICK:  Thank you, Judge.

9    And I have only met Government counsel today and I am

10 sure she didn't mean to insult anybody on a personal level, but

11 to suggest that Donny Deluca, Jim Milford, and DC Page are

12 corruptible because the source of their payment comes from --

13    THE COURT:  And I do not think that that is at all

14 what she was saying.

15    MR. SREBNICK:  I hope not.

16    THE COURT:  I understand that some people take it that

17 way, but I think in the context of her argument that is not.

18 She was simply identifying that there is a conflict.

19    MR. SREBNICK:  I'm not sure if any Court has suggested

20 there was such a conflict because --

21    THE COURT:  Well, there is clearly a conflict when the

22 jailer, if you will, is being paid by the person who is being

23 jailed.  How could their not be some conflict?

24    That does not mean that it is an irreconcilable

25 conflict, but anyway --

1    MR. SREBNICK:  Fair enough.  I think that the reason I

2    chose V2 Global is I thought that would ensure the Court that

3    given their law enforcement history that that would not be a

4    legitimate concern.

5         I also hear the Government suggesting that because

6    Alon Alexander, who is a U.S. born citizen, who has parents who

7    are also U.S. naturalized citizens who have emigrated from

8    Israel some 50 years ago that that somehow makes him a flight

9    risk.

10        And I suppose under that logic, so too am I since I am

11   a Jew who could go to Israel and seek citizenship and I am the

12   son of two Cuban parents.  I guess I could go to Cuba and my

13   grandparents are Polish and I suppose I could go there, too.

14        And I suppose with all of my flight history, I could

15   be accused of being a flight risk as well, but I hope that we

16   have come to the point where the Court is not going to penalize

17   someone because they are an emigrant and they are not going to

18   tell someone that they are a risk of flight even though there

19   is no evidence that Alon Alexander has any intention of

20   fleeing.

21        Just because his parents were born in Israel that is

22   not a basis to detain somebody and not a basis to say they are

23   a risk of flight.

24        And the fact that Alon Alexander has visited Israel

25   and has visited other parts of the world, as have I, I just

1 find that to be a troubling argument for the Government to make

2 when there is no evidence that there is any intention.

3 　　　　Anybody can flee.  You don't need a private jet.

4 Cubans come here on rafts every day and if someone wants to

5 flee they will flee wherever they go.  They will flee as we

6 know from the Magluda (phonetic) case and hang out in Orlando.

7 　　　　The point is that Alon Alexander has shown nothing to

8 the Court of an intention to flee this jurisdiction.  He has

9 known about the FBI investigation for months.  His wife has

10 known about it for months.  His parents have known about it for

11 months.  His brothers have known about it for months and here

12 they are.

13 　　　　On the question of Israel, because it seems like such

14 a sensitive topic and the Government continues to focus on it.

15 The U.S. Attorney's Office, as I cited, was the office that

16 prosecuted Seth Rosenstein (phonetic).  I was the lawyer in

17 that case representing an Israeli citizen extradited by Israel

18 to face charges in the U.S.

19 　　　　There is no impediment, none, to extraditing a U.S.

20 born citizen to come back.  If a U.S. born citizen thinks he is

21 going to get on a plane without a passport and sneak his way

22 into Israel while it is under war and hide there during the

23 course of a federal criminal case.

24 　　　　The suggestion is not really even worth responding to,

25 except the Government continues to repeat that even though

1  Judge Reid, herself, rejected that as a basis.  Judge Reid also

2  rejected as a basis the danger to the community.

3          THE COURT:  Well, Mr. Srebnick, she did not really

4  reject the danger to the community.  She just simply found that

5  they could impose conditions that would address it.

6          MR. SREBNICK:  Fair enough.

7          And so I think I have suggested conditions the most

8  onerous as possible to address that, but I think the record at

9  this point is quite clear from the presentation today.

10          There is no evidence that Alon Alexander has assaulted

11  anyone.  And if you believe the 2016 allegation, just for

12  purposes of probable cause, no one since 2016.  There has been

13  no identification of a single person Alon Alexander has

14  assaulted, even allegedly, since 2016.

15          I asked the witness that.  He had not identified

16  anyone from 2016 all the way to 2024.  Since then Alon

17  Alexander has married.  You met his wife today.  They have two

18  children.  They have a neighborhood of friends who all have

19  great respect for him.

20          And he has shown no propensity to commit a single

21  crime, federal crime, or sexual assault, or violent crime in

22  the years that we have described here since 2016.  Even if we

23  have to address the allegation, which I think at this point,

24  you have heard enough about the weakness of the Government's

25  case.

And I would suggest the Court should think twice about the idea that there should be some sort of presumption when you have heard today that the accuser did not stand before the Grand Jury and take an oath and make an accusation before the Grand Jury.

So the accuser, Victim Two, supposedly never testified against Alon.  We are hearing summary from a witness today, the agent, who really has no knowledge about the case.  And yet, the Government is relying heavily on this presumption under the statute which, of course, is rebuttable.

The Government raises a few issues that I am going to ask Miss Paul to address.  Particularly the Sean Combs case and the issue of the other case.  If you want to address the other -- one moment.

Let me introduce the Court to Deanna Paul.

MS. PAUL:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MS. PAUL:  So, Your Honor, if I may approach?

I have a copy of the detention letter in the Combs case, which since counsel brings it, I think it is something that the Court should review in its entirety.  So I am showing it to counsel.

MS. ESPINOSA:  Your Honor, just to be clear for the record, I thought Miss Paul was representing Tal Alexander and not Alon Alexander; is that correct?

1        MS. PAUL:  It is correct, but I also represent Tal on

2 the civil matters and counsel for (inaudible) on the federal

3 civil matters (inaudible).  So as it relates to --

4        THE COURT:  I'm sorry.  I can't hear you from there.

5        MS. PAUL:  Yes.  I represent Tal Alexander both in the

6 federal civil and federal criminal cases, but in the federal --

7 in all of the cases Alon Alexander is a co-Defendant and I am

8 familiar with -- I mean the totality of all of the matters that

9 have been brought against them.

10        THE COURT:  So you are making -- but you are not

11 representing this Defendant?

12        MS. PAUL:  No, Your Honor, but we are in a joint

13 defense.

14        MR. SREBNICK:  May we approach sidebar just for one

15 moment so I could alert the Court to one issue with counsel?

16        THE COURT:  Sure.

17 (Sidebar discussion.)

18        MR. SREBNICK:  The Government raises Sean Combs in

19 that case.  I represented P. Diddy.  I just don't feel

20 comfortable in trying to distinguish the bail conditions for

21 Diddy.

22        THE COURT:  Okay.

23        MS. PAUL:  And so I -- perhaps.

24        THE COURT:  Okay.  I will address this on the record

25 and you can --

1          MS. PAUL:  I could limit it to just (inaudible).

2          THE COURT:  We can.  Don't worry.

3          MS. PAUL:  Thank you.

4          THE COURT:  Okay.

5    (Sidebar concluded.)

6          THE COURT:  Okay.  Let me just say for a moment, as I

7    understand it, your presentation now is only dealing with the

8    Sean Combs matter.  And frankly, I will not say that it is

9    irrelevant to this matter, but my decision will not be based on

10   that.  So I don't think we need to hear anything on that.

11         That is an example of -- I understand and I do not

12   find that this if such conditions are not favorable that sort

13   of condition is not something that would be legally

14   unavailable.  So I don't think that is something that you need

15   to address further if that was the point of your presentation.

16         MS. PAUL:  Yes, Your Honor.

17         THE COURT:  Okay.

18         MR. SREBNICK:  And so in the memorandum that we

19   submitted yesterday, we addressed arguments the Government

20   makes about foreign ties and wealth.

21         Interestingly, in the Seth Rosenstein case, an Israeli

22   citizen extradited here, because of the Government took Judge

23   Dimitrouleas approved a bond of ten million dollars for Seth

24   Rosenstein, who is an Israeli mobster.  He didn't post it, but

25   that was the bond that was set.

1       In a case involving a Pakistani citizen, who lives in

2  the UAE, two countries that don't have treaty relationships

3  with the United States like Israel does.

4       Judge Middlebrooks approved a bond set by Magistrate

5  Judge McAliley for Byron Javat (phonetic), also a client of

6  mine, where the Judge set conditions of financial conditions

7  and house arrest for a Defendant, I might add, who provided no

8  financial disclosure.  None.

9       And the argument in that case was, Judge, you should

10  assume he has money to flee.  He is not making any financial

11  disclosures.  He is a Pakistani citizen and he lives in the

12  UAE.  He is not a U.S. resident and both Judge McAliley and

13  Judge Middlebrooks were satisfied that conditions could be

14  fashioned in a case involving a 60 million dollar fraud.

15       In the case of the former comptroller of Ecuador,

16  Carlos Polit (phonetic), his bond was set.  He was placed on

17  house arrest.  He fully complied and went to trial and appeared

18  as required before Judge Williams.

19       He was convicted.  He got taken into custody.  No

20  issues.  He was on electronic monitoring.  Foreign national

21  Ecuador with a dual citizenship.

22       In *United States v. Wakil*, Venezuelan national charged

23  with corruption and fraud.  Placed on house arrest.  He lived

24  at his waterfront condominium in Coconut Grove and was not a

25  cooperator and did not plead guilty.

1    He actually passed away while on pretrial release of a

2 heart attack at his waterfront home fully compliant with all

3 conditions of release.  Including posting a significant

4 financial bond of roughly I think 20 or 25 million dollars that

5 he posted to secure his release.

6    So the notion that wealth is a reason to detain

7 someone is a bit troubling because under that logic a family

8 like the Alexanders who are self-made people -- they didn't

9 inherent the money.  They were not gifted the money.

10    The mother and the father, Orly and Shlomy, got here

11 as emigrants and they made the American dream come true by

12 going to school, educating themselves, and starting a business

13 and everything that they have made, they made with their own

14 work.

15    And the fact that they have been successful and that

16 their sons are successful should not be a basis to deny them

17 and to just presuppose that wealthy people will flee because

18 they have wealth.

19    That is a circular argument that I could never defeat

20 .  It would be just to say that a poor person should be denied

21 bail because he has nothing to lose.

22    So what is it, Judge?  Poor people get bond, but

23 wealthy people do not, or vice-versa.  So I don't know if the

24 middle class are entitled to bond under the Government's logic,

25 but what we have offered you today is more than anyone in this

1  district, I think, has ever offered.

2       The parents have given you a financial statement.

3  They are showing you that they are taking the Emperor's clothes

4  off.  Here is everything that we have.

5       And we are so confident that our sons will not betray

6  our trust and the Court's order that we are prepared to lose

7  everything we have built in this country for 50 years; their

8  homes, their businesses, their assets, their livelihood,

9  everything.

10       What more can we offer the Court to ensure both that

11  the boys will stay home.  No one is going to be hurt.  No one

12  has been hurt.  No one has alleged that they have been hurt in

13  more than five, six, seven years.

14       You heard from the wife.  They have been living a

15  quiet life in the neighborhood.  The neighbors are here.  You

16  could be quite sure that under the supervision of Pretrial

17  Services, under the supervision of Deluca, DC Page, Jim Milford

18  and their company V2 Global, that there ain't going to be any

19  criminal activity going on in whatever residence Your Honor

20  prefers that they reside in whether it be waterfront, house,

21  condominium.

22       It makes no difference.  They are prepared to abide by

23  all those conditions to assure the Court they will be where

24  they need to be and there will be no criminal activity pending

25  the trial.

1    If I could just have a moment.

2    I think it goes without saying, but you have heard

3  that the suggestion that because the Alexander brothers, either

4  filing defamation claims or reporting to the police defamation

5  that that constitutes a danger to the community, that seems far

6  afield from what the pretrial detention statute was doing.

7    Even Judge Reid commented that reporting something to

8  the police or filing a lawsuit is not a basis for detention in

9  and of itself.

10    Unless the Court has questions.  Which I am prepared

11  to answer, I think you have heard everything you need to hear

12  to make a decision.

13    We understand, of course, that whatever decision you

14  make, the Government is likely to appeal if it is a release and

15  for the Judge to seek a stay.

16    And we think it is important that Your Honor, despite

17  Reid's finding in her case where she had found that the lawyers

18  for Tal had not made an adequate record of the family's

19  finances.

20    I think we have overcome what Judge Reid thought was

21  the problem and the reason why she denied bail and denied an

22  opportunity to re-open on the basis that this kind of evidence

23  should be presented now.

24    All of the arguments that were not made in front of

25  the Court, before Judge Reid, and I hope that we have addressed

all of those concerns.

We have laid it out in our memorandum.  If the Court wants to take more time or the rest of the day or tomorrow to think about it, what we are looking for is to satisfy you that Alon Alexander will abide by any order you set in this court and we are prepared to wait for the right answer for that.

And we are prepared to answer any questions you have and we will take any suggestions from the Court about conditions that you think would be appropriate.

Thank you.

THE COURT:  Okay.  Miss Espinosa.

MS. ESPINOSA:  Thank you, Your Honor.

Now counsel said that the Defendants have known about this FBI investigation for months.  I am not aware of evidence to that effect, but that is besides the point.  The point is now it is real.

Rumors of an FBI investigation is different than the filing of charges.  And now they are facing a 15-year mandatory minimum and that carries every incentive for them to flee.

And again, to be clear, Your Honor, we are not arguing that they should be detained because they come from emigrant families.  We are arguing because that they should be detained because they are an extreme danger to the community.

And that they are a flight risk and that their history and characteristics, their individual circumstances give them

1 the means and opportunity to flee more easily than most.

2          Now, I also want to clarify one point that counsel

3 said that there is no allegations or no evidence that anyone

4 has accused Alon Alexander of assault of the 2016 assault.

5 That is not what the witness said.  She said she was unaware of

6 any at this time.

7          And as to the question of whether or not the

8 Government would typically call a victim and put them on to

9 testify in the Grand Jury and the fact that we did not do so

10 here somehow suggests a weakness in the case.  As the Court

11 well knows that is neither required nor customary in federal

12 practice.

13          And as for each one of those cases that the Defendant

14 listed out, I am not familiar with the individual circumstances

15 there, but at least some of them were clearly nonviolent

16 offenses.

17          At least some of them were fraud cases.  Those are

18 cases where the primary contention is risk of flight and there

19 is not the underlying element of extreme danger to the

20 community that is present here and that is extremely

21 distinguishable.

22          It is a very different situation to detain someone who

23 is facing a fraud charge, which typically carries a 20-year

24 statutory maximum, though it could be different depending on

25 individual circumstances.  And a dangerous violent sex

1   trafficking offense that carries a 15-year mandatory minimum

2   sentence.

3         And the incentive is simply different in those cases

4   and we respectfully submit that there are absolutely no

5   conditions or combination of conditions that would ensure the

6   safety of the community or the Defendant's appearance in court

7   as required.

8         If the Court has any questions we are happy to address

9   them.

10        THE COURT:  I have a number of questions for each of

11  you.

12        And they all focus primarily on the issue of flight.

13  As Judge Reid was concerned, that is my primary concern.

14        At this point, let me ask the Government, because I do

15  think that there is a very serious risk of flight here.  And I

16  am concerned because, Mr. Srebnick, despite what you said, I

17  think the foreign contacts -- it is not that the parents are

18  emigrants.

19        It is that there are continuing contacts with those

20  foreign countries.  And given the nature of the charges here,

21  the minimum mandatory and the life sentence exposure, when

22  dozens of victims are complaining of these offenses is severe.

23        I mean, the question really is not whether there is

24  that question of flight.  In my opinion it is simply whether

25  there are any combination of conditions that can do it.

1      I understand what has been offered by the family in

2 terms of their willingness, as you said, to be put destitute

3 and that their money is no object.

4      And I will say that I find that the family's care for

5 these three men to be extraordinary in many ways, but I am also

6 concerned that it really shows the fact that they are

7 absolutely willing to go destitute in order that they could

8 escape and not serve potential life sentences.

9      And that is really the concern, right?  There are

10 cases where someone puts it up and there is, you know, they

11 don't want to.  There is not that willingness here.

12      I am not sure that with three members of the family

13 subjected to these penalties that the family isn't willing to

14 do whatever is necessary, or risk whatever is necessary so that

15 they do not have to face those sentences.

16      And that is really a large part of what my concern is

17 tied to these other issues.  But having said that, I am willing

18 to know from the Government -- because I am concerned and I

19 think, you know, and I am not sure how it will work because I

20 don't think it has always worked, the home confinement with

21 private security.

22      In my recollection, going way back I can think of an

23 example which I cannot identify by one at least one individual

24 who I think under circumstances like that did, in fact, flee.

25      I do not know what the security concerns are.  This is

some faint memory from way back and part of it is, you know, as

honorable and reputable as Mr. Deluca and his school company V2

may be, you know, they are not law enforcement.

They cannot, I think, contain an individual who is set

on fleeing if that is what is happening. They might be able to

report it if they see it.

I am also concerned that this individual works in the

security business and might have notions and ideas on how he

could evade that security.

You know, this is a family that is in this business.

And you know, while had an ordinary person might not have any

sorts of ideas, this may be a person who can and that is very

concerning to me.

But let me ask you, Miss Espinosa, from the

Government's perspective why can this not work?

MS. ESPINOSA: Well, Your Honor, I think it can't work

for a number of the reasons that Your Honor has just

highlighted.

First of all, they are not law enforcement officers.

They do not have the authority to physically restrain and stop

an individual set on fleeing.

If they are restricted to calling the Marshals, or

calling the FBI, or calling the police, it is too late. These

Defendants can cut an ankle bracelet and be on their way and

have enough of a head start that would be extraordinarily

1  difficult, if not impossible, for law enforcement to catch up

2  with them.

3        And without knowing the specifics of a particular

4  property that would be the exact location for this, we don't

5  know how easy it would be within that property to evade

6  detention by security to exist the premises undetected.

7        And I know counsel has thrown out the possibility of

8  renting an apartment, but that is all hypothetical.  We cannot

9  agree to a bail package that involves private security at a

10 private residence based on a hypothetical.

11       And here, we think that the -- absolutely no

12 disrespect to the proposed security company here, but we do

13 think that the conflict between the security guards jailing the

14 person, paying their tab is a real consideration and we do have

15 concerns about that.

16       We also simply think that given the limited scope of

17 their authority they are not going to be equipped to deal with

18 a real serious flight risk in the moment that it is happening.

19       With Defendants who have access to boats, who have

20 access to significant resources, who have access to private

21 jets , if they get on one of those vehicles between the time

22 they leave their property and the time that the FBI is able to

23 find them, they are gone and we would have extraordinary

24 difficulty getting them back.

25       And I simply do not think that there is any private

security company that could do effectively what we know the
United States Marshal's Service or the Bureau of Prisons is
specifically designed to do, which is to keep people safely
detained and prevent them fleeing in advance of their trial.

So we simply do not think that the authority that
these people would be imbued with would be sufficient under the
circumstances.

THE COURT:  Mr. Srebnick.

MR. SREBNICK:  Judge, I would like to suggest a few of
the points that you have made.

Let me start with telling you that in this district,
1999, Chris Ludison accused of racketeering, conspiracy, and a
murder who is also known as Chris Paselo.  He was arrested in
this district on a removal to New York, Eastern District of New
York where the Court there and here set a bail condition
similar to what we are proposing, although not nearly as
onerous as I am proposing and it was successful.

He was accused of murder because I know you are
worried about -- the Government is worried about violent crime.
So that was a violent crime case where bail was set and it was
done with private security in New Jersey or Statin Island and
that was a serious crime case.  A woman was killed in that case
and he was (inaudible).

THE COURT:  Mr. Srebnick, you do not have to convince
me that as a categorical matter, if you will, that a bond can

1  be set in this case.  The issue is not a categorical argument

2  and I am not looking at it that way.

3       This is really about the individual circumstances of

4  this case.  The individual charges.  The nature of the case.

5  You know, the Defendant's particular ties and the

6  circumstances.  That is all that is playing in.  It is not a

7  categorical thing.

8       MR. SREBNICK:  Got it.

9       THE COURT:  Can bond be granted in some cases like

10  this and meet these conditions?  Yes.  In other cases can it

11  not?  Also yes.  And that is really what we are here on and

12  this is turning on the facts and not on the law.

13       MR. SREBNICK:  So if he was a U.S. born with U.S. born

14  parents with no foreign ties, then the theory is he would not

15  flee the United States, but maybe he would hide in Orlando

16  where one of the alleged cocaine cowboys spent 25 years on the

17  run.  He didn't have to go back to Cuba or anywhere else.

18       This idea that because someone has foreign ties they

19  are likely to leave the United States and be an international

20  fugitive, they will be apprehended, whoever does that, because

21  if you try to fly internationally and you try to land in a

22  foreign country like Israel as the Government is suggesting

23  that Alon would do, this is fanciful and no one can defend

24  against that type of --

25       THE COURT:  Again, Mr. Srebnick, I think the

1  Government has made this point, but I do not think it needs to

2  be made.

3         The issue is not whether someone who flees can be

4  returned.  That is never the issue on the bond consideration.

5  It may factor in the background, but the issue --

6         MR. SREBNICK:  I think the issue is whether he is

7  going to do it.

8         THE COURT:  That is the issue.  This is whether under

9  the circumstances what he faces and what his --

10         MR. SREBNICK:  Right.  So he is basically being

11  penalized by his family's national origin of Israel because if

12  he was a U.S. person they couldn't even make these arguments.

13  And plenty of Americans travel internationally.

14         The wealthiest people in our community travel all over

15  the world and have ties and homes in foreign countries.  I was

16  with people who have homes in Spain and have homes in other

17  countries and that is not the issue.

18         THE COURT:  I disagree with you, Mr. Srebnick.

19         If this was a Defendant who had a home in a foreign

20  country, that would absolutely increase the likelihood of

21  flight.

22         MR. SREBNICK:  It would increase the person's options,

23  but that does not mean they are going to do it.  And he does

24  not have a home in a foreign country.

25         And the notion that because he owns Kent Security,

which they do condominium security basic condominiums and you
have seen Kent perhaps around the community.

He is a lawyer who started expanding the family's
business into the New York area.  He is an investor but he,
himself, is not James Bond or does any those kinds of -- I
presume that Orly is not also out there chasing down people
because she is the owner of the security company and the CFO.

Alon is a trained lawyer and a businessman.  He is not
in the real estate business.  He is in that security business.

And the Government has just done nothing specific
about him as a person other than accusing him of a crime
through accusers and we don't need to get into the issue of the
strength or the weakness of the Government's case because the
Government always tells you that they have a strong case.
Every case they come in here and tell you it is a strong case.

The issue is -- and today we are only dealing with
Alon.  One human being today and today the family says, Judge,
we will give you everything.

And I think you want a family that says that.  Don't
begrudge them because they are willing to risk everything to
satisfy you that they believe in their son.

If they told you, Judge, we will only give you one
hundred thousand, or let's cap it at a thousand, or let's cap
it at a million.  The argument would say that the family is not
willing to put up everything they have.

1    You can't whipsaw these Defendants that way that the

2 Government does.  They are willing to put up everything and

3 that's no good.  They are willing to put up some and that's no

4 good.

5    The issue is has this man given you any reason to

6 believe that he, who has been a family man for five years, no

7 arrests in his life, no criminal convictions, a U.S. born

8 citizen with the strong ties.  He was born at Mount Sinai

9 Hospital that is going to disobey the court order and

10 jeopardize his family's future.

11    Because he has to think if he is going to flee he is

12 going to get away with it.  Nobody is going to flee if they

13 thought they would get caught.  And there is no reason to think

14 that Alon Alexander has any reason to believe that he is going

15 to abandon his family, destroy them, leave his two brothers.

16    One of them has already been denied bail.  Tal didn't

17 get bail yet.  He has to appeal that.  Oren hasn't had bail and

18 finished yet, but we are talking about Alon.

19    And if he was the only person in this courtroom, I

20 think that it would be a solution that we have given you would

21 be the obvious one.  Put the family in financial destitute if

22 he flees.

23    Hire a reputable company like Page and Deluca offer

24 you.  Give every option to the Court to ensure compliance.

25 Although much of it is unnecessary because the one thing you

1   have is the commitment of the family that they are willing to

2   give up everything they have to show you their commitment that

3   their son will appear.

4           And I would like to answer any other questions that

5   you have about that because I worry that we are getting to the

6   point where wealthy people cannot post bail because they have

7   too much wealth, or they have traveled too much in their

8   lifetime and they have friends in foreign places.

9           I hope we are not going in that direction for Alon

10  Alexander.  We have his passports.  We have his family's

11  passports.  We have his children's passports.  Where is he

12  going?  Where is he going?  Does the Government really think

13  that he is going to escape to Israel?

14          MR. SREBNICK:  Judge, a couple of things.

15          If the Government is concerned about the waterfront

16  home and says, well, you can't set a hypothetical bond, take a

17  pause.  We will give the Government a different address on a

18  high floor in a building with one way in and one way out if

19  that is the concern.

20          It is not hypothetical.  We are saying to the Court

21  you tell us what would satisfy you and we will satisfy it.

22  Don't penalize us because we are trying to read minds here.

23          We have offered you the home of the parents.  The home

24  of the Defendant.  The home of the uncle, but if a lakefront

25  home in Broward is no good, we will get a condominium on a high

1  floor and we will have no balconies if that helps.

2       I just find it difficult to ever satisfy the

3  Government.  Every time you offer something they will say it is

4  hypothetical, but we can do it.  We are not in a rush.  We can

5  take a day or two and we will get a lease.  We will show you

6  the place.  We will let the Government come in and inspect it.

7  They can hire their own people.

8       We are offering everything that we can to show you

9  that the family means business.  If the Deluca firm is, for

10  some reasonable, unreliable let the Government pick the

11  security firm.  Let it be a firm that they are confident in.

12       You cannot give us an impossible burden to satisfy.

13  That is just not right for the Government to expect that of a

14  Defendant.  Tell us what we need to do and we will do it.

15       THE COURT:  Okay.  This is what I am going to do.

16       And I am largely doing it because of the hour and

17  because the Defense has made the request and the afternoon

18  calendar is set to start in 15 minutes and there is another

19  hearing that was scheduled to start at 11:30, but I wanted to

20  make sure that this has the time it deserves and needs.

21       I remain very concerned about the risk of flight, but

22  I am concerned as well because on some levels this is close

23  because of the conditions that are being offered.

24       I do not think the conditions as they have been set

25  forth at this point I think are sufficient to satisfy me

1  looking at this record, but I think some of the things that you

2  have suggested, a different location, that there may be some

3  circumstances where security can be had.

4       And the Government had a made a comment at some point

5  also suggesting that the hypothetical wouldn't be good, but the

6  -- and I am not suggesting that you would agree to it and I am

7  not in any way suggesting that you would agree to it, but if

8  there is some different possibility, I would want to make sure

9  that it is considered.

10       I am concerned as well.  I know you are making the

11  argument that the wealthier are being denied, but at the same

12  time there are circumstances where someone who wasn't wealthy

13  would not even be able to offer this security option because I

14  think that security option is really the only thing that is

15  potentially keeping this in place, making the detention versus

16  bond decision viable at this point.

17       Because really, you know, looking at what is going on,

18  the nature of the circumstances of the offense here, the weight

19  of the evidence, the dozens of victims spanning years from

20  different places.

21       I know your argument is that the weight of the

22  evidence is not strong, but it seems to me that it is very

23  strong and certainly strong is in the nature of creating an

24  incentive for someone to consider fleeing.

25       Tied with the minimum mandatory sentence as being

1  faced here and the potential life in prison.  And while I am

2  concerned with the Defendant individually, the fact that his

3  two brothers are involved in facing the same penalties also

4  adds to the incentive to flee.

5         This is a case that if the Government is right and if

6  the evidence establishes this case that would destroy this

7  family, right?  This isn't just a matter of being destitute.

8  This is a case where, you know, three of the four children of

9  this family could potentially be in jail for life in one case.

10         And it is extraordinarily unusual circumstances and I

11  think very troubling, but I want to make certain before I make

12  this decision that if there is any other option to consider

13  that it is considered.

14         So what I am going to do and I am going to reset this

15  for 11:30 tomorrow.

16         Does that --

17         MS. ESPINOSA:  Your Honor, would it be if counsel is

18  amenable, could we potentially do it on Friday with Oren's

19  hearing as I am traveling back and forth.

20         I can, of course, change my travel if that is

21  necessary, but if that would be mutually convenient to conduct

22  Oren's hearing, as well as to finish argument on Alon's hearing

23  on Friday, potentially that would be a solution.

24         THE COURT:  Let me make sure the Defense -- I am

25  certainly willing to consider that, but I want to make sure

1  that -- and tomorrow is difficult because the court is closing

2  at 2:00 and --

3     MR. SREBNICK:  If Your Honor is suggesting that we can

4  present an additional option -- for example, I am going to make

5  this up.  A 55th floor condominium with one way in and one way

6  out and you want us to bring it to you so that --

7     THE COURT:  You are not suggesting that there could be

8  options like that and the Government has talked about

9  hypotheticals.

10     And I agree with the Government.  A hypothetical is

11  not going to establish -- but if there is something that is

12  concrete and it sounds, Mr. Srebnick, like you were suggesting

13  like there is something that might -- and I don't want to put

14  words in your mouth, but it seems to me like that was a

15  developing thing but --

16     MR. SREBNICK:  So Friday is fine, Judge.

17     THE COURT:  Okay.  So, then, let's continue this

18  hearing until Friday for presentation on that topic.

19     MR. SREBNICK:  If I can just have one moment with

20  counsel.

21     U.S. PROBATION:  Your Honor, Pretrial Services.

22     We would request that they confer with us also as to

23  the conditions since we will be ones supervising him if he is

24  released.

25     MR. SREBNICK:  No objection.

1          THE COURT:  Yes, I ask that that be done, but both the

2    Defense and the Government confirm with Pretrial Services as to

3    any proposal that may be offered.

4          U.S. PROBATION:  Because we will have a list of our

5    own conditions that we will be requiring.

6          THE COURT:  And I want to make clear that I not

7    suggesting that that is an option that I will except, Mr.

8    Srebnick.

9          But that is certainly something that I am willing to

10   consider and would like to hear and determine whether or not

11   that is something that could satisfy the conditions.

12         I just want to be clear on that.  I am not deciding

13   here today yeah or nay on that.  I am deferring that until the

14   presentation to make that decision.

15         MR. SREBNICK:  One more moment, Judge.

16         Thank you, Judge.  That will be fine.  We will see you

17   Friday.  What time do you want us?

18         THE COURT:  We will set it for, I think, we have

19   Defendant Oren Alexander at 10:00 a.m.

20         Is that right?

21         THE COURTROOM DEPUTY:  Yes, Judge.

22         U.S. PROBATION:  We will see you then.

23         MR. SREBNICK:  Thank you for all the time you have

24   given us.

25         THE COURT:  Okay.  Thank you.

1          THE COURTROOM DEPUTY:  All rise.

2          MS. ESPINOSA:  Your Honor, if I may?

3          They are not providing another witness for Friday at

4    this point in time.

5          THE COURT:  That is my understanding.

6          And I know Mr. Klugh is back there.  I just want to be

7    clear for, if you would, Mr. Klugh and I know we continued the

8    case and I know Defendant Oren Alexander is here as well.

9          You never require a witness from the Government on

10   Friday; is that true?

11         MR. KLUGH:  Your Honor, we do not think the Government

12   has presented a witness today to be quite honest, very

13   seriously.  And we are going to present a motion for that, but

14   we are not in the position to compel them to call a witness on

15   Friday given our agreement.

16         MR. SREBNICK:  I might say, Judge?

17         We were prepared to subpoena for today Victim Two and

18   Individual One to come to court.

19         The Government suggested that that would be harassing

20   or inappropriate.  I decided to delay that strategy, but if the

21   Court has any thought about the reliability, credibility of the

22   accusation.

23         THE COURT:  The evidentiary presentation in terms of

24   your client is completed.

25         MR. SREBNICK:  She is also accusing Oren Alexander.

1        THE COURT:  I understand.

2        But my understanding is they were not seeking a

3 witness or were not doing anything else from Mr. Klugh's motion

4 to continue that hearing and the agreement that was made with

5 the Government.

6        MR. SREBNICK:  I am not requiring of the Government.

7 I am saying we were going to subpoena.

8        THE COURT:  No, no, I understand, but you didn't.

9        MR. SREBNICK:  Not yet.  That's right.

10        MS. ESPINOSA:  And Your Honor, I want to be clear that

11 we would view that as utterly inappropriate in this

12 circumstance and would seek to quash any such subpoenas.

13        This not an appropriate -- this is not a mini trial.

14 This is not the time to challenge the underlying --

15        THE COURT:  Look, I am giving you an opportunity to

16 present another option on Friday in terms of what can be done

17 to secure -- I am not reopening the evidentiary presentation.

18        You told me that you were concluded with your

19 evidentiary preparation and I am not going to reopen it for

20 that for something that you could have done for today.

21        And I think, Government, I don't know if that would

22 have changed anything anyway.

23        MR. SREBNICK:  Understood.

24        THE COURT:  Okay.

25        MS. ESPINOSA:  Your Honor, may the Government retain

1    copies of the Pretrial Service Report?

2           THE COURT:  Yes.  The Government will retain the

3    Pretrial Services Report until Friday.

4             (Thereupon, the proceedings concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

I hereby certify that the foregoing transcript is an accurate transcript of the audiotape recorded proceedings in the above-entitled matter.

01/01/25
                          Bonnie Joy Lewis,
                  Registered Professional Reporter
                     CASE LAW REPORTING, INC.
                      7001 Southwest 13 Street,
                  Pembroke Pines, Florida 33023
                           954-985-8875