P1FKALEC1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

          v.                                24 CR 676 (VEC)

ALON ALEXANDER, OREN
ALEXANDER, TAL ALEXANDER,

                                   Conference

          Defendants.

------------------------------x

                                   New York, N.Y.
                                   January 16, 2025
                                   1:30 p.m.

Before:

                 HON. VALERIE E. CAPRONI,

                                   District Judge

P1FKALEC1

```
1                                    APPEARANCES

2   EDWARD Y. KIM
          Acting United States Attorney for the
3         Southern District of New York
    ANDREW JONES
4   ELIZABETH ESPINOSA
    KAIYA ARROYO
5         Assistant United States Attorneys

6   BLACK SREBNICK PA
          Attorneys for Defendant Alon Alexander
7   BY:  HOWARD M. SREBNICK

8   KLUGH WILSON LLC
          Attorneys for Defendant Oren Alexander
9   BY:  RICHARD C. KLUGH
          JENNY WILSON
10

11  WALDEN MACHT HARAN & WILLIAMS LLP
          Attorneys for Defendant Tal Alexander
12  BY:  MILTON L. WILLIAMS
          ALEXANDER KAHN
13        DEANNA PAUL

14  Also Present:

15  Ashley Cosme, Pretrial Services Officer
    Antonio Pagan, NYPD, Detective
16  Justine Atwood, FBI, Special Agent

17

18

19

20

21

22

23

24

25
```

P1FKALEC1

```
 1              (Case called)
 2              MR. JONES:  Hello, your Honor, good afternoon.
 3    Andrew Jones, Elizabeth Espinosa, and Kaiya Arroyo, for the
 4    government.  With us today are Special Agent Justine Atwood and
 5    Task Force Officer Tony Pagan, from the FBI, and at the end of
 6    the table is Ashley Cosme, from pretrial.
 7              THE COURT:  Good afternoon.  The front table can sit
 8    down.  Everybody that's not an attorney can sit down.
 9              Let's go from this end.
10              MR. SREBNICK:  Good afternoon.  My name is
11    Howard Srebnick.  I'm a member of the Florida and California
12    bars.  I've been admitted, thanks to your Honor, pro hac vice
13    for this appearance today.  I represent Alon Alexander.
14              THE COURT:  Good afternoon.
15              MR. KLUGH:  Good afternoon, your Honor.  My name is
16    Richard Klugh.  I'm here with Jenny Wilson, my partner.  We
17    represent Oren Alexander.
18              THE COURT:  Good afternoon.
19              MR. WILLIAMS:  Good afternoon, your Honor.
20    Milton Williams, for Tal Alexander, by the firm of Walden Macht
21    Haran & Williams.  My two colleagues, Deanna Paul and
22    Alex Kahn, are with me.
23              THE COURT:  Good afternoon.
24              MR. WILLIAMS:  Good afternoon.
25              THE COURT:  Y'all can sit down.
```

P1FKALEC1

1          First off, before we start anything, let me confirm

2     with all of the defense attorneys, you've each indicated that

3     you waive the presence of your client.

4          Is that correct, Mr. Srebnick?

5          MR. SREBNICK:  Correct, your Honor.

6          THE COURT:  Mr. Klugh?

7          MR. KLUGH:  Yes, your Honor.

8          THE COURT:  Mr. Williams?

9          MR. WILLIAMS:  That's correct, your Honor.

10          THE COURT:  Just to be clear, I agreed to this because

11     of the unusual circumstances of your client not being removed

12     up to New York.  This is kind of a one-time thing.  I don't let

13     defendants waive their appearance at court appearances, but I

14     agreed for this time.

15          So, this is a defense appeal of the magistrate judge's

16     determinations in Florida.  So, who wants to talk first?

17          MR. WILLIAMS:  Your Honor, I will go first.

18          THE COURT:  Mr. Williams.

19          MR. WILLIAMS:  Yes.

20          THE COURT:  You have the floor.

21          MR. WILLIAMS:  Thank you, your Honor.

22          So, your Honor, good afternoon again.

23          Just to give you an idea of how we'd like to proceed,

24     I am going to take the lead and present a number of factors

25     that I think will absolutely pertain to Alon Alexander and also

P1FKALEC1

1    to Oren.  After I finish my presentation, my colleague,

2    Ms. Paul, has a little bit more that she would like to present,

3    and then Mr. Srebnick and Mr. Klugh will do whatever they need

4    to do on behalf of their clients.

5         THE COURT:  Okay.  You're doing the overarching, what

6    you think is sort of the overarching, facts you want me to

7    consider?

8         MR. WILLIAMS:  That's exactly right, your Honor.

9    Everything that's salient with regard to all the defendants.

10         THE COURT:  Just a reminder to everybody, you always

11    need to be talking into a microphone.

12         MR. WILLIAMS:  So, your Honor, just to start off, I'm

13    going to start where I'm going to finish, and I neglected to

14    mention, when I introduced who was with us, two individuals.

15    If your Honor — and I'm going to get to this later on, but I'm

16    going to start with it right now — if your Honor has any

17    inclination to grant home detention in this matter, I want you

18    to understand how seriously the lawyers and the defendants are

19    taking it.  And we, in the courtroom today, with us, sitting

20    right behind me in the row right there, are John Mazzella of

21    Kroll and Tony Valente, who's going to be -- hired by Kroll as

22    an independent contractor.  Just by way of background — and

23    we're happy to have you or the government question them in any

24    way —

25         THE COURT:  I know both of them.

P1FKALEC1

1          MR. WILLIAMS:  Anyway, John is a veteran --

2     Mr. Mazzella is a veteran fraud investigator with over 25 years

3     experience in the Justice Department and Labor Department's

4     office of labor racketeering, and financial records,

5     informants, and international fieldwork.

6          And Mr. Valente is an independent contractor who has

7     lots of experience in home detention scenarios.  He did the

8     home detention and spearheaded it for Bernard Madoff, Dominique

9     Strauss-Kahn, Cameron Douglas, and — I hope I'm not butchering

10    this name — Mahender Sabhnani, who was charged with slavery.

11         There's another individual who's not here today who

12    has a particular expertise in the logistics of the home

13    detention and the hiring of the individuals, and the

14    surveillance camera.  Kroll uses him quite often.  His name is

15    Matt Dumpert.  He's a managing director, and he's with Kroll,

16    sorry, and leads Kroll's enterprise security risk management

17    practice.  He previously served in the U.S. Department of

18    State's Diplomatic Security Service, where he also advised on

19    matters of international security, counterespionage, and

20    counterintelligence programs.

21         THE COURT:  Could you tell me his name again, and

22    spell the last name?

23         MR. WILLIAMS:  Absolutely.

24         Matthew Dumpert, D-u-m-p-e-r-t.

25         THE COURT:  Okay.

P1FKALEC1

1              MR. WILLIAMS:  Now, your Honor, I'll move to the first

2    issue.  There are really two significant issues here — the risk

3    of flight, and the government has asked the Court, obviously,

4    to evaluate and revisit danger to the community.  I'll start

5    with risk of flight.

6              With regard to risk of flight, the three defendants

7    have significant ties in the community in Florida.  They're all

8    married.  They all have kids, young kids.  Their parents are

9    there.  Their synagogue is there.  They're well entrenched in

10   the community.  That's number one.

11             Second of all, they are United States citizens.  They

12   have no citizenship in the country of -- when I was present at

13   the bail hearing in Miami — Israel that the government really

14   was focused on.  And mostly important, and probably the most

15   salient factor, is that way back in early July of 2024, there

16   were -- based on the civil litigation, there were a number of

17   reports in the country's leading news publications — New York

18   Times, Bloomberg, and I believe The Wall Street Journal —

19   reporting that the U.S. Attorney's Office in Manhattan, I

20   believe the U.S. Attorney's Office in Florida, and I believe

21   one other agency, had open criminal investigations into the

22   very same conduct that was being alleged in the civil lawsuits.

23             Not once since June/early July of 2024 has there been

24   any evidence of any of the brothers flee, doing anything to

25   make plans.

P1FKALEC1

1          I won't rehash the record that's already before you.

2     These are questions that I asked Special Agent Atwood during

3     the hearing in Miami on December 13th.  There's absolutely

4     nothing that indicates that they did anything to try to make

5     plans to abscond.  I'm almost positive during the hearing on

6     December 13th for Mr. Tal Alexander, it came out that he had

7     been only between Miami and New York since July, early July, of

8     2024.  So, you have that factor as well.  Nothing that they did

9     indicated that there was any risk of flight at all.

10          Now, the Court found differently, obviously,

11     Magistrate Judge Reed and, obviously, Magistrate Judge Sanchez,

12     on behalf of Alon Alexander.  And the government, with regard

13     to the risk of flight, both in their recent submission to you

14     and during the presentation on December 13th, laid heavy

15     emphasis on their wealth, the defendants' wealth, the family

16     wealth.  And in their submission to you, they relied, and

17     cited, a case, it's *United States v. Boustani*, and the fact is

18     that *Boustani* actually supports the defendants' position,

19     because *Boustani*, although the initial part of the opinion

20     talks about you can't have a two-tier system for wealth and for

21     people who don't have wealth --

22          THE COURT:  Correct.

23          MR. WILLIAMS:  -- but if you look further — and the

24     government did put this in their submission — a defendant may

25     be released on such a condition only where, but for his wealth,

P1FKALEC1

1    he would have not been detained.  It is applicable only where

2    the defendant is detained on risk of flight premised on his

3    wealth.

4         THE COURT:  Right.  I've read the case, and I am

5    familiar with the case.  The issue here is you're trying to use

6    wealth or their ability, essentially, to create a private jail

7    to answer both the government's arguments on danger, as well as

8    risk of flight.  And I appreciate the defense argument, and I

9    certainly read all your papers.  I did not interpret the

10   government's position to be the risk of flight focuses on or

11   rests on the defendants' wealth.  I think their argument was,

12   because of their wealth, they had the ability to make good on a

13   desire to flee.

14        MR. WILLIAMS:  I agree with your Honor, and I had a

15   little bit more.  I was just covering *Boustani* because that was

16   a case that they really highlighted.  It was a centerpiece in

17   their submission to you.

18        THE COURT:  Does everybody agree that *Boustani* is the

19   controlling precedent in the Second Circuit relative to private

20   jails?  I'm seeing nods.

21        MR. WILLIAMS:  Well, your Honor, the only thing I'd

22   like to point out — and this was what I was getting to —

23   *Boustani* is obviously an important case.  That's why I covered

24   it immediately.  But there are two other cases subsequent to

25   *Boustani*.  One is *United States v. Fox*, 22-1043, 2022 Westlaw,

P1FKALEC1

1  WL, 2564600, a Second Circuit case, July 8th of 2022.  In that

2  case — it was a summary order, your Honor — but in that case,

3  the Second Circuit affirmed an order granting a bail package

4  for a defendant charged with sex trafficking, firearms, and

5  drug trafficking offenses.  Bail conditions included home

6  detention with GPS monitoring and installation of security

7  cameras at the detention location, which are less stringent

8  conditions than we're actually proposing here.  And the

9  government proffer had substantial shock value and disturbing

10  allegations, but the defendant there presented a combination of

11  conditions that reasonably assured his return to court.

12        Now, you will see, when you look at the summary order,

13  the Second Circuit made clear that if there had been a little

14  difference in the facts — a little bit differently, it was a

15  close call — that it would have went the other way.  But that's

16  one case.

17        Subsequent to *Boustani*, and I think it's worthy of the

18  Court's consideration, the other case is a Judge Rakoff case,

19  it's *U.S. v. Weigand*.  It's 492 F.Supp.3d 317 (S.D.N.Y. 2020).

20  And a court in this district approved home detention with

21  private security for a wealthy German citizen with minimal U.S.

22  ties charged with conspiracy to commit bank fraud, which

23  carried a substantial sentence, a maximum sentence of 30 years.

24        The government --

25        THE COURT:  It's a white collar case, though.

P1FKALEC1

1           MR. WILLIAMS:  It is a white collar case.  It is.

2           The Fox case with the sex trafficking, the firearms,

3    and the drugs probably is better in terms of my argument, but I

4    did want to point out the *Weigand* case.

5           But here's the key with the *Weigand* case where I think

6    it's relevant and worthy of the Court's consideration, and that

7    is, there, Judge Rakoff granted bail, and he said, equal

8    protection — this goes to the wealth issue — equal protection

9    works both ways.  If defendants are to be treated similarly,

10   without regard to wealth, then he cannot be detained when

11   otherwise a similarly situated indigent defendant would be

12   released.

13          THE COURT:  Exactly.  So, it seems to me, going back

14   to my question whether everybody agrees that *Boustani* is the

15   controlling precedent, I read that case to say if the person

16   would be detained if they were poor, and you have the same

17   facts as someone who is wealthy, then the wealthy person should

18   be detained, and conversely, or inversely, if the person would

19   be released if they didn't have any money, then on the same

20   facts, you should also release a wealthy person.  That is, you

21   should make the decision of release or detention based on the

22   facts of the case, not resting solely on the wealth of the

23   defendant.

24          MR. WILLIAMS:  Yes, your Honor.  And I wouldn't argue

25   that, but what I will say is that if there can be a combination

P1FKALEC1

1   of a package, especially if you look at the Fox case, which had

2   similar allegations — sex trafficking, drug trafficking, and

3   firearms — then if you can do it there, there's no reason why

4   in this case, where there are a number of measures that the

5   defendants are willing to submit to, including additional

6   measures, if this Court and the U.S. Attorney's Office came up

7   with additional measures, to ensure that there's no risk of

8   flight, which is the primary consideration, and also that

9   there's no danger to the community.

10          So, that's the thrust of our argument.  There is

11  something here that can be done so that home detention works,

12  just like it has worked in other cases where there was very

13  serious allegations.  And, again, I'll point out the Fox case.

14          The other thing I'll just point out is, with regard to

15  the whole Israel component that the government argues in terms

16  of them fleeing to Israel because of ties there:  (a) the

17  government has not pointed out a case where there was

18  difficulty in terms of having someone extradited from Israel.

19          The other factor is, all three brothers will surrender

20  their U.S. passports, they will surrender their children's,

21  wives' passports, they will surrender -- the parents, too, have

22  an Israeli passport.  They will surrender the parents' U.S. and

23  Israeli passports.  And they'll execute waivers of extradition,

24  all three of them.

25          So I just point that out.  And anything else the Court

P1FKALEC1

1      or the U.S. Attorney's Office would see fit.  I would submit to

2      this Court that something can be worked out here where home

3      detention will work like it has in other cases.

4               Now, going to danger to the community:  The

5      government, in their submission of December 13 to the Florida

6      federal court, identified two things, two facts, and had not

7      identified any since then.  The two facts are:  (a) that the

8      brothers and my client, and I think was Oren, Oren Alexander,

9      the defendant, Oren Alexander, allegedly filed a police report

10     against an alleged victim for harassment.  That was one

11     example.  And the other example is they told someone that they

12     would file a defamation lawsuit if they continued -- the

13     alleged victim continued to make disparaging remarks about

14     them.

15               THE COURT:  Well, I'm going to let you talk about

16     those two things, but just so the argument is clear, the

17     government's argument on danger to the community does not rest

18     on those two facts.  It rests on the charges in the case.

19               MR. WILLIAMS:  I will get to that.

20               THE COURT:  I just wanted to be clear because we can

21     talk about the harassment and the defamation, but the danger to

22     the community rests on the charges in the case.

23               MR. WILLIAMS:  And also -- and those two, I'm getting

24     to it, and Ms. Paul will also cover some of that.  What I was

25     really pointing out is that in terms of witness intimidation

P1FKALEC1

1     and witness tampering, they pointed out those two items.

2                    THE COURT:  Understood.

3                    MR. WILLIAMS:  That's where I was going with that.

4                    Now, like I said, my colleague, Ms. Paul, will cover a

5     little more on the weight of the evidence, but I would just

6     point out, kind of along the same lines, focusing on the

7     evidence, that there is no allegation in the indictment that

8     anything occurred subsequent to 2021.

9                    And there is nothing in any of the government's

10    submissions to suggest that any of the brothers had engaged in

11    any type of witness intimidation or tampering since 2021.  Just

12    to make that point.  Nothing in the last, I guess, almost

13    four years that they engaged in in terms of any more alleged

14    criminal conduct, as well as anything to do with witness

15    tampering.

16                    Now, look, let me move to the bail package that we're

17    talking about, your Honor.  And we're happy to submit, and I

18    think some of it's been submitted, but we will submit whatever

19    the Court asks for in terms of the financials that support the

20    bail package.

21                    THE COURT:  Let me just ask what you are proposing,

22    because it was a little unclear.  I realize you said you were

23    about to do that, but I've read your papers.  So the question

24    is:  Is the defense proposing a third-party surety bond so that

25    the surety company is responsible for getting liens, or

P1FKALEC1

1    whatever they're going to get, to secure their bond, or are you

2    proposing giving the government a lien on a variety of things

3    that I don't know that there's even a way to take a lien on

4    them?

5              MR. WILLIAMS:  We did the surety bond way.  We can do

6    it any way that they propose.  But the value -- look, the

7    logistical part, okay, because this is a novel case, has not

8    yet been worked out.  That's something that we're happy to work

9    through with the Court and the government.  But the upshot of

10   it is that when I argued in Florida, the bail package for all

11   three brothers was $115 million, which involved all the family

12   homes, all the brothers' homes, the parents' home, an office

13   building.  Since then, the value of the bail package has been

14   augmented.  Now it's well in excess of $115 million.  We will

15   provide financial, and we will work through a way to make

16   certain that the government is made whole if any of the

17   brothers were to abscond or bail was revoked for any reason.

18             But here's the key:  The family and the three

19   defendants are willing to give up basically -- not basically —

20   everything that they have as bail, part of the bail package,

21   and if any one of them, one of the three, were to do anything

22   to cause bail to be revoked, the entire largess, the entire

23   bail — the equity, the cash, supporting the package — would be

24   forfeited.  And so that, I would submit to the Court,

25   demonstrates how serious it is for the family in terms of their

P1FKALEC1

1    understanding that the defendants need to show up in court and

2    need not do anything to pose a danger, even a hint of a danger,

3    to the community.

4         Now, the last part of what I'd like to talk about is

5    the home detention package.  And that would involve private

6    armed security stationed at the location 24 hours a day, every

7    day.  Most, if not all, of the team would be comprised of

8    retired federal agents and NYPD officers, as well as off-duty

9    law enforcement officers -- I'm sorry, off-duty law

10   enforcement, who have arrest authority, installed video cameras

11   and door and window sensors and alarms, which the team will

12   monitor.  The three defendants will be accompanied by the team

13   for any necessary travel.  They will consent to the government

14   wiretapping and monitoring of their phones, computer activity,

15   and the team, as I indicated, which would be led by

16   Mr. Mazzella, Mr. Valente, and Mr. Dumpert, would report to the

17   Court and government any violations of bail conditions.

18        Access to the location where they would stay — and if

19   the Court wanted them all in one location or if they wanted

20   separate locations, okay — access to the location will be

21   restricted to a list of visitors approved by pretrial services,

22   the government, and the Court.  The government will be

23   authorized -- we'd consent to authorize to search the location

24   at any time, no contact at all with any alleged victims or

25   witnesses in the case, and, again, as I say, any other

P1FKALEC1

1    conditions that the Court, the government, or pretrial services

2    would deem appropriate.

3         With that, I am done with my portion of the

4    presentation.  I'll turn it over to my colleague, Ms. Paul.

5         THE COURT:  Okay.

6         Ms. Paul.

7         MS. PAUL:  Your Honor, before I begin, I've provided

8    the government with five slides from a document that was

9    submitted under seal as Exhibit 3 to ECF to your Honor.  If I

10    can approach, and just so you can follow along with the five

11    slides that I'm going to talk about?

12         THE COURT:  Sure.  That would be great.

13         MS. PAUL:  Your Honor, the government has pointed

14    repeatedly in their presentations to the seriousness of the

15    charges here.  And we agree, these allegations are serious.

16    That doesn't make them true.

17         To address the weight of the evidence, I'd like to

18    walk the Court through key places where the government's

19    proffer is nothing more than speculation, and then issues of

20    some of the credibility of the witnesses that cut against the

21    strength of the case.

22         At Tal's detention hearing on December 13, 2024,

23    Agent Atwood, who is the lead case agent on this case,

24    testified that the criminal investigation began about

25    six months ago, and that was after a personal injury lawyer

P1FKALEC1

began recruiting several plaintiffs to bring a lawsuit against

at least one of the Alexander brothers.  That was the beginning

of orchestrated efforts encouraging women to profit from past

sexual experiences that they had had with the brothers.  Your

Honor also has evidence of this in this same document that we

submitted under seal.

Since news of the first lawsuits broke in June, there

have been dozens, if not hundreds, of news articles with

salacious allegations written about all three of the Alexander

brothers.  The media has even reported not that women were

sexually assaulted by the brothers, but that now, ten,

fifteen years later, they may have been assaulted.

The government similarly plans to use dozens of

accusers who simply cannot point to any wrongdoing.  For

example, Victim 1 in the indictment, in Count Two of the

indictment, was quoted in the New York Times last year saying,

I have no idea what happened.

Your Honor, when you whittle down what the government

has actually presented — and, again, not to detract from the

seriousness of the allegations here — but the government's case

is far weaker than what has actually been portrayed in this

courtroom, or what will be, I expect, to be portrayed in this

courtroom, what AUSA Espinosa has previously argued in our

other court appearances.

As an initial matter, the indictment and detention

P1FKALEC1

1   letter don't even actually accuse Alon Alexander of any

2   specific wrongdoing.  It's couched in the ether of this

3   conspiracy count, which the government has yet to unpack for us

4   at all.  The government has multiple accusers who cannot point

5   to any wrongdoing, as I said.  A few months ago, these women

6   say they didn't remember anything, whose lawyers now accuse the

7   Alexanders essentially of date rape and are pointing to media

8   reports as the source of their information.

9           THE COURT:  Whose pointing to media reports?  Not the

10  government.

11          MS. PAUL:  No.  The attorneys for some of these

12  accusers.

13          THE COURT:  I don't care what the civil lawyers say.

14  They have their own agenda.

15          MS. PAUL:  Okay.

16          Yes, your Honor, but we do believe that the government

17  has spoken to the civil plaintiffs, and we do believe --

18          THE COURT:  Well, I assume there's overlap between the

19  civil plaintiffs and the --

20          MS. PAUL:  Yes.

21          THE COURT:  -- victims that the government is

22  referencing.

23          MS. PAUL:  Yes.

24          And now, in the government's reply, they proffer that

25  they have videos of multiple people engaging in sex acts, women

P1FKALEC1

1    who were aware enough to react to being recorded, but were not

2    aware enough to react to being penetrated.

3              We submit that these videos, the fact that they're

4    even being discussed at this point, show the lack of the

5    strength of the government's case.  The government doesn't

6    allege that these acts were nonconsensual or that illegal

7    conduct appeared in the videos.

8              THE COURT:  Well, they alleged that in some of the

9    videos, the women appear visibly incapacitated.  In my view,

10   having sex with a woman who is visibly incapacitated is likely

11   rape.

12             Do you disagree with that?  Do we have any base

13   agreement on that point, that if someone is incapacitated, they

14   don't have the capacity to consent to sex?

15             MS. PAUL:  Your Honor, I believe the government's

16   submission said physically intoxicated or --

17             THE COURT:  I think they used the word

18   "incapacitated."  I could be wrong.

19             Government, am I recalling correctly?

20             MR. JONES:  Your Honor, I'll scan my letter for the

21   specific language that we used, but I think here's one point on

22   a specific video that we're talking about.  We're talking about

23   a video where I believe it's Oren Alexander — frankly, they're

24   twins, I've never met them — but one of these very stone sober

25   twins sets up a tripod.  The camera is on the bed.  You have a

P1FKALEC1

1    woman on the bed, she is naked, she is laying there, she's with

2    another man.  When she tries to speak, it's incoherent, it's

3    mumbling.  She's laying there, Oren -- or, excuse me, the

4    defendant, one of the defendants, gets on the bed.  She's,

5    frankly, unable to react.  I believe her arm is kind of across

6    her stomach, I can't recall for sure, and she lays there.  The

7    defendant kind of picks up and scoops up her knees, positions

8    them up, and then has sex with her while she's laying there.

9          At the end, after that sex act is finished, she does

10   sit up, I think she manages to stand kind of off the bed, but

11   is quickly back on the bed and collapsing back over.  We

12   haven't spoken to that person.  I'm not here to tell what you

13   she says about the encounter, but I am here saying that that

14   trophy — it's a 2009 video — that trophy was in Tal's apartment

15   this December.  It depicted one of his brothers doing that to a

16   functionally unconscious person.  That's what the video is.

17         MS. PAUL:  Your Honor, the government's submission

18   also says that there are videos that don't include the

19   Alexanders, and they ask you to also consider that in deciding

20   whether or not to detain them for the next several months

21   without bail.

22         The government also calls only the Alexanders

23   depraved, where these videos include other participants by

24   their own admission.  And we would --

25         THE COURT:  Would you feel better if they called them

P1FKALEC1

1    all depraved?  I have to say, the quibbling and distress over

2    the government's use of the word "depraved" is escaping me.

3              MS. PAUL:  Your Honor, our point is that these types

4    of speculative allegations, where they've not spoken to the

5    participants in this video yet, should not support a weight of

6    the evidence argument, and the Court should not consider them

7    as part of a proffer of detention.

8              THE COURT:  Okay.

9              MS. PAUL:  I'd also like to highlight for the Court

10   the type of accusers that we've encountered in the civil

11   litigation.  And I know your Honor said that civil plaintiffs

12   have separate motives.  However, I think that it's worth

13   raising the patterns that we've seen for two reasons:

14             One, we do believe the government has spoken to many,

15   if not all, of the civil plaintiffs.

16             THE COURT:  Again, I don't quarrel with that.  I

17   suspect that's correct.

18             MS. PAUL:  Yes.

19             And, second, in light of Agent Atwood's testimony at

20   Tal's hearing, she said that she didn't investigate what we

21   believe is questionable conduct on behalf of these women; and,

22   two, she said that she spoke to 98 percent of the accusers and

23   found not a single one of them to be not credible.  So, in

24   light of that, I do think it's worth going through some of the

25   patterns that we've seen that we do think undercut their

P1FKALEC1

1    credibility.

2              THE COURT:  Okay.

3              MS. PAUL:  And I will preface all of this by saying

4    that we do understand that there is no one way that an alleged

5    victim of sexual assault should act — some report, some don't,

6    some remain in touch with their accusers, some don't — but,

7    again, we believe it's worth raising these patterns.  So the

8    documents that I handed up to you, your Honor, the first

9    individual — I think it's the first three slides, I'm going to

10   refer to her as Civil Plaintiff 1 —

11             THE COURT:  Is she the person identified in the

12   indictment as Victim 1?

13             MS. PAUL:  No, she is not.

14             THE COURT:  Is she named in the indictment or

15   referenced in the indictment at all?

16             MS. PAUL:  If the government is --

17             THE COURT:  The government is shaking their head, from

18   side to side, no.  So this is someone who is not a victim in

19   the indictment, just so I understand that?

20             MS. PAUL:  Yes, your Honor.  The indictment only has

21   two victims, yes.

22             THE COURT:  Okay.  This is somebody else?

23             MS. PAUL:  Yes, this is somebody else.

24             One of the initial litigants, who alleges that she was

25   sexually assaulted, but in the year and a half after the

P1FKALEC1

1    alleged sexual assaults, she's sending provocative invitations,

2    sexually explicitly photographs.  She does this for a year and

3    a half after she claims that she was violently raped, never

4    reported it to law enforcement, and then 12 years later, she

5    sues Oren and Alon Alexander, and the only eyewitness to this

6    alleged rape denies that it ever happened.

7              This individual --

8              THE COURT:  So, the only eyewitness being

9    Mr. Alexander?

10             MS. PAUL:  No.  There is someone that this individual

11   has named as an eyewitness who denies that it happened.

12             THE COURT:  Okay.

13             MS. PAUL:  This individual is also not the only civil

14   plaintiff with whom one of the Alexanders has had consensual

15   sex with who has tried to see them again after that alleged

16   encounter, asked to sleep with him again, send sexual messages

17   and photographs to them.  And I will ask your Honor to now turn

18   to the next slide.

19             THE COURT:  Sorry, I already did.  I thought I was

20   already on the next slide.

21             MS. PAUL:  Sorry.  They have names on them, and the

22   government has asked me not to name the civil plaintiffs by

23   name.

24             THE COURT:  I'm on the second slide.  This one

25   references something that happened on June 22nd?

P1FKALEC1

1          MS. PAUL:  So I believe it's the fourth slide, the

2    second name.

3          THE COURT:  That's the second name?

4          MS. PAUL:  Yes.

5          THE COURT:  Wait a minute, I'm sorry.

6          Okay.  Got it.

7          MS. PAUL:  This individual, after having sex with

8    Oren Alexander, invited him to an event with her parents at her

9    parents' home.  Similarly, nothing is reported in realtime, and

10   a decade later, after reading about a flurry of lawsuits,

11   claims for the first time that she was raped in her own

12   lawsuit.

13         The last plaintiff I'm going to talk about, Civil

14   Plaintiff No. 3, is the last slide that your Honor has.  To

15   further demonstrate the opportunism at play, and without

16   minimizing again the seriousness of the allegations here,

17   another of the Alexanders' accuser, this individual is quite

18   literally a professional plaintiff.  This person has filed two

19   other lawsuits against men accusing them of sexual misconduct.

20   The first was against Boxer Oscar De La Hoya.  A New York court

21   found it was a frivolous lawsuit, it was maliciously brought,

22   and it was dismissed.  The plaintiff was required to pay his

23   attorneys' fees.

24         The second lawsuit, which is currently pending in this

25   courthouse, the public information that we know about this case

P1FKALEC1

1    is notable and relevant.  This individual has a history of

2    extorting rich men by engaging in sexual acts with them, that

3    has come out in discovery, and what's also come out in

4    discovery is that Ivan Wilzig, who is involved in one of -- an

5    individual by the name of Ivan Wilzig --

6              THE COURT:  How do you spell that last became?

7              MS. PAUL:  W-i-l-z-i-g.

8              THE COURT:  Okay.

9              MS. PAUL:  -- is this individual's romantic partner,

10   and he has schemed with her to shake down wealthy men.

11   Discovery has sought text messages that actually say that they

12   are having discussions to make somebody the next Oscar

13   De La Hoya.

14             THE COURT:  Well, that didn't work out very well.  So

15   that seems like an odd thing to do.

16             But, okay.

17             MS. PAUL:  So, based on the information available, the

18   government's proffer of speaking to at least 40 women, none of

19   whom testified in the grand jury, by Agent Atwood's testimony,

20   is not indicative of a strong case and should not be the

21   Court's basis for detention.

22             Before I sit down, I want to address our request for

23   *Jencks* material.  Agent Atwood testified --

24             THE COURT:  Here's what I need you to address on that.

25   In New York, we don't put agents on the stand at detention

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P1FKALEC1

hearings.  So, that seems to me an issue that is moot at this

point.  If the magistrate judge in Florida didn't see it clear

to do something, why am I supposed to?  She's not testifying

here.

MS. PAUL:  Because, your Honor, there's one piece of

it that I do think is worth raising and we do think is

important and is not a fishing expedition, but is dispositive

for Count No. 1.

THE COURT:  But we're at a detention hearing.  We're

not at trial.  You're not making a motion to dismiss the

indictment.  This isn't an issue of -- there may be *Brady*

material that needs to be turned over, and turned over

promptly, I don't know, but if you want to cabin it as this is

clear *Brady* material, and they should have turned it over

already, we can talk about that, but you're arguing that it's

Jencks Act material.  And her testimony -- she's not testifying

here.  And I'm not considering the testimony that she gave in

Florida.

So, I just don't understand -- I get it that Florida

has different procedures, but this argument seemed to me to be

appropriate to address to the Florida judge under the rules

that Florida uses.  I don't know if whatever it is that you

want from the government would even be 3500 material because

your cross-examination was very different from the government's

direct examination.

P1FKALEC1

MS. PAUL: Your Honor, I believe that this was covered in both, and it was then reraised at Alon's hearing with a different agent who couldn't testify to it either. So I would just like to make the record.

THE COURT: Go ahead. What it is that you want that you don't have?

MS. PAUL: We want the agent's notes about what the last act in the conspiracy was. Agent Atwood was cross-examined on that. She is the lead agent in the case. She was unable to tell us what the last act of the conspiracy was. She couldn't tell us when in 2021 it was, the month, the season, which of the brothers it involved, and what the act was. And, again, the government calls this a fishing expedition, but the government indicted and superseded this case. When they presented this case to a grand jury, they must have had a date that was the end of the conspiracy within the five-year statute of limitations.

Without it, there is no conspiracy to commit federal sex trafficking. We are entitled --

THE COURT: Wait a minute. All of '21 is within five years of when the indictment was returned.

MS. PAUL: Yes, your Honor. But the government now, in their reply, has highlighted that the last act may actually have happened in 2022, in contradiction to Agent Atwood's testimony, but the fact that they're refusing to give us the

P1FKALEC1

| 1 | agent's notes or reports as it relates to the very last act of |
| 2 | the conspiracy -- |
| 3 | THE COURT:  Well, again, I'm struggling to understand |
| 4 | those arguments on this.  Do you think that somewhere in the |
| 5 | agent's notes is a paragraph headed "Last Act of the |
| 6 | Conspiracy"?  No.  So what you really want is all of her notes, |
| 7 | or you want them to go through all of the notes and figure out |
| 8 | chronologically what was the last kind of proveable act that |
| 9 | they're going to hang their hat on as being part of the |
| 10 | conspiracy. |
| 11 | MS. PAUL:  Your Honor, we would hope that when the |
| 12 | government presented this case to a grand jury, they had their |
| 13 | conspiracy set.  They knew that they were within the statute of |
| 14 | limitations, and there should be notes to reflect that that the |
| 15 | agent has.  That's what we're asking for. |
| 16 | THE COURT:  Okay.  I understand what you're asking |
| 17 | for. |
| 18 | MS. PAUL:  Thank you, your Honor. |
| 19 | And I will turn it over to Richard. |
| 20 | THE COURT:  Mr. Klugh, right? |
| 21 | MR. KLUGH:  That's right, your Honor. |
| 22 | My family were immigrants, and when the name first |
| 23 | came here, there was no H on it.  People added an H. |
| 24 | Immigrants sometimes do things like that to make life easier |
| 25 | here in the United States. |

P1FKALEC1

```
1              As I was preparing for the hearing in Milt Williams'

2    office, I had the pleasure of looking out and seeing both the

3    Statue of Liberty and Ellis Island, and I thought it is very

4    important to mention those things in this case because the two

5    concepts there that really play into this initial hearing, this

6    initial on hearing, for my client, Oren Alexander, relate to

7    those two things.  The government's, and indeed the

8    magistrates' decision with regard to Alon Alexander, rested

9    heavily on the fact that the parents of these young men were

10   born in Israel.  They came here basically penniless many, many

11   years ago, in the '70s, they married, and they worked up from

12   nothing to build something great in this country.

13             THE COURT:  That's the American dream.

14             MR. KLUGH:  The American dream, and I think both the

15   Statue of Liberty and Ellis Island really echo how fundamental

16   that is to this country and how it should not in any way be --

17   unless absolutely necessary, be turned against them, be turned

18   against --

19             THE COURT:  It will never be turned against them.

20   Absolutely, that fact is not relevant to whether these three

21   defendants should be detained or not.

22             Now, the fact that they have ties to a foreign country

23   is relevant, but the fact that their parents immigrated and

24   achieved the American dream is wonderful, and I'm sure they're

25   heartbroken at where their sons are at this point.
```

P1FKALEC1

1     MR. KLUGH:  If the Court were referring back to

2 Judge Sanchez's, Magistrate Judge Sanchez's, ruling --

3     THE COURT:  No, I'm just referring to where we stand,

4 which is I've got two detention hearings -- two detention

5 orders.

6     Your client was the one that waived in Florida, right?

7     MR. KLUGH:  Yes, he has --

8     THE COURT:  He has not had a detention hearing.

9     MR. KLUGH:  This is not an appeal.

10     THE COURT:  Well, I can assure you, I am not holding

11 against him the fact that his parents immigrated as young

12 adults and became U.S. citizens.

13     MR. KLUGH:  The fact that --

14     THE COURT:  I will, however, consider the fact that

15 they own property in a foreign country.

16     MR. KLUGH:  I don't believe that there is -- one

17 property?  There's a couple of properties, again, that would be

18 restrained, and I will get to that.

19     THE COURT:  Just in fairness to you, I'm telling you,

20 I am not holding against anyone the fact that the senior

21 Alexanders immigrated to this country.

22     MR. KLUGH:  That property could be sold, if necessary.

23     It could have been -- if we had anticipated the

24 virulence with which the government is proceeding in this

25 matter, we could have had that property sold six months ago,

P1FKALEC1

1    any property outside the country.  Certainly, they have a

2    distance or more distant relative who still lives there.  But

3    they are U.S. citizens.

4         My client is a U.S. citizen.  He cannot just up and go

5    to Israel.  In fact, we've cited in our papers that unlike

6    other countries he might be able to go to, Israel, which was

7    the one cited by the magistrate, is very difficult for him to

8    get in as a United States citizen right now.  It's not

9    something you break out of any kind of facility and then

10   somehow run to Israel, and they'd welcome you with open arms,

11   while you've got sex trafficking charges pending against you.

12   It is, in fact, absurd.  The government has not cited a single

13   person, whether Israeli or Jewish heritage or not, that has not

14   been extradited from Israel or any grand difficulty of any

15   extradition from Israel as to any person.

16        I personally represent cases -- there's a published

17   case in the 11th Circuit with regard to my client.  They've

18   mentioned Brazil.  Brazil is a horrible place for a U.S.

19   citizen to run to, because it's not only that you will be

20   extradited rapidly, but to the extent you have to stay there,

21   you're staying in what is a hellacious prison.  There is no

22   quantification of probability that any one of these, much less

23   my client, would engage in these absurd efforts to make their

24   trial possibilities impossible.  We have already indicated,

25   through Ms. Paul, some of the reasons why this is an

P1FKALEC1

1    extraordinarily triable case.

2            The Court — and I want to get back to what the Court

3    mentioned last time with regard to *Brady*.  There are *Brady*

4    issues in this case.  We did make a decision in Florida to go

5    ahead and proceed.  When we made that decision, the first

6    magistrate had already issued an order to the government — an

7    order to the government — following Agent Atwood's testimony to

8    produce *Jencks* material.  That order has not been complied

9    with.  This Court, I believe, does have authority to enforce

10   that order.

11           THE COURT:  I'll ask you the same thing I asked your

12   colleague.  Again, she testified in Florida.  I'm not

13   considering her testimony.  I'm just struggling -- I get that

14   you're upset, that the defense is upset, that the government

15   didn't give whatever it is that you thought they should give

16   you, but we don't do detention hearings that way.  Nobody's

17   testifying here.

18           MR. KLUGH:  But it bears on the Brady question.

19           THE COURT:  Well, *Brady* is a different question.  If

20   there's *Brady* information, the government knows its

21   obligations, I'll reiterate them to them.  They have an

22   obligation to turn over *Brady* information promptly.

23           MR. KLUGH:  Yes, and there were at least two in-court

24   admonitions under Rule 5 of the Rules of Criminal Procedure to

25   the government at the time, and at no time, prior to arriving

P1FKALEC1

```
1   here in New York, did we learn that there were videos of the,

2   quote, orgy activity that one of the prosecutors indicated was

3   the point of the conspiracy.  And now we have, again, not

4   received the videos.

5           THE COURT:  I'm sorry, why do you think that's *Brady*?

6           MR. KLUGH:  Because notwithstanding the fact that one

7   can put a label on viewing it, the description we have just

8   heard for the first time in court today is the victim -- the

9   sexual partner that the government has been riding on.

10          THE COURT:  The woman who seemed to be totally

11  incapacitated, that woman?

12          MR. KLUGH:  The woman who stood up immediately after

13  having sex.

14          THE COURT:  That one.

15          MR. KLUGH:  I have never heard in any case, in any

16  document, ever, of an incapacitated person who suddenly,

17  because they had sex, then they're ready to stand up.  It is

18  absurd.  The levels to which the government has gone in this

19  case to avoid the provision of evidence, where all of the

20  evidence, every single bit of evidence on that video, we would

21  proffer from what we've heard, you will not see any of the

22  allegations that we heard in Florida.  You will not hear people

23  who were unable to speak.  The allegation is she was mumbling,

24  again, on a video --

25          THE COURT:  Well, Mr. Klugh, I want to let you be as
```

P1FKALEC1

dramatic as you want to be, but I did not understand what

Mr. Jones to be saying is that that is the sole video evidence

that the government has.  That was one, one video, that he

proffered what was on it.  I'm also confident that as soon as

we move forward in this case, which we are going to very

promptly, you're going to get all this discovery.

MR. KLUGH:  Your Honor, I do want to get to that.  I

would be happy to defer to Mr. Jones at this time to relate any

other person that he wants to call incapacitated who stands up

afterwards --

THE COURT:  All right.  But, in addition to the video

that he talked about, they've talked to these witnesses.  So

they have witnesses who say, this is what happened — I got a

drink, something was in the drink.  I don't think you have to

be -- I realize that you and I are both not of the age that we

were subjected to date rape and drugs, but you don't have to be

20 years old to know what the effect of a date rape drug is.

That certainly sounds like what the women were

ingesting.  Whether your clients are responsible for that or

not remains to be seen at a trial, but that appears to be what

was happening.

And they've spoken to the witnesses, and the witnesses

tell them that.  And I know the defense attorneys want to say

that's not evidence, but that is evidence.  You have a human

being who says this is what happened to me.

P1FKALEC1

1          MR. KLUGH:  Your Honor, what I'm saying is that, in

2     any case in which -- and Ms. Paul has gone over the

3     circumstances of these individuals, who I understand --

4          THE COURT:  She's gone over the circumstances of three

5     people, who I have no idea what connection, if any, they have

6     to the government's evidence.

7          MR. KLUGH:  Well, we know one thing.  We can do one

8     thing without even relying on the government, and I don't

9     believe there's any other video where they have a standing

10    person who they want to claim is incapacitated.  But I defer to

11    the government to respond any other video.  They have a lot,

12    apparently, a lot of images, and what they have is an orgy, an

13    orgy of people, people orgying, the very word the government

14    used in Florida, to refer to the conspiracy's goal.  And, so,

15    that is fundamentally important, again, when we're talking

16    about a charge of conspiracy to commit commercial sex

17    trafficking.  When the government itself said orgy in Miami,

18    and their videos say orgy now, it's important.

19          What the witnesses are saying, again, we don't know.

20    We might have a better idea with *Jencks*.  I'm not trying to

21    return to that.  The Court said it's not relying on

22    Agent Atwood's testimony, and I think that's a reasonable

23    compromise in this context.  What we have is a circumstance

24    with the event that my client is charged with, and the Court is

25    aware that we filed a polygraph report with regard to that

P1FKALEC1

1    event.

2              THE COURT:  I have no idea that that was the case,

3    and, as you know, polygraphs are not admissible.

4              MR. KLUGH:  Well, your Honor, they're not

5    admissible --

6              THE COURT:  You want all of these guys to hear that.

7              MR. KLUGH:  No, your Honor.  We referred to two

8    cases -- we could have cited another case, but we cited the

9    United States v. Fox, also, and, in effect, the government has

10   used polygraphs in bond hearings.  The rules of evidence don't

11   apply.

12             THE COURT:  I'm fully aware of that.

13             MR. KLUGH:  I understand, but they have been used even

14   by the government.  This is a polygrapher who trained other FBI

15   polygraphers.  He had many, many years in both offices.  He was

16   sent to another office in Florida to train and mentor.  This is

17   an extraordinary polygrapher who provides complete detail,

18   complete graphs, showing that the level of confidence that

19   Oren Alexander is telling the truth, and Alon as well, is like

20   ten times what you would need to be sure that the person --

21   relatively confident the person is telling the truth.

22             THE COURT:  You believe in polygraphs.

23             MR. KLUGH:  Your Honor, I have one thing that I know.

24   When one party is willing to be polygraphed, and the other

25   party's witnesses are not willing to be polygraphed, I take

P1FKALEC1

that in consideration.  And when I have only evidence of what

actually occurred, these videos, where the person at any time

both before or after who appears to be objecting to the orgy

activity, I begin to have serious doubts about this case at the

outset.  And then when I have added onto it that the nature of

this case is a conspiracy to commit sex trafficking, and we're

talking about date rape — and, again, the drug that they're

claiming is --

THE COURT:  We're talking about what is called a date

rape drug.

MR. KLUGH:  That's right.

And that is important.  Even the DEA refers to this

substance that they're talking about, that they think was used,

or somebody says was used, as a party drug.  It's literally --

THE COURT:  A party drug?

MR. KLUGH:  GHB is referred to as a party drug.  It

can be, if used to excess, cause -- be used in a similar way,

but it is to be distinguished from Rohypnol, or roofies.  In

this case, the way it's portrayed in the media or otherwise is

as if they gave these people roofies, when the evidence from

the polygraphs is they didn't give anybody anything.  But the

government -- and, again, this is -- I don't know how -- I'm

not in front of the jury.  I don't know how to convince this

Court that this evidence is questionable, but what I can tell

the Court is that these defendants have lived their entire

P1FKALEC1

1    lives — they were all born in my hometown — in Miami.

2         THE COURT:  I understand that.  They have deep roots.

3    You don't have to persuade me that they have deep roots in the

4    United States.  You don't have to persuade me that they don't

5    have criminal records.  I understand all that.

6         MR. KLUGH:  What I have to persuade, your Honor, is

7    that they have fundamental rights to a trial in a very triable

8    case.  It's triable factually --

9         THE COURT:  They will have a trial.

10         MR. KLUGH:  It's triable legally, but if they don't

11    have the opportunity -- we don't know -- they have not given a

12    single name of a victim.  We've had to figure them out through

13    piecing together, like a puzzle, in order to do a polygraph

14    with Mr. Alexander.  The only count he's referred to

15    substantively is in Count Three, and we've refuted that.  And,

16    so, we will do this all the time, but the difficulty in doing

17    that polygraph in jail alone, I would urge the Court, please

18    consider, give us a chance to try this case.  We believe it's

19    bogus.  We believe it's made up of women who came forward for

20    money.

21         THE COURT:  Mr. Klugh, Mr. Klugh, you're going to get

22    a trial.  We're not -- I don't have the power to deny you a

23    trial.  The question is whether your client — your client — and

24    any of his brothers, but who seem to be glomped as a package,

25    are going to be released on pretrial release.  Trust me, you're

P1FKALEC1

1    going to get a trial, the government's going to give you all of

2    the evidence they've got, you're going to do a phenomenal

3    cross-examination of witnesses.  Maybe the jury will believe

4    they're lying, maybe they won't believe they're lying, but

5    that's the jury's job.

6          MR. KLUGH:  Your Honor, all I'm saying is this:  One

7    of the reasons — and, of course, it comes into play in the

8    pretrial detention statute and in terms of the length of the

9    detention — on a case like this, where the government is not

10   even giving us names yet, we're going to be here a long time

11   before we go to trial.

12         THE COURT:  No, we're not.  I can assure you, we're

13   not.

14         MR. KLUGH:  Well, your Honor, if we're not, then we're

15   going to be extremely prejudiced.

16         THE COURT:  You're going to have enough time to

17   prepare for trial.  We don't have to argue about a trial date

18   now, but you're going to get a trial date, and it's going to

19   hold, and you're going to have adequate time to prepare for

20   trial.

21         So, we're not arguing about that now.  What we're

22   arguing about is whether your clients pose a risk to the safety

23   of the community and a risk of flight, and whether those risks

24   can be mitigated.

25         MR. KLUGH:  The way I would ask the Court to -- and,

P1FKALEC1

1    again, I'm a defense attorney.  I've been on the defense

2    side --

3              THE COURT:  I figured that out.

4              MR. KLUGH:  You did?

5              I've been on the defense side since I started in 1978

6    at the Harvard Defenders.  I've done nothing but defense since

7    then.  I've never prosecuted anybody.  So maybe I'm biased.

8    But, to me, the most important thing that this Court, or any

9    Court, can do is to ensure that the accused has an opportunity

10   for preparing a defense and so that we can adversarily test

11   this evidence.

12             THE COURT:  Absolutely.

13             MR. KLUGH:  And doing so under the conditions that

14   exist now in prison, given the number and variety of evidence

15   we have to go back and forth with, the coordination between the

16   defendants, it is an extraordinary detriment to our right to

17   be --

18             THE COURT:  It will be difficult, but you are a very

19   experienced defense attorney.  You've been a defense attorney

20   since 1978 and have never been a prosecutor, and I am confident

21   of your ability to defend the case adequately, whether your

22   defendants are detained or whether they are released.

23             MR. KLUGH:  To get back to my question, which is how

24   do we if we're trying to create a formula for whether

25   somebody's going to flee.  The government says one factor

P1FKALEC1

matters more than anything else — they've been indicted.  And I

would say to your Honor, in my experience, two other factors

matter more than anything else.  It's that given their

situation in life, they've all become married since these

allegations — well, one was married even before the statute

would have run on the conspiracy -- and that calls into

question another matter, and that's Mr. Srebnick's claim — my

brother was married thereafter.  These marriages themselves

come into play on the notion that there's going to continue to

be orgies.  There's been no more orgies.  They're married.  My

client had a child on Christmas Day just, you know, two weeks

ago -- three weeks ago.  He had a child, his only child, on

Christmas day, three weeks ago.  There's no more orgies.  The

danger of having an orgy is zero at this point.

        In jail, out of jail.  What's the danger?  The danger

of defending against a defamatory matter?  The government

raised repeatedly — repeatedly — the fact that they hired a

lawyer to obtain an injunction against someone who was

publishing on the internet a false and fabricated article in

the Miami Herald alleging some form of violation.  That false

allegation, a false creation of an article from the Miami

Herald on a blog, an injunction was finally entered

appropriately, and that is one of the factors that the

government has used in this case to say there's some other

danger besides the risk of orgy.

P1FKALEC1

1            As to that matter, it is also important that once that

2     blog precipitated in the world, it precipitated the various

3     plaintiffs' attorneys going out and recruiting people.  What

4     objective factor — besides the videos, besides the marriages,

5     besides the polygraphs — what objective factor do we have that

6     this is a case that these gentlemen want to try, that these

7     gentlemen who have young children, beautiful wives, wonderful

8     families, who are willing to risk everything for them, and

9     that's whether they're rich or poor, I don't get that much in

10    the last 50 years I've been doing this.  They're willing to

11    risk everything, their whole lives.

12            Again, a side note.  The Court asked for how can that

13    be done for sure.  I handled the case of David H. Brooks here

14    in the Eastern District.  That case was a much larger amount,

15    but the entire amount, $400 million, was placed in a controlled

16    account — I think we used Lantern Investments — and the control

17    of that account was absolutely perfect.  Nobody tried to flee.

18    There was one technical violation, and in the initial order,

19    everything was wiped out, everybody's assets, a technical

20    violation.  What these defendants are being placed on an oath

21    and a duty to their families is very significant.

22            Now, the Second Circuit, Judge Seybert, eventually

23    reduced the amount to $45 million that the family lost.  But he

24    didn't go anywhere, he never left Manhattan, and even in that

25    case.  And so what I'm saying is that this is an

1    extraordinarily triable case.  This is a case that needs to be

2    worked, it needs to be worked together with lawyers, so that

3    means these defendants have an incentive beyond the ordinary

4    case to work it, to try it.  There are statute of limitations

5    issues.  There's fundamental issues regarding commercial sex.

6    There is no such thing in federal law as a date rape

7    conspiracy.  There is no such thing in federal law as a

8    conspiracy when your brothers, y'all like to do the same thing,

9    y'all like orgies, sometimes one does one thing and one does

10   another, there's no precedent for that.  And there's

11   fundamental issues of credibility.  There's fundamental issues

12   of --

13          THE COURT:  No precedent for conspiracies involving

14   family members?  In all of your defense work, you've clearly

15   never had Mafia cases because, trust me, brothers are capable

16   of conspiring with each other.

17          MR. KLUGH:  No, I understand they're capable of it,

18   but the premise of this conspiracy is that the brothers -- I

19   don't know what the premise of the conspiracy is.  I don't

20   know --

21          THE COURT:  The premise is that they agreed to engage

22   in commercial sex.

23          MR. KLUGH:  Again, how does that work?

24          THE COURT:  We're going to get to that.

25          MR. KLUGH:  I can't see it articulated in my mind.  I

P1FKALEC1

can't see it articulated on paper.  I haven't seen it.  It
wasn't articulated in Miami.  I've never seen a precedent for
it whatsoever.  Three guys -- I haven't even seen a three-guy
conspiracy — we like to go out and date girls, sometimes we get
them too intoxicated, and then we have sex with them.  I've
never heard of such a conspiracy.  Again, the allegations are
vague, the allegations of the victims, when we have identified
the victims, the ones that we've identified, we pinpointed it,
and everything, not just the polygraphs, but the surrounding
evidence that we provided in our PowerPoint suggest a very
defensible case on the sole substantive count my client is
alleged with.

        So, what I'm saying is, I'm not trying to win the case
here.  I'm not treating this Court as a jury.  I am begging
this Court the way I would beg for anybody for the cheapest,
lowest person, homeless person, I'm begging because they've got
a very triable case.  Please, please, let us have that
opportunity.  We've done everything in our power.  I'm not
asking the Court to impose these conditions, these kind of
onerous conditions.  We're trying to respond to the claim that
because they're wealthy, they are a risk of flight, or because
they have parents who came from Israel, they have a risk of
flight.  If that's going to be the test, their status, their
familial history, their wealth, then *Boustani* is no object.

        THE COURT:  You're right, but I didn't understand that

P1FKALEC1

1      to be the government's argument.

2                MR. KLUGH:  My point is that in any case — in any

3      case — if these were the allegations, and it was this shaky,

4      and the defendants involved had such solid ties, where, again,

5      there's no federal court precedent for this type of party

6      conspiracy again, and where the only video evidence shows

7      nobody incapable of handling themselves — nobody -- even by the

8      admission today, you cannot call somebody incapacitated who

9      stands up after sex.  You just can't.

10               THE COURT:  All right, Mr. Klugh, to the extent that's

11     your argument, with all due respect, I disagree.

12               MR. KLUGH:  Well, your Honor, the argument is only --

13               THE COURT:  I'm just telling you, if that's your

14     argument, you lose.

15               MR. KLUGH:  I just want to make sure it's

16     understandable.  Our argument is, how do you evaluate an --

17               THE COURT:  You lose on the argument that just because

18     someone can stand up, that means they are not incapacitated

19     from consenting to sex.

20               MR. KLUGH:  Right.

21               THE COURT:  That was your argument.  And that is

22     nonsense.

23               MR. KLUGH:  No.  The consent issue is, again, a very,

24     very close one.  But I do want --

25               THE COURT:  A very close one?

P1FKALEC1

1          MR. KLUGH:  The consent issue is a very, let's say --

2     well, close is the term used by Judge Sanchez with regard to

3     the whole bond issue.  I did want to say that.  When

4     Judge Sanchez denied bond to Mr. Oren Alexander, he said it was

5     a very close case.

6          I do think that -- what I'm talking about is

7     whether -- something can be nonconsensual that appears

8     consensual, something can be consensual that doesn't appear

9     consensual.  Those are all triable issues, but none of the

10    circumstances that were alleged in Miami — women screaming,

11    women held down, women completely unable to move — occurred

12    here.  None of that --

13          THE COURT:  Occurred on the video.

14          MR. KLUGH:  No, they didn't.

15          THE COURT:  Your argument is none of it appeared on

16    video.

17          MR. KLUGH:  Right.

18          THE COURT:  That doesn't mean the government doesn't

19    have evidence of it.  They've got witnesses who will say that's

20    what happened.

21          MR. KLUGH:  Again, what --

22          THE COURT:  And I understand that you think that you

23    are going to decimate them on cross-examination, and maybe you

24    will, but what I've got right now is the government's proffer

25    that says they have a whole lot of women who are saying very

P1FKALEC1

1    similar things, even though they don't know each other.

2              MR. KLUGH:  Again, most important — and the Court says

3    this is not the occasion for a motion to dismiss, and I'm not

4    trying to win the case today — what I am trying to tell the

5    Court is that the only way for me as an individual, and I'm not

6    a judge, to evaluate whether somebody's a risk of flight is

7    whether they have a lot invested and whether they had a shot at

8    winning that is really meritorious.  It's the same type of

9    analysis that the Supreme Court uses in ineffective assistance

10   of cases on plea decisions.  You look at what is a rational

11   person looking at this going to do.  The guidelines can vary

12   greatly.  We have the guidelines well under 20 years in this

13   case, not at life.  The possibility of winning for various

14   defendants is extraordinarily high.  We have great

15   cross-examination, obviously, we have great impeachment, and

16   that's before we even get to the one — to me, and I may be

17   alone — salient factor that not a single one of these supposed

18   instances, for eternity basically, has ever been reported to

19   the police, not a single one has appeared in a text message,

20   not a single one has appeared in social media.  Not a single

21   one.  And the one individual in this entire scenario who says I

22   told a girlfriend of mine, what is the evidence of that we

23   have, we showed your Honor.  That girlfriend doesn't seem to

24   act like she was just told she's been around a bunch of

25   rapists.  Far from it.  She acts like those are the people she

P1FKALEC1

 1    likes and she wants, she called them the A team, she loves them

 2    and wants to continue to be with them.

 3           So, I'm not trying to win the case.  I can't win the

 4    case today because I haven't seen the evidence.  Nobody's seen

 5    the evidence.  But I have clients who are willing to take

 6    polygraphs, even in those horrible circumstances of the jail.

 7    I have clients who passed those polygraphs with flying colors.

 8    I have the claim of witnesses that I don't know even what the

 9    reports of those interviews say.  I have a triable case.  I

10    have United States citizens who have lived here their whole

11    lives.  They have no criminal history.  They deserve a bond.

12    They deserve some kind of bond.  It's not a matter of it --

13    they are not trying to buy a private jail.  They're trying --

14           THE COURT:  Well, that's what you're proposing.

15           MR. KLUGH:  Your Honor, we're trying to meet any

16    obstacle that would be created.

17           THE COURT:  And I appreciate that.  Trust me, I'm not

18    being critical of the defense for what you're proposing.  I'm

19    just saying that is what you are proposing.  You are proposing

20    a private funded jail.

21           MR. KLUGH:  The difference is, your Honor, between --

22           THE COURT:  I understand why.  Again, I didn't just

23    fall off the turnip truck, I understand what you're doing, but

24    let's be honest, what you're proposing is a privately funded

25    jail.

P1FKALEC1

1          MR. KLUGH:  We're proposing -- your Honor, this is

2    what would happen in the case of somebody who's not rich.  And

3    these gentlemen are not rich; they've just done well.  These

4    are working people.  These are not people who just, like,

5    inherited --

6          THE COURT:  They are exceedingly wealthy.

7          MR. KLUGH:  They've made wealth by their work.  Their

8    work --

9          THE COURT:  That doesn't mean they're not wealthy.

10         MR. KLUGH:  I understand.

11         THE COURT:  Okay.

12         MR. KLUGH:  But it has to do with the character of the

13   person, and it goes to risk of flight.  And it goes to one

14   thing, which is that we have not -- when the Court refers to a

15   private jail, what we are talking about is similar to what

16   would occur in a poor person, a homeless person, where we'd

17   say, yeah, you can live with your aunt with ankle monitoring,

18   and we know because you're so poor, you're not going to take a

19   flight.

20         So the similar situation is you have an individual

21   with a number of great defenses.  You have a government that's

22   talked about one piece of physical evidence.  That physical

23   evidence, in my opinion, cuts heavily against them.  We have no

24   identification of any victim.  You have passed polygraph tests.

25   Is that individual going to be deprived of an ankle monitoring

P1FKALEC1

```
 1    when he has no apparent means to flee anywhere because he's
 2    poor?  So, it is not a benefit to the rich.  It is a benefit to
 3    due process.
 4           And in this initial bond hearing, that is the
 5    fundamental obligation of this Court.  Because the government
 6    has very carefully avoided -- when they went to the second bond
 7    hearing, they made sure to keep Agent Atwood off the stand.
 8    They put an agent on the stand who didn't even know that there
 9    was a superseding indictment, didn't know anything about the
10    superseding indictment.
11           It cannot be --
12           THE COURT:  I don't understand the Florida process.  I
13    don't understand why you need a witness on detention hearing.
14    So, you don't get much out of that.
15           MR. KLUGH:  Your Honor, can I just have my law partner
16    go over the letters of support for this individual which we
17    have submitted?
18           THE COURT:  I'm sorry, say what?
19           MR. KLUGH:  Can I just have my law partner,
20    Jenny Wilson, go over the letters of support?
21           THE COURT:  Sure.
22           Did I get letters -- I saw those.  Those were part --
23    you submitted those.
24           MR. KLUGH:  We did submit them.
25           THE COURT:  I read them.
```

P1FKALEC1

1          MR. KLUGH:  Your Honor, those are very serious

2    letters.  They talk about this individual -- this is not the

3    type of individual that, by any means, one sees leaving this

4    country forever in the hopes that somehow he will be the one

5    person in history that does not immediately get extradited

6    back.  It simply does not add up when he has everything,

7    everything, to go for here.  He has a triable case on an

8    unprecedented prosecution.  His family and everybody he knows

9    is basically putting up everything they have to trust him.  He

10   is willing to do ankle monitoring.  He's willing to do

11   anything.  He is not asking for a break because he's rich.

12   He's asking for a chance to defend himself.

13          THE COURT:  I understand your point.  Thank you.

14          Mr. Srebnick?

15          MR. SREBNICK:  Yes, your Honor.  Good afternoon.

16   Howard Srebnick.  I appeared for Alon Alexander at the hearing

17   before Magistrate Judge Sanchez.  And at that time, I

18   introduced to the Court the parents, who are here in court

19   today -- I'd ask Shlomo, if you would stand up, Shlomo, and

20   Orly Alexander --

21          THE COURT:  Thank you for coming.

22          MR. SREBNICK:  -- who appeared before the Court, and I

23   think they really personify the issue today.  As you know now,

24   they came to this country, studied at the University of Miami,

25   built a family, established great success through the American

P1FKALEC1

dream.  And they're telling you, Judge — they told

Judge Sanchez, and they're telling you — and they're here today

to answer any questions you have, that they are prepared to

risk everything they have — everything — because they know

their children will not disappoint them, their children will

not disobey your Court's orders, they've known about this

investigation for six months, and we are prepared to do

whatever it takes to satisfy it.

             Now, in Florida — I know the procedures are

different — in Florida, typically, the courts ask for

sureties — they could be friends, family — to sign a bond, and

I think in one of the submissions, we gave you a link to that

cite, and the Court sets an amount.  It could be a million, it

could be 5 million.

             THE COURT:  We do that, too.  That's not unusual.

             My question was:  You had proposed a secured bond, and

so my question is, like, normally, if it's a guy who sold

drugs, and they're being released on a $50,000 bond, somebody

signs a bond for $50,000.  It's not backed by anything other

than the promise to pay.

             My understanding was — and you've reiterated this —

that that's not what you're proposing.  You're proposing a

secured bond, and the sorts of assets that you listed, in

addition to property in Florida, where I don't understand the

law of Florida, I don't even know if you can foreclose on that

P1FKALEC1

1    property, given homestead exemptions and all that, so I don't

2    know if that really can be -- I just don't know.  I'm a

3    New York lawyer, not a Florida lawyer.  But I just don't

4    understand what you're proposing in terms of, do we really

5    expect the government to somehow figure out how to take a lien

6    on their private LLC?  And what would that even mean?

7            MR. SREBNICK:  So there are multiple ways of doing it.

8    One way is --

9            THE COURT:  I'm not disagreeing.  I'm just asking,

10   what are you proposing?

11           MR. SREBNICK:  First is that they would sign a bond,

12   and they would have a judgment, a forfeiture judgment, against

13   them individually should either/or more than one -- one or more

14   of their sons fail to appear.  So, there would be a judgment

15   against them.  It would be a judgment against all of their

16   assets.

17           THE COURT:  Well, it would be a judgment against them.

18           MR. SREBNICK:  Yes.  And it could result in the

19   forfeiture of every single one of their assets --

20           THE COURT:  Well, only if the government chases the

21   assets down and is allowed to execute against them.  Hence, my

22   question about Florida.  That's why they're having a trial with

23   Giuliani's condo, is whether you can satisfy a judgment with

24   someone's home in Florida because they're homes.

25           MR. SREBNICK:  Right.  But a criminal forfeiture

1    judgment, homestead doesn't apply --

2              THE COURT:  Well, I don't know.  That was my question.

3              MR. SREBNICK:  Well, that is the answer.  And there

4    are multiple ways of securing the bond.  Of course, a signature

5    is typically unsecured.

6              THE COURT:  Correct.

7              MR. SREBNICK:  But there would be a judgment.

8         The Court can also require mortgages on real estate in

9    favor of the United States — we do that routinely — so that the

10   family, the owners, mortgage to the United States, all of the

11   real property, just like you would do if it was to a bank, the

12   government holds it contingent upon the defendants appearing as

13   ordered.  If any one of the defendants fails to appear as

14   ordered by the Court, that property is now the United States

15   Government's real property.  So, that's how we resolve real

16   property.

17        When it comes to a family business, of course, it's a

18   little bit more complicated, but there are ways the Court can

19   also secure that by way of similar kinds of instruments.  And

20   if the Court was concerned that these parents, who have lived

21   in this country for all these years, never disobeyed the law,

22   would do anything to put you at concern that they're doing

23   something wrong, you could, for example, appoint someone, a

24   monitor, just to make sure there's been no activity with the

25   business that has given you concern.

P1FKALEC1

1          THE COURT:  We're not communicating.  My understanding

2     of what the defense proposed was a fully secured bond.  So,

3     you've now told me how for real property, and you've told me no

4     way the defendants would flee because they would leave their

5     family penniless.  So I'm just trying to understand

6     mechanically how that's the case.  How are you proposing to do

7     that?

8          MR. SREBNICK:  When we say in Miami, that it's

9     secured, a personal surety bond is secured, it means the Court

10    enters an order, it's right on the document, that none of those

11    assets can be pledged, hypothecated, et cetera.  We can record

12    the mortgages as I've described.  A lis pendens is placed.  As

13    it comes to other assets, for example, the Court can also — an

14    option that I presented to Magistrate Judge Sanchez — set what

15    we call a corporate surety bond.  That's when you have a

16    bondsman.  Typically, the Court imposes a bond in the

17    neighborhood of 250,000 to 500,000, sometimes as high as a

18    million, the reason being bondsmen charge 15 percent fee,

19    nonrefundable, earned when paid, you'll never see the money

20    again.

21          THE COURT:  Right.

22          MR. SREBNICK:  But that gives the Court additional

23    assurance that the bondsman has something to lose.

24          THE COURT:  A million dollars is nothing to this

25    family.

P1FKALEC1

1          MR. SREBNICK:  That's why we have said to the Court,

2    even a combination of those two --

3          THE COURT:  Okay.  Just to be clear, what you're

4    proposing, then, is secured to the extent of their real

5    property and presumably liquidated assets, so bank accounts,

6    brokerage accounts, et cetera?

7          MR. SREBNICK:  That's exactly right.  The only other

8    thing they own would be the business.

9          THE COURT:  Correct.

10          MR. SREBNICK:  And the business is worthless if it's

11    not operating.

12          THE COURT:  Correct.

13          MR. SREBNICK:  It's run by the two people you see in

14    court.  The CFO is the mother, Orly.  The father is with the

15    company.  The other key man of the company is Orly's brother,

16    who's here.  His name is Gil Newman.  He also appeared.  These

17    are the three people that will lose.  If judgments are entered

18    against them, they're done.  And, so, what the Court has to

19    evaluate is whether these three boys are going to leave their

20    parents, their uncle, penniless.

21          Now, Richard Klugh was saying if the Court's concerned

22    that they have a piece of property in Israel, which we

23    disclosed, an investment property in the Bahamas, we can sell

24    those now and deposit the money in a registry of the Court, if

25    that's the concern.  We'll do anything we need to give the

P1FKALEC1

Court the comfort that the boys are not going to flee and leave

their parents, their uncle, penniless.  That's the evaluation

you need to make.

Now, there is a presumption in the case because of the

nature of the offense, and that's what brings us here, because

the government relies so heavily on the presumption, but it's a

presumption that doesn't shift the burden of persuasion to us,

and we produced evidence.  I brought to court --

THE COURT:  They have the burden of persuasion,

there's no question about that.  They're well aware of that.

MR. SREBNICK:  Now, let's break it down — danger to

the community, risk of flight.  Let's talk about danger to the

community.

What has the government shown you that gives you

reason to believe that if they go out on the street, into a

home detention scenario — let's put aside the private security

because that raises this whole *Boustani* issue — that if an

ankle bracelet was put on each of their ankles, they were

confined 24/7 to a condominium in the sky with one door in and

one door out, monitored by pretrial services.  Let's leave the

private security out for the moment.

THE COURT:  So we're going to take a pretrial services

officer and tell them their next duty is not to do pretrial

services work, but to watch this camera.

MR. SREBNICK:  That's the typical condition that home

P1FKALEC1

1    detention has.  In United States --

2              THE COURT:  We don't usually put -- maybe in Florida,

3    you guys maybe have more assets than we do up here in New York,

4    but we don't usually do that when we've got somebody on home

5    detention.

6              MR. SREBNICK:  In *United States v. Fox*, Judge --

7              THE COURT:  I'm not saying a judge hasn't ordered it.

8    I'm telling you it's not normally done.

9              MR. SREBNICK:  Well, home detention in South Florida,

10   and I think in most districts, can include ankle bracelet

11   monitoring.

12             THE COURT:  Yes, but a camera on the door?

13             MR. SREBNICK:  That's an option that I've seen, and

14   I've cited the case --

15             THE COURT:  I've never seen it anywhere.

16             MR. SREBNICK:  It's pretty cost effective.

17             THE COURT:  Somebody's got to monitor it.

18             MR. SREBNICK:  Understood.  But I'm just citing to you

19   what judges have done.

20             THE COURT:  Okay.

21             MR. SREBNICK:  And what we're proposing, when I came

22   to the Court for Alon Alexander, I was adding to the conditions

23   to give comfort to the Court, and I'm saying to you, your

24   Honor, let's start with the proposition, let's talk about

25   dangerousness.  What's the evidence that they're going to

1    commit any of the offenses that the government has alleged they

2    committed many, many years ago?  Put aside the strength of the

3    evidence for the moment.  Let's just talk about what's the

4    evidence that in the last four years, any one of the brothers

5    has engaged in any of the conduct that the government alleged

6    happened four-plus years ago.  Zero.  That's why two out of the

7    judges that listened to this case found that dangerousness was

8    not a basis to detain.

9        So I'd like to answer any questions you have about

10    that, but two judges, who heard the government's proffer, heard

11    from Agent Atwood, heard from Agent Hamps, two judges concluded

12    that dangerousness was not a basis to detain them.  And I

13    emphasize that as to Alon Alexander --

14        THE COURT:  I think what they held was that the

15    conditions you had proposed mitigated the danger to the

16    communities, not that there was no danger to the community from

17    these defendants.  And that is a big, big difference, because

18    that implicates the private jail problem.

19        MR. SREBNICK:  Well, even before we get to the private

20    jail, what's the evidence they've committed any offenses in the

21    last four years?  What's the evidence there have been any

22    allegations of sexual misconduct in the last four years?

23    There's not even allegations in the last four years.  All four

24    men -- excuse me, all three men are married.  I meant

25    four years, three men.  All three men married with children.

P1FKALEC1

1   You know that.  For his part, Alon Alexander, who has been

2   married the longest, when questioned --

3           THE COURT:  When did he get married?

4           MR. SREBNICK:  2020.

5           He met his wife in --

6           THE COURT:  The conspiracy was still going on,

7   according to the government.

8           MR. SREBNICK:  And yet not a single allegation that

9   Alon Alexander was involved in any misconduct involving sexual

10  activity since -- 2016 is the last allegation.  That's Count

11  No. 3 in the indictment.  Since 2016, I asked the agent, is

12  there an allegation of any sexual misconduct after 2016.  Not

13  even an allegation, much less have we seen a report --

14          THE COURT:  I thought the way you phrased it was in

15  the indictment, which I thought was kind of a dumb question

16  because you know what's in the indictment, as opposed to is

17  there any evidence of misconduct involving him after that

18  point.

19          MR. SREBNICK:  Well, there's a conspiracy count that

20  goes through 2021, so I assume the government's theory is that

21  even if it's not charged as a substantive count, there could be

22  acts in furtherance of the conspiracy since 2016.

23          THE COURT:  Sure.  But I'm just saying your question

24  to the Agent was a -- with all due respect, was a bad question,

25  because I think you phrased it in terms of what was mentioned

P1FKALEC1

1    in the indictment.

2          MR. SREBNICK:  That's what we're here on.  That's what

3    the presumption --

4          THE COURT:  Okay.

5          MR. SREBNICK:  In any event, I'll --

6          THE COURT:  What I'm saying is, her answer didn't

7    advance your ball because the way the question was phrased did

8    not answer the question of is the government in possession of

9    any evidence that Alon Alexander engaged in sexual misconduct

10   of the nature charged in the conspiracy count after 2016.

11         MR. SREBNICK:  I'll take the criticism.  I'll learn

12   from it.  I'll ask the question better.  But, for the moment,

13   what matters is that in four years, there's been no allegation

14   of any continuing criminal conduct.  And that alone gives you

15   reason and comfort to believe that there will be no ongoing

16   criminal conduct from the three men who have young children,

17   are married, and have lived a quiet lifestyle in the last

18   four years.

19         So, let's start with dangerousness.  Two judges have

20   said we can fashion conditions that overcome any issue of

21   dangerousness.

22         THE COURT:  Right.  But, again, those conditions were

23   a private jail.

24         MR. SREBNICK:  Even --

25         THE COURT:  So, just be aware, that I have real

P1FKALEC1

1    problems with that conclusion.  And it may be that the law in

2    the Eleventh Circuit is different, so I'm not being critical of

3    the two magistrate judges, they did their job.  But in the

4    Second Circuit, if the only way I can mitigate danger to the

5    community is creating a private jail, that's not -- I can't do

6    that.

7         MR. SREBNICK:  What I'm saying is given their conduct

8    in the last four years, there's no evidence, no basis to

9    conclude, they will resume conduct, which the government said,

10   even by the indictment's own dating, is four years ago.

11        THE COURT:  Okay.  That argument, I understand.

12        MR. SREBNICK:  So now we've returned to the issue of

13   risk of flight.

14        And what evidence has the government presented to you,

15   other than the presumption that applies but for which the

16   government continues to bear the burden of persuasion, what

17   evidence leads you to believe that the three men would

18   jeopardize their entire family's American dream and not obey

19   the Court's order?  Because that's what you're trying to

20   decide, will they obey your order when you say you need to be

21   here in court on such-and-such a date.  And what gives you

22   reason to believe that they won't do that?

23        It's certainly not the crime that they committed,

24   according to the government, because sexual misconduct doesn't

25   bear on their willingness to follow your orders.

P1FKALEC1

|  | That's why when your Honor referenced white collar
cases, it rang loud to me, because in white collar cases, what
most of those people are accused of are acts of deception, acts
of trickery and fraud and looking at someone and lying to their
face.

THE COURT:  Yes, you don't think looking at someone
and handing them a drink that has a drug in it is deceptive?

MR. SREBNICK:  Well, on that point, Mr. Alon Alexander
was asked by the polygraph examiner, and you may not give it a
lot of weight, your Honor, but --

THE COURT:  Again, you wanted it for the press, but
it's not moving me.

MR. SREBNICK:  Well --

THE COURT:  Make your record.

MR. SREBNICK:  It's in the record.  I don't need to
make it.

The point is, you're assuming guilt.  You're assuming
that he's guilty when you ask the question, your Honor,
respectfully.  The government hasn't shown you a report, they
haven't shown you a witness, it's all attorney proffers by the
government.

THE COURT:  Correct.

MR. SREBNICK:  So I'm afraid if your Honor is assuming
guilt and asking us to disprove it, it's not possible.

THE COURT:  I'm not assuming guilt.  I'm taking the

P1FKALEC1

1    government's proffer for what it is.

2             MR. SREBNICK:  But a proffer, that is nothing more

3    than an attorney speaking --

4             THE COURT:  I'm sorry, but we've gotten sort of off

5    track.  The point was you're saying -- I said white collar

6    crime; you said white collar criminals can look at somebody,

7    face in the eye, and lie to them.  I'm saying that's what the

8    allegation is against your client.

9             MR. SREBNICK:  Again, respectfully, I disagree, but

10   let's call --

11            THE COURT:  I don't know how you can disagree.  That's

12   their allegation.  You don't think they can prove it, I

13   understand that, but do you not understand that's their

14   allegation?

15            MR. SREBNICK:  Of course I understand what they

16   allege.

17            THE COURT:  Okay.

18            MR. SREBNICK:  But there's no material difference,

19   then, in terms of if that's the case, if there's equilibrium of

20   honesty or dishonesty, then the sexual misconduct case is no

21   worse than a white collar case for purposes of risk of flight.

22            THE COURT:  No, but it is for purposes of danger to

23   the community.

24            MR. SREBNICK:  I thought we've already overcome that.

25            THE COURT:  You think you've overcome that.  Whether I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P1FKALEC1

1      think you've overcome that or not is a different question.

2                    MR. SREBNICK:  Forgive me.

3                    THE COURT:  You referenced that I said those are white

4      collar cases.  I did it in the context of one of your

5      colleagues talking about a case where the bail conditions

6      involved these sorts of private guards.  Those were white

7      collar cases where the issue of danger to the community is a

8      different analysis.  So, that's why I referenced it.

9                    MR. SREBNICK:  Understood.  And people who commit

10     white collar offenses continue to commit them even while

11     they're on bond as well.

12                    THE COURT:  Some do, some don't.

13                    MR. SREBNICK:  In all events, on the issue of risk of

14     flight, the question is what have these three men done to

15     suggest to you they won't obey your orders?  That they won't

16     obey your order to appear, that they'd be willing to risk their

17     parents' American dream and leave them destitute?  That they

18     would somehow manage to get on some sort of plane and fly past

19     the iron dome into Israel that's in a state of war and not be

20     extradited back to the United States?  That's the government

21     theory?  Well, their suggestion, the government's suggestion,

22     is just wrong, and I have the personal experience of having

23     represented the Israeli, Rosenstein, who was extradited back to

24     the United States, and he's an Israeli citizen who Israel

25     extradited.  It is fanciful to think, and the government has

P1FKALEC1

1    not cited a single case where Israel has declined to extradite

2    an American citizen.  They haven't cited one case.  And

3    certainly none in our judicial lifetime.

4              So it is --

5              THE COURT:  Once you get to extradition, the person

6    has already fled.  So I'm not focused so much on whether Israel

7    will or won't extradite.  My issue is, does the defendant have

8    ties to another country.

9              MR. SREBNICK:  Of course.  But their theory is that a

10   defendant will think to himself, I can go to Israel and take

11   refuge there, that that's their claim.  That has to be their

12   claim.  It's either Israel or Brazil, they say, that they'll

13   take refuge there, and you should be worried, Judge, they'll

14   figure out a way to get out of here and take comfort and

15   refuge, leave their parents destitute, and spend the rest of

16   their lives free and clear in Israel.  That's just a fanciful

17   claim by the government.

18             And Brazil -- I represented a man who was extradited

19   from Brazil, a U.S. citizen, extradited to Tampa, and then he

20   famously cooperated after he was extradited back to the United

21   States against someone in the family, as you say, Judge, the

22   Mafia.  So Brazil extradites Americans.  Once again, the theory

23   that these three men are going to somehow find a private jet,

24   without passports, to fly them to Brazil, and they'll take

25   refuge in Brazil, another fanciful claim by the government.

P1FKALEC1

1            So I ask your Honor, what is the real theory of what

2    these men will do if you order them to stay under home

3    detention, with electronic monitoring, whether with a video,

4    whether with a private security, what other conditions your

5    Honor might feel would give the Court additional comfort?  And,

6    of course, even home detention, with electronic monitoring, is

7    at the expense of the defendant, at least under the court

8    orders I've seen.  And, so, now the question is, how much more

9    will it cost to have a security company with the gentlemen who

10   have indicated they have the capacity to do it, that the Court

11   can inquire of, and decide whether you can be satisfied that

12   they can give you additional assurances that those three boys

13   will remain in that one-door, locked apartment, unless you say

14   come to court.  They'll never leave there unless you give them

15   authority to come here, and those men would escort them to the

16   courthouse.  And during the time of pretrial release, we'd be

17   working with them.  And that's what our goal is, is to have

18   that opportunity.

19           The other issue -- the one issue that I thought the

20   magistrate in Miami was most concerned about when it came to

21   house arrest was not so much the so-called two-tiered system,

22   but it was to make sure that a security company actually had

23   arrest authority so that if someone were to step outside that

24   door, cuff them, take them right to your Honor, and bail is

25   forfeited, all three are back in jail, because if one bond is

P1FKALEC1

1    forfeited, all three are no longer out on bond.  Because the

2    bond will have been forfeited, all three go to jail even if one

3    violates.

4            So, we made sure that the company that Mr. Williams

5    has introduced — he did the vetting, he gets the credit for

6    it — they have arrest authority.  They can stand outside that

7    door.  They can make sure that nobody leaves.

8            So, I always thought in the United States of America

9    the presumption was you do get bond.  I understand we have a

10   presumption that has now flipped, but we've come forward to you

11   and said, we can give you, Judge, assurances beyond what you

12   could imagine.  We've imagined it for the Court, but we didn't

13   invent these.  In 1999, in a case in the Eastern District of

14   New York, prosecuted, coincidentally, by Mr. Williams' partner,

15   who was then a prosecutor.  I had a case in 1999.  The

16   defendant was arrested in Miami.  Bail was set.  The government

17   appealed.  Eastern District of New York, Judge Korman and

18   Magistrate Judge Azrack, approved house arrest, security

19   company, in a racketeering murder conspiracy where the

20   defendant was accused of being involved in a home invasion

21   where a woman was shot pointblank in the face, *United States v.*

22   *Ludwigsen*.  The defendant remained under house arrest with a

23   private security company, approved by the Court, paid by the

24   defendant by court order.  I assume we're not even arguing this

25   point about conflict of interest and how someone of the

P1FKALEC1

1    reputation of the men that Mr. Williams has identified would

2    somehow compromise their integrity because the payments have to

3    come from the defendant.  They would respond to you, your

4    Honor, and only you.  They won't take orders from the lawyers.

5    They wouldn't take orders from the defendants.

6            And in the 1999 case, remember Mr. Walden, the

7    prosecutor, objected vigorously.  The judge set those

8    conditions, and they worked.

9            THE COURT:  That was 20 years before the Second

10   Circuit decision.

11           MR. SREBNICK:  I just wanted to let you know, we

12   didn't invent this today.

13           THE COURT:  I know you didn't invent it, but the law

14   in the Second Circuit is what it is.

15           MR. SREBNICK:  And I say to you, Judge --

16           THE COURT:  Again, Mr. Valente and Mr. Mazzella are

17   good guys.  I don't have a problem with them.  The issue is the

18   Second Circuit law is not favorable to what you're proposing.

19           MR. SREBNICK:  My view is electronic monitoring, in a

20   secure location like a one-door condo, with or without security

21   guards, just typical electronic monitoring, should be

22   sufficient.  It should be sufficient because of the reasons

23   I've said — no criminal activity in the last four years.

24   They're now being treated as if they're guilty, and they have

25   to stay in a house.  The only reason we're even talking about

P1FKALEC1

1    this is for a regulatory purpose, not a punitive purpose.  I

2    think we all understand that some people don't understand that

3    pretrial detention is not supposed to be punitive.

4          THE COURT:  That is correct.

5          MR. SREBNICK:  It's supposed to be regulatory.  The

6    Court's only concern should be, will they come to court, will

7    they abide by the court orders.

8          THE COURT:  And do they pose a threat to the

9    community.

10          MR. SREBNICK:  Exactly.

11          And I hope the Court hears us when we say four years

12    of --

13          THE COURT:  I hear your argument.

14          MR. SREBNICK:  Okay.  I don't know what else to do to

15    establish, given their current lifestyle, given the change in

16    their lifestyle in the last four years, and the absence of even

17    an allegation of misconduct, what more someone can bring to a

18    court to satisfy you that you shouldn't be concerned that if

19    the government had waited another year to indict the case,

20    there would be no criminal activity in the next year.  Much

21    less when they're now under supervision, and their parents will

22    lose everything if they so much as spit on the sidewalk and

23    break another law, they could have their bond forfeited.

24          So I think, Judge, I tried to address your concerns.

25    The *Boustani* case, it's not a simple case to address, but I'm

P1FKALEC1

```
 1    satisfied that there have to be cases where the courts accept

 2    that a defendant who has shown crime-free activity for

 3    four-plus years, his family is willing to lose everything if he

 4    violates those conditions — you can meet the parents, you can

 5    talk to them, you know who they are based on what you've read

 6    in the record — that these three brothers will obey your

 7    orders.  They'll obey your orders, I think that's all that

 8    really counts going forward.  It's not whether the video shows

 9    this or the witness can be impeached.  Right now, it's can they

10    obey your orders.  And I think we have shown you, Judge, they

11    will obey your orders.

12               THE COURT:  Thank you.

13               We've been going for almost two hours.  So why don't

14    we take a five-minute break, and let the government get their

15    ducks in a row.

16               (Recess)

17               THE COURT:  You're still standing.

18               MR. SREBNICK:  Your Honor --

19               THE COURT:  I took a break for you to sit down.

20               MR. SREBNICK:  Give me 60 seconds just to make clear,

21    under the Florida procedure, and New York, I assume, is the

22    same, when someone signs on a bond, they're subject to penalty

23    of contempt of court if they disobey.  So the parents and the

24    father wanted to remind me — he pulled me aside — he remembers

25    me explaining, and I am reiterating, if you order they cannot
```

P1FKALEC1

1    further encumber any of their assets, dissipate their assets,

2    he goes to jail and she goes to jail if they disobey your court

3    order.  They wanted you to know they're prepared to take that

4    risk.

5            THE COURT:  Okay.  I appreciate that.

6            Who's talking for the government?  Mr. Jones?

7            MR. JONES:  Yes, your Honor.  Thank you.

8            Your Honor, one of the questions you asked earlier

9    today is, is *Boustani* controlling, and the answer is,

10   absolutely, yes.

11           So, that means that this proposed -- excuse me.

12   *Boustani* has only one very narrow circumstance.  This private

13   security type provision is allowed if, and only if, you have a

14   risk of flight that is premised principally, exclusively, but

15   for the defendant's wealth.  And we're not in that situation.

16   We're in the situation where detention is warranted for

17   dangerousness grounds, and we're in the situation where

18   detention is warranted for flight risk grounds that are not

19   because of the defendants' wealth.

20           So, just to highlight a couple of the points here,

21   starting first with the danger:  The danger here is really

22   evident from the offenses and from the evidence of those

23   offenses.  The government, meaning the FBI and the U.S.

24   Attorney's Office, the investigation is ongoing, interviews are

25   ongoing, but to this point, we've interviewed more than 40

1    women who have been raped or sexually assaulted by one or more

2    of the defendants.  This is dating back, roughly, 20 years to

3    when they were in high school, but it also includes 35 — and

4    we're talking now about a prime time frame that starts in 2009,

5    2009 extending up to 2021, at least — and so these victims,

6    they don't know each other, or they know one or two other

7    people, but they all don't know each other.  They live in

8    different places, they were assaulted in different places, they

9    were assaulted in different years.  Some are substantially

10   younger than the defendants, some are about their age, some are

11   older.  Some did tell people around the time of the assault,

12   and certainly before lawsuits were brought, what had happened

13   to them.  And yet, with all of this, they have a consistent

14   account.  They are describing the means and methods of the

15   conspiracy.

16         So, these accounts are self-reinforcing in their

17   credibility, in the numbers, in the way they describe it,

18   despite not having the chance -- they're not coordinating this

19   with each other.  But it's not only that that is the strong

20   evidence here; there is additional evidence that we highlighted

21   in our letters.  There will be other witnesses relating to

22   these assaults.  There are the communications between the

23   defendants that we've highlighted in previous submissions

24   talking about the assaults.  There are communications with

25   victims.  There are the videos that we talked about.  I

P1FKALEC1

described one earlier today.  We've noted another where a

victim that we've talked to, she's been assaulted by two of the

defendants -- or by the defendants, and then there's a video of

her kind of in a blacked-out state, additional sexual activity

is going on.  She doesn't remember this incident.  I think, to

the point the Court understood, she's not passed out on the

floor, but she's incoherent, unable to really control herself,

unable certainly to consent.  So that's more evidence that we

have kind of tying all of this together.

            THE COURT:  Do you know what the date of that is?

            MR. JONES:  That was in 2013, your Honor.

            And then the video I described earlier, I believe, is

in the spring of 2009.

            THE COURT:  Okay.

            MR. JONES:  We've talked about this, but this is

really a well-formed conspiracy.  There are kind of two

playbooks or, excuse me, two ways the defendants carried out,

uses the same playbook each time.  They're bringing their

victims to them through the promises of travel, through luxury

experiences, luxury accommodations — trips to the Hamptons is

something that we see a lot — and they are targeting women that

they see and meet through social media, through dating apps,

through club promoters that they have bring them additional

people, and then they get them to these locations, and they

drug them.

P1FKALEC1

1          Of the people we've talked to, the vast, vast majority

2     describe — and, frankly, it's more than two-thirds, more than

3     that, probably three-quarters — describe intoxication symptoms

4     that are grossly disproportionate to the amount of alcohol they

5     have consumed.  There are some women who basically drank half

6     of the drink that's given to them and then can't control their

7     limbs, had a hard time speaking, and that is when the

8     defendants isolate them, that is when they take them to a

9     bedroom, to a bathroom, and assault them.

10          The defendants pin their victims down.  They either

11     get on top of them, or in instances where two people are

12     involved, they might be held.  They forcibly have intercourse

13     with them.

14          Some of these women basically say I couldn't even

15     scream.  Others say I said, no, I tried to push them off, and I

16     couldn't.

17          And so there's a huge danger here that comes from all

18     of this.  There are kind of two ways.  There's the people that

19     traveled to them, the victims that traveled to them.  The

20     defendants did this for years, with more opportunistic

21     encounters, as well.  It's more or less the same playbook, but

22     it can be somebody that you meet at a club in Miami, in

23     Manhattan, isolate the victim, take her to a second location,

24     provide a drink, and then you have a drugged victim who is

25     unable to fend off the defendants.

P1FKALEC1

1          Talking a little bit about each of them specifically —

2     because I recognize there's one bail package, more or less, but

3     there are three defendants — and just thinking of them

4     individually:  Alon Alexander, of the people we've

5     interviewed — and they're still ongoing — 13 women have said

6     that he assaulted them.  This is one from high school, and then

7     12 of them in the time period of 2009 to 2018.  I think it's

8     really critical to note here, two of the people Alon Alexander

9     assaulted were minors at the time he assaulted them.

10          THE COURT:  Was he a minor, also?

11          MR. JONES:  He was not, your Honor.  One of them, he

12     was about 22, 23 years old, and the other, he was 29 years old.

13          So, he did also assault a minor when he was himself a

14     minor, but I'm describing acts as an adult.

15          THE COURT:  Okay.

16          MR. JONES:  And so that is what we have from him.

17          One of these minors, she had told him her age.  He

18     described that that was, in fact, exciting, that he thought it

19     was hot.  And then, after she's drugged, he takes her to a

20     hotel room.  He assaults her in a bathroom so badly, that she

21     bleeds.  He did this while his brother, Oren, had taken another

22     high school student back to the same hotel room, where he

23     assaulted this high school student who was not a minor, who was

24     18 years old, on the bedroom there.  Oren used his hand.

25          And so talking about Oren, transitioning to him, more

P1FKALEC1

than 20 of these women have identified Oren Alexander as the

person who raped them, excuse me.  And some of this was while

he was still in high school and college, but at least 17 have

reported being raped or sexually assaulted by Oren Alexander

between 2011 and 2021, including two women in 2021.

As I noted a moment ago, one of these victims was a

high school student.  She was 18 years old.

THE COURT:  One of the 17 that occurred between 2011

and 2021 was a high school student?

MR. JONES:  Yes, your Honor.  She was an 18-year-old

high school student.  The assault was in 2017.

Tal Alexander has been identified by ten victims -- at

least ten victims, excuse me, as the person who assaulted, the

defendant who assaulted, that victim.  One of those was while

he was still himself in high school.  Nine are in the period of

2009 to 2020.  This includes one victim who was assaulted in

2009 along with Alon, and at that time, that victim was

16 years old.

THE COURT:  And how old was Tal?

MR. JONES:  2009?  23 or thereabouts, young twenties.

Many of these assaults have been committed together.

I think there are approximately eight victims who had been

assaulted by two or more of these defendants working in tandem.

That number doesn't include five, another five or so — just,

again, all of these numbers are people we've talked to so far,

P1FKALEC1

and interviews are ongoing — another five or so where more than
one defendant is in the room, where --

THE COURT:  Is that different from the eight?

MR. JONES:  Yes, your Honor.  Meaning that those eight
I described, more than one defendant penetrated the victim.

And these other five, you could be in a circumstance
where the victim either because she was drugged and isn't sure
that the second person violated her or they might have been
holding her, that's where I'm describing they're in the room.

THE COURT:  Okay.

MR. JONES:  That number still doesn't include other
instances where they worked together.  And Victim 2 charged in
the indictment is instructive on this.  Because we put forward
in one of our first letters on detention here, Victim 2, you
see from the defendant's communications amongst each other, is
somebody that they are discussing, they decide together we're
going to fly her and others out to the Hamptons, provide the
travel, the lodging, and then during that weekend, Oren gives
Victim 2 the drug drink, when she's incapacitated sufficiently
by it, alone escorts her, isolates her, puts her in the
bedroom, and then Oren later climbs on top of her and violently
rapes and assaults her.

So, I am not including in the eight or five number
that instance, for example, where Oren was the only one in the
room at the time of the assault, even though there is work in

P1FKALEC1

1   tandem to make this happen.

2           So, it's been suggested that what we have here is weak

3   evidence, and I, frankly, honestly, very strongly disagree.  We

4   have victim accounts.  I described from a variety -- from women

5   with a variety of backgrounds at various times that corroborate

6   each other.  And, of course, that's what we have, that's the

7   way these cases are built.  They're built, and other similar

8   cases we've cited in this courthouse, that way every day.  It

9   would be no different, frankly, than suggesting that in an

10  accounting fraud case that has too many spreadsheets to say

11  that we are too reliant on the victim accounts.  But that's not

12  all we're reliant on.  We've got the defendants'

13  communications.  And we've got other witnesses.  So we're

14  talking about prompt outcry witnesses.  There are friends and

15  family members told by these victims and corroboration of this

16  shortly after the assault.  That's not every single victim.

17          THE COURT:  How many outcry witnesses do you have?

18          MR. JONES:  I don't have the number, your Honor.  I'd

19  estimate -- at least five, ten.  I don't actually know.  I'm

20  sorry for that.  But there are, I think notably here, just

21  Victim 2 had significant corroboration of prompt outcry, and

22  she's the one who had been attacked.  That is a strong case

23  with a prompt outcry.

24          There's also --

25          THE COURT:  I'm sorry, on that one, they seem to be

P1FKALEC1

```
 1   relying on her -- it wasn't clear to me if they were friends,
 2   whether -- I think you called them Person 1 and Victim 2 --
 3             MR. JONES:  Yes.
 4             THE COURT:  -- whether Person 1 and Victim 2 were
 5   friends or whether they just ended up together sort of
 6   independently.
 7             MR. JONES:  They knew each other before the weekend.
 8             THE COURT:  And has the government spoken to
 9   Individual 1?  And can you respond to --
10             MR. JONES:  Your Honor, I don't want to talk about all
11   of the steps we've taken, but what I do want to say is that
12   for -- they've attacked Individual 1's credibility, but for
13   Victim 2, when I say we have outcry witnesses, I'm not talking
14   about Individual 1, I'm talking about a third person who has
15   confirmed it.  Frankly, there is text message confirmation of
16   this.  And so this is a strong corroboration there.
17             One of the assaults I described earlier in 2009
18   happened, there is a percipient witness to that assault who was
19   with the defendants and victims over the weekend.  It was
20   Memorial Day weekend, they were at a party, and this witness
21   hears somebody being assaulted, hears the request to stop,
22   hears the cries, so does not see the assault, but does overhear
23   the reaction of the victim.
24             So, this is among some of the stuff I'm talking about.
25   I'll mention one more, a victim that Tal Alexander raped in
```

P1FKALEC1

1    2014, somebody else who was flown out to the Hamptons.  As Tal

2    and this victim communicated about the plans, the victim booked

3    travel, she was later given accommodation by Tal, some internal

4    travel in New York by Tal, but after she booked travel to New

5    York, he sent an email to his brother, Alon, that said, "See

6    below, these cheap hookers coming to the Hamptons this

7    weekend."  And then later that weekend, after the victim had

8    gone to bed early one night, and Tal felt -- he approaches her,

9    he confronts her, is this how you thank me, and then he raped

10   her in the shower.

11            And so, the danger here comes from these acts.  The

12   danger here comes from this conduct.  And the Court can know

13   and have confidence that it is coming from this because the

14   evidence of it, the victim testimony and the additional

15   evidence, is strong.

16            It's not the only danger the Court needs to consider.

17   We have noted before that the victims have been threatened, and

18   to highlight a couple of points, Oren Alexander has told

19   multiple women that he would ruin them or destroy them if they

20   made allegations.  He's made thinly veiled --

21            THE COURT:  Independent of the going to the police and

22   alleging harassment and independent of the threatened --

23            MR. JONES:  One of those is connected with that, your

24   Honor.

25            THE COURT:  One of those is, but are there other

P1FKALEC1

1    victims who say he threatened --

2              MR. JONES:  Yes, your Honor.  I believe there are

3    three, including the one where the police report was made

4    against her and a defamation suit was threatened against her.

5              THE COURT:  Was that one person?

6              MR. JONES:  That was one person.

7              THE COURT:  Okay.

8              MR. JONES:  There is another who is assaulted by Oren,

9    who's raped by Oren, and she confronts him, and when she

10   confronts him, he actually holds her down and masturbates onto

11   her, and then says that he would destroy her or ruin her if she

12   made the allegation.

13             There have been other things said to someone who

14   confronted Oren where he said — you know, it's thinly veiled,

15   but it's like those are serious allegations, kind of in the way

16   the Mafia says, you know, you need to be careful with what

17   you're doing.  And so, that's Oren.

18             Tal threatened at least one person who confronted him,

19   and all of the brothers have tried to weaponize the courts

20   through defamation threats to silence their accusers.

21             So, this danger is serious.  Many of the conditions

22   that have been proposed in this private security, like the

23   video monitoring -- you know, some of it goes to risk of

24   flight, I understand that, but much of it will keep visitors

25   out, will keep approved-list only, like those are

P1FKALEC1

danger-mitigating proposals in there, and *Boustani* says, very

squarely, that that type of condition cannot be used to

overcome the significant danger here.

And so I'll move on to flight unless the Court --

THE COURT:  Before you leave danger, let me ask you:

The defense has, obviously, made a big deal out of the fact

that the agent testified, I gather, that to her knowledge, the

last event that the government knows about in the conspiracy

happened in 2021.

MR. JONES:  The last victim that we've interviewed

that says she was assaulted was in 2021.

THE COURT:  And do you know when in 2021?

MR. JONES:  October.

THE COURT:  It was an October event?

Does the government have a theory of what happened?

Or is it just that you haven't -- all of a sudden, this has

been going on for 20 years, and --

MR. JONES:  I don't think there's any evidence that it

stopped.  I think that it's acknowledged by advocates, by

experts, and the Court that processing the trauma of an event

like this takes time.  So it seems wholly unsurprising to me

that people who were assaulted in 2016, 2017, are at a place

now where they're able to talk with the FBI about it as

compared to those that happened later.

What I do not think happened is that they got married

P1FKALEC1

1    and changed their ways.  I think that that just flies in the

2    face of -- that would suggest that they were trying to have

3    girlfriends when they raped these women rather than exercising

4    power other than being violent.

5          So, we are continuing to investigate.  That is the

6    last victim that we've spoken to at this point.  I have no

7    belief that that's the last victim that exists in the world.

8          THE COURT:  I assume that there were devices seized

9    when the defendants were arrested.  Have those phones been

10   cracked, and what's the status of that?

11         MR. JONES:  Your Honor, there were devices seized when

12   the defendants were arrested.  At this point, we are in some

13   discussions with counsel regarding things about privilege

14   review, and we're working on our own privilege review

15   internally.  I believe one has been cracked.  I'm not sure

16   about the other two.  I will note we did, prior to indicting,

17   seize iCloud accounts.  For the most part, contents had been

18   deleted.  I think Tal --

19         THE COURT:  I'm sorry, the contents of the iCloud

20   account were deleted?

21         MR. JONES:  Yes, your Honor, or at least messages

22   extending to more recent times.

23         THE COURT:  But can Apple tell you when that happened?

24         MR. JONES:  My general understanding when I do this is

25   that I can see they're deleted or I can see that things don't

P1FKALEC1

1    exist rather than saying -- rather than knowing when they were

2    deleted.  I don't know, and I couldn't answer --

3            THE COURT:  You're not saying they were deleted,

4    you're saying there were no current messages in their iCloud

5    account?

6            MR. JONES:  Yes.

7            MS. ESPINOSA:  One moment, your Honor?

8            THE COURT:  Sure.

9            (Pause)

10           MR. JONES:  There isn't content there past 2023.  I

11   think that -- for some.  Depending on how much this specific

12   answer matters to the Court, I guess what I could say is that

13   there are some messages there that extended forward that were

14   backed up.  I don't know -- I could not tell the Court what was

15   initially backed up versus what was deleted.  That's a thing

16   that might take time to figure out, if it's answerable at all.

17           THE COURT:  Got it.  Okay.

18           When you arrested somebody, you ended up seizing a

19   bunch of videos?

20           MR. JONES:  Yes, your Honor.  So, we referenced this.

21           So, Tal Alexander rented an apartment on Billionaires'

22   Row.  During the search of that residence, which was not where

23   he was at the time of his arrest --

24           THE COURT:  This is Tal's apartment?

25           MR. JONES:  Yes, your Honor.

P1FKALEC1

1          At Tal's apartment, multiple hard drives were found in

2    the closet.  We noted in our letter that there are some indicia

3    of things in that closet that show they might have been -- they

4    could have been Oren Alexander's.  We know that Oren and Tal

5    previously lived together in that same apartment.  So one of

6    those hard drives does have kind of a large quantity of

7    sexually explicit videos and photos.  I think some of them --

8    we've described the one or we've described a couple in our

9    letter.  We're still reviewing that.  It's been said that we

10   haven't turned them over.  There's no protective order.  I also

11   think we got into it or saw a copy of it late last week.  And,

12   so, that's still being processed.

13          THE COURT:  Okay.

14          On the videos that you have seen, what's the most

15   recent one; do you know?  To the extent there's anything in it

16   that indicates the timing?

17          MR. JONES:  I think early 2010s.  2015, excuse me.

18          THE COURT:  One of the things you mentioned in your

19   letter was that some of the victims sought medical care after

20   the assault.

21          Do you know, has the investigation gotten to the

22   point, or do you know, whether rape kits were done, and whether

23   there are toxicology reports from those victims?

24          MR. JONES:  I don't believe there are, your Honor.

25          THE COURT:  So, no rape kit was done, and no

P1FKALEC1

1    toxicology, no blood tests, were done?

2              MR. JONES:  Not that I'm aware of.

3              THE COURT:  Okay.  I think this probably is the right

4    time for me to segue a little bit.  Help me understand the

5    government's legal theory of why this is commercial sex acts as

6    opposed to what Mr. Klugh called it — I think he has coined a

7    new word, orgying.

8              MR. JONES:  Yes, your Honor.

9              THE COURT:  I'm not sure there's a gerund form of

10   orgy, but maybe there is.

11             MR. JONES:  Yes, your Honor.

12             And, so, just to start, and I know this is kind of

13   obvious, but the term commercial sex act is defined very

14   broadly in the statute.

15             THE COURT:  I confess, I tried to find it, and then I

16   thought maybe it was not defined.

17             MR. JONES:  It's 18 U.S.C. 1591(e)(3), your Honor.

18             THE COURT:  Hang on just a second.

19             1591(e)?

20             MR. JONES:  (3).

21             THE COURT:  Oh, there it is.  Okay.

22             MR. JONES:  Just to note, there have been a few

23   decisions in this courthouse, they've involved civil lawsuits

24   against Harvey Weinstein that have fallen under the same

25   provision, and that there, the courts have found that the

P1FKALEC1

1    commercial nature of the sex act doesn't have to be monetary,

2    it could be something without monetary value — the promise of a

3    job interview, the consideration for a job interview.

4            THE COURT:  A vacation in the Hamptons.

5            MR. JONES:  A vacation in the Hamptons.

6            And there's also a Second Circuit case with Raniere,

7    it's the NXIVM case, those prosecuted in E.D.N.Y.  The Second

8    Circuit has said, as well, that it doesn't have to be a cash

9    transaction, it doesn't have to be a money transaction.

10           And so that's --

11           THE COURT:  That's your theory?

12           MR. JONES:  Yes, yes, your Honor.

13           THE COURT:  Your theory was they were swapping luxury

14   travel for coerced sex?

15           MR. JONES:  Yes, your Honor, at a very high level

16   without binding myself on what I expect to be a motion to

17   dismiss.

18           THE COURT:  Correct.

19           All right.  To the defense, that's the theory.

20           MR. JONES:  And, your Honor, should I turn to flight?

21           THE COURT:  Yes.

22           MR. JONES:  We talked in the letter, we talked earlier

23   on, that the flight risk here comes from so many things, and

24   only one of them is the defendants' wealth.  I think the

25   biggest consideration here is the strength of the evidence, the

P1FKALEC1

high guidelines, and the high mandatory minimum.

So, I've described the evidence talking about the danger, but the other thing that that evidence does is it creates a 15-year mandatory minimum, it creates a life guidelines sentence.  And, so, faced with that, I understand defense lawyers will come in and say the evidence is weak, but, respectfully, I disagree, and faced with that, the incentives to flee are through the roof.

Something else that was suggested is that the defendants will come back, they'll follow the Court's orders, maybe they will just abide by them.  I think the nature of the crime here also in part, as you pointed out earlier, is quite deceptive.  It is intentional drugging of people for the purpose of taking advantage of them.  This is something that happens, and it shows a complete disregard for the rules of ordered society in a way that is different even than other violent crimes.  There's both the underhandedness, the deception of it, the lack of respect for the victims, the lack of respect for the women, the lack of consent, the lack of listening when somebody says stop.  That is all something in the nature of the crimes is very noteworthy and why the Court shouldn't trust that they'll follow through conditions.

The foreign connections here are also very significant.  And this is not something that is tied, principally or exclusively, to the wealth of the defendants.

P1FKALEC1

1    This is something that comes up in drug trafficking cases,

2    where there are ties frequently in this courthouse to the

3    Dominican Republic, to Colombia, to other places, and where

4    courts rightfully rely on the defendants to return to those

5    places or to go to those places if they have familial ties and

6    reestablish themselves.  That's what we're talking about here.

7    We're talking about the ability to go establish themselves — it

8    could be in Israel, it could be in Brazil, they travel to the

9    Caribbean by boat a lot.  Like, their parents have property in

10   the Bahamas, there's property in Tel Aviv.  And, so, all of

11   these are places that are available to flee to.  Whether or not

12   extradition is possible is, frankly, not the question.

13              THE COURT:  I agree.

14              MR. JONES:  Extradition, even when it goes well, takes

15   a long time.  In a case where we're talking about victim

16   testimony being so important, both the ability to kind of

17   discourage victims from participating in the process or to have

18   memories fade is a real concern.  So there is a benefit to

19   fleeing even if you know that you might come back with the U.S.

20   Marshals as your escort some day.

21              (Continued on next page)

22

23

24

25

P1fFALEc

1          MR. JONES:  (Continuing)  And so I don't think the

2     extradition point matters.  I think what matters is the ability

3     to travel, the inclination to travel, the ability to pick up

4     somewhere else and to reestablish the life there.

5          And so the private security that's been suggested, I

6     think, is inappropriate.  But I think, going beyond the fact

7     that the Bail Reform Act prohibits it is a condition here, I

8     think it's also not likely to be effective.  It has been -- I

9     think one thing that was said is that perhaps because there

10    might be off-duty officers that, like, someone is concerned

11    they could use force.  I'm not entirely sure.

12         Maybe criminal contempt of court would be the offense

13    that's committed the moment you step out the door, but bail

14    jumping hasn't happened yet when you step out the door.  I'm

15    not exactly sure what the arrestable offense is.  I suggest

16    maybe criminal contempt.  I'm not trying to laud the issue.  I

17    just don't think it's particularly strong.

18         I also think that the idea that now we're talking

19    about whether or not the security guards can use force and what

20    level of force against the defendant just underscores even

21    further the real flight risk, the real concerns that the Court

22    should have.

23         THE COURT:  I think it's also the real problem with

24    this notion of private guards.  A private guard on Bernie

25    Madoff is one thing.  But that's kind of -- the Second Circuit

P1fFALEc

1   says that's when it's appropriate, when the only reason you're

2   thinking about this is because the money would allow the person

3   to flee.

4                  MR. JONES:  Yes.

5                  THE COURT:  And that's a very different scenario than

6   when you've got concerns of safety.

7                  MR. JONES:  Yes, your Honor.

8                  And Judge Nathan in *Maxwell* said exactly the same

9   thing.  She said, this is an inappropriate consideration, and

10  she did it on risk of flight, but she said it's all of these

11  things working together.  And so yes, I agree with that point,

12  your Honor.

13                 One other thing that's been suggested is, well,

14  they've known since July --

15                 THE COURT:  Yeah.  What's the story with that?

16                 MR. JONES:  I just don't believe it.

17                 I agree there was a Wall Street Journal article in

18  July of 2024 that said the FBI is investigating; that is true.

19  There was then additional, kind of, circular reporting, always

20  sourced back to the Journal, that said the FBI is

21  investigating.

22                 And so there were additional accounts, but none of

23  them contained additional information.  We didn't confirm it.

24  The FBI didn't confirm it.  And then to take one of the points

25  raised by defense counsel, it seems like they may not have even

P1fFALEc

1    thought it was a federal crime, so what did they have to be

2    scared of?

3            Now this is real.  A report in July of 2024

4    speculating about an investigation that's confirmed by nobody

5    is different than the indictment.  It's different than facing

6    the 15 to life.  Like, things have changed, and they have

7    changed dramatically so.  The incentive to flee wasn't there

8    the same way that it is now.

9            THE COURT:  Did any of the defense attorneys reach out

10   to the government to offer to surrender their client, if you

11   got to that point?

12           MR. JONES:  No, your Honor.

13           We heard nothing from any counsel before --

14           THE COURT:  The arrest.

15           MR. JONES:  Before the arrest.

16           And just to note one, there's been a case in this

17   courthouse recently with Sean Combs where that did happen, and

18   the Court has now, thrice, found that there's still a

19   significant flight risk.  So that doesn't even exist here.

20           Your Honor, these defendants have acted with impunity

21   for so long.  From that, I mentioned earlier, you can tell they

22   don't respect represent the victims.  They don't respect

23   consent.  They don't respect the orders that they would be

24   given by the Court.  When they've had a chance to act in their

25   own self-interest, they've done it every single time.

P1fFALEc

1              I'll sit down in a second, but I'll note one final

2      point.  I think the Court's picked up on it.  The floating

3      nature of the bond proposal, I think, gives some pause as well.

4      You know, I don't want to dwell on it too much because, I don't

5      think more collateral can perfect the bond.  I don't think that

6      more financial disclosure can perfect the bond.  But we

7      actually have no idea what the liquid assets are that are

8      available here.  I don't think an accounting report is what the

9      Court should be looking for about it.  As the Court considers

10     all of this, there's nothing here that can meet the conditions

11     of the Bail Reform Act to reasonably assure safety, to

12     reasonably assure their return to court.

13             The presumption exists for good reason.  I recognize

14     it's ultimately my burden to carry, still, and I believe we

15     have done it.

16             THE COURT:  Let me just confirm one other thing.  I

17     think you have done this, but I want to kick off from my list,

18     I think your letter told me that you have at least ten

19     potential victims who report specific sexual assault involving

20     each defendant.

21             MR. JONES:  Yes, your Honor.

22             I believe, when going through them, I think I said Tal

23     with ten, and then more with the others.

24             THE COURT:  Okay.  And the government has been in

25     contact with more than 40 victims, overall.

P1fFALEc

1          MR. JONES:  Yes, your Honor.

2          And we are still interviewing more.

3          THE COURT:  And are you counting the private

4    plaintiffs that are in the PowerPoint?

5          MR. JONES:  Only if we've interviewed them.

6          THE COURT:  Okay.

7          MR. JONES:  Thank you, your Honor.

8          THE COURT:  Thank you.

9          All right.  You're going to get very short responses,

10   if you want to respond.

11         MR. WILLIAMS:  I do.

12         THE COURT:  Mr. Williams, would you like to respond?

13         MR. WILLIAMS:  Very quickly, your Honor.

14         I'll stand here if that's okay, or you want me at the

15   lectern?

16         THE COURT:  You can stay there.  Just push your mic

17   up, so that it's close to your mouth.

18         MR. WILLIAMS:  So your Honor, I just want to cover one

19   point.  Obviously, earlier in my presentation to you, I focused

20   right away on, very early on, on *Boustani*.  I just want to

21   point out to the Court, again, and I mentioned this case

22   earlier, and I would just like to go through it just slightly.

23         *Fox*, which is a Second Circuit case from 2022, was

24   decided by Judges Lynch, Nardini, and Nathan.  There, the

25   allegations were heroin and cocaine distribution, possessing a

P1fFALEc

1    firearm, distributing heroin, causing serious body injury, and

2    sex trafficking by coercion in violation -- very same charges,

3    I think, that are here, 1591(a)(1) and 1591(b).

4                THE COURT:  Do the facts that are laid out in the

5    summary order give you any color as to what was going on there?

6                MR. WILLIAMS:  In terms of -- what do you mean?

7                THE COURT:  In terms of that charge.

8                MR. WILLIAMS:  Yes.

9                And I would ask your Honor to look at it.  It's some

10   color, but I think the main point that I'm trying to make is

11   that --

12               THE COURT:  Well, what color does it give you?

13               I don't have the case pulled up.

14               MR. WILLIAMS:  Would you like it?

15               THE COURT:  Sure.

16               MR. WILLIAMS:  Would you like me to hand up the case?

17               THE COURT:  If you've got it, sure.

18               (Counsel conferred)

19               MR. WILLIAMS:  924(c), heroin and sex trafficking.

20               THE COURT:  Hang on.

21               (The Court conferred with clerk)

22               THE COURT:  This is the original opinion, right, that

23   you just handed up?

24               MR. WILLIAMS:  That's the appellate decision.

25               The original opinion, your Honor -- and I don't have

P1fFALEc

1    this; do either of you have it -- its citation is 602.  This is

2    Judge Vilardo's decision 602 F. Supp. 3d 434.  That lays out

3    everything about the case.  And then you have the summary order

4    from the Second Circuit.

5         What I just wanted to note -- and I just have a two or

6    three other quick other points -- is that in that case, the

7    individual was released on a $300,000 surety bond secured by

8    certain properties.  It was required that he live in his

9    parents' home, that he be placed in the custody of his father

10   who would, in turn, have to execute a supervision agreement

11   that the defendant participate in a home incarceration program,

12   including electric monitoring, and install security cameras at

13   every entrance to his father's house with live feed available

14   to both the government and his probation officer.

15        All I want to do is point out that subsequent to

16   *Boustani*, there was a Second Circuit case that seems to be

17   reasonably similar so what is occurring or what the facts and

18   circumstances are here.

19        Absolutely probably not a perfect match, but just

20   worth your Honor considering.

21             THE COURT:  Okay.

22             MR. WILLIAMS:  I'm sorry.

23             Go ahead.

24             THE COURT:  No; it looks like whatever conduct he was

25   engaged in was relatively short-lived, September 2020 to Spring

P1fFALEc

1  2021, which is a little different from a 15 or 20-year period

2  of criminal conduct.

3           MR. WILLIAMS:  I understand, your Honor.

4           The charges, though, were still very serious, and they

5  involved a firearm.  So I just --

6           THE COURT:  Fair enough, Mr. Williams, but as you

7  know, all of these cases, ultimately, sit on their own facts.

8           MR. WILLIAMS:  I understand, your Honor.

9           And you've made your position clear.  I understand.

10          I just want to make sure that, to the extent you are

11  inclined to, you focus on -- you might give some consideration

12  to the fact that after *Boustani*, there's this decision.  That

13  really is my main point.

14          THE COURT:  Understood.

15          MR. WILLIAMS:  Second point is -- and one of my

16  colleagues had some dealings with Apple and iCloud in another

17  case, not this case.  And per Apple, they won't confirm

18  deletion, but it could have happened, because the software

19  update didn't happen.

20          They couldn't -- just to amplify the record.  That's

21  all.

22          THE COURT:  The way Mr. Jones first said it, it

23  sounded like there had been texts deleted.  It's clear that's

24  not what he was saying.  He doesn't know that, and I am not

25  considering that at all.

P1fFALEc

1          MR. WILLIAMS:  And then --

2          THE COURT:  Let me just say, if that were true, it

3    would be a really bad fact for you.

4          MR. WILLIAMS:  And that's why I wanted to make the

5    Apple point.

6          THE COURT:  Yeah.

7          MR. WILLIAMS:  Exactly.

8          The next point is, the New York Times -- and there was

9    a Wall Street Journal, they all reported in early July of 2024

10   about a criminal investigation.  The fact that that came out

11   was noticed by defense counsel, noticed by me, okay,

12   immediately.  And so -- and the client, my client, Tal, and

13   none of the other clients did anything.  As I said, I won't

14   belabor the point.

15         The other point --

16         THE COURT:  Just to be clear, I think Mr. Jones's

17   point is, there's a real difference between an unconfirmed

18   report in the Wall Street Journal and the New York Times, as

19   good as these newspapers are, and the reality of, charges have

20   occurred.

21         MR. WILLIAMS:  I agree with you.

22         But the fact that is, if the New York Times and Wall

23   Street Journal come out -- and this is just my opinion -- if

24   they come out with an article saying that your client's being

25   investigated, it would be foolhardy for you not to seriously

P1fFALEc

1    consider it.  That's really the point.

2                THE COURT:  Fair enough.

3                MR. WILLIAMS:  And the last point that I wanted to

4    make is that, with regard to Tal Alexander, when the government

5    went -- when the government agents -- and I think it was a task

6    force; I think some state authorities were involved in it too

7    -- went to arrest him, they didn't have a search or arrest

8    warrant to enter the premises of his parents' home.  He was

9    inside.  He came out, and he surrendered himself.

10               That's all I have, your Honor.

11               MR. KLUGH:  Your Honor, I just wanted to add, again,

12   my point, all along, has been that this is a case, in many

13   ways, unusual.  And the government cites the "anything of

14   value" provision in 1591, but they don't cite the actual

15   language.

16               THE COURT:  I read the language.

17               MR. KLUGH:  The only thing of value is not what the

18   accuser receives.  The "anything of value" is what the pimp

19   receives.  That's what the statute says.

20               And even today in this courtroom, they don't seem to

21   understand the statute.  The Court should consider that.

22               THE COURT:  What's the statute?

23               MR. KLUGH:  1591, your Honor.

24               I don't mean to speak while the Court's reading, but

25   this is essentially a statute about the trafficking of what we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P1fFALEc

1    would call prostitutes.

2            THE COURT:  To be clear, just to read the statute, it

3    says, and I quote, the term "commercial sex acts" means any sex

4    act on account of which anything of value is given to or

5    received by any person.  It doesn't focus entirely on, as you

6    put it, the pimp.

7            MR. KLUGH:  The definition -- if the Court goes

8    further to the actual definition, the statute further makes

9    that clear, that what they're talking about is profiting,

10   profiting by.  In other words, the trafficker, as in drug

11   trafficking, as in everything else, the statute -- if I could

12   read the language from statute, whoever knowingly benefits

13   financially or by receiving anything of value from

14   participation in a venture and which is engaged in an act.

15           THE COURT:  From participating in --

16           MR. KLUGH:  The venture, which is this sex

17   trafficking.

18           So it goes to whoever benefits from it, and that's why

19   it is a pimp statute, your Honor.  It's always been a pimp

20   statute.

21           I understand that there's some new cases in this

22   district.  I don't know exactly what the facts of them are, but

23   I know what the facts of this case are.  The facts of this case

24   are not luxury travel; they are travel.  Yeah.  And the theory

25   the government is proceeding on --

P1fFALEc

1          THE COURT:  This issue is not be decided on quibbling

2     over whether travel to the Alexanders' home in the Hamptons

3     constitutes luxury travel or mere travel.

4          MR. KLUGH:  That's right, your Honor.

5          THE COURT:  No; we're not deciding it on that.

6          MR. KLUGH:  I understand.

7          And then the next step down from this slippery slope

8     is, someone calls someone in New Jersey and says, well, I'll

9     send an Uber for you and then a federal sex crime.

10         The government wants to turn this --

11         THE COURT:  That's across state lines.

12         MR. KLUGH:  It is not us -- it is not we that want to

13    turn what is always, throughout history, in terms of whether

14    it's party rape or date rape -- however it's sort of dressed --

15    and we strongly disagree that there was any such thing here --

16    it is not us that want to bring that concept into federal court

17    for the first time; it's the government that wants to bring

18    that concept in.

19         And it is important to recognize, it does not cohere

20    with the language that the person who has to benefit from

21    commercial sex trafficking is the trafficker.  And they still,

22    to this day, will not admit it.

23         Now, again, the point is -- let's go through the other

24    elements here.  One of the problems, if anything, in this case

25    all along is, we've got twins and we've got another brother,

P1fFALEc

 1   and the government has begun today, for the first time, I

 2   think, to try and isolate out various accusations.  One of them

 3   that they did not isolate out was, if anybody has ever said

 4   before, in the last eight years -- before today, in the last

 5   eight years -- because the last act, allegedly, in the

 6   indictment filing, by Oren regarding sex activity is 2016; and

 7   that's the one he took the polygraph on.  No one has alleged as

 8   to any person relating to Tal, relating to Oren, for example.

 9            THE COURT:  My notes, correct me if I'm wrong, show

10   that you have -- the government proffered today that they have

11   17 victims who identify Oren as the assailant between 2011 and

12   2021, two of which occurred in 2021.

13            MR. KLUGH:  I understand.

14            THE COURT:  Are my notes correct?

15            MR. JONES:  Yes, your Honor.

16            2009 -- I'm sorry -- might be the earlier of them.

17   I'd have to check.

18            THE COURT:  I think this was when he was an adult.  I

19   think your 17 was after he had become an adult.

20            MR. JONES:  Yes, your Honor.

21            MR. KLUGH:  Your Honor, I'm not disputing that there

22   is some number of accusers.  What I'm saying is that the

23   government has not offered any -- as to my client, as to any of

24   them who now say they might have been drugged, that not a

25   single one of them, received, went to, sought any treatment,

P1fFALEc

```
 1    testing, concern, that none of them, as far as the record shows
 2    as to my client right now, I have no evidence that either of
 3    them ever cried out to anybody, that ever posted any text to
 4    anybody as to my client.  I have nothing like that.
 5         I have no injuries from anybody who was violently
 6    raped -- again, a term that I did not hear in the indictment,
 7    because I don't even think that Victim 2 told them there was
 8    some violence.  Victim 2 doesn't really -- as I understand it,
 9    the allegation is somewhat different than violence.
10         THE COURT:  I guess it depends on your definition of
11    violence.
12         MR. KLUGH:  But I'm talking about Victim 2's
13    definition.
14         THE COURT:  And I'm talking about my definition.
15         MR. KLUGH:  Yes, your Honor.
16         And I don't dispute that.  Every sex act that is
17    un-consensual, I concede, we can call it violent.  I'm saying
18    that when you add today, for the purposes of this hearing, a
19    word that was not part of the indictment, is not part of the
20    allegation as we understand it, is not part of the supposed
21    cry-out -- and this is what we're talking about, and this is,
22    again, the one he passes the polygraph on.
23         So none of these people as to my mind, none of these
24    people has injuries.  None of these people has a police report.
25    None of these people, as far as I know, as to Oren, has a
```

P1fFALEc

cry-out witness of any kind.  None of these people has

anything, and when we have a video, not a single one of those

people on the video has said anything, apparently, to the

government about anything negative that occurred in those

events.

So it is tough to be in a case -- and it's always

tough to be in a conspiracy case when allegations are thrown in

a sort of agglomeration, but it's particularly tough in a case

like this where the allegations are disparate and where they're

trying to force it into a concept of commercial sex trafficking

conspiracy that there is no precedent for.

And so I ask the Court to please -- I return to my

original statement.  This is both a legally-defensible case, a

factually-defensible case.  You have defendants who have

already taken steps to expose themselves, to be polygraphed, to

fight back.  You have everything on the line.

THE COURT:  Again, Mr. Klugh, I want to let you say

anything you want to say, but they didn't expose themselves by

taking a polygraph, because if they had failed the polygraph,

that polygraph would have never seen the light of day.  And you

know it, and I know it, and they all know it.

So come on; don't kid me.

MR. KLUGH:  The polygraph was taken in front of a

whole bunch of federal officers.  That's what I'm saying.  Part

of problem with having clients in jail, that they have to be

P1fFALEc

1    taken in a very difficult room with a federal officer coming in

2    and checking on him once in a while.  You have to do all kinds

3    of forms you have to fill out.  You have to make a very public.

4            We took chances doing that.  We made it very public to

5    the Department of Justice what we were doing, your Honor.  So

6    I'd concede that there were product privilege, and I concede

7    that.

8            And it's not -- they would not have necessarily known

9    if there was a failure, but the rest of them would have known,

10   so there was some risk --

11           THE COURT:  The rest of who would have known?

12           MR. KLUGH:  The rest -- that they wanted to take a

13   polygraph, that they took a polygraph.  They would know that.

14   They would have the record of that.

15           And because -- and that's part of the problem that

16   they're in jail.  They're going to know every expert that we

17   might try to go in there and interview.  They're not -- it's

18   going to be extraordinarily difficult for us to talk about them

19   over the phone.  We hear a new victim, a new claim of a cry-out

20   --

21           THE COURT:  It's not going to be hard to talk to them

22   over the phone.  You can talk to them on an attorney line

23   that's not taped.

24           MR. KLUGH:  I understand, your Honor.

25           It's not as -- having been -- again, I turn to my

P1fFALEc

1   experience.  It's not as easy as it should be.

2        THE COURT:  I know.  Don't misunderstand me.  I fully

3   understand and appreciate that it is much harder to defend a

4   case when your client is detained than when they are not

5   detained.

6        MR. KLUGH:  Final point, your Honor.

7        Again, if the concern -- Alon married -- is married

8   five -- in five years.  He got engaged five years ago.  The

9   last act in the alleged incident is 2018.  My clients married

10  in 2022.  They newly-allege -- even though the indictment

11  doesn't, the last indictment in the allegations against my

12  client is 2016.

13       There's some new allegation that's somebody's come

14  forward -- again, for publicity -- and said something happened

15  in 2021.  He was married in 2022.  The risk of orgying is zero.

16  It is zero.  If they did enter -- to say -- even the risk of

17  orgying with an electronic monitor -- forget Kroll, one of the

18  best organizations in the world, I would assume, maybe, if not

19  the best -- forget Kroll.  Even with electronic monitoring,

20  what is the risk of orgying?

21       So what are we talking about?  The risk of filing

22  lawsuits?  The risk of threatening to file lawsuits?

23       THE COURT:  I don't understand how the GPS monitor on

24  one's ankle prevents one from having sex.  We have an awful lot

25  of defendants who are on GPS monitoring, and I am pretty

P1fFALEc

1    confident they're having sex.

2          MR. KLUGH:  I understand, your Honor.

3          But what we're talking about -- and I don't want --

4    what we're talking about is the defendants inviting someone

5    other than their wife into the apartment to be raped.

6          I mean, I understand the Court is trying to address

7    these things logically and all the possibilities, and they --

8    just as the government is trying to address the logical

9    possibility, it is theoretically possible that they could, you

10   know, swim to the Bahamas and somehow catch a boat that would

11   take them to the Middle East, and they would throw away

12   everything that their parents worked for for 50 years.

13         Everything is theoretically possible; I'm talking

14   about realistic.  Rape is not possible.  Orgying is not

15   possible with a -- even with electronic monitoring, even with

16   daily call-ins, it's simply not possible.  The publicity of

17   this case has -- a video of any -- even a minor video

18   operation.  Rape is not possible.

19         The other question is, well, they threaten to sue

20   people.  That can be enjoined so easily.  Every victim is going

21   to be aware of this case.  They're still coming.  Every victim

22   -- every accuser.

23         And if anybody sends out anything contacting the

24   witness again, bang, everybody in the family loses everything.

25   They're destitute they're ruined.  They might as well just kill

P1fFALEc

1    themselves.  I mean, it's not going to happen.

2            The Court can monitor that.

3            THE COURT:  All right.  Mr. Klugh, finish up.

4            MR. KLUGH:  -- to do that.

5            What I'm saying -- the reason I'm saying that, your

6    Honor, it's not about money; it's about trying to address what

7    we consider to be unreasonable hypotheticals.  Whatever

8    unreasonable hypothetical the government can come up with, we

9    can accommodate it, and I don't think *Boustani* stops that from

10   happening, your Honor.

11           MR. SREBNICK:  Your Honor, I heard the government say

12   two things that bothered me, and I want to address them.

13           The prosecutor said, there's no evidence that they

14   stopped.  Exact words.  I wrote it down.

15           THE COURT:  I heard that, too.

16           MR. SREBNICK:  And so I don't know what evidence you

17   need more than the absence of evidence, the absence of anybody

18   making these accusations since 2021.  As to Alon, the

19   government today said that the last accusation was in 2018.

20           It appears that their current state of lifestyle --

21   policed, I assume, by their wives -- has worked.  The

22   suggestion that if they're on home detention, they're going to

23   return to the kind of behavior the government claims they did

24   before 2018, once again, is a fanciful theory.  We don't need

25   Kroll to monitor that.  We have the evidence of their lifestyle

P1fFALEc

1   in the last many years, and as to Alon, since 2018.

2          THE COURT:  Well, we don't, really.  We don't really

3   know what they were doing.  All we know, we have an absence of

4   victims coming forward.  So I don't have anything to hang my

5   hat on, but I don't have anything on the opposite side.  I

6   don't have any evidence that these men all of a sudden became

7   stay-at-home, "not going out to party" guys.

8          MR. SREBNICK:  I have two things.  One is, it's their

9   burden of persuasion, their burden of proof.  They've proved

10  nothing about anything since 2018.  And then I have -- as I

11  brought last time -- Shani Alexander, the wife, who came to

12  court, who described the lifestyle, and we have the letter of

13  the neighbors who live around the block who say that Alon has

14  been, basically, the captain of the safe neighborhood.

15         So we offered that.  The government offers nothing,

16  zero, so I think we established that we've met -- they haven't

17  met their burden, and we brought you enough for you to be

18  comfortable that these so-called orgies are not going to

19  suddenly resume while they are on house arrest, with or without

20  Kroll.

21         The next thing that really bothers me is, once again,

22  the government is treating Alon and the brothers as if they

23  were Israeli.  They're going to, quote, reestablish -- using

24  the word "reestablish" their ties to Israel.

25         What do you mean, reestablish?  They are not Israeli

P1fFALEc

1  citizens; they were born in the USA.

2          THE COURT:  I thought he said, reestablish themselves.

3          MR. KLUGH:  Yeah.  In Israel.

4          And that's what's the evidence of that?

5          THE COURT:  Again, the issue is not Israel.  It's not

6  Brazil.  It's not any particular country.

7          MR. SREBNICK:  Exactly.

8          THE COURT:  The issue is, they have ties to foreign

9  countries.

10          MR. SREBNICK:  The issue is that they've traveled to

11  foreign countries, because --

12          THE COURT:  They have family in foreign countries.

13          MR. SREBNICK:  They have a grandmother in a foreign

14  country.

15          THE COURT:  That's your client.

16          The others, somebody's wife has family in Israel.

17          That's your client.

18          MR. SREBNICK:  Yes.

19          Alon's wife is from Israel, but --

20          THE COURT:  They've got inlaws in Israel.

21          MR. SREBNICK:  That is true.

22          THE COURT:  They've got a grandmother in Israel.

23          MR. SREBNICK:  That is true.

24          THE COURT:  The family owns property in Israel.

25          MR. SREBNICK:  That is true.

P1fFALEc

1              And there's no evidence that he's made any effort to
2     move to Israel or do anything to --
3              THE COURT:  These are just contacts.
4              I hear your point.  I think Mr. Jones's argument was
5     just that they have -- as in many cases, you have a defendant
6     who has contacts in foreign countries.
7              MR. SREBNICK:  That's the land of America, the home of
8     the --
9              THE COURT:  Well, it's not.
10             Many people have absolutely no contacts with a foreign
11    country.
12             MR. SREBNICK:  But many of us, like myself, do.  And
13    so that's why I'm a little troubled by it, that because my
14    parents were born in Cuba or any grandparents are from Eastern
15    Europe, that that means that I'm a flight risk.
16             THE COURT:  Not standing alone.
17             MR. SREBNICK:  But what really made the difference in
18    this case as well, and that's what I want to finish with.
19             THE COURT:  And the strength of the case and what
20    they're facing.
21             MR. SREBNICK:  What they're facing is, the presumption
22    is that the government is relying on the presumption --
23             THE COURT:  They're not just relying on presumption.
24             MR. SREBNICK:  I was going to build to it.
25             The presumption, plus their claim of a strong case,

P1fFALEc

1    even though you've seen none of it, Judge.

2                    THE COURT:  I disagree.

3                    MR. SREBNICK:  You've heard proffer.

4                    THE COURT:  Correct.

5                    MR. SREBNICK:  There's no corroborating --

6                    THE COURT:  We don't have a trail at a detention

7    hearing.

8                    MR. SREBNICK:  Of course I come from a different

9    district.  I understand.

10                   But we have, for your Honor's assessment of how strong

11   is the case, you have no forensic evidence, no rape kits,

12   nothing to back up the claims of rape.  You have very delayed

13   reports of it, all of which came after civil lawsuits started,

14   and there's now a monetary benefit to coming forward --

15                   THE COURT:  Wait a minute.  Hang on a second.

16                   Do you know how many of the 40 women you're talking

17   about have filed civil lawsuits?

18                   MR. JONES:  I don't have the ratio; it's certainly not

19   all of them.

20                   THE COURT:  Is most of them?

21                   MR. JONES:  Half and half.  I'm not entirely sure.

22   Less than that, your Honor.

23                   MR. SREBNICK:  And of course, the government has

24   sought forfeiture, and they'll seek restitution from this case,

25   so there's a financial motive for people to come forward.

P1fFALEc

1          THE COURT:  I have to say, this argument is beneath

2     you.

3          MR. SREBNICK:  Well, forgive me, your Honor.

4          When half of them, according to the government, have

5     sought money, I think it's a relevant fact.

6          THE COURT:  Well, of course.  If they were drugged and

7     raped, a tort claim is not outrageous.

8          MR. SREBNICK:  But in evaluating the strength of

9     evidence, your Honor -- that's where I was at -- you evaluate

10    the fact that there's no corroboration and the delay.

11         And so what the government ultimately -- whether

12    strong or not, the case, and you've heard our responses to

13    that, and you know what the cross-examinations will look like;

14    you know what the legal challenges will look like -- what the

15    government ultimately relies upon is that they're wealthy

16    people who the government fancifully says are going to flee to

17    Israel, Brazil or somewhere else that they can't identify.

18         It's, ultimately, their wealth that the government is

19    resting their theory why simple home detention, that

20    Mr. Williams cited in other cases of sexual assault cases, has

21    been sufficient.

22         We've haded the option --

23         THE COURT:  Just to be clear, there's also many

24    examples of commercial sex cases, that are far less extensive

25    than this one, where the defendant was detained.

P1fFALEc

1          In fact, detention is more of the norm in these cases.

2     It is the exception that a defendant -- and I haven't seen a

3     case that involves a ten-year run or a 20-year run, whatever it

4     is, of engaging in this sort of conduct where the defendant was

5     bailed.

6          MR. SREBNICK:  And those cases, I submit, are where

7     there's a concern, a danger to the community --

8          THE COURT:  Correct.

9          MR. SREBNICK:  -- that the person was going to resume

10    the conduct if let out of prison.  That was the case.  The

11    various cases that have been cited are all on dangerous

12    grounds, not on flight grounds.

13          If we've satisfied you that these men, even if you

14    accept, without any rebuttal, the accusations that the

15    government says happened before 2021 and before, if you accept

16    that, it's enough to show you that there's no risk of

17    recurrence in 2025, then we're beyond the cases that you're

18    referring to.  We're only at the cases of flight.

19          And I say to you, Judge, once again, with Orly

20    Alexander and Shlomo Alexander, willing to risk -- they would

21    go to jail if they violate your court order of not restraining

22    assets.  They would be willing to do that.

23          And if you tell them what the conditions are, these

24    two people will lose everything they have.  And if we're not

25    worried about further victims for the reasons I've said,

P1fFALEc

 1    because enough time has gone by to satisfy -- and they're not

 2    going to be engaged in these so-called orgies.  They're going

 3    to be sitting in an apartment somewhere here, within a mile of

 4    the courthouse, wherever you tell them an apartment should be.

 5    We can put it right next door.

 6           They will be on home detention, and if they violate,

 7    if they walk out that door, if you have a private security,

 8    they can be arrested for violating your court order.  So you'll

 9    be assured they're not going anywhere.

10           But to say that they need to be in jail?  Put aside

11    Mr. Klugh's concern about preparing for trial.  I understand

12    the Court's point.  Other people get stuck in that situation.

13    I understand your point.

14           But your decision today is not to punish them because

15    it upsets you that so many people are accusing them.  That

16    would be the wrong reason, I believe.  Your question is, will

17    they obey your court order?  Will they put Shlomi and Orly into

18    bankruptcy by disobeying your order?  Can you fashion a

19    condition?  If necessary, you bring the good people from Kroll

20    to give you an additional assurance.

21           I think we've satisfied, Judge, that they're not

22    fleeing to Israel, Brazil, or anywhere.  They're coming to

23    court to defend themselves.

24           Thank you.

25           THE COURT:  Thanks, everybody.

P1fFALEc

1          In determining whether any condition or a combination

2     of conditions is sufficient, the Court is supposed to consider

3     several factors, including the nature and circumstances of the

4     charged offense, the weight of the evidence, the history and

5     characteristics of the defendant, and the nature and

6     seriousness of the danger posed by the defendants' release.

7          Defendants' argument, in essence, is that both their

8     dangerousness and their risk of flight can be mitigated.  They

9     believe there is no dangerousness and no risk of flight, but

10    whatever risks there are can be mitigated because they have the

11    wealth to create, in essence, a private prison outside the

12    control of the Bureau of Prisons.

13         Controlling Second Circuit authority expressly

14    prohibits the Court from going down that trail.  As the Circuit

15    said in *Boustani*, quote, we now expressly hold that the Bail

16    Reform Act does not permit a two-tiered bail system in which

17    defendants of lesser means are detained pending trial, while

18    wealthy defendants are released to self-funded private jails.

19    It is a fundamental principle of fairness that the law protects

20    the interest of rich and poor criminals in equal scale, and its

21    hand extends as far to each.

22         To interpret the Bail Reform Act as requiring district

23    courts to permit wealthy defendants to employ privately-funded

24    armed guards, where an otherwise similarly-situated defendant

25    without means would be detained, would violate this core

P1fFALEc

1    principle.  Such a two-tiered system would foster inequity and

2    unequal treatment in favor of a very small cohort of criminal

3    defendants who are extremely wealthy.  That's *United States v.*

4    *Boustani*, 932 F.3d 79, 82 (2d Cir. 2019), internal quotations

5    and citations omitted.

6         This a presumption case.  Even if it were not, there

7    is no question that the government has shown, by clear and

8    convincing evidence, that these defendants pose a risk to the

9    community.  The government has proffered that over many years,

10   they have sexually assaulted women.  The nature and

11   circumstances of that offense weigh in favor of a finding of

12   dangerousness.

13        The weight of the evidence is strong.  I understand

14   that the defense disagrees with me.  Once you actually see the

15   discovery, if the government's proffer is false, you can always

16   come back to me and ask me to reconsider my decision.

17        I understand that there is a possibility of false

18   allegations of coerced sexual conduct.  That is, while many, if

19   not most, people who say they were sexually assaulted are

20   telling the truth, that is not universally the case.  But the

21   government's proffer is that more than 40 women have made such

22   allegations against these defendants, and there is a

23   consistency in the details about how they are lured into an

24   area under the defendant's control and then drugged and

25   assaulted.  That tends to corroborate their stories that these

P1fFALEc

victims are not fabricating what happened to them.

Further, the government proffers that there is videotape corroboration of at least some of the victims' stories, with a victim who is obviously and visually incapacitated.  In short, the evidence against them is strong.

The history and characteristics of the defendant. While no defendant has a criminal record, the government's evidence is persuasive that this sort of joint, fraternal sexual misconduct has continued for years.  This was not a one-time party where things went wrong.  Nevertheless, the government acknowledges that the defendants have been employed all of their adult lives, and other than these charges, there is no evidence that they have engaged in other criminal conduct.

In terms of the nature and seriousness of the danger posed by the defendants' release, the defendants rely heavily on the fact that the government has proffered no evidence of misconduct after 2021.  I'm not as sanguine as the defense is, that that means that with their marriage, they have changed their stripes and are now staying home with their wife and not engaging with other women.

They pose a danger to unsuspecting women to be drugged and raped, and that's a serious danger.  The defendant's proposed mitigation of that danger is a private prison, which, for the reasons discussed, cannot be considered.

P1fFALEc

1          The Court also finds, by at least a preponderance of

2     the evidence, that the defendants are also a risk of flight.

3     Their parents own substantial real estate in a foreign country.

4     Alon is married to a woman who is a citizen of a foreign

5     country, and his wife has family in that country.  Oren is

6     married to a woman who is a citizen of a foreign country.  Tal

7     has no spousal connections to overseas, but his, as well as the

8     other defendants' grandmother, lives overseas.

9          Put differently, although they all have substantial

10    ties to the United States -- they're all United States

11    citizens -- they all have ties to other countries.  They are

12    facing very substantial jail time if convicted, a 15-year

13    mandatory minimum, and based on the proffer of Mr. Jones,

14    because some of the victims were minors at the time, they are

15    facing very substantial time.

16         They are also facing very substantial reputational

17    harm.  The defendants argued that they have a reason to stay

18    and fight, and I understand that.  If the facts are as the

19    defendant says, this is going to be a fascinating trial to

20    watch.

21         There's also substantial reason for them to say they

22    don't want to put their family through what they know -- if the

23    government is right and the victims are telling the truth -- is

24    going to be a horrible trial for their family to sit through.

25    That all could give them a substantial reason to leave the

P1fFALEc

1    country.

2              They will be brought back eventually, but as the

3    government says, memories fade.  I've got a defendant who fled

4    four years ago, and he's still not brought back, and he doesn't

5    have the money to fight the extradition; it's just taking

6    forever.

7              In short, these three defendants both pose a

8    substantial risk to the safety of the community and a flight

9    risk, and there is no condition or combination of conditions

10   that are consistent with the Bail Reform Act that would

11   reasonably ensure the safety of the community and the

12   appearance of the defendants at trial.

13             In short, the defendant's motions to reverse the

14   detention order of the magistrate judges in Florida are denied.

15   And Oren Alexander -- this is his detention hearing -- as to

16   him, the government's motion to detain is granted.

17             For the defendants, my understanding is that your

18   clients will be brought to New York some time next week.  I

19   think I've heard the date, but I don't think I'm supposed to

20   disclose it.

21             So what I intend to do is set a status conference

22   early the next week to give everybody time to see their client.

23             So Angela, can you give me a date early, not next

24   week, but the following week?

25             THE DEPUTY CLERK:  January 30.

P1fFALEc

1            MR. SREBNICK:  I have a court date that day in Second

2    Circuit of Florida.

3            Would, perhaps, the day before be possible?

4            THE COURT:  What day is that?

5            MR. SREBNICK:  That's a Friday, I believe.

6            THE DEPUTY CLERK:  The 30th is a Thursday.  The 29th

7    is a Wednesday.

8            THE COURT:  Okay.  How about on the 29th?

9            THE DEPUTY CLERK:  The 29th works.

10           MR. SREBNICK:  Okay, Judge.

11           THE COURT:  You going to fly out that morning, or does

12   it matter?

13           MR. SREBNICK:  If you can do it at this time in the

14   afternoon, it's fantastic, because then we have the morning to

15   fly.

16           THE COURT:  Hang on a second.

17           (The Court and deputy clerk conferred)

18           THE COURT:  Let's set it in the morning.  10:30.

19   10:30 on the 29th.

20           Does that work for everybody?

21           MR. JONES:  Yes, your Honor.

22           MR. SREBNICK:  Is there any chance that if someone

23   needs to fly up and back the same day, that we could do it a

24   little bit later, maybe noon-ish?

25           THE COURT:  Sure.

P1fFALEc

1              Is that the plan?

2              Is there going to be New York counsel in this case for

3    your clients?

4              MR. SREBNICK:  We're working that out now.

5              THE COURT:  Okay.

6              MR. KLUGH:  I have an oral argument in the Fourth

7    Circuit on the 31st, and we have a sentencing in Orlando on the

8    28th, so if it could be in the afternoon so it could be a

9    one-day trip, it would be most appreciated.

10              (The Court and deputy clerk conferred)

11              THE COURT:  1 o'clock.

12              MR. SREBNICK:  Thank you, Judge.

13              THE COURT:  Okay.  Anything further from the

14    government?

15              MR. JONES:  Yes, your Honor.

16              Just, when the defendants arrive here, does the Court

17    want them sent to 5A the following day, or would the Court like

18    to do all of the Rule 5 stuff that would normally happen in mag

19    court on the 29th?

20              THE COURT:  I'll do it all on the 29th.

21              There's no reason for them to go to the magistrate.

22              MR. JONES:  Yes, your Honor.

23              We'll make sure the marshals are aware.

24              Thank you.

25              THE COURT:  Okay.  Anything from the defense?

P1fFALEc

1           MR. WILLIAMS:  No, your Honor.

2           MR. SREBNICK:  Forgive my ignorance.

3           Where will they be housed?

4           THE COURT:  Likely, in the MDC.

5           MR. SREBNICK:  Yeah.

6           THE COURT:  Let me just say, to all of the: MDC is a

7    horrible place, and it's awful, and they're going to be locked

8    down forever, that's just not true anymore.  All of those

9    decisions that you read about were months ago.  There's a lot

10   more staffing at the MDC.  The number of defendants who are

11   ending up in lock down for substantial periods of time are

12   minimal.  So I'm just saying that.  So I assume your guys are

13   going to MDC, but I don't know.  They may go to one of the

14   other facilities.

15          MR. SREBNICK:  Obviously, the parents are quite

16   concerned about what they've read about in the media.

17          THE COURT:  To the parents, I can only say, MDC --

18   look, it's a jail.  But the horror stories from a year ago are

19   just -- it's not the facility.  They have put a lot more staff

20   on.  They've got a lot more medical staff, and they're doing

21   the best they can.  Okay?

22          All right.  Thank you, all.

23          (Adjourned)

24

25