UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

ALON ALEXANDER,
OREN ALEXANDER, and
TAL ALEXANDER,

                    Defendants.

**S3 24 Cr. 676 (VEC)**

**THE GOVERNMENT'S OPPOSITION
TO THE DEFENDANTS' MOTIONS *IN LIMINE***

JAY CLAYTON
United States Attorney
Southern District of New York
26 Federal Plaza
New York, New York 10278

Kaiya Arroyo
Elizabeth A. Espinosa
Andrew Jones
Madison Reddick Smyser
Assistant United States Attorneys
    *Of Counsel*

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ......................................................................................... 1

**DISCUSSION** .................................................................................................................... 2

I. The Court Should Admit Dr. Rocchio's Testimony .................................................... 2

   A. Background .......................................................................................................... 2

   B. Applicable Law ................................................................................................... 5

      1. Expert Qualification ....................................................................................... 6

      2. Admissibility of Testimony ............................................................................ 6

   C. Discussion ........................................................................................................... 8

      1. Dr. Rocchio Is Qualified to Testify About Memory in this Case and Her Testimony Is Reliably Supported by Her Expertise ........................................................ 9

      2. Dr. Rocchio's Testimony Will Properly Help the Jury Understand the Evidence ....... 11

      3. Dr. Rocchio's Testimony is Sufficiently Tailored to the Facts of this Case................ 14

      4. Dr. Rocchio Will Not Opine on Any Legal Terms, and Will Make Clear that Her Testimony Relates Only to Psychological Concepts, Not Legal Definitions .................. 24

      5. Dr. Rocchio's Testimony Easily Satisfies Rule 403 ....................................... 26

II. The Court Should Admit Dr. Hail's Testimony ...................................................... 28

   A. Background ........................................................................................................ 28

   B. Discussion ......................................................................................................... 29

      1. Dr. Hail's Testimony Will Help the Jury................................................... 29

      2. Dr. Hail's Testimony Will Not Opine on the Credibility of Victims or Instruct the Jury in Legal Concepts .................................................................... 35

      3. The Government Provided Timely Notice of its Intent to Call a Toxicologist as an Expert Witness ...................................................................................... 36

III. The Court Should Admit Witness-1's Testimony and Related Photographs .................... 37

   A. Relevant Facts ................................................................................................... 38

   B. Discussion ......................................................................................................... 39

IV. The Court Should Admit Victim-4's Testimony ................................................... 46

V. The Court Should Admit Testimony Regarding Effect of the Defendants' Assaults on the Victims ................................................................................................................. 48

   A. The Court Should Admit Limited Testimony Regarding the Effect of the Rapes and Sexual Assaults on the Victims ................................................................... 49

   B. The Court Should Permit Testimony About Victim-20's Medical Diagnosis ................. 52

VI. The Court Should Require the Defendants to Produce Exhibits on the Agreed-Upon Schedule................................................................................................................. 54

**CONCLUSION** ............................................................................................................... 59

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the defendants' motions *in limine* filed in connection with the trial scheduled to begin on January 5, 2026.  Five of the defendants' motions seek to prevent the Government from admitting highly probative evidence of the defendants' conspiracy to lure women to their location, often drug the women, and rape them.  Specifically, the defendants seek to preclude the Government from admitting (1) expert testimony from a psychologist, Dr. Lisa Rocchio, who will provide crucial context about the behavior of victims during and following sexual assault; (2) expert testimony from a physician, Dr. Stacey Hail, regarding the typical effects of certain date rape drugs; (3) testimony from a witness present the weekend Minor Victim-3 was assaulted by the defendants, as well as photographs from that weekend; (4) testimony from Victim-4 about what she witnessed the night the defendants assaulted her; and (5) testimony from victims concerning the impact of the defendants' abuse on them.  For the reasons set forth below, the Court should reject these attempts to prevent the jury from seeing and hearing highly probative evidence.

The defendants' final motion, which asks the Court to excuse them of their obligations under Rule 16 and the agreement the parties struck to produce all non-impeachment evidence and exhibits before trial should also be denied, and the Court should reiterate its order that the defense must turn over all defense exhibits, including those to be used on cross-examination for non-impeachment purposes, on the agreed-upon and so-ordered date of December 22, 2025.

1

## DISCUSSION

### I. The Court Should Admit Dr. Rocchio's Testimony

The defendants ask the Court to preclude large swaths of Dr. Lisa Rocchio's expert testimony, despite her strong qualifications and anticipated testimony, which is standard within this Circuit. Dr. Rocchio is a board-certified forensic psychologist and a clinical psychologist with 30 years of experience who will offer "blind" expert testimony on topics relevant to this case. She has repeatedly been qualified to offer expert testimony, including in multiple criminal federal trials, on topics including sexual assault and sexual abuse; responses, labeling, and disclosure of such assaults; and memory. There is nothing controversial about this testimony. Dr. Rocchio's testimony is well supported by established scientific principles, is highly relevant—including to arguments that the defendants have already previewed—and should be admitted at this trial.

#### A. Background

The trial will focus on the defendants' years-long scheme to repeatedly and violently drug, sexually assault, and rape dozens of female victims, including as many as 25 victims who may testify at trial. Each victim will testify about (1) the social interactions and dynamics between herself and one or more of the defendants; (2) her reaction to the assault(s), both in the moment and in their aftermath; and (3) the ways in which she coped with, labeled, and disclosed the sexual assault to others. Dr. Rocchio's testimony will provide context relevant to this testimony.

Dr. Rocchio is a leading expert on sexual assault, interpersonal violence, sexual abuse, and traumatic stress. She maintains an independent practice in clinical and forensic psychology, and has taught, published, and presented on the topics that will be the subject of her testimony. Dr. Rocchio currently serves as an editorial review board member for the American Psychological Association's Journal of Trauma Psychology: Theory, Research, Practice, and Policy. Her 30 years of practice, her trauma-based education and training, and an extensive study of the empirical

data and social science literature on sexual assault, interpersonal violence, and trauma together form the basis of her proposed testimony.

The Government expects Dr. Rocchio to testify regarding: (1) rape, sexual assault, and sexual abuse generally; (2) common victim responses during and following rape and sexual assault, including victim coping strategies; (3) common ways that victims describe or disclose such assaults, including delayed disclosure; and (4) memories associated with traumatic events.

<u>Rape, Sexual Abuse, and Sexual Assault</u>:  Dr. Rocchio is expected to testify that interpersonal violence "is violence committed between individuals, including rape, sexual assault, childhood sexual abuse, sexual harassment, or intimate partner violence, among others." (Def. Ex. 10 ("Rocchio Notice") at 1-2.)  She also is expected to testify that "sexual assault is an abuse of power that occurs when one individual has physical contact with another in a sexual manner without the second individual's consent, either because the individual has not given consent or because they are incapable of consent for some reason, such as age or some other impairment" and that rape "is a form of sexual assault" that "refers specifically to penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim." (*Id.* at 2).  Dr. Rocchio is expected to testify that victims may be forced into penetrative sex in multiple ways, "including the use of physical force or by the administration of alcohol or other drugs to the point where the victim is incapable of providing consent because they are unconscious or otherwise mentally or physically incapacitated."  (*Id.* at 2).  She will also testify that "[s]exual abuse can . . .  encompass nonconsensual behaviors that do not involve physical contact," including, among other things, "taking sexually explicit photographs without consent."

Responses During and Following Rape and Sexual Assault.  Dr. Rocchio will testify about common responses to rape and sexual assault during its perpetration, including the following:

> [C]ommon responses include freezing or . . . attempting to please or placate the abuser or remaining silent. The majority of individuals report experiencing some form of freeze response at some point during a rape or sexual assault, during which they feel or actually become temporarily unable to speak or move. These individuals commonly describe episodes of their mind going "blank" and report feelings of confusion about what is happening to them.  Most individuals . . . use some form of explicit verbal communication of nonconsent . . . [but] most fall back on habitual responses to power or gender role socialization by engaging in polite resistance, such as attempts to persuade, deflect, or convince the perpetrator to stop. A minority of victims report screaming, yelling, or calling for help. Most individuals who experience rape and physical assault who have not been incapacitated do employ some form of physical resistance, such as trying to turn away or close their legs; however they are less likely to use more extreme methods of resistance such as kicking, punching, and hitting. . . victims often experience a greater feeling of fear and entrapment [when there are multiple perpetrators].

(*Id*. at 4).

Labeling and Disclosure of Rape and Sexual Assault.  Dr. Rocchio will testify about common coping strategies and psychological defenses used by sexual assault victims, which "help the individual to put aside and protect themselves from painful and frequently overwhelming feelings and to continue to function."  (Rocchio Notice at 3).  She will testify that the "majority of individuals who have experienced rape or sexual assault do not label it as such" but rather "describe what happened to them as something that was unwanted, weird, scary, or uncomfortable."  (*Id.*).  Dr. Rocchio also will explain that delayed disclosure is "common among individuals who experience rape and sexual assault for a variety of reasons, including . . . confusion, fear of backlash, self-blame, shame, difficulty labeling the experience as abuse, and fear of not being believed" and, when victims do disclose, it is "most likely . . . with a close friend or trusted family member."  (*Id.*).  "Most victims do not report sexual assault to law enforcement, authorities, or medical professionals, and most do not seek medical care following an assault." (*Id.*).

Memory.  With respect to memory, Dr. Rocchio will testify that "individuals are always paying more attention to some details over others, and trauma can narrow that focus of attention." (Dkt. 174 ("Def. Mem.") at 4).  She will explain that "central details," or "details to which individuals are paying attention and that are emotionally significant to them . . . tend to be accurately recalled over time" "along with the gist of what occurred."  (*Id.*).  Dr. Rocchio also will testify that "the general principles of memory apply during traumatic events" and that "during a traumatic event an individual's attention is narrowed, and the emotional response to fear triggers the brain's defensive responses, resulting in less higher order thinking and an increase in the use of habitual responses."  (*Id.*).  She also will explain that traumatic events can result in "[e]rrors in order processes, such as specific timelines and sequencing" but that "[t]raumatic memories have not been shown to be less reliable than memories for other types of events." (*Id.*).

### B.  Applicable Law

Under Federal Rule of Evidence 702, "a district court may admit testimony by 'a witness who is qualified as an expert by knowledge, skill, experience, training, or education' if it is more likely than not that the expert's 'specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.'" *United States v. Pollok*, 139 F.4th 126, 139 (2d Cir. 2025) (citing Fed. R. Evid. 702); *see also Daubert v. Merrell Dow*, 509 U.S. 579, 592-93 (1993).[1] This is a two-step inquiry that requires the district court to determine that (1) an expert is qualified and (2) their testimony is relevant, helpful, and reliable.  *See* Fed. R. Evid. 702. The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied.  *See Daubert*, 509 U.S. at 593 n.10.

---

[1] Unless otherwise noted, all case text quotations omit all citations, internal quotations, footnotes, and prior alterations.

### 1.  Expert Qualification

In determining admissibility, the district court's first duty is to determine whether a witness is qualified to opine on the subject matter at issue.  *United States v. Kidd*, 385 F. Supp. 3d 259, 263 (S.D.N.Y. 2019). "Courts in this district often describe the analysis of an expert's qualifications as comprising two subparts[:]. . . [1] the court must examine the totality of the witness's background to determine whether he or she exhibits any one or more of the qualifications listed in Rule 702—knowledge, skill, experience, training, or education—with respect to the a relevant field" and (2) "the court compares the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *Washington v. Kellywood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015); *see also United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).

### 2.  Admissibility of Testimony

After determining qualification, the Court may admit her testimony if: "(a) the expert's scientific . . . knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."   Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 592-93.  Thus, "[g]enerally, an expert may be permitted to testify if he is qualified, reliable, and helpful." *United States v. Gatto*, 986 F.3d 104, 117 (2d Cir. 2021).  The Second Circuit has explained that, at bottom, the *Daubert* analysis is intended to give the district court the discretion "needed to ensure the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." *Amorgianos v. Nat'l R.R. Passenger*, 303 F.3d 256, 267 (2d Cir. 2002).

With respect to reliability, the court must "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Amorgianos*, 303 F.3d at 265-66. In determining whether an expert's reasoning or methodology is reliable, the trial court may consider: (1) whether the theory or technique used by the expert can be, or has been, tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error of the method used; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or method has been generally accepted within the relevant scientific community. *Daubert*, 509 U.S. at 593-94. The Supreme Court cautioned district courts, however, that in carrying out their gatekeeper function, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

To be helpful to the trier of fact, expert testimony must "concern matters that the average juror is not capable of understanding on his or her own." *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008); *see Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 375 (S.D.N.Y. 2014) ("Weighing whether the expert testimony assists the trier of fact goes primarily to relevance."). Courts within this Circuit regularly admit expert psychologist testimony in criminal cases involving allegations of rape, sexual assault, sex trafficking, and sexual abuse of minors to provide testimony about: (1) responses during and following rape and sexual assault; (2) labeling and disclosure of rape and sexual assault; and (3) the ways in which trauma impacts memory. *See, e.g.*, *Pollok*, 139 F.4th at 140-141 ("[E]xpert testimony on general background concepts is permissible under Rule 702 where it helps to explain or put into perspective characteristics . . . with which a jury may not be familiar"); *United States v. Thomas*, No. 23 Cr. 481 (NSR), 2025

WL 2860312, at *4 (S.D.N.Y. Oct. 9, 2025) (permitting Dr. Rocchio to testify about "the nuances regarding the ways in which victims of sexual abuse act and react," which "are not within a juror's ken") (citing *United States v. Zhong*, 26 F.4th 536, 555-56 (2d Cir. 2022)); *United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2021 WL 5283951, at *2-5 (S.D.N.Y. Nov. 11, 2021) (permitting Dr. Rocchio's testimony related to sexual abuse and incremental, delayed, and non-disclosure); *United States v. Ray*, No. 20 Cr. 110 (LJL), 2022 WL 101911, at *9-13 (S.D.N.Y. Jan. 11, 2022) (permitting expert testimony "to help a jury understand a common set of conduct experienced by victims . . . and to explain the 'seemingly counterintuitive behavior' of victims or 'conduct not normally familiar to jurors") (citing cases); *United States v. Raniere*, No. 18 Cr. 204 (NGG), 2019 WL 2212639 at *7-8 (E.D.N.Y. May 22, 2019) (permitting expert testimony "about sexual assault victims and their psychologies").

## C.  Discussion

The Court should admit Dr. Rocchio's testimony in its entirety because she is an expert in each subject about which she is expected to testify, her testimony fits comfortably within the parameters of Rule 702, and her testimony will be both relevant and helpful to the jury.  Tellingly, the defendants cannot point to a single case where expert psychologist testimony like that proffered here was excluded in a case involving sexual abuse.  That is because such testimony is entirely proper and highly useful to juries considering allegations of rape, sexual assault, and sexual abuse. Indeed, in the lone case the defendants cite within this District about sexual abuse, the court specifically permitted the expert testimony *of Dr. Rocchio herself*.  (Def. Mot at 13); *see Thomas*, 2025 WL 2860312, at *4.

The defense raises five arguments in support of precluding Dr. Rocchio's testimony: (1) that Dr. Rocchio—a clinical and forensic psychologist specializing in the assessment and treatment of interpersonal violence and traumatic stress—is not qualified to testify about memory and that

her testimony regarding memory is therefore unreliable; (2) that Dr. Rocchio's testimony is within the ken of the average juror and therefore not helpful to the jury; (3) that Dr. Rocchio has insufficiently tailored her opinions to the facts of this case; (4) that Dr. Rocchio's testimony would improperly invade the province of the jury by explaining or opining on concepts like "interpersonal violence," "rape," "sexual assault," and "force"; and (5) that Dr. Rocchio's testimony should be precluded under Rule 403 because it is unfairly prejudicial or could lead to juror confusion.  Each argument fails.

### 1. Dr. Rocchio Is Qualified to Testify About Memory in this Case and Her Testimony Is Reliably Supported by Her Expertise

The defendants do not contest Dr. Rocchio's qualifications generally.  (Def. Mem. at 19) ("[Dr.] Rocchio is an experienced clinical psychologist with advanced training and practice in trauma treatment.").  Nor could they: Dr. Rocchio is a leader in her field, teaching others as a professor at Brown University, and she has over 25 years of clinical and forensic experience.  She has repeatedly been qualified to offer expert testimony, including in multiple criminal trials in this District.  (*See* Rocchio Notice at 24-25).

Instead, the defendants argue that Dr. Rocchio is not qualified to offer expert testimony "on memory encoding, retrieval, or reliability."  (Def. Mem. at 19).  But this is nonsensical, as deep expertise in how memory works—how it is encoded and retrieved, and how to evaluate the reliability of memory—is a core function of trauma therapy.  As outlined in her curriculum vitae, Dr. Rocchio received both her master's degree and doctorate from the University of Rhode Island, a program which is accredited by the American Psychological Association.  (Rocchio Notice at 8).  As she can explain, her training required her to complete coursework and receive training in, for example, cognition, memory, learning theory, perception, memory encoding, memory consolidation, and memory storage.  As a practitioner, she has evaluated and treated hundreds of

patients, which requires a sophisticated understanding of how trauma and emotion interact with memory, and how trauma interacts with the encoding, recovery, and reliability of memory over time.

Dr. Rocchio's expertise goes beyond her general practice. She is a Clinical Assistant Professor at the Alpert Medical School of Brown University (Def. Mem. at 9), where she trains prospective psychologists in different aspects of trauma therapy, including memory. She also was a research group member of the Trauma Science Research Group. (*Id.* at 12). During her tenure, the group conducted an interview-based study to test the scientific literature surrounding false memory syndrome and published recommendations regarding the appropriateness of certain practices surrounding the topic. She has provided expert testimony on the topic of memory in multiple cases. *See*, *e.g.*, *People v. Weinstein*, No. 74118-24/001 (N.Y. Supr.), May 27-28, 2025 Tr.; *United States v. Jeffress*, 2023-CF1-6998 (D.C. Super.), June 4, 2024 Tr.; *United States v. Maxwell*, No. 20 Cr. 330 (AJN) (S.D.N.Y.), Nov. 10, 2021 Tr. Simply put, Dr. Rocchio is eminently qualified to testify about all aspects of memory outlined in her notice and the Court should so qualify her.

Notably, the defendants only argue (incorrectly) that Dr. Rocchio's qualifications are insufficient—they do not suggest that testifying about the field of memory generally does not satisfy any of the reliability factors in set forth in *Daubert*[2] and they do not suggest that Dr. Rocchio's opinions fall beyond the generally accepted social science on this topic. (Def. Mem. at 20-21). Should this Court join the many courts within this District that have determined that Dr. Rocchio is qualified to opine on memory, the bases for her testimony on this topic is clear and

---

[2] Nor can they, as their own proffered expert, Dr. Deryn Strange, offers a host of opinions associated with memory that are addressed in the Government's opening motions *in limine* regarding Dr. Strange's opinions. *See* Dkt. 89.

undoubtedly reliable—they are derived from her decades-long career as a leader in her field. However, even if the Court did not find that Dr. Rocchio was qualified in this area based on her clinical experience, Dr. Rocchio supports her statements on memory with citations to sample articles on the subject. (*See* Rocchio Notice at 5-7) (citing N. Diamond et al., *The truth is out there: Accuracy in recall of verifiable real-world events*, Psychological Science, Vol. 31(12), 1544–1556 (2020); H.G. Engen et al., *Memory control: A fundamental mechanism of emotional regulation*, Trends in Cognitive Sciences, Vol. 22(11), 982-95 (2018); C.S. Küpper et al., *Direct suppression as a mechanism for controlling unpleasant memories in daily life*, Journal of Experimental Psychology: General, Vol. 143(4), 1443-49 (2014); L.J. Levine et al., *Emotion and memory narrowing: A review and goal relevance approach*, Cognition and Emotion, Vol. 23(5), 833-75 (2009); E. Tulving et al., *Encoding specificity and retrieval processes in episodic memory*, Psychological Review, Vol. 80(5), 352-73(1973)). These articles are more than sufficient to reliably support her proposed testimony.[3]

### 2. Dr. Rocchio's Testimony Will Properly Help the Jury Understand the Evidence

Next, the defense argues that Dr. Rocchio's testimony is "completely within the understanding of the average juror." (Def. Mem. at 22). This exact argument has been repeatedly rejected by courts across this Circuit. "The Second Circuit has held that expert testimony regarding the general dynamics of sexual abuse . . . is admissible under Rule 702, 'when it provides jurors with information to assist them in evaluating, and placing into perspective, conduct that may be the result of complex interpersonal relationships that could be difficult for a jury to understand on its own.'" *Thomas*, 2025 WL 2860312 at *4 (citing *Pollok*, 139 F.4th at 140-41). "Such expert

---

[3] Notably, the defendants' own memory expert falls into this category of expertise, having never treated any patients herself and instead relying on research and studies, much carried out by others, as her basis of knowledge.

testimony may be particularly important where . . . it helps the jury contextualize the seemingly counterintuitive behavior of the victims.'" *Pollok*, 139 F.4th at 141. *See also United States v. Johnson*, 860 F.3d 1133, 1140 (8th Cir. 2017) ("Regardless of the victim's age, expert testimony about how individuals generally react to sexual abuse . . . helps jurors evaluate the alleged victim's behavior.").

Multiple courts within this jurisdiction have admitted Dr. Rocchio and similar experts' testimony on exactly this basis. For example, Judge Nathan rejected a similar challenge and permitted Dr. Rocchio to testify in *United States v. Maxwell*. There, the Government noticed Dr. Rocchio for her expert opinion that "nondisclosure, incremental disclosure, and secrecy are common among victims of sexual abuse and that memory can be affected by a variety of factors, including the effects of trauma." *Maxwell*, 2021 WL 5283951, at *2. Judge Nathan authorized Dr. Rocchio to opine on each of these topics and specifically identified delayed disclosure as "outside the ken of the average person, and so appropriate for expert testimony." *Id.* at *4. Similarly, in *United States v. Thomas*, a matter decided only last month, Judge Román admitted Dr. Rocchio's testimony related to labeling and disclosure of childhood sexual abuse and memory, holding that "the nuances regarding the ways in which victims of sexual abuse act and react are not within a juror's ken." *Thomas*, 2025 WL 2860312, at *4; *see also. e.g.*, *Rapp v. Fowler*, No. 20 Civ. 9586 (LAK) (S.D.N.Y.), Dkt. 303 (permitting Dr. Rocchio to testify as an expert in interpersonal violence, which includes rape, sexual assault, and childhood sexual abuse, among other things). These decisions recognize that such testimony is "specialized information [that] may very well be beyond the knowledge of many jurors." *United States v. Batton*, 602 F.3d 1191, 1201 (10th Cir. 2010) (allowing testimony on the modus operandi of perpetrators and citing similar holdings by the Seventh and Fifth Circuits).

12

In seeking nevertheless to preclude Dr. Rocchio's testimony, the defendants argue that the jury will be familiar with the ideas of "defense mechanisms," how "individuals talk about their experiences of rape and sexual assault," and that "memories . . . can be influenced by a number of factors." (Def. Mem. at 13). They further argue that much of Dr. Rocchio's proposed testimony relates to assertions that are fact-specific, and that the average juror can understand the complexities of a witness's testimony such as "regret, shame, or embarrassment," without testimony that "may be true in some instances and untrue in others." (Def. Mem. at 9-10).

The defendants' arguments only underscore the need for expert testimony. As discussed in greater details in Section I.C.3.a, *infra*, blind testimony such as that offered here is both helpful and routinely admitted in cases such as these. While some jurors may have experience with employing personal "defense mechanisms" in other contexts or have knowledge that sexual assault exists generally, only a minority of jurors (if any) will have experienced rape or sexual assault— either by force or by a drug or intoxicant. Generally, the jury will lack understanding of the "unusual area of human interaction" present in instances of rape, sexual assault, and sexual abuse, much less the social science surrounding how victims typically respond during and after an assault of this type or how this type of trauma can impact memory. *Ray*, 2022 WL 101911, at *10. That is why most jurors will not intuitively understand the dynamics present in such an experience and its aftermath, and why Dr. Rocchio's testimony is based on her experience working with survivors of such interactions and the academic literature will be useful to jurors.[4]

---

[4] The defendants also argue that the helpfulness of Dr. Rocchio's testimony "is predicated on the notion that jurors harbor 'rape myths,' and that Dr. Rocchio has not provided "any empirical evidence demonstrating that such myths are widely prevalent today." (Def. Mem. at 10.) Rape myths themselves are not a topic that the Government intends to elicit on direct examination from Dr. Rocchio, but only last year Dr. Rocchio was qualified as an expert on the topic of rape myths in another criminal matter. *See United States v. Jeffress*, 2023 CF1 6998 (D.C. Super.) June 4,

### 3.  Dr. Rocchio's Testimony Is Sufficiently Tailored to the Facts of this Case

Next, the defendants argue that Rocchio's testimony is not sufficiently tailored to the facts of this case for two reasons: (1) that testimony regarding the general social phenomena of rape, sexual assault, sex abuse, and their associated effects on responses, disclosure, labeling, and memory are insufficiently tailored to the facts of the case, and (2) that specific topics noticed by Dr. Rocchio are inapplicable to the facts of this case.  (Def. Mem. at 10-14).  For the reasons outlined below, these arguments fail.

#### a. Dr. Rocchio's Testimony About Typical or Common Responses to Violence or Sexual Assault Is Appropriate in this Case

First, the defense takes issue with Dr. Rocchio's testimony because she will testify only to general principles and "has never evaluated any of the accusers in this case and is unfamiliar with the circumstances surrounding their allegations." (Def. Mem. at 13-14).  The defense's description of blind testimony as somehow inappropriate is mistaken.  Indeed, such subject matter testimony by blind experts has repeatedly been admitted within this Circuit to "help a jury understand a common set of conduct experience[d] by victims or the actions normally taken by those committing certain crimes to seduce their victims."  *Ray*, 2022 WL 101911, at *10; *see also, e.g.*, *Thomas*, 2025 WL 2860312, at *4; *Maxwell*, 2021 WL 5283951, at *2-5; *Torres*, 2021 WL 1947503, at *6; *United States v. Kidd*, 385 F. Supp. 3d 259, 263 (S.D.N.Y. 2019).

Moreover, while the defense insists that Dr. Rocchio must evaluate the victims in this case to provide reliable testimony, "[t]he Defense has the law backwards on this point." *Maxwell*, 2021

---

2024 Trial Tr. at 99-101.  The defendants' contention about a lack of evidence concerning the existence of rape myths is also flat wrong: according to the current literature on the topic, one quarter to one third of people in the United States accept one or more rape myths.  *See* Kristen C. Elmore, et al., *Rape Myth Acceptance Reflects Perceptions of Media Portrayals as Similar to Others, But Not the Self*, National Institute of Health - Violence Against Women (Mar. 2021).

WL 5283951, at *5.  Indeed, "Dr. Rocchio's testimony is appropriate because she does *not* testify as to any specific witness's credibility."  *Id.* (emphasis in original).  *See also Torres*, 2021 WL 1947503, at *7; *United States v. Johnson*, 860 F.3d 1133, 1140 (8th Cir. 2017) (explaining that an expert may testify "regarding the general characteristics that sexually abused children exhibit" but may not usurp the jury's role of assessing the credibility of any specific victim); *United States v. Telles*, 6 F.4th 1086, 1097-98 (9th Cir. 2021) (same).[5]

The defense further argues that Dr. Rocchio's testimony should be excluded because "she will be mirroring the testimony of the [victims]."  (Def. Mem. at 13).  The defendants' argument is misguided.  There is "nothing wrong with testimony that corroborates the testimony of a party's fact witnesses and thereby makes that testimony more credible or believable to the jury."  *Ray*, 2022 WL 101911 at *12.  Indeed, "[t]hat is a necessary condition of all admissible evidence—it has the 'tendency to make a fact more or less probable than it would be without the evidence.'"  *Id.* (quoting Fed. R. Evid. 401(a)).  As Judge Liman aptly noted regarding similar proposed testimony on coercive control in *United States v. Ray*:

> [This type of] testimony will bolster the testimony of any particular victim or witness only in the sense that if the jury finds [the expert's] testimony regarding modus operandi and the effect of sexual abuse on a victim to be credible and if it finds that the facts as testified to by a victim fit the pattern described by [the expert], it might find that testimony to be more credible than if [the expert] had not testified.  But the defense will be able to cross-examine both [the expert] and the alleged victims.  If it turns out that the testimony of [the expert] will support the testimony of the victims, that will be because the witnesses testify consistently with what [the expert] will testify is victim experience generally and because the jury—after cross-examination—will believe both [the expert] and the victims.  It will not be because [the expert] lends an expert sheen by testifying that a witness is credible.  Presenting

---

[5] The defense's citation to the APA Guidelines regarding forensic psychologists is similarly misunderstood or misconstrued.  According to the guidelines, an expert who is provided case-specific information—*i.e.*, testifying about one or more individuals in a case—should, in an ideal world, evaluate the individual.  Here, Dr. Rocchio has not been provided with information about any particular individual and will not opine on the testimony or credibility of any witness or of the defendants.

expert testimony that is consistent with lay witness testimony is the permissible building block for any case, whether it be presented by the plaintiff or by the defendant.

*Id.* at \*13.  Here too, the jury will be presented with both the testimony of a number of victims and the expert testimony of Dr. Rocchio regarding the psychological dynamics of responding to, coping with, describing, and disclosing rape and sexual assault, and encoding and retrieving memories of rape and sexual assault.  If the jury finds that Dr. Rocchio's testimony "mirrors" that of the Government's victims, and thereby corroborates it, it will be because "the jury—after cross-examination—will believe both Dr. [Rocchio] and the victims," nothing more.  *Id.*

In support of their contrary position, the defendants primarily cite to inapposite cases in which parties noticed experts to explicitly opine on the credibility of other witnesses in a case.  *Nimely*, 414 F.3d at 397-98 (excluding testimony offered "as to the tendencies of police officers to lie or to tell the truth in investigations of the sort at issue here"); *United States v. Lumpkin*, 192 F.3d 280, 288-289 (2d Cir. 1999) (excluding testimony that "the degree of confidence a witness purports to have in his or her identification does not correlate to the accuracy of that identification"); *United States v. Dugue*, 763 F. App'x 93, 96 (2d Cir. 2019) (excluding testimony regarding "the credibility of cooperating witnesses generally, and the benefits such witnesses receive in exchange for government cooperation").  These cases have no bearing on the issues presented here because Dr. Rocchio will not—and, indeed, cannot—testify that any victim's testimony is more or less credible for any reason.

The remaining cases cited by the defense are inapposite.  In *United States v. Duncan*, the Circuit considered whether an IRS case agent improperly opined on an ultimate legal conclusion regarding falsified IRS filings.  42 F.3d 97, 101-102 (2d Cir. 1994).  *Duncan* says nothing about whether generalized testimony is inadmissible.  In *United States v. Teman*, the court excluded

testimony in a bank and wire fraud case where the proposed expert would testify about whether certain checks were, in fact, counterfeit. 465 F. Supp. 3d 277, 329 (S.D.N.Y. 2020). There, the court determined that whether the issued checks were counterfeit was irrelevant to the elements of the crime and precluded the testimony on that basis. (*Id*.) And finally, in *United States v. Amuso*, the Circuit *affirmed* the admission of the expert testimony at issue, finding "no manifest error" where a law enforcement officer testified as an expert "regarding the organization, structure, and terminology of organized crime families." 21 F.3d at 1263; *see id*. at 1264 ("Despite the prevalence of organized crime stories in the news and popular media, these topics remain proper subjects for expert testimony."). Moreover, as here, the *Amuso* panel found no error in the Government calling an expert witness whose testimony corroborated its fact witness since the expert's "testimony did not serve simply to bolster the testimony of the government's fact witnesses as to matters readily understood by the average juror." *Id.* Like the other holdings cited by the defense, this case only strengthens the Government's arguments for admitting Dr. Rocchio's testimony.

Further, case law recognizes a difference between testifying about a pattern of conduct and leaving the jury to determine whether an individual's conduct fits the pattern—which is permissible—and testifying that an individual's conduct fits a particular pattern of conduct, which is not. *See, e.g.*, *United States v. Ruggiero*, 928 F.2d 1289, 1305 (2d Cir. 1991) (distinguishing between testimony that "a certain pattern of conduct is often found in narcotics cases, leaving it for the jury to determine whether the defendant's conduct fits the pattern, but also that such conduct fitted the pattern" (quoting *United States v. Scop*, 846 F.2d 135, 141-142 (2d Cir. 1988), *rev'd in part on rehearing*, 856 F.2d 5 (2d Cir. 1988))); *United States v. Skyers*, 787 F. App'x 771, 775 (2d Cir. 2019). Dr. Rocchio will testify about the psychological dynamics of rape, sexual assault, and

17

sex abuse, and leave to the jury to conclude whether any relevant individual's conduct fits the pattern.  *See, e.g.*, *United States v. Grady*, 645 F. App'x 1, 4 (2d Cir. 2016) ("[The expert's] testimony did not violate Rule 704(b) because, while it could have been used by the jury to conclude that the crack cocaine in [the defendant's] possession was intended for distribution rather than personal use, that final inference was left to the finder of fact.").  Dr. Rocchio's opinions about these topics are based on her general expertise and not on any specific knowledge about the facts of this case.  The question of whether the facts of this case fit the pattern laid out by Dr. Rocchio will remain entirely with the jury.  Accordingly, Dr. Rocchio's proposed testimony is well within the bounds of the rules governing expert testimony, as confirmed by the fact that numerous courts that have allowed similar testimony from Dr. Rocchio and other similarly qualified experts.

### b. Dr. Rocchio's Opinions Are Sufficiently Tailored to the Facts of the Case

In addition to arguing that blind testimony is generally unhelpful to the jury, defendants also argue that several of Dr. Rocchio's opinions are disconnected from or otherwise not relevant to the facts of this case, including (1) "high-level concepts like trauma, defense mechanisms,[6] [and] memory" (Def. Mem. at 7-8); (2) that victims "may disclose a varying level of detail about the experience, depending on the context or their level of trust in the person to whom they are speaking," (*id*.); and (3) that "[p]erpetrators often exploit preexisting power differentials between themselves and their victims for the purpose of committing rape and sexual assault and preventing disclosure." (Def. Mem. at 10-11.)  For the reasons that follow, these topics are relevant and sufficiently tailored to the facts of the case.

---

[6] Dr. Rocchio's notice references a number of coping mechanisms and psychological defenses commonly used by victims in response to rape and sexual assault.  (Def. Mem. at 3-4.)

***Trauma and Memory.***  Testimony about trauma and memory is clearly relevant in this case.  The Government has noticed 25 victims to testify at this trial.  Each of these victims will testify either about her experience of rape, sexual abuse, or sexual assault by at least one of the defendants, or of losing memory of a large swath of time and later discovering that at least one of the defendants had engaged in sexual contact with her during that period of incapacitation. Each of these events is clearly a trauma, and the ways that such traumas can affect a victim's memory and the ways that they respond to, process, label, and ultimately disclose those traumas are highly relevant to this case.

***Coping Mechanisms.***  The defendants have made clear throughout this case that their primary defense at trial will be to claim that any sexual contact with the victims was consensual. (*See*, *e.g.*, Dkt. 37 at 39 ("We believe [the case is] bogus. We believe it's made up of women who came forward for money.")).  They have been equally clear that at least one way that they will attempt to prove consent is to argue that victims did not behave consistently with how, they claim a victim should act before, during, and after an assault.  For example, at the bail hearing before this Court on January 16, 2025, counsel for Tal Alexander stated that the allegations were not true and that the issue of "the credibility of the witnesses . . . cut against the strength of this case." (Dkt. 76 at 17:13-21).

Coping mechanisms and psychological defenses that victims use to deal with the trauma of rape, sexual abuse, and sexual assault are thus entirely relevant to the case.  At the bail hearing before this Court, defense counsel indicated that the issue of consent was a "triable issue[]" because the Government had not proffered evidence of "women screaming, women held down, [or] women completely unable to move." (Dkt. 37 at 47:6-12).  To be clear, the Government will present evidence that this type of assault occurred at trial.  However, not all rapes require a screaming,

sobbing woman. Dr. Rocchio notes, as examples of coping strategies during an assault, that victims commonly "fall[] back on habitual responses to power, such as attempting to please or placate the abuser or remaining silent," "experience[e] some form of freeze response at some point during a rape or sexual assault, during which they feel or actually become temporarily unable to speak or move," or "describe episodes of their mind going 'blank' and report feelings of confusion about what is happening to them." (Def. Mem. at 2.) Many of the victims in this case experienced these or similar responses. (Victims-1, -2, -3, -6, -7, -8, -9, -13, -14, -15). Dr. Rocchio also explains that, while most victims "do use some form of explicit verbal communication of non-consent," "[a] minority of victims report screaming, yelling, or calling for help." Here, most of the victims experienced or employed at least some type of verbal indication of non-consent, but many of them did not scream out to others who were in the vicinity and almost none of the women attempted to overpower their attacker. (Victims-2, -4, -5, -6, -13, -14, -15, -24.) Dr. Rocchio further explains that victims often submit "as soon as they determine that the perpetrator has decided to assault them or if they perceive that physical resistance is likely to escalate the perpetrator's conduct." (*Id*. at 2.) (*Cf*. Victims-3, -7, -8, -14.) Accordingly, Dr. Rocchio's testimony will help to put into context the psychological factors that may not be obvious to the jury in these scenarios.

Dr. Rocchio's opinions about coping strategies after an assault are similarly relevant. Also at the bail hearing, defense counsel provided examples of three women who sued the defendants for sexual assault and outlined how the women remained in contact with the defendants and did not report the assault to law enforcement in support of the claim that at least some of the defendants' victims were not credible. (Dkt. 37 at 22:9-26:21). However, Dr. Rocchio will explain that remaining in contact with an attacker is not uncommon. For example, victims may "remain[]"

in touch [with perpetrators of assault] . . . to better understand what happened, as a way of regaining control, or to prevent further loss of social circle" and that coping mechanisms like "denial[], minimization, self-doubt, or self-blame" make it "less likely that a victim [] directly confront[s] a perpetrator." (Rocchio Notice at 2-3.) Dr. Rocchio also identifies "non-labeling of the experience as a rape or sexual assault" as a coping strategy," which is consistent with the way several of the victims who will testify did not use the words "rape" or "assault" to describe their experiences initially, which can be relevant to whether a victim remains in contact. (*Id*. at 3.)

Here, several victims remained in contact with at least one of the defendants after the assault, for a variety of reasons, including shock, shame and self-blame, and as part of an attempt to minimize the conduct and convince themselves that they were alright. As illustrative examples, Victims-7 and -9 both had conversations with at least one the defendants on social media after the assault and did not confront their attacker about the assault during those communications. Victim-7 also has consistently stated that, despite coming to in the middle of a rape, she originally blamed herself for what happened and, in substance and in part, for putting herself in that situation. For

████████████████████████████████████████████████████████

████████████████████████████████████ Many of the victims also initially told their friends that what happened to them was "weird," made them uncomfortable, or that the guys were "creepy" rather than identifying the encounter as "rape" or "sexual assault." Dr. Rocchio's opinions, including that many of these coping strategies "function to help the individual to put aside and protect themselves from painful and frequently overwhelming feelings and to continue to function," may help to put these seemingly counter-intuitive responses into context. (Rocchio Notice at 3.)

21

***Disclosure of Assault.***  Defendants also take issue with Dr. Rocchio's opinion that victims "may disclose a varying level of detail about the experience, depending on the context or their level of trust in the person to whom they are speaking" as a specific opinion that "do[es] not touch upon the facts of this case."  (Rocchio Notice at 4, Def. Mem. at 9).  But the manner in which the victims disclosed their assaults to others is a key issue at the heart of this case and, specifically, to the arguments the Government expects the defense will make to discredit the victims.  Indeed, as outlined above, the defendants have repeatedly and publicly claimed that the victims in this case are lying to get money through civil lawsuits, and that many of the victims only disclosed their assault to law enforcement after a series of initial lawsuits in or about 2024.[7]  The defense has further noticed an expert in false memory, making clear that their strategy is to discredit the victims.  Dr. Rocchio's testimony will provide necessary context for the process and timing by which many of the victims disclosed the details of their rape.

***Power   Differentials.***    Finally, Dr. Rocchio's opinions on how pre-existing power differentials between a victim and abuser are also sufficiently tailored to the facts of the case.  (*Contra* Def. Mem. at 9-10.)  While the defendants did not engage in "long-standing [romantic] relationships" with their victims (*id.*), those are not the only types of relationship that create a power imbalance.  Here, the power differentials that existed at the time of the rapes and sexual assaults relate to, at minimum, age, status, location, and knowledge.

With respect to age, each of the defendants are accused of having raped or assaulted at least one minor or teenager: Minor Victim-3, Minor Victim-8, Minor Victim-25, and Victim-9.  (Dkt.

---

[7] *See, e.g.*, Tynisa Senior & Alex Browning, "Judge denied bond for Alon Alexander in federal sex trafficking cases; decision pending for twin brother," Miami 7 News (Jan. 3, 2025) at 02:20-02:25,      https://wsvn.com/news/local/miami-dade/judge-denies-bond-for-alon-alexander-in-federal-sex-trafficking-case-decision-pending-for-twin-brother (Q: "So all of the [victims] are lying? A: [counsel for Alon]: Every one of them. Q: Every one them?  A: Every. One. of them.").

188 at 6-7, 11-14). For each assault, the difference in age—and the associated life experience that comes with age—was significant. When Alon and Tal raped Minor Victim-3, they were approximately 21 and 22, had the means to rent a summer home, and had significant experience with sex and group sex. By contrast, Minor Victim-3 was a ███████████████████████████ ████████████████████████████████████████████████████████████████████

Alon was approximately 30 years old and an executive at his company when he raped Minor Victim-8 and assaulted Minor Victim-25, ██████████████████████████████. Oren was approximately 30 years old and a nationally-recognized real estate agent when he sexually assaulted Victim-9, ████████████████████████.

With respect to location, at least Victims-1, -2, -3, -4, -5, and -6 were raped or sexually assaulted after having travelled to a location away from their homes that was in the defendants' control. (*Id*. at 4-11.) Several of the victims will testify about how they found themselves in an unfamiliar location (including the defendants' homes or hotel rooms) and had to navigate finding their way away from their attacker. Finally, with respect to status, multiple victims have stated that the defendants' presence in shared social circles influenced the way that they responded to the assault (*e.g.*, Victims-15, 20) and others stated that the defendants' status as successful leaders in their industry played a similar role. (*E.g.*, Victim-12, -16, -17.)

These pre-existing age, experience, and control gaps—which the defendants' used as a tool to assault their victims—are facially apparent. To be sure, Dr. Rocchio knows none of the facts outlined above, and will testify only about the social science surrounding how different types of pre-existing power imbalances can be exploited and can prevent or delay disclosure, but this context is clearly helpful context that the average juror does not know. *Mejia*, 545 F.3d at 194;

*Faulkner*, 46 F. Supp. 3d. at 375 ("Weighing whether the expert testimony assists the trier of fact goes primarily to relevance.").

Ultimately, the jury will need to determine for themselves whether to credit the victims' testimony regarding their experiences or, for that matter, to credit Dr. Rocchio's opinions. However, her testimony on these topics is certainly relevant and helpful. Moreover, while Dr. Rocchio will testify as a blind expert, her testimony will be tailored to the facts of the case by the parties. Neither the prosecution nor defense may seek to elicit testimony that is not relevant to the case. Fed. R. Evid. 401, 402. Accordingly, each of the opinions outlined above are sufficiently tailored to the case and should be admitted at trial.

### 4. Dr. Rocchio Will Not Opine on Any Legal Terms, and Will Make Clear that Her Testimony Relates Only to Psychological Concepts, Not Legal Definitions

Contrary to the defendant's suggestion, Dr. Rocchio will not purport to explain what rape, interpersonal violence, sexual assault, or force is under the law applicable to this case; rather, she will explain these concepts as they are understood within academic literature and within the practice of psychology.[8] (Def. Mem. at 16-17.) Throughout her testimony, Dr. Rocchio will make clear that the terms she uses and the concepts she explains are all used within the field of psychology, and are not legal terms or definitions. The defendants' concerns that Dr. Rocchio's testimony will somehow confuse the jury about the definitions on legal terms such as force are thus overblown and easily addressed.

Multiple courts in this Circuit have permitted experts to testify about the terms rape and sexual assault in criminal cases featuring a charge of sex trafficking through force, fraud, and coercion. *See, e.g.*, *United States v. Ray*, 20 Cr. 110 (LJL), Dkt. No. 514 at 147-182 (S.D.N.Y.

---

[8] Notably, "interpersonal violence" and "sexual assault" are not legal terms or words used in any element of any charge against the defendants.

March 14, 2022); *United States v. Kelly*, No. 19 Cr. 286 (AMD) Dkt. No. 250 at 179-202 (E.D.N.Y. Sept. 20, 2021); *United States v. Raniere*, 18 Cr. 204 (NGG), Dkt. No. 780 at 43-58, 60-65 (E.D.N.Y. June 6, 2019).

As noted above, Dr. Rocchio will not purport to opine on the specific facts of this case but instead will explain relevant concepts within her field. To be sure, this includes the concepts of "rape," and "force," the latter of which is a concept used when discussing rape and sexual assault, and which Dr. Rocchio uses to explain nonconsensual penetrative sex. (Def. Mem. at 2) ("Perpetrators can <u>force</u> a victim into penetrative sex in a variety of ways, including the use of physical <u>force</u> or by the administration of alcohol or other drugs to the point where the victim is incapable of providing consent because they are unconscious or otherwise mentally or physically incapacitated.") (emphasis added).) To be clear, Dr. Rocchio will use those words because they are necessary concepts in explaining how victims cope with interpersonal violence in a way that is relevant to this case, but she will also clarify that she is not defining legal concepts. Indeed, in her prior testimony, Dr. Rocchio has been careful to clarify that her testimony relates only to concepts within the practice of psychology. *See, e.g.*, *Maxwell*, 20 Cr. 330 (AJN), November 1, 2021 Trial Tr. at 114 ("Q: And that is your definition [of grooming]? A. It's my understanding of the definitions that have been talked about in the literature.")

By no means will Dr. Rocchio's testimony usurp the role of the Court in instructing the jury or the jury in determining whether the defendant committed the crimes charged. Dr. Rocchio will not testify that any particular set of facts or behaviors meets the legal definition of (1) force under 18 U.S.C. §§ 1591 or 2241(a); (2) forcible under N.Y.P.L § 130.52; or (3) rape under N.Y.P.L §§ 130.35, 130.30, or 130.25. Rather, she will describe these terms to put into context certain psychological responses to rape, sexual assault, and forcible physical contact that are

generally not within the experience of the typical juror. As discussed above, that testimony will provide useful to the jury about these topics.

For avoidance of any doubt, and while none of the cases discussed above provided a limiting instruction regarding that expert testimony, the Government would have no objection to such an instruction here to ensure that the jury does not confuse the psychological concepts of rape or force with the legal concepts of "force" under 18 U.S.C. §§ 1591 or 2241(a) or "rape" under N.Y.P.L §§ 130.35, 130.30, or 130.25. Such an instruction would inform the jury that although Dr. Rocchio may use and define these phrases, her testimony does not purport to provide any legal instructions; rather, the Court will instruct the jury on the legal definition of coercion to be applied when they deliberate. *Cf.* Nov. 27, 2023 Trial Tr., *United States v. Joseph*, 23 Cr. 68 (JPO) Dkt. No. 65, at 80-81 ("I want to clarify one thing for the jurors, and that is: The charges in this case involve threats, as I mentioned in introducing the case; and a threat is a special legal term, which I'm going to explain to the jury in detail. Mr. Friedman, as a witness, has testified using the word 'threat,' and that's fine—it's the common understanding of what a threat is something he can testify to—but I want to clarify that I will be explaining in detail the legal definition of a threat, which is a specific thing. . .. I'll be explaining in more detail how to determine whether something is a threat, and it will be up to the jury to decide, among other things, whether the threat was made in the legal sense of the term.").

### 5. Dr. Rocchio's Testimony Easily Satisfies Rule 403

Finally, the defense argues that Dr. Rocchio's testimony should be excluded under Rule 403. (Def. Mem. at 21-23). The defense makes two arguments in support of exclusion pursuant to this rule, each of which is a mere regurgitation of arguments raised above repackaged under Rule 403.

First, the defendants argue that Dr. Rocchio's specific opinion that "perpetrators exploit pre-existing power dynamics for the purposes of committing sexual assault" violates Rule 403. (*Id*. at 22.) While the defendants do not articulate why her testimony would be objectionable under Rule 403, as discussed in Section I.C.3.b, *supra*, the jury will hear evidence about the uneven power dynamics present during multiple assaults, including age, status, location, and knowledge. Dr. Rocchio's testimony on this score will assist the jurors in understanding how those factors can be used to facilitate an assault. This testimony is not only proper, but it would helpful to the jury for the reasons discussed above. It also is not unfairly prejudicial, as the jury will already know about the facts underlying the power dynamics between the defendants and their victims, which they will hear from witnesses other than Dr. Rocchio, and so there is no fear that this "concededly relevant evidence [may] lure the factfinder into declaring guilty on a ground different from proof of the specific offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (defining unfair prejudice).

Second, the defendants speculate that Dr. Rocchio's testimony, which they argue "consist[s] of overly generalized, inapplicable, and purely anecdotal information regarding interpersonal violence," would confuse the jury. (Def. Mem at 22-23. *See also id.* at 23 (contending that "academic descriptions of trauma symptoms" would "mislead the jury by focusing their attention on generalized concepts . . . rather than evaluating the facts" of this case.) As discussed in Section I.C.3.a-b, *supra*, blind testimony is entirely permissible and Dr. Rocchio's testimony is sufficiently tied to the facts of the case. Such testimony is frequently offered by both Dr. Rocchio and other experts in this District, including over similar Rule 403 objections, and this case should be no different. *See, e.g.*, *United States v. Combs*, No. 24 Cr. 542 (AS) (S.D.N.Y.) May 21, 2025 Trial Tr. at 2076-125; *United States v. Ray*, 20 Cr. 110 (LJL), Dkt. No. 514 at 147-

182 (S.D.N.Y. March 14, 2022); *United States v. Kelly*, No. 19 Cr. 286 (AMD) Dkt. No. 250 at

179-202 (E.D.N.Y. Sept. 20, 2021); *United States v. Raniere*, 18 Cr. 204 (NGG), Dkt. No. 780 at

43-58, 60-65 (E.D.N.Y. June 6, 2019).  Both of Dr. Rocchio's cited opinions are relevant, useful,

and not duly prejudicial.  They should accordingly be admitted at trial.

## II.  The Court Should Admit Dr. Hail's Testimony

### A.  Background

Dr. Stacey Hail is a double board-certified emergency medicine physician and medical

toxicologist who serves in multiple roles within these specialties. She is an associate professor in

the Department of Emergency Medicine at the University of Texas Southwestern Medical Center

at Dallas, an attending physician in the Parkland Hospital Emergency Department in Dallas, and a

member of the medical toxicology faculty with the North Texas Poison Center. Dr. Hail is an

expert in recognizing the signs and symptoms of intoxication from prescription medications,

alcohol, and illicit substances and consults with other physicians to assist with the appropriate

management of all types of overdoses, ingestions, and toxic exposures to these substances. She

has testified as an expert in civil and criminal cases extensively in both state and federal courts.

Dr. Hail's testimony will educate the jury about drug-facilitated sexual assaults and the use

of specific substances to commit those assaults.  Dr. Hail will describe the way that "[d]rugs with

a sedative-hypnotic toxidrome, but which do not cause respiratory depression, are commonly used

to commit drug-facilitated sexual assaults." (Def. Ex. 11, "Hail Notice," at 1). Specifically, Dr.

Hail will testify about GHB, Ambien, benzodiazepines (a category that includes Xanax), and

Quaaludes. (*See id.* at 1-3).  She is expected to testify that these drugs "induce symptoms in victims

that are beneficial for committing [drug-facilitated sexual] assault, such as memory loss, sedation,

and a temporary inability to move, but do not depress the respiratory drive and are therefore less

likely to kill victims than other drugs that cause sedation, paralysis, and amnesia but also depress

the respiratory drive, such as opioids." (*Id.* at 1-2).  Dr. Hail will also describe MDMA's use in drug-facilitated sexual assaults, since the drug "induces compliance and can lead to increased feelings of attachment and increased sexual drive … [and] can lead an individual to engage in sexual activities where they otherwise would not without the effects of the drug." (*Id.* at 3).

### B.  Discussion

The defendants do not argue that Dr. Hail is not qualified to opine about the use of certain drugs to commit drug-facilitated sexual assaults and the effects of those drugs. They likewise do not argue that her opinions are unsupported by relevant science and literature or by her professional experience. Essentially, there is no dispute that Dr. Hail is an expert toxicologist whose opinions about drug-facilitated sexual assaults are generally reliable. (*See* Def. Mem. at 15 ("There are no factual disputes regarding the physiological effects of benzodiazepines, opiates, GHB, quaaludes, etc. among recreational and non-recreational drug users.")). Confronted with a clearly qualified expert espousing reliable opinions, the defendants instead argue that Dr. Hail's testimony is irrelevant and lacks a connection to evidence in the case. (*See* Def. Mem. at 6-8; 11-12; 14-16; 21-23).  They also claim her testimony about the use and effects of certain drugs to commit drug-facilitated sexual assaults will, in effect, opine about the credibility of witnesses (*see* Def. Mem. at 11-12; 14-16) and instruct the jury on legal matters (*see* Def. Mem. at 16-17).  Finally, the defendants claim Dr. Hail's testimony should be excluded because of untimely notice. (*See* Def. Mem. at 5-6). Each argument falls short, and the Court should deny the motion.

### 1.  Dr. Hail's Testimony Will Help the Jury

The defendants' chief objection to Dr. Hail's testimony is their incorrect claim that her opinions "are not relevant to the facts of this case . . . [because] there is no evidence of the

defendants procuring or distributing these drugs to the alleged victims." (Def. Mem. 14).[9] This is flatly wrong. Because the evidence will show the defendants had access to and distributed drugs that are commonly used to facilitate sexual assaults and because the victims will describe experiencing symptoms consistent with ingesting those drugs, Dr. Hail's testimony will be helpful to the jury to understand the defendants' conduct, including their intent, and ultimately will assist the jury in determining whether the defendants committed the charged offenses.

### a. There is Extensive Evidence of the Defendants Acquiring and Using Drugs to Facilitate Sexual Assault

As the Government described in its motions *in limine*, at trial the evidence will show that the defendants engaged in a long-running scheme where the "defendants raped and sexually assaulted female victims to whom they had provided material benefits, including travel to vacation destinations and accommodations there, as well as access to events and parties." (Dkt. 188 ("Gov't Mem.") at 3). As part of this scheme, "the defendants or their friends often offered [victims] alcohol, which for some victims caused symptoms consistent with being drugged, including impaired physical and mental capacity, limitations of movement and speech, and incomplete memories of events." (*Id.*). Evidence of the defendants' use of drugs to incapacitate their victims will come in many forms.

---

[9] The defendants articulate this same general claim many ways. (*See* Def. Mem. at 7-8 (calling Dr. Hail's proposed testimony "at best, tangentially related to the facts of the case"); 11-12 (arguing testimony about "typical reactions to various drugs . . . [has] no place in this criminal trial without some connection to the actual facts of this case"); 21 (claiming Dr. Hail's opinion "that drugs with a sedative-hypnotic toxidrome are commonly used to commit drug-facilitated sexual assaults . . . has no nexus to the facts of this case"); and 21-23 (seeking to exclude under Rule 403 "Hail's opinions that ingestion of certain drugs led to certain alleged victim's responses, with no corroborative evidence.")). The Government will address the defendants' various formulations of this argument together.

Numerous victims are expected to testify that after drinking an alcoholic drink the defendant's provided to them, these victims "[felt] far more intoxicated than was consistent with the amount they had consumed, los[t] control of their bodies and black[ed] out for periods of time." (*See* Gov't Mem. at 36-38. Symptoms the victims reported also included, among other things, the inability to move despite an awareness of the situation (*e.g.* Victims-2, -16, -19, -23, and -24), coming to while ostensibly already awake (*e.g.* Victims-3, -4, -7, -12, and -23), and having flashes of memory (*e.g.* Victims-1, -5, and -20). (*See* Gov't Mem. at 4-24; *see also id.* at 57). These symptoms are consistent with ingesting a sedative-hypnotic drug. (*See* Hail Notice at 1-3).

But that is not all. ███████████████████████████████████ ████████████████████████████████. (*See* Gov't Mem. at 20-22). Additionally, a video recording of Oren with a visibly incapacitated victim records him saying to the victim, "Did you take that pill? You should have took that pill," shortly before he recorded himself raping the victim. (*Id.* at 25). And in yet another video (which, according to its metadata was recorded in July 2010), Oren says to someone about a sexual encounter the night before that "we gave everybody Xanax, and no one can really remember." Later in that same video, Alon, while he was sitting next to Oren and talking to another person, says, "Can we start drugging bitches? I'm serious. I drug bitches."

The defendants' written communications will also provide extensive evidence of the defendants acquiring and using drugs to commit sexual assaults. (*See* Gov't Mem. at 55-63). For example, before a trip to Tulum in 2016, a co-conspirator ("CC-8") made explicit the preference for GHB to ensure the sexual pliability of the girls who were being brought on this trip. (*Id.* at 56-57). Tal's reaction to this comment was to confirm that the drugs were being acquired, to which Alon and Oren then responded that they were trying to ensure "max returns" during the trip. (*Id.* at 57). Tal later wrote that the group required "[c]oke and molly for the girls" and "[c]ialis for the

boys[.]" (*Id.* at 61). Four years later, in June 2020, in another group chat planning another trip, CC-8 again wrote to the defendants about using drugs to induce sexual compliance from women. This time, in response to Alon's suggestion that the group should "should think of some fraternity type games at hotel," including "[b]eer pong," CC-8 replied in a series of messages, "[y]eah let's get these girls real wasted. Maybe we'll be able to bang em easier 🤣🤣🤣🤣," and "[h]ow times have changed." Alon then responded "[w]e can put natural wine in cups" / "[s]ounds more our speed these days," to which CC-8's reply was "[w]e used to do it with tequila and Xanax."

And as further described in the Government's motions *in limine*, the defendants' explicit discussions of drugs that are used to facilitate sexual assaults extended well beyond the examples above. For example, the defendants regularly communicated with each other about acquiring and distributing Ambien outside of proper channels, including an instance in August 2018 in which Oren texted Tal that he "[n]eed[ed] to get ambien and condom" to have sex with a woman in a hotel room. (*See* Gov't Mem. at 59). The defendants also discussed acquiring Quaaludes in large orders and using them to induce sex, including an instance in which after being asked, "Did you try those ludes?" Oren answered, "Yes.  Can't wait to tel you the story about that night.  Wow," and then said he wanted direct access to the dealer. (*Id.* at 60). And in yet another example, in August 2018, Tal sent a message to CC-9 and CC-10 asking, "Do you have a good qualud connect?" When CC-9 and CC-10 did not have an immediate supply of Quaaludes, Tal said "[l]et's come up with a plan," and CC-9 responded, "[l]et's find a chemist." The Tal followed up, "I have a crew of Wall Street Guys here that will pay whatever it takes for real deal ludes."

### b. Dr. Hail's Testimony Will Help the Jury Understand the Evidence of the Defendants Drugging Their Victims

As an initial matter, Dr. Hail knows none of the facts outlined above and will not opine about the defendants, their possession or use of drugs, or the victims ingesting those drugs.  But

given the extensive evidence that the defendants used various drugs to commit their crimes, expert testimony from Dr. Hail about the nature of those types of drugs, their effects on those who ingest them, and the ways in which those drugs are used to commit drug-facilitated sexual assaults will clearly be helpful to the jury. Among other things, Dr. Hail's testimony will help the jury evaluate the testimony of victims to understand whether the testimony is consistent with the effects of drugging and will help the jury evaluate the defendants' intent as it relates to drugging and assaulting the victims.

With the assistance of Dr. Hail's testimony, the jury will be better equipped to evaluate other witness testimony and understand the other evidence presented at trial. The victims will describe what happened to them after they consumed drinks the defendants gave them, including becoming sedated or lethargic, having gaps in their memory, and/or being unable to move. Text messages and other evidence will show that the defendants sought out, possessed, and used a variety of drugs to facilitate sex, including GHB, Ambien, Xanax, Quaaludes, and MDMA. Thus, Dr. Hail's testimony about the effects of taking those drugs will plainly help the jury understand the evidence in the case, specifically how ingesting certain drugs could lead to symptoms consistent with those experienced by the victims. Moreover, Dr. Hail's testimony will help the jury understand that the types drugs the defendants possessed and discussed in their communications are ones that are commonly used to commit drug-facilitated sexual assaults, which is relevant to, among other issues, the defendants' intent. Without this testimony, the jury will not appreciate the significant of the defendants accumulating these particular types of incapacitating drugs.  All of this is proper expert testimony that Dr. Hail is qualified to provide. *See Ruggiero*, 928 F.2d at 1305 (an expert may testify that "a certain pattern of conduct is often found in narcotics cases, leaving it for the jury to determine whether the defendant's conduct fits the pattern"); *United States v.*

*Nunez*, 14 Cr. 284, 2016 WL 3626222, at *3 (E.D. La. July 7, 2016) ("Testimony that certain drugs have been used to facilitate rape provides the jury with permissible background information. Accordingly, Dr. Morris-Kukoski's testimony is admissible as long as she does not stray across the line offering a direct opinion as to the defendant's mental state or by giving the functional equivalent of such a statement."); *cf. Diaz v. United States*, 602 U.S. 526, 534-35 (2024) (expert testimony "about the knowledge of *most* drug couriers" is admissible background testimony "for the jury to consider or reject when deciding" disputed factual issues of knowledge and intent (emphasis in original)).

The defendants' arguments to the contrary fail. The defendants contend that because Dr. Hail has not herself treated or evaluated any of the testifying victims that her testimony is "fundamentally unreliable." (*See* Def. Def. Mem. at 15-16). But this has no bearing on the reliability of what Dr. Hail will say about the effects of certain drugs or the general use of those drugs to facilitate sexual assault.[10] Put simply, "[t]he government is free to offer expert testimony both as background for an offense and to assist in proving one or more elements of the offense," including "on the issue of intent," and that is what Dr. Hail's testimony will do here. *United States v. Mulder*, 273 F.3d 91, 102 (2d Cir. 2001). The defendants may cross examine Dr. Hail about the fact that she has not evaluated any specific victim and thus has no opinion about whether any victim's symptoms were caused by ingestion of drugs, but that is no reason to exclude Dr. Hail's testimony. *See Diaz*, 602 U.S. at 535. Neither is there any danger that Dr. Hail's testimony will mislead or confuse the jury. *See Ashley v. City of Bridgeport*, 473 F. Supp. 3d 41, 49 (D. Conn. 2020) ("[T]he court cannot discern the potential for confusion resulting from testimony that certain

---

[10] The defendant's finding fault with Dr. Hail for not evaluating any specific victim also runs counter to their argument, addressed below, that her testimony will improperly bolster the testimony of victims and opine on their credibility.

behavior is consistent with having taken a particular drug."). Dr. Hail's testimony will educate the jury about certain background topics in toxicology, and understanding these topics will permit the jury to more comprehensively evaluate the evidence in the case. This proposed testimony is relevant and reliable and should be admitted.

### 2. Dr. Hail's Testimony Will Not Opine on the Credibility of Victims or Instruct the Jury in Legal Concepts

The defendants also argue that Dr. Hail's testimony will "effectively be telling the jury what result to reach in their decision-making and fact-finding process." (Def. Mem. at 13). The defendants cite cases where the Second Circuit has found inadmissible expert testimony that offered direct opinions about witness credibility, (*see* Def. Mem. at 12), but the defendants barely argue (probably because they recognize the argument is preposterous) that testimony from a toxicologist about the use and effect of certain drugs to commit drug-facilitated sexual assault is at all like improper expert testimony that addresses directly the credibility of other witnesses. As described above in Section I.C.3.a, regarding similar claims made about Dr. Rocchio's testimony, the cases the defendants rely on provide no support for their argument.

There is no reasonable argument that Dr. Hail will opine on the credibility of witnesses or otherwise infringe on the jury's fact-finding role because Dr. Hail will not opine about any specific witness that is testifying at trial. Dr. Hail's testimony will be limited to topics that will enable the jury to evaluate other evidence and reach the factual conclusions necessary to deciding the case. She will not tell the jury that any witness is telling the truth. And neither will she opine that the defendants used any particular substances to incapacitate their victims or possessed any particular intent. Dr. Hail will simply provide the jury with information to help it make those determinations on its own.

Relatedly, the argument that Dr. Hail will "defin[e] legal terms" during her testimony is nonsense. (*See* Def. Mem. 16). The defendants take issue with Dr. Hail's definition and use of the term "drug-facilitated sexual assault," but that is not a legal term. (*See id.* at 17). The term is used to describe sexual assaults that involve the use of drugs. Though the jury will be presented with extensive evidence that the defendants committed numerous such offenses, they will not be asked to conclude whether the defendants committed any "drug-facilitated sexual assaults," and there is no risk of confusion. Accordingly, Dr. Hail's use and defining of the term is entirely proper.

### 3. The Government Provided Timely Notice of its Intent to Call a Toxicologist as an Expert Witness

This August, the Government informed the defendants of its intent to call as an expert witness a toxicologist to testify about the use of certain drugs to commit drug-facilitated sexual assaults. On August 15, 2025, the Government provided its notice to call as a witness Gail Cooper, Ph.D., who is the Director of Forensic Toxicology for New York City's Office of the Chief Medical Examiner. *See* Exhibit A. On October 10, 2025, after receiving a six-week extension of their expert disclosure deadline, the defendants noticed their intent to call Dr. Elie Aoun, a general, addiction, and forensic psychiatrist to testify about many of the same topics as Dr. Cooper. Dr. Aoun's disclosure also noted that he would "testify as to the effects of an alcohol blackout on individuals." On October 24, 2025, the Government informed the defendants of its intent to call Dr. Hail as a witness and provided the defendants a copy of Dr. Hail's CV and notes of a recent call with her. On October 29, 2025, the Government formally provided notice of Dr. Hail's expected testimony, which largely mirrored Dr. Cooper's August notice.

The defendants have asked the Court to exclude Dr. Hail's testimony because of untimely notice. The Court should not take this drastic step. The defendants' argument relies on *United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017), a case where the court excluded experts the

defendant noticed two weeks into a three-week trial. *See* 858 F.3d at 91 & n.17. But even then, though the court cited untimeliness as justifying exclusion, the court also found "the disclosures were substantively inadequate under Rule 16." *Id.* The Second Circuit affirmed, saying "[n]ot only were the disclosures late, more importantly, they were plainly inadequate." *Id.* at 115.

To state the obvious, none of the circumstances present in *Ulbricht* are present here. To begin, as discussed above, Dr. Hail's testimony is entirely appropriate for this case. Additionally, in August, five months before trial, the Government informed the defendants of its intent to call a toxicologist as witness at trial to describe the use and effects of various drugs to commit drug-facilitated sexual assaults. Then in October, still more than two months before trial, the Government told the defendants it would call a different toxicologist as an expert witness about the same topic. The defendants have suffered no prejudice from a change in the Government's witness, and their contrary claims are exaggerated. To the extent the defendants claim prejudice from any updates between Dr. Cooper's notice and Dr. Hail's, such as the inclusion of Ambien or Quaaludes in Dr. Hail's notice, they are in no position to complain, having supplemented the notice of their own proposed expert, Dr. Deryn Strange, on November 6, 2025, after the Government filed its motion to exclude Dr. Strange's testimony. (*See* Dkt. 195).  Accordingly, the Court should reject the defendants' meritless argument on this score.

## III.  The Court Should Admit Witness-1's Testimony and Related Photographs

A woman ("Witness-1") was present at the Hamptons House rented by the defendants (the "2009 Hamptons House") during Memorial Day Weekend 2009, ██████████████████████████
███████████████████████ The defendants seek to preclude her testimony about what she saw and heard that weekend, as well as photographs of doors in the 2009 Hamptons House ████████████
███████████████████████████ The defendants argue that Witness-1's testimony is not direct evidence of the conspiracy because the Government apparently has never claimed it to be,

and that it is inadmissible under Rules 404(b) and 413. (Def. Mem. at 26-29). They also argue that the photographs are so inflammatory that they should be excluded under Rule 403. (*Id.* at 29-30). As explained below, Witness-1's testimony regarding what took place in the defendants' home on Memorial Day Weekend 2009 is admissible as direct evidence, or in the alternative, under Rules 404(b) and 413, as are the photographs, which are no more prejudicial than the charges in this case.

### A. Relevant Facts

CC-2 invited Witness-1 to stay in the 2009 Hamptons House for Memorial Day Weekend in 2009. Witness-1 was living in New York and ███████████████████ at the time. She decided to go, and a party bus took her—as well as dozens of other girls—from Manhattan to a particular club in the Hamptons. After spending time at the club, Witness-1 and many of the others went to the 2009 Hamptons House. Witness-1 met at least Alon and Oren while at the 2009 Hamptons House and understood that the brothers were hosting the weekend. Witness-1 stayed at the house that night, and the next day, she and the others at the house spent most of their time by the pool. That evening, she saw drugs at the house and witnessed people taking the drugs. Later that night, Witness-1 saw Tal and one of the twins dragging a girl, who did not appear sober, by her wrists from inside the house out to the hot tub. Witness-1 stayed inside but could hear the girl screaming and asking them to stop.

Witness-1 was upset by what she saw and heard and planned to take a taxi to the first Long Island Railroad train the next morning. Before she left, Witness-1 used ████████████ ██████████████████████████████████████████ Witness-1 recalls being very upset by this incident ████████████████████████████████████ ██████ At some point thereafter, CC-2 called her and said, in sum and substance, that she had

been a guest, that CC-2 had to pay for ███████████████, and that the defendants were "big shots."

During a search of Tal's apartment, the Government recovered a hard drive that contained photographs of doors with ████████████████████████████ (the "Door Photographs"), as pictured below:



The metadata from these photographs reflects that they were taken on or about May 25, 2009—the Monday of Memorial Day weekend.

**B. Discussion**

Witness-1's testimony is admissible as direct evidence of the charged crimes.[11]  Witness-1 saw Tal and one of the other defendants—at a rental home they provided for free to victims—

---

[11] The law related to direct evidence, Rule 413, Rule 404(b), and Rule 403 is laid out in the Government's memorandum in support of its motions *in limine* and is incorporated in full herein. (*See* Dkt. 188 at 26-32).

lead an intoxicated woman to the hot tub by her wrists and then heard that woman screaming for

the defendants to stop. There was no doubt in Witness-1's mind that what she heard was two of

the defendants assaulting a woman whose screams could be heard inside the house, and there are

photographs confirming ███████████████████████ to that effect. The Second Circuit has

been clear that "uncharged acts," such as this assault, "may be admissible as direct evidence of the

conspiracy itself." *United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997). As the Government

described in detail in its motions *in limine*, evidence that "the defendants worked together to rape

and sexually assault victims" is direct evidence of the conspiracy offense charged in Count One,

and Witness-1's testimony will plainly be evidence of two defendants working together. (Gov't

Mem. at 33-36). Likewise, evidence that "the defendants drugged and incapacitated victims," like

the intoxicated victim they led to the hot tub, is also evidence of their conspiracy. (*Id.* at 36-38).

And beyond that, evidence that "the defendants used physical force to restrain and rape victims,"

such as taking a victim to a hot tub by her wrists and then causing her to scream while being

assaulted, is also direct evidence of the charged conspiracy. (*See* Gov't Mem. at 38-39). Finally,

that the defendants did this all at one of the Hamptons homes they offered as lures to entice

unsuspecting women, indeed at the same home where they assaulted Minor Victim-3, Victim-4,

and Victim-5 is likewise evidence of their agreement to use the property to engage in sex

trafficking.

  In addition, Witness-1's testimony regarding the assault will also provide critical evidence

as to "how the illegal relationship between coconspirators developed" because it, like Minor

Victim-3's testimony, demonstrates that as early as 2009, multiple brothers were working together

closely to sexually assault victims together, a playbook they employed for multiple victims in the

years to come. *United States v. Mercado*, 573 F.3d 138, 141 (2d Cir. 2009)); *see also United States*

*v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000) (admitting evidence of defendant's prior criminal conduct with his co-conspirators as relevant "to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed"); *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) (explaining that background evidence can be admitted to show "the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed").

Although direct evidence is not limited to "that which directly establishes an element of the crime," *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997), Witness-1's testimony and the Door Photographs *are* also directly relevant to an element of the sex trafficking crimes that the Government must prove: the defendants' intent. The Government expects that the defense may argue that the defendants never intended to rape anyone and/or that they were not aware that the women were not consenting. But this evidence shows that as early as 2009—the first year of the charged conspiracy—the defendants were on notice that these acts were not consensual and that others viewed their conduct as rape.

In addition to being evidence of the charged conspiracy and of the defendants' intent, Witness-1's testimony also provides direct, background evidence of "the circumstances surrounding the events" of Count Five. *Daly*, 842 F.2d at 1388. Her testimony that she overheard an assault at the 2009 Hamptons House in the hot tub committed by ███████████████ ████████████████████████████████ "arose out of the same" events as Count Five, is "intertwined" with the evidence of the charged crimes, and "complete[s] the story of the crime on trial." *Gonzalez*, 110 F.3d at 942. Witness-1 was present at the 2009 Hamptons House the weekend that Minor Victim-3 was raped. Her testimony is corroborative of Minor Victim-3:

41

each was invited to the Hamptons house for Memorial Day weekend, taken by a party bus to a club in the Hamptons, stayed that night at the house rented by the defendants (for which the women did not pay), and spent much of the next day outside near the pool. Later on the second day, ███

████████████████████████████████████████████████████████████

████████████████████████████ Witness-1 witnessed the assault of another victim by two of the defendants.[12]  Witness-1's testimony is relevant as it confirms many of the details of Minor Victim-3's account of the weekend, including that women were promised a stay in the Hamptons and transported to the Hamptons by bus.  But even more, Witness-1 strongly corroborates Minor Victim-3's testimony that she was raped given that Witness-1 also witnessed a sexual assault by two of the defendants that weekend, which was so disturbing ███████

████████████████████████████████

The defendants argue that the assault that Witness-1 witnessed was not the assault of Minor Victim-3 and therefore her testimony is supposedly irrelevant to any of the charges.  (*See* Def. Mem. at 26-27).  But even if she did not witness Minor Victim-3's assault, Witness-1's testimony is corroborative of Minor Victim-3 for the reasons described above—including the close temporal and geographic proximity of the assault witnessed by Witness-1 and Minor Victim-3's rape. Undoubtedly, the substance of Witness-1's testimony "arose out of the same transaction or series of transactions as [Count Five]"; "is inextricably intertwined with the evidence regarding [Count Five"; and "is necessary to complete the story of the crime on trial." *Gonzalez*, 110 F.3d at 942. This testimony is therefore also relevant to Count Five.

---

[12] Following her assault, Minor Victim-3 saw ████████████████████████████

████████████████████████████████████████████

Even assuming *arguendo* that Witness-1's testimony and the Door Photographs are not admissible as direct evidence of the charged crimes, they would be properly admitted under Rules 413 and 404(b) for many of the same reasons already described.[13]  First, the evidence is admissible under Rule 413—for propensity or otherwise—as evidence of another sexual assault.  *See* Fed. R. Evid. 413(a) (providing that "[i]n a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault" for "any matter to which it is relevant").  The assault Witness-1 saw and heard was similar to the sexual assaults of many of the other victims in this case, given that the victim appears to have been intoxicated to some degree (just as Victim-1, -2, -3, -4, -5, -7, -8, -9, -12, -14, -16, -17, -19, -20, -21, -23, -25 were) and told the brothers stop assaulting her (just as Victim-2, -4, -6, -9, -10, -12, -13, -15, -18, -20, -24 did).  *See United States v. Schaffer*, 851 F.3d 166, 177-178 (2d Cir. 2017) ("In other words, a prosecutor may use evidence of prior sexual assaults precisely to show that a defendant has a pattern or propensity for committing sexual assault.").

---

[13] The defendants note that the Government did not include Witness-1's testimony in its Rule 404(b) disclosure.  (Def. Mem. at 27.)  The Government did not do so because it views her testimony as direct evidence of the charged crimes, for the reasons explained *supra*.  *See United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir.1992) ("An act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged.").  But this filing, as well as the Government's motions *in limine*, constitutes notice that the Government may offer this evidence as evidence of other sexual assaults under Rule 413 or evidence of the defendants' intent, knowledge, *modus operandi*, plan, absence of mistake, and lack of accident under Rule 404(b) if the Court were to find that they were not direct evidence of the crime.  In addition, the defendants are in no way prejudiced by this notice, given that it is more than six weeks before trial, and they have had 3500 material since on or about October 27, 2025.  *See, e.g.*, *United States v. Gotti*, No. S8 02 Cr. 743 (RCC), 2004 WL 2423799, at *5 (S.D.N.Y. Oct. 29, 2004) ("[C]ourts in this circuit have consistently upheld two to three weeks' notice as reasonable."), *aff'd sub nom. United States v. Matera*, 489 F.3d 115 (2d Cir. 2007).  Indeed, there was such little prejudice that defendants were able to file this motion to preclude Witness-1's testimony more than two months before trial.

Second, this evidence is also admissible under Rule 404(b) to show the defendants' intent and knowledge, which will be at issue unless the defendants clearly agree not to dispute them, either through a statement to the court or through a stipulation. *See United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992); *United States v. Colon*, 880 F.2d 650, 659 (2d Cir. 1989). As laid out above, Witness-1's testimony and the Door Photographs demonstrate that the defendants knew, from the very beginning of the conspiracy, that what they were doing with women was not consensual. In addition, evidence regarding the sexual assault Witness-1 witnessed is evidence of the defendants' *modus operandi* and plan, as well as absence of mistake or lack of accident. As noted above, the defendants engaged in a pattern of sexually assaulting incapacitated women, of which this was a part. Courts routinely admit evidence of a pattern or *modus operandi* "in sexual assault cases where, as here, the defendant is alleged to have engaged in a distinctive pattern of conduct related to non-consensual sexual contact." *Carroll v. Trump*, 124 F.4th 140, 168 (2d Cir. 2024). Finally, Witness-1's testimony and the Door Photographs are admissible because they corroborate Minor Victim-3's testimony as described above—a fair basis for admission under Rule 404(b)—as well as the testimony of other victims who experienced the defendants sexually assaulting them despite their being intoxicated and despite their pleas to stop. *See id.* at 169 (admitting Access Hollywood tape as "directly corroborative" of victim testimony).

Witness-1's testimony and the Door Photographs do not present a Rule 403 problem. They are certainly probative, as the sexual assault of an intoxicated victim described by Witness-1 "is sufficiently similar in material respects" to the charged conduct "to be probative." *Carroll*, 124 F.4th at 170; *see also United States v. Everett*, 825 F.2d 658, 660 (2d Cir. 1987) ("Under Rule 404(b) evidence of 'other crimes' has been consistently held admissible to corroborate crucial prosecution testimony."). And there is no undue prejudice because there is nothing "more

sensational" or "more disturbing" about this testimony or the photographs than the charged crimes, which allege sex trafficking and sexual abuse crimes. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also Schaffer*, 851 F.3d at 182 (evidence may be "highly prejudicial" without being "unfairly prejudicial").

The defendants argue that Witness-1's testimony and the photographs should be precluded under Rule 403 because there is apparently "no connection between what [she] could testify to and any of the three defendants." (Def. Mem. at 28). That is false. As described above, Witness-1 will testify that two of the defendants dragged the girl to the hot tub by her wrists, where she was assaulted. And although Witness-1 heard rather than saw most of the assault, she does have a memory of seeing Tal and one of the twins with the girl in the hot tub that night. The defendants' unfounded assertion that the assault has no connection to them should be rejected.[14]

The defendants also claim that Witness-1's testimony and the photographs should be precluded because they reflect Witness-1's "unverified personal belief" that a sexual assault occurred. (Def. Mem. at 30). This too is wrong. Witness-1's testimony is not speculative. Instead, she will describe what she saw (the brothers dragging an intoxicated girl to the hot tub) and what she heard (the girl's pleas for the defendants to stop) that formed the basis of her belief that an assault occurred, ██████████████████████████. This is admissible testimony based on Witness-1's personal knowledge and observations. Put another way, cross-examination, not preclusion, is the right tool to test Witness-1's percipient observations.

---

[14] Similarly, the defendants also claim that photographs are inadmissible under Rule 404(b) because ████████████████████████████████████████████████████████ is not the bad act—it is instead based on the bad act of the defendants' assault of yet another victim.

The defendants further argue that this evidence should be precluded because it is "uncharged misconduct" that is being used "to lend weight to another accuser's story or to imply a broader pattern of sexual violence." (Def. Mem. at 29). But the Second Circuit has approved of exactly this kind of evidence to prove a pattern in cases involving sexual assault. *See Carroll*, 124 F.4th at 168.

Finally, the defendants also claim the Door Photographs are too inflammatory and should be precluded under Rule 403 because ████████████████ (Def. Mem. at 30). Given that this trial is one in which victim after victim will testify that the defendants raped them, ██ ████████████████ is, by any measure, *less* disturbing than the case itself. *See Schaffer*, 851 F.3d at 183 (finding no error in district court's admission of videos depicting minors trying on swimsuits and being fondled by the defendant where conduct portrayed was "not more inflammatory" than the sexual conduct for which the defendant was tried). Given the Circuit's inclusionary approach to evidence of uncharged acts, the Court should admit Witness-1's testimony and the Door Photographs.

## IV. The Court Should Admit Victim-4's Testimony

Victim-4 is expected to testify that in or about late June 2009, she was invited by party promoters to take a party bus to a club in the Hamptons for Alon and Oren's birthday. Once there, Alon invited her to the 2009 Hamptons House, where he gave her a drink that made her feel tired and then held her down and raped her in the hot tub. Victim-4 is also expected to testify that she saw Tal in a bedroom having sex with a woman who appeared to be crying the same night she was raped by Alon in the hot tub of the 2009 Hamptons House. (*See* Gov't Mem. at 7-8). The defendants claim that Victim-4's testimony about Tal is inadmissible under Rule 404(b) and Rule 403. (Def. Mem. at 31-32). But as with Witness-1, Victim-4's testimony concerning Tal is direct evidence of the conspiracy and completes the story of the night. The Court should admit it.

46

The Court should admit Victim-4's testimony about seeing Tal have sex with a crying woman because it "complete[s] the story," *Gonzalez*, 110 F.3d at 942, and provides evidence of "the circumstances surrounding the events" of that night, *Daly*, 842 F.2d at 1388. Victim-4 will be testifying about what she saw and heard in the 2009 Hamptons House, which included seeing Tal have sex with this crying woman as Victim-4 was going to the hot tub where she was raped by Alon. The Court should therefore allow the testimony as direct evidence of the charged crimes and to show the effect on Victim-4, who was subsequently raped by one of the other brothers.

Even if the Court found that this testimony were not direct evidence, it is also admissible under Rules 413 and 404(b).[15] This incident demonstrates yet another sexual assault (admissible under Rule 413), as well as Tal's intent and knowledge (admissible under Rule 404(b))—he was willing to have sex with a woman who was crying, which is an obvious sign that she may not have consented to that encounter. This testimony also is not precluded by Rule 403. It is probative, given that it completes the story of Victim-4's night and demonstrates Tal's intent. And it is not unduly prejudicial given that the jury will hear a number of victims testify about Tal raping them. *See Roldan-Zapata*, 916 F.2d at 804.

Without citing any useful case law,[16] the defense argues that this testimony should be precluded under Rule 403 because Victim-4 cannot say the woman Tal was having sex with was

---

[15] The defendant again faults the Government for not noticing this conduct as Rule 413 or 404(b) evidence. The Government did not do so because it views this testimony as direct evidence of the charged conduct. However, this motion serves as notice that the Government may offer this piece of Victim-4's testimony as an additional sexual assault and as evidence of the defendants' intent and knowledge. There is no prejudice to the defendants, given that they are receiving this notice six weeks before trial. *See supra* note 13.

[16] *United States v. Johnson* provides no support for the defendants' position. In that case, the court rejected the defendant's Rule 403 argument and admitted evidence of an uncharged rape. No. 22 Cr. 494 (JS), 2025 WL 2959272, at *7-8 (E.D.N.Y. Oct. 17, 2025). In so concluding, the court stated that "the potential for prejudice or confusion is small here, as this is a case in which the

forced or coerced.  (Def. Mem. at 32).  It is true that Victim-4 cannot speak to what was in Tal's mind or the woman's, but it is nevertheless probative that Tal was having sex with a crying woman, which as noted above, is a piece of evidence the jury can consider as relevant to Tal's knowledge of non-consent.  The defense also states that Victim-4 was told the woman was Tal's girlfriend and that they were in a fight, but this does not change the analysis regarding the testimony's admissibility.  (Def. Mem. at 31).  The defendants are free to cross-examine Victim-4 regarding her knowledge—or lack of knowledge—of the reason the woman was crying to the extent Victim-4 has admissible testimony on that point.  And even if it is correct that Tal was dating the crying woman, Tal is not therefore entitled to have sex with her whenever he wants regardless of her preferences.  The defendants' insinuation that because Tal was in a relationship with the crying woman, what Victim-4 witnessed could not be rape, is as absurd as it is offensive.  The Court should thus permit this testimony.

## V.  The Court Should Admit Testimony Regarding Effect of the Defendants' Assaults on the Victims

The defendants move to preclude testimony about the victims medical and mental health treatment following their rape or sexual assault by the defendants.[17]  (*See* Def. Mem. at 32-41). For the reasons set forth below, that motion should be denied.

---

Defendant is being tried for multiple sex crimes; therefore the jury will already be hearing evidence and argument about other sex-based actions, interactions and alleged criminal acts."  *See id.* at *8. *Johnson* supports the Government's position.

[17] This motion is sharply at odds with the defendants' attempt to introduce testimony from Dr. Strange regarding therapy as a suggestive source of false memories.  (*See* Dkt. 195 Ex. A).  Indeed, by seeking to preclude any mention of victims' mental health diagnoses, the defendants underscore that they are trying to introduce a purely speculative narrative about therapy as a potential source of false memories without any factual basis to support such testimony.

### A.  The Court Should Admit Limited Testimony Regarding the Effect of the Rapes and Sexual Assaults on the Victims

At this time, the Government is not seeking to introduce testimony of any mental health diagnoses that the victims may have received.[18]  However, the Government should be permitted to elicit limited testimony about how certain victims felt as a result of the defendants' assaults as it relates to actions they took or did not take, or statements they made or did not make, as a result of this trauma.  This testimony is highly probative.  Moreover, given that the defendants' appear poised to attack the victims' credibility by arguing that they did not behave in a way consistent with being victimized, these are proper subjects for direct examination.  Specifically, the Government seeks to elicit testimony about the impact of the defendants' assaults as it relates to (1) the timing of victim disclosures about the defendants' assaults; and (2) whether victims remained in contact with the defendants after their assault.  For example, the Government expects that certain victims will testify that, following the defendants' attacks, they were shocked or in disbelief, that they were embarrassed, ashamed, or blamed themselves for the defendants' misconduct, and as a result questioned themselves, were in denial, minimized the severity of what had happened, or delayed reporting the assault.

"Testimony regarding a crime's impact on a victim is admissible at trial if it is relevant to prove an element of the charged offense and is subject to the normal tests of relevancy and unfair prejudice." *See United States v. Hendricks*, 921 F.3d 320, 329 (2d Cir. 2019) (citing *United States v. Copple*, 24 F.3d 535 (3d Cir. 1994) (upholding victim impact testimony from bank tellers as to how they felt during the robbery as relevant to whether the defendant acted "by intimidation"). In *United States v. Copple*, on which the Second Circuit relied in *Hendricks*, the Third Circuit

---

[18] Because the Government is not seeking to introduce evidence of any victims' mental health diagnoses, the defendants' request for access to their treatment records is moot.

explained that victim impact evidence is relevant and admissible under Rules 401 and 403—but that certain lines need to be drawn to ensure that such testimony did not become unfairly prejudicial. *Copple*, 24 F.3d at 544-46. *Copple* was a mail fraud case, and victims "testified about their losses, and about the impact of those losses on their lives." *Id.* at 544. The Third Circuit held that even though the Government did not need to prove the victims suffered a loss to satisfy the mail fraud statute, evidence of loss was relevant because it went to the defendant's intent. *Id.* at 545. The victim impact testimony, however, went too far when it involved victims testifying about, among other things, how "they had used to pay back the losses from money they had saved for their children's college educations." *Id.*

Such testimony is particularly important in this case, where the defendants have already indicated that they will attack victims for delaying disclosure of the assaults and for remaining in touch with the defendants after the assaults. (Dkt. 37 at 23-26). The impact of the defendants' assaults on victims understandably shaped their responses, and will assist the jury in understanding why victims responded to the defendants' attacks in various ways. Without this testimony, the jury will be left with significant gaps; in essence, the defense will have highlighted the post-assault conduct of the victims to undermine them but the victims will be unable to provide any context of their own to explain their actions. Courts in this District have permitted expert testimony for its relevance regarding the "psychological consequences" of abuse, including coping strategies, hopelessness, and depression. *United States v. Ray*, No. 20 Cr. 110 (LJL) (S.D.N.Y.), Mar. 14, 2022, Tr. at 475, 509. Similarly, courts have permitted expert testimony regarding reasons for a victim's delayed disclosure in sex abuse cases, particularly where the defendant attacks victim credibility, because of its high probative value. *Maxwell*, No. 20 Cr. 330 (AJN), 2021 WL 5283951, at *2-5 (permitting Dr. Rocchio's testimony related to sexual abuse and incremental,

delayed, and non-disclosure). The victims' responses to the defendants' rapes and sexual assaults are thus highly probative as to victims' credibility and the weight of the evidence.

Courts permit victims to testify about the effects of sex abuse when such testimony is relevant under Rule 401 and so limited as not to be unduly prejudicial under Rule 403. For example, in *Maxwell*, Judge Nathan permitted one victim to testify about the effect of the defendant's abuse on her and how that led her to delay disclosing the abuse:

> Q. During this time period, did you ever tell your mother about the sexual abuse that you were experiencing when were you at Epstein's house?
>
> A. No.
>
> Q. Why didn't you tell your mother during those years?
>
> A. Because I felt very ashamed, I felt very disgusted, I was confused, I didn't know if it was my fault, and my mother and I did not have that kind of a relationship. We didn't talk about our feelings. We weren't allowed to. I was raised in a household where you were sort of spoken to, and you don't speak unless you're spoken to, and I would be afraid that I would be in trouble if I said something.
>
> Q. During those same years, did you tell your brothers or any of your friends that you were being sexually abused by Maxwell and Epstein?
>
> A. No.
>
> Q. And why not?
>
> A. Because how do you tell or describe any of this to any one of your peers or your siblings when all you feel is shame and disgust and confusion and you don't even know how you ended up there.

*Maxwell*, Trial Tr. of Nov. 29, 2021, at 336-37; *see also Purcell*, Trial Tr. of Oct. 16, 2018, at 216 (permitting the victim to testify about how she felt when she fled from the defendant and ran to the police station).

The Court should permit the Government on direct examination to elicit testimony from victims about the impact of the defendant's abuse where such testimony serves a specific and

relevant purpose. Courts in this District routinely permit the Government to elicit testimony on direct in anticipation of potential defense attacks on witness credibility. Indeed, the "rule in this circuit" is that:

> [A]lthough credibility generally may not be supported until it has first been attacked, an exception exists which allows the Government to bring out on direct examination the circumstances surrounding a witness' motivation for cooperating with the Government or *other matters damaging to the witness' credibility*.

*United States v. Edwards*, 631 F.2d 1049, 1051-52 (2d Cir. 1980) (quoting *United States v. Singh*, 628 F.2d 758, 761 (2d Cir. 1980) (emphasis added)); *see also United States v. Dozier*, 492 F. App'x 205, 208 (2d Cir. 2012) (permitting admission of entirety of cooperation agreement after witness' credibility is attacked in defense opening statement). This practice is consistent with the flexibility accorded district courts under Rule 611:

> The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment.

Fed. R. Evid. 611. Here, the defendants have already indicated that they will attack the credibility of the victims. The Court should thus permit the Government to elicit testimony in anticipation of such attacks about the impact of the defendants' rapes and sexual assaults in order to present context for the jury, for purposes of efficiency, and to protect the victims from harassment and undue embarrassment. *See id.*

### B. The Court Should Permit Testimony About Victim-20's Medical Diagnosis

As to medical diagnoses, the only such diagnoses that the Government intends to introduce is ███████████████████████████████████████████████████████, and the Government does not seek to introduce that diagnosis for its truth. As laid out in the Government's motions *in limine*, (*see* Dkt. 188 at 20-22), ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

Rule 801(c)(2) specifies that statements constitute hearsay only if offered "to prove the truth of the matter asserted in the statement."  As such, statements not offered for their truth do not constitute hearsay, even where no exclusion or exception exists in the rules.  *See United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013).  Consistent with that definitional understanding, out-of-court statements may be offered for a variety of non-hearsay purposes, including for their effect on the listener or to help the jury understand the future actions of someone acting upon the out-of-court statement.  *See United States v. Quinones*, 511 F.3d 289, 312 (2d Cir. 2007).  That rule applies even where the statement conveys assertions that implicate a defendant in criminal activity.  *See, e.g.*, *United States v. Gilliam*, 994 F.2d 97, 103 (2d Cir. 1993) ("The district court in this case specifically admitted the statement by the anonymous caller to establish the reasons for the return of the officers to the scene, not to prove the truth of the caller's reference to the second gun.").

Statements by out-of-court declarants may also be offered to give context to other evidence, such as by establishing what various parties knew at relevant times.  *See United States v. Rowland*, 826 F.3d 100, 115 (2d Cir. 2016) (admitting out-of-court statements by a non-defendant to two

witnesses, because those statements were offered "to provide context for what [the witnesses] knew during their subsequent meeting with [the defendant]"); *United States v. Sorrentino*, 72 F.3d 294, 298 (2d Cir. 1995) (overruled on other grounds) (confidential informant's statements were not hearsay where offered not "to prove the truth of the matters asserted but only to render what [the defendant] said in these conversations intelligible"). In these circumstances, courts generally provide limiting instructions directing the jury not to consider the statement for its truth.

Here, the Government is seeking to introduce testimony regarding Victim-20's diagnosis to explain what ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████. The diagnosis therefore is not being offered for its truth, but rather for the permissible purpose of the effect on or understanding of the listener. Accordingly, these statements are not hearsay and are admissible. *See Bellomo*, 176 F.3d at 586-87 (affirming admission of statements by witness as to what the witness "heard and . . . saw" and that "bore on [the witness's] state of mind").

## VI. The Court Should Require the Defendants to Produce Exhibits on the Agreed-Upon Schedule

In early September the parties conferred and agreed on a pre-trial disclosure schedule. The agreement included timing for disclosure of Jencks Act material, Government and defense witness lists, Government and defense exhibits, Rule 413 and 412 notices, and defense Rule 26.2 materials. (*See* Dkt. 162). The Court endorsed and so-ordered the parties' joint proposal. (*See* Dkt. 163).

Three weeks ago, the defendants began receiving the benefit of this bargain when they received the Jencks Act materials more than two months before trial. Based on discussions with defense counsel, the Government understood this early disclosure of witness statements was the most important aspect of the negotiated pre-trial disclosure agreement to the defendants. Now,

less than a week after receiving their prime benefit under the agreement, the defendants asked the Court to endorse them reneging on a part of the agreement that was important to the Government. The Court should not permit the defendants to do so.

Specifically, in September the defendants agreed that on December 22, 2025, they would produce their exhibits, "to include exhibits the defense may seek to introduce during the Government's case-in-chief for purposes other than impeachment." (*See* Dkt. 163). Now they ask the Court to instead require the production by the agreed upon deadline of only those exhibits they would introduce while defense witnesses testify and to allow them to delay producing exhibits they intend to introduce during cross examination until the middle of trial, and even then, only the night before a witness is cross-examined. (*See* Def. Mem. at 42-45). The defendants make their argument by incorrectly interpreting their discovery obligations under Rule 16 and by wrongly claiming that virtually any exhibit introduced during cross-examination is one introduced for impeachment purposes. Moreover, they ignore entirely their prior agreement to a different procedure despite having already benefited heavily from that agreement. Their arguments are wrong, and the defendants should be held to their obligations under the Federal Rules of Criminal Procedure and the agreement they struck with the Government.

As to the defendants' Rule 16 arguments, they are wrong that the rule does not apply to materials they intend to introduce through Government's witnesses. The case they rely upon, *United States v. Harry*, 2014 WL 6065702 (D.N.M. Oct. 14, 2014), is the exception, not the rule. Other than *Harry*, "nearly every court to consider the issue has concluded" that Rule 16 requires defendants to produce all non-impeachment exhibits they intend to introduce at trial, whether the exhibits will be introduced through a Government or defense witness. *United States v. Crowder*, 325 F. Supp. 3d 131, 136 (D.D.C. 2018); *see also, e.g.*, *United States v. Kostin*, No. 24 Cr. 91

(GHW), 2025 WL 1412049, at *1 (S.D.N.Y. May 15, 2025); *United States v. Scott*, 24 Cr. 158 (KAM), 2025 WL 1384301, at *14 (E.D.N.Y. May 12, 2025); *United States v. Napout*, No. 15 Cr. 252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017). In other words, the defendants cannot evade Rule 16 obligations simply by introducing evidence through a Government witness.

Equally wrong are the defendants' attempts to categorize nearly any evidence they may offer during cross-examination as impeachment evidence not subject to Rule 16. To be sure, the defendants' principal aim at trial appears to attacking the credibility of victims, but this does not transform all evidence the defendants want to offer during cross-examination into impeachment evidence. The Court should limit the carve out for impeachment exhibits that the defendants need not disclose by their exhibit deadline to exhibits that are actually impeaching, namely those that (1) are prior inconsistent statements of witnesses; (2) are probative of a witness's bias; (3) are evidence of the witnesses character for untruthfulness; (4) call into question the witness's ability to perceive events; or (5) directly contradict the testimony of a witness. *See* Black's Law Dictionary (12th ed. 2024) (Impeachment: "The act of discrediting a witness, as by catching the witness in a lie or by demonstrating that the witness has been convicted of a criminal offense"; Formal Impeachment: "The discrediting of a witness's testimony by confronting the witness with his or her specific untruthful acts, prior convictions, prior inconsistent statements, or the like"); *see also* 1 McCormick On Evid. § 33 (9th ed.) ("There are five main modes of attack on a witness's credibility. The first, and probably most frequently employed, is proof of a prior inconsistent statement or 'self contradiction,' as it is sometimes imprecisely described. That technique consists of proof that the witness previously made statements inconsistent with his present testimony. The second is an attack showing that the witness is biased on account of emotional influences such as kinship for one party or hostility to another, or motives of pecuniary interest, whether legitimate

or corrupt. The third is an *ad hominem* attack on the witness's character, but lack of religious belief is not available as a basis for this type of attack on credibility. The fourth is an attack showing a deficiency in the witness's capacity to observe, remember, or recount the matters testified about. The fifth is specific contradiction, that is, proof by other witnesses that material facts are not as testified to by the witness being impeached."); *Berry v. Oswalt*, 143 F.3d 1127, 1132 (8th Cir. 1998) ("The evidence in question, however, does not fit the definition of 'impeachment.' That term refers to matters like the bias or interest of a witness, his or her capacity to observe an event in issue, or a prior statement of the witness inconsistent with his or her current testimony."). Permitting the defense to expand the scope of their "impeachment" exhibits beyond these circumscribed areas will unduly delay proceedings, give license to the defense to sandbag the Government, and greenlight the defendants' end-run around their prior bargain.

The defendants claim to have found "a raft of material that flatly undermines the credibility of a number of government witnesses." (Def. Mem. at 42). Where this evidence impeaches a witness's testimony, such as by showing a witness has previously said something different than what she said while testifying, the defendants should be entitled to keep this evidence to themselves until the day before cross examination.[19] But so far, what the defendants have claimed to be devastating evidence of victims lying has been no more than the defendants' attempts to portray victims as failing to act like "real" rape victims. For example, the defendants have noticed their intent to introduce photographs of Victim-1 during the summer and fall of 2011, where she is wearing a bathing suit and/or revealing clothing. Although the defendants have not identified any plausible relevance of the photographs, the Government expects that the defense intends to portray

---

[19] The Government agrees that production by 6:00 p.m. the day before cross examination will be vital in maintaining an efficient trial schedule. (*See* Def. Mem. at 44-45).

Victim-1 as enjoying her summer and thereby argue that Victim-1's account of being raped earlier in the summer cannot be believed. The defendants have used a similar tactic in defending state charges in Florida where they have sought to portray evidence that a victim attended a concert hours after being raped as relevant to whether the defendants raped her earlier in the night. *See* Colon, Christian, "Footage shows Alexander brothers' accuser partying hours after alleged assault," NBC 6 South Florida, May 2, 2025, https://www.nbcmiami.com/news/local/footage-shows-alexander-brothers-accuser-partying-hours-after-alleged-assault/3605981/.[20]

Even if the Court permits the defendants to introduce such evidence, it is not impeachment evidence. Rather the defendants are introducing the evidence because they have a theory about what "real rape" looks like and how "real victims" act. *See United States v. Harris*, 557 F.3d 938, 942 (8th Cir. 2009) (utility records that were introduced to disprove a witness's testimony that she was living at an apartment on a particular date were "substantive evidence" and were not "introduced for purposes of impeachment."). Procedurally, the defendants may be able to introduce their evidence while the victims testify (assuming the evidence is otherwise admissible under Rules 401 and 403) because the victims may be able to authenticate photographs of themselves. But the defendants using the testimony of victims in this manner does not serve the purpose of impeachment; rather, the defense is using the victim's testimony to authenticate and offer affirmative evidence that is intended to "buttress [the defendants'] theory of the case." *Napout*, 2017 WL 6375729, at *7. Similarly, unless the content of communications directly contradicts the victim's testimony, evidence of communications between a defendant and a victim after an assault is also not properly considered impeachment evidence and must be produced before

---

[20]

trial, pursuant to Rule 16. Simply put, the defendants cannot avoid their obligation (and agreement) by reframing all of their evidence and arguments as about impeachment.

The defendants agreed to a production schedule and have already reaped the benefit of the bargain they struck. The Court should enforce the defendants' obligations under Rule 16 and under the agreement in this case.

## **<u>CONCLUSION</u>**

For the reasons set forth above, the defendants' motions *in limine* should be denied.

Dated:      New York, New York
            November 18, 2025

                              Respectfully submitted,

                              JAY CLAYTON
                              United States Attorney

                    By:      _____/s/_____
                              Kaiya Arroyo
                              Elizabeth A. Espinosa
                              Andrew Jones
                              Madison Reddick Smyser
                              Assistant United States Attorneys