UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                        :

UNITED STATES OF AMERICA          :

                 -against-         :       24-CR-676 (VEC)

                       :

ALON ALEXANDER, OREN ALEXANDER, and  :      OPINION AND ORDER
TAL ALEXANDER,                  :

                       :

                   Defendants.  :

                       :

------------------------------------------------------------------X

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #:_____ |
| DATE FILED:__12/12/2025__ |

**VALERIE CAPRONI, United States District Judge:**

      The Government has charged Defendants with conspiracy to commit sex trafficking, sex trafficking, inducement to travel to engage in unlawful sexual activity, aggravated sexual abuse, and sexual exploitation of a minor.  *See* S4 Superseding Indictment, Dkt. 207 ("Indictment").  Now before the Court are the parties' motions in anticipation of trial, which is scheduled to begin on January 20, 2026.  *See* Dkt. 241.  In particular, Defendants have moved *in limine* to preclude the Government's proposed experts Doctors Lisa Rocchio and Stacey Hail from testifying.  *See* Def. Mot., Dkt. 174, at 1–23.  The Government has moved *in limine* to preclude the Defendants' proposed experts Doctors Deryn Strange and Eli Aoun from testifying about certain topics.  *See* Gov't Mot., Dkt. 188, at 98–124.  On Friday, December 5, 2025, the Court heard oral argument on the parties' motions that are the subject of this order.[1]  *See* Dkt. 241.

      For the following reasons, Defendants' motions to preclude the Government's experts from testifying are DENIED.  The Government's motions to preclude certain testimony from Defendants' experts are GRANTED in part and DENIED in part.

---

[1]      This Opinion and Order addresses only the motions *in limine* related to the parties' proffered experts.  The remainder of the parties' motions *in limine* have been separately resolved.  *See* Dkts. 210, 241, 252.

BACKGROUND

Count One of the Indictment charges Defendants with conspiracy to commit sex trafficking in violation of 18 U.S.C. § 1594(c).  Indictment ¶¶ 1–7.  According to the allegations in the Indictment, from 2008 through 2021, Defendants worked together and with unnamed other parties to drug, sexually assault, and rape dozens of victims.  *Id.* ¶¶ 1, 7.  Defendants offered material benefits, including domestic and international travel, luxury hotel accommodations, and access to events, to cause victims to travel with them or to meet them in various locations.  *Id.* ¶¶ 1, 4–5.  In some instances, victims were transported across state and international lines.  *Id.* ¶ 5.f. On several occasions during those trips, Defendants or others drugged the victims, rendering them mentally or physically incapacitated.  *Id.* ¶ 5.g.  Defendants also physically restrained victims before raping or sexually assaulting them.  *Id.* ¶ 5.h.

Counts Two, Three, and Five through Eight of the Indictment charge Defendants with sex trafficking by force, fraud, or coercion in violation of 18 U.S.C. § 1591 (with Count One, the "Sex Trafficking Counts").  *Id.* ¶¶ 8–9, 11–14.  Counts Four and Nine charge Defendants with inducing victims to travel to engage in unlawful sexual activity in violation of 18 U.S.C. § 2422(a).  *Id.* ¶¶ 10, 15.  Count Ten alleges that Alon and Oren Alexander committed aggravated sexual abuse on a cruise ship in violation of 18 U.S.C. §§ 2241(a)(1), (b)(2).  *Id.* ¶ 16. Count Eleven alleges that Oren Alexander sexually exploited a minor and recorded himself and another person engaging in sexual activity with an incapacitated 17-year-old girl in violation of 18 U.S.C. §§ 2251(a).  *Id.* ¶ 17.

On November 5, 2025, the parties filed motions *in limine* seeking, in part, to preclude the testimony (or portions thereof) of each parties' proposed experts.  *See* Dkts. 174, 188 (originally filed under seal).  Responses in opposition to each parties' motions *in limine* were submitted on

November 17, 2025.  *See* Gov't Opp., Dkt. 202; Def. Opp., Dkt. 201.  On November 18, 2025, following Defendants' November 6, 2025, supplemental expert disclosure, the Government filed a supplemental motion *in limine* seeking to further preclude certain additional aspects of Dr. Strange's proposed testimony.  *See* Gov't Suppl. Mot., Dkt. 195.  The Defendants opposed the Government's supplemental motion on November 25, 2025.  Def. Suppl. Opp., Dkt. 224.

## LEGAL STANDARD

"A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*."  *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008) (citing *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984)).  An *in limine* motion is intended "to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial."  *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996).  "Because a ruling on a motion *in limine* is 'subject to change as the case unfolds,' th[e] ruling constitutes a preliminary determination in preparation for trial."  *United States v. Perez*, No. 09-CR-1153 (MEA), 2011 WL 1431985, at *1 (S.D.N.Y. Apr. 12, 2011) (quoting *Palmieri*, 88 F.3d at 139).

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides that a person "qualified as an expert by knowledge, skill, experience, training, or education may" offer opinion testimony so long as:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts.

While the party offering expert testimony bears the burden of establishing by a preponderance of the evidence that the testimony satisfies Rule 702, "the district court is the ultimate gatekeeper." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (internal quotation marks omitted). Rule 702 tasks the trial judge with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). This gatekeeping obligation "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

The threshold question for the Court is whether the "proffered expert testimony is relevant." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002). If it is, the Court must then determine "whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered." *Id.* (internal quotation marks omitted). The Supreme Court has laid down several factors pertinent to this inquiry, including "whether a theory or technique . . . can be (and has been) tested"; "whether the theory or technique has been subjected to peer review and publication"; whether uniform "standards controlling the technique's operation" exist; and whether the theory or technique enjoys "general acceptance" within an identifiable relevant scientific or professional community. *Daubert*, 509 U.S. at 593–94. The Court's ultimate objective is to "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

"To warrant admissibility, . . . it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267. "Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also, e.g.*, *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213–14 (2d Cir. 2009) ("[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that 'are so unrealistic and contradictory as to suggest bad faith[.]'"). That said, "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Amorgianos*, 303 F.3d at 267. At bottom, "Rule 702 embodies a liberal" and "permissive" standard of admissibility, *Nimely v. City of New York*, 414 F.3d 381, 395–96 (2d Cir. 2005), and not every expert admissible under *Daubert* need rely on frameworks that conform with "the exactness of hard science methodologies," *E.E.O.C. v. Bloomberg L.P.*, No. 07-CV-8383 (LAP), 2010 WL 3466370, at *13–14 (S.D.N.Y. Aug. 31, 2010) (quoting *United States v. Simmons*, 470 F.3d, 1115, 1123 (5th Cir. 2006)).

<u>DISCUSSION</u>

**I.    Defendants' Motion to Preclude the Testimony of the Government's Proposed Expert Dr. Rocchio**

Defendants move to preclude the testimony of clinical and forensic psychologist Dr. Lisa Rocchio. *See* Def. Mot. at 1–23. The Government anticipates that Dr. Rocchio will testify about: "(1) rape, sexual assault, and sexual abuse generally; (2) common victim responses during and following rape and sexual assault, including victim coping strategies; (3) common ways that victims describe or disclose such assaults, including delayed disclosure; and (4) memories associated with traumatic events." Gov't Opp. at 3. Defendants argue that Dr. Rocchio's

5

proposed testimony: (i) is "not applicable to the facts of the case," Def. Mot. at 6–8, 11–14; (ii) involves topics that are within the ken of the average juror, *id.* at 8–11; (iii) will invade the province of the jury, *id.* at 16–17; (iv) does not meet the reliability requirement of Rule 702, *id.* at 18–21; and (v) is more prejudicial than probative, in violation of Rule 403, *id.* at 21–23. The Government opposes, arguing that Dr. Rocchio is qualified to testify in this case, Gov't Opp. at 9–11, and that her testimony is relevant and sufficiently tailored to the facts of the case to assist the jury, *id.* at 11–28. The Court agrees with the Government and will permit Dr. Rocchio's proposed testimony in full.

At the outset, the Court notes that Defendants do not challenge Dr. Rocchio's qualifications generally. *See* Def. Mot. at 19 ("[Dr.] Rocchio is an experienced clinical psychologist with advanced training and practice in trauma treatment[.]"). They do, however, argue that Dr. Rocchio is not qualified to testify about "memory, encoding, retrieval, or reliability," specifically. *Id.* But this position is belied by even a cursory review of Dr. Rocchio's curriculum vitae and disclosures. Memory formation is a critical component of the trauma training that Dr Rocchio has received *and* teaches. *See* Gov't Opp. at 9–10. To that end, she has provided expert testimony on this very topic in various other cases, including in this District. *See id.* at 10 (collecting cases, including *United States v. Maxwell*, No. 20-CR-330 (AJN) (S.D.N.Y. 2020)). It is fair to say that Dr. Rocchio's "expertise, training, and background [] indicate why successful challenges to her testimony are not more prevalent." *United States v. Kidd*, 385 F. Supp. 3d 259, 264 (S.D.N.Y. 2019).

Moving into the substance of the proposed testimony, Defendants argue that Dr. Rocchio's "broad testimony on matters already familiar to the jury will not help the jury understand the evidence or any facts at issue in this case." Def. Mot. at 7. According to

Defendants, Dr. Rocchio's proposed testimony "covers subjects that are neither complex nor technical" and will "merely tell[] the jury which inferences to draw in matters of common sense." *Id.* at 8. Further, Defendants argue that "[i]t will come as a surprise to no one that" "sexual assault is common, that most sexual assault is committed by assailants known to the victim, and that some sexual assault victims do not report the assault or do so after some delay." *Id.* at 10. All these arguments are unpersuasive. Defendants' position that a juror will generally understand the experience of a rape victim is, quite simply, incorrect. *See, e.g., United States v. Thomas*, No. 23-CR-00481 (NSR), 2025 WL 2860312, at *4 (S.D.N.Y. Oct. 9, 2025) (slip op.) ("[T]he nuances regarding the ways in which victims of sexual abuse act and react are not within a juror's ken."); *United States v. Johnson,* 860 F.3d 1133, 1140 (8th Cir. 2017) ("Regardless of the victim's age, expert testimony about how individuals generally react to sexual abuse—such as not reporting the abuse and not attempting to escape from the abuser—helps jurors evaluate the alleged victim's behavior."); *United States v. Halamek*, 5 F.4th 1081, 1088 (9th Cir. 2021) ("Extensive experience interviewing victims can qualify a person to testify about the relationships those victims tend to have with their abusers."). While sexual assault, particularly of women, remains a disturbingly persistent problem in American life, the Court can state with confidence that most Americans likely do *not* have personal experience with the severe and particularized forms of sexual abuse that are at the heart of the Government's allegations. Indeed, the Court agrees that "[g]enerally, the jury will lack understanding of the unusual area of human interaction present in instances of rape, sexual assault, and sexual abuse, much less the social science surrounding how victims typically respond during and after an assault of this type." Gov't Opp. at 13 (citing *United States v. Ray*, No. 20-CR-110 (LJL), 2022 WL 101911, at *10 (S.D.N.Y. Jan. 11, 2022)). "Rape myths" remain ubiquitous in the United States, *see* Gov't

Opp. at 13 n.4, and it is critical that experts "help the jury contextualize the seemingly counterintuitive behavior of the victims," *Ray*, 2022 WL 101911, at *13 (alterations and internal quotation marks omitted); *see also United States v. Torres*, No. 20-CR-608 (DLC), 2021 WL 1947503, at *7 (S.D.N.Y. May 13, 2021) (permitting expert testimony about "psychological dynamic[s] . . . that lead[] an abuse victim to behave in counterintuitive ways"). Dr. Rocchio's proposed testimony about trauma, memory, coping mechanisms, disclosure of assault, and power differentials all comport with decisions of many judges in this District that "expert testimony regarding the general dynamics of sexual abuse, including manipulation tactics, is admissible under Rule 702." *Thomas*, 2025 WL 2860312, at *4.

Nor is the Court persuaded that Dr. Rocchio's proposed testimony is somehow problematic because she has never personally evaluated the alleged victims and "is unfamiliar with the circumstances surrounding their allegations." Def. Mot. at 13. "The Defense has the law backwards on this point." *United States v. Maxwell*, No. 20-CR-330 (AJN), 2021 WL 5283951, at *5 (S.D.N.Y. Nov. 11, 2021). "Dr. Rocchio's testimony is appropriate because she [will] *not* testify as to any specific witness's credibility." *Id.* This District regularly admits blind-expert testimony that "help[s] a jury understand a common set of conduct experience[d] by victims, or the actions normally taken by those committing certain crimes to seduce their victims." *Ray*, 2022 WL 101911, at *10; *see also, e.g.*, *Thomas*, 2025 WL 2860312, at *4; *Maxwell*, 2021 WL 5283951, at *2–5; *Torres*, 2021 WL 1947503, at *6; *Kidd*, 385 F. Supp. 3d at 263–65. That Dr. Rocchio will not be opining on the individual experiences or credibility of any specific witness is precisely what makes her testimony admissible.[2]

---

[2]    "Expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702." *See United States v. Hamlett*, No. 19-3069, 2021 WL 5105861, at *1 (2d Cir. Nov. 3, 2021) (summary order). But "Dr. Rocchio will not — and, indeed, cannot — testify that any victim's testimony is more or less credible for any reason." Gov't Opp. at 16. That Dr. Rocchio's

Finally, at the December 5, 2025, hearing, Defendants raised the argument that Dr. Rocchio's testimony about these same issues with special regard to teens and adolescents should be precluded because the Government's original expert disclosure did not include notice that Dr. Rocchio would be testifying about teenagers. *See* Tr. of Dec. 5, 2025, Dkt. ___, at 107:16–109:4. Because (i) the topics that Dr. Rocchio intends to testify about vis-à-vis teen victims are nearly identical to the topics that were timely disclosed by the Government, (ii) there are two counts in the Indictment that involve sexual assault of a minor, and (iii) Defendants have not identified any actual prejudice resulting from the Government's delayed disclosure, the Court finds Dr. Rocchio's testimony on this point to be relevant and admissible. Defendant's request to preclude Dr. Rocchio's testimony about the psychological impacts of sexual assault on teenagers and adolescents is DENIED.

For all these reasons, the Court will permit Dr. Rocchio's testimony in full.[3] Defendants' motion to preclude Dr. Rocchio's testimony is, therefore, DENIED.

---

testimony – which will focus on broad themes derived from her vast experience in this domain of the social science – may affect the jury's perception of the witnesses' credibility is not a reason to preclude the testimony, nor does it amount to Dr. Rocchio opining on the credibility of the witnesses. Support of other evidence (*i.e.*, the tendency of the expert testimony to make a fact more or less probable) is one of the many valid functions of all admissible evidence, including expert testimony. It is yet to be determined whether Dr. Rocchio's testimony will "mirror[] the testimony of the accusers," Def. Mot. at 13; regardless, Defendants may challenge Dr. Rocchio's conclusions *and*, separately, a given victim's statements, during the cross examination of each.

[3]    Defendants also argue that Dr. Rocchio's testimony should be precluded because she will testify about "definitions pertaining to legal terms." Def. Mot. at 16. The Government responds that Dr. Rocchio will not opine on the definitions of legal terms and will only testify about "the concepts [as they are] used within the field of psychology." Gov't Opp. at 24. The Court is comfortable allowing Dr. Rocchio's testimony, provided she clarifies that she is not defining legal concepts. *See id.* at 25. And, in any event, Defendants' concern can be easily remedied by an appropriate limiting instruction to the jury. *See also id.* at 26 ("[T]he Government would have no objection to [a limiting] instruction here to ensure that the jury does not confuse the psychological concepts . . . with the legal concepts.").

II.    **Defendants' Motion to Preclude the Testimony of the Government's Proposed Expert Dr. Stacey Hail**

Defendants also move to preclude the proposed testimony of emergency medicine physician and toxicologist Dr. Stacey Hail.  *See* Def. Mot. at 1–23.  The Government anticipates that Dr. Hail will "educate the jury about drug-facilitated sexual assaults and the use of specific substances to commit those assaults," as well as "describe the way that drugs with a sedative-hypnotic toxidrome, but which do not cause respiratory depression, are commonly used to commit drug-facilitated sexual assaults."  Gov't Opp. at 28 (alterations and internal quotation marks omitted).

Defendants do not challenge Dr. Hail's qualifications, arguing only that her proposed testimony: (i) is "not applicable to the facts of the case," Def. Mot. at 6–8, 11–13, 14–16; (ii) does not meet the reliability requirement of Rule 702, *id.* at 21; and (iii) is more prejudicial than probative, in violation of Rule 403, *id.* at 21–23.  The Defense further argues that Dr. Hail's testimony should be precluded because the Government did not provide timely notice that it intended to use Dr. Hail as an expert witness in its case in chief.  *Id.* at 5–6.  The Government responds that Dr. Hail's testimony is relevant and sufficiently tailored to the facts of the case to assist the jury, Gov't Opp. at 35, will not amount to an improper credibility assessment, *id.* at 35–36, and that Defendants were not prejudiced by the Government's delayed disclosure, *id.* at 36–37.  The Court agrees with the Government and will permit Dr. Hail's proposed testimony in full.

Defendants' primary argument is predicated on relevancy.  In sum and substance, Defendants argue that Dr. Hail's opinions "are not relevant to the facts of this case . . . [because] there is no evidence of the defendants procuring or distributing these drugs to the alleged victims."  Def. Mot. at 14.  That is simply not correct.  The Government's submissions to date

make clear that its case in chief will include evidence that Defendants had access to, and distributed, drugs that are commonly used to facilitate sexual assaults.  *See* Indictment ¶¶ 5.g, 6; Gov't Mot. at 55–63; Gov't Opp. at 30–32.  Moreover, the Government has proffered that there is "extensive evidence of the [D]efendants acquiring and using drugs to commit sexual assault," Gov't Opp. at 31, and that witnesses will testify that they experienced symptoms consistent with being drugged prior to being sexually assaulted by Defendants, *id.* at 31–32.  Testimony about which and how drugs are used to facilitate sexual assaults, and the impact that such drugs may have on those who ingest them, is well within the realm of Dr. Hail's expertise as a physician and toxicologist, and "provides the jury with permissible 'background' information" necessary to evaluate the evidence that will be presented in this case.  *United States v. Nunez*, No. 14-CR-284, 2016 WL 3626222, at *3 (E.D. La. July 7, 2016).  Her proposed testimony is, therefore, highly relevant.

Defendants also argue that Dr. Hail's testimony merely "seek[s] to validate the testimony of fact witnesses, [and Dr. Hail] will effectively be telling the jury what result to reach in their decision-making and fact-finding process."  Def. Mot. at 13.  Not so.  As with Dr. Rocchio, Dr. Hail "will [not] opine on the credibility of witnesses or otherwise infringe on the jury's fact-finding role because Dr. Hail will not opine about *any specific witness*."  Gov't Opp. at 35 (emphasis added).  Instead, her "testimony will be limited to topics that will enable the jury to evaluate other evidence and reach the factual conclusions necessary to deciding the case."  *Id.* As previously noted, this sort of blind testimony (*e.g.*, about overarching trends, such as typical reactions to certain drugs) tends to make Dr. Hail's opinions more reliable, not less.[4]

---

[4]        Defendants also argue that Dr. Hail's testimony should be precluded because she may define legal terms, such as "drug-facilitated sexual assault."  Def. Mot. at 17.  "Drug-facilitated sexual assault," however, is not a legal term.  Even if it were, or to the extent that Defendants are concerned that Dr. Hail may define legal terms not mentioned here, any such concerns can be easily remedied by an appropriate limiting instruction to the jury.

Finally, Defendants argue that the Government's "undue delay" in disclosing Dr. Hail as an expert witness in its case in chief is "prejudicial" and should be excluded on that basis. Def. Mot. at 6. Although Defendants are correct that the Government failed to timely disclose that Dr. Hail would provide this testimony, *see id.* at 5–6, the Court is not inclined to preclude her testimony on that basis, primarily because the delay was only in identifying precisely *who* would provide the testimony, not in disclosing that the Government would call *a* toxicologist to testify about these subjects.[5] Defendants have not demonstrated that they suffered any actual prejudice from the delay, beyond minor inconvenience (maybe), in learning that Dr. Hail would provide this testimony (in lieu of someone else).[6]

Defendants' motion to preclude Dr. Hail's testimony is, therefore, DENIED.

## III.  The Government's Motion to Preclude Certain Testimony of Defendants' Proposed Expert Dr. Deryn Strange

The Government seeks to preclude certain portions of the testimony of Defendants' proposed expert, Dr. Deryn Strange, a cognitive psychologist. *See* Gov't Mot. at 102–19; Gov't Suppl. Mot. at 1–6. Per Defendants' expert disclosure, Dr. Strange intends to provide testimony on the following topics: (i) a general overview of how memory works, including encoding and memory retrieval, *see* Gov't Mot., Ex. B, at 2–4; (ii) traumatic memory processing, *see id.* at 4–5; (iii) false memory formation and influences that may have an impact on memory recall, *see id.*

---

[5]     In August, the Government timely informed Defendants of its intent to call Dr. Gail Cooper, another expert toxicologist, as a witness. Dr. Hail is merely replacing Dr. Cooper as a witness in the Government's case-in-chief; she is testifying about the same subjects that were timely disclosed. *See* Gov't Opp. at 36–37.

[6]     Defendants state that the two-month "delay has prevented [them] from identifying a proper rebuttal expert to Hail's testimony . . . and has forced the defense to switch preparation from motions *in limine* and investigation of the Jencks Act material . . . to preparation on drugs of which there is no evidence in this case." Def. Mot. at 6. These grievances are not credible given that Dr. Hail intends to cover the same subjects Dr. Cooper would have covered. Moreover, the Government's disclosure of its intent to use Dr. Hail in its case in chief, even if delayed, came more than two months before trial is slated to begin. The Court finds this runway, combined with the lack of demonstrated prejudice, sufficient to permit Dr. Hail's testimony.

at 5–9; and (iv) memory distortion as to specific victims in this case, *see id.* at 9.  The

Government argues that "significant swaths" of Dr. Strange's testimony are: (i) unreliable, in

violation of Rule 702 and *Daubert*; (ii) irrelevant, in violation of Rule 401; and (iii) more

prejudicial than probative, in violation of Rule 403.  *See* Gov't Mot. at 102, 106.  Defendants

counter, arguing that precluding Dr. Strange's testimony will prevent Defendants from

presenting a complete defense, Def. Opp. at 82–85, and that Dr. Strange's testimony is relevant

and admissible under Rules 401 and 702, *id.* at 85–94, and is scientifically supported and

reliable, *id.* at 90–92.

 Because the Government does not challenge Dr. Strange's qualifications and objects only

to certain aspects of her proposed testimony,[7] the Court considers each in turn.

  *a.  Opinions Regarding False Memory Formation*

 First, the Government objects to any attempt by Defendants "to offer [Dr. Strange's]

testimony [regarding] [] opinions as to false memory formation . . . that do not fit the facts of the

case and/or are unreliable."  Gov't Mot. at 106.  The crux of the Government's argument is that

Dr. Strange's proposed testimony about false memory formation is not relevant here (nor

particularly reliable) because "Dr. Strange's opinion that false memory may be implanted is

based primarily on research studies wherein the researchers *purposefully lied* to participants," *id.*

at 106, and "[t]he trial evidence in this case will not contain any analogues to the [] research

studies [cited in Dr. Strange's disclosure] whatsoever," *id.* at 108.  Defendants argue that the

Government "misunderstand[s] the significance of the articles cited in [Dr. Strange's] disclosure

as well as the scientific findings that can be extrapolated from them, precisely because

government attorneys are not experts in the field."  Def. Opp. at 88.  Defendants further argue

---

[7] For the avoidance of doubt, the Court will permit Dr. Strange to testify on the topics that the Government does not challenge in its *in limine* motions.

that, in any event, "Dr. Strange's opinion is not solely based on these studies but also on her relevant education, training, skills, knowledge, and professional experience." *Id.*

The Court, like counsel, is not particularly well versed in the nuances of false memory formation. A review of the articles to which the Government draws the Court's attention, *see* Gov't Mem. at 107–08, suggests that they do not hit the bullseye in terms of relevancy to this case. But psychological studies and theories do not need to perfectly approximate the facts in a case for expert testimony to be admissible. *See Bloomberg L.P.*, 2010 WL 3466370, at *13–14 (noting that "there are areas of expertise, such as the social sciences in which the research, theories and opinions cannot have the exactness of hard science[s]" (quoting *Simmons*, 470 F.3d at 1123)). The whole of Dr. Strange's disclosure (which includes the cited research) tends to support the notion that, in certain situations, humans can form false memories. To that end, Defendants' position that "Dr. Strange can testify that memory is malleable *even up to an extreme where false memories are plausible under certain circumstances*" appears reasonable, and the Court believes that proposed testimony on that topic is relevant. Def. Opp. at 89. In short, it is Defendants' prerogative to ask Dr. Strange to "apply th[e] principles [discussed in the literature] to the facts of a particular case." Def. Opp. at 92. To the extent the Government wants to challenge the efficacy or applicability of the studies that Dr. Strange has relied on to form her opinions, it can do so during cross examination.[8]

---

[8] In other words, it is not appropriate for the Court to stifle Dr. Strange's testimony on the notion that, unless there is "evidence that third parties lied to the victim witnesses in order to deliberately plant false memories in them," the testimony is not relevant. Gov't Mot. at 109. This takes an unreasonably narrow view of the literature cited in Dr. Strange's disclosure and, more importantly, overstates the Court's role as a gatekeeper of expert testimony. *See, e.g.*, *Nimely*, 414 F.3d at 395–96; *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 317 (S.D.N.Y. 2015) ("[W]hile the evidence underlying" expert testimony may "be thin, questionable, or self-servingly selective," the Court's "role as gatekeeper is not to divest" the parties "of the task of challenging the weight of such evidence before the trier of fact."). That the Government understands that reliability of victims' memories will play a role in this case is evident from its own desire to introduce expert testimony about memory, trauma, and recall. And "[m]uch like Dr. Rocchio may inform jurors that victims of sexual assault often delay disclosure, [the Defendants' expert] may inform jurors that the literature indicates that false accusations can result from suggestive activities or

Accordingly, the Government's motion to preclude Dr. Strange's testimony related to false memory formation is DENIED.

   *b.   Opinions Regarding Potential Sources of Suggestive Influence and Witness Credibility*

The Government next argues that Dr. Strange's opinions "on potential sources of suggestive influence, including (1) media; (2) social media; and (3) retelling/discussion . . . should be precluded on the ground that they are unreliable and do not fit the facts of this case." Gov't Mot. at 111. The Government further moves to preclude Dr. Strange's opinions as to the potential suggestive influence of "therapy and a therapist's beliefs," including "internal family systems therapy," "EMDR and BLS therapy," "group therapy," "guided imagery/visualization and journaling/writing," "prolonged exposure therapy," and "dreams and nightmares." Gov't Suppl. Mot. at 1–2 (capitalization corrected). Much of the Government's briefing challenges Dr. Strange's proposed testimony as unsupported by the relevant scientific literature.[9] Defendants disagree, arguing that Dr. Strange's testimony as to sources of suggestive influence are relevant in this case and, moreover, that it is supported by the literature and "Dr. Strange's professional knowledge and expertise." Def. Opp. at 93.

Having reviewed some of the sources about which the parties now quarrel, the Court is not inclined to preclude Dr. Strange's testimony that suggestive influences may have an impact

---

false memory creation." Opinion & Order, *United States v. Maxwell*, No. 20-CR-330, Dkt. 516, at 15 (S.D.N.Y. Nov. 21, 2021).

[9] *See generally* Gov't Mot. at 111 ("The statement is unsupported by the literature Dr. Strange purports to rely on."), 112 ("Dr. Strange's own work . . . does not come close to supporting the proposition that someone reading a news article about another person would adopt those experiences as their own."), 113 ("This study simply does not support the conclusion that social media use can cause a person to adopt false autobiographical memories as their own."), 114 ("Dr. Strange did not cite any articles to support[] the "general proposition" that "'retelling' can lead to inaccurate details[.]"); Gov't Suppl. Mot. at 2 ("Even an initial review of the research upon which Dr. Strange's opinions are based demonstrates that these opinions are unreliable."), 3 ("Dr. Strange's conclusion is at best a gross exaggeration of what the literature supports.").

on a victim's memory. Defendants' nine-page rebuttal to the Government's supplemental motion *in limine* – and the many sources discussed therein – are compelling evidence that the science on external influences on memory, even if imperfect, is not so universally panned as to warrant wholesale exclusion of Dr. Strange's testimony at this juncture.[10] *See Amorgianos*, 303 F.3d at 267 ("The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." (internal quotation marks omitted)). And, as Defendants note, at least one court in this District agrees with their position. *See* Order, *United States v. Paduch*, No. 23-CR-181, Dkt. 126, at 1 (S.D.N.Y. May 3, 2024) (permitting Dr. Strange to testify about how (i) "information acquired over time can change how people interpret earlier events," (ii) "information that people learn from others can influence how they later recall an event," and (iii) "the influence of other sources – such as media, retelling of a story, therapy, and dreams – can lead to the formation of false memories"). Again, to the extent that the Government seeks to challenge the propriety of the studies on which Dr. Strange has relied to form her opinions – which appear to be facially reliable and scientifically grounded – it may do so on cross. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

That said, this order should not be read as a *carte blanche* for Dr. Strange to speculate about how specific external forces *did* or *could have* had an impact on specific victims "based on her review of the evidence." Def. Opp. at 86; *see also* Gov't Mot. at 117–19. That Defendants

---

[10]    While the Government's Supplemental Motion focuses entirely on Dr. Strange's proposed testimony about therapy's potential influence on memory, Defendants' Supplemental Opposition is an all-encompassing response that challenges the Government's basic arguments about the reliability of memory reinterpretation and the influence of outside sources generally. *See* Def. Suppl. Opp. at 1–8.

have allowed Dr. Strange to evaluate the evidence in this case is not *per se* problematic; it is

incumbent on Defendants, though, to ensure that Dr. Strange does not hypothesize about which

victims *may* have developed false memories through external influences that they were, or *might*

have been, exposed to.  Such speculation would constitute an impermissible credibility

assessment.  In other words, the Court will permit Dr. Strange to testify generally about *what* and

*how* certain factors can lead to memory distortion, but not *whether* those factors were present

here, nor to *whether* certain victims were subject to them.[11]  Accordingly, the Government's

motion to preclude Dr. Strange's testimony related to the impact of suggestive influences on

memory (including, *e.g.*, media, social media, retelling/discussion, and therapy) is GRANTED in

part and DENIED in part.

> c.  *Opinions Regarding Juror Bias and Pretrial Publicity*

The Government objects to a paragraph in Dr. Strange's disclosure "about how pretrial

publicity 'can significantly bias juror and jury verdicts,'" arguing that "[p]ermitting jurors to hear

expert testimony about their own memories of evidence presented at trial would be highly

inappropriate and prejudicial" and thus must be excluded.  Gov't Mot. at 114.  In its opposition

brief, the Defense clarifies that it does not "seek to call Dr. Strange to testify that jurors are

susceptible to pretrial publicity" and only included the point "in her expert disclosure to help

demonstrate that even courts recognize that jurors can be influenced by external factors such as

media."  Def. Opp. at 87.

---

[11]     Testimony about the general factors that may influence memory, including, for example, "memory's inherent[] malleab[ility] and unreliable nature," "social media[,] mainstream media[,] conversations with attorneys[,] and conversations with friends, therapists, and parents[,]" is sufficiently relevant here and non-prejudicial.  Def. Opp. at 86.  And, of course, as the Government concedes, Defendants can "elicit factual predicates for th[e] sources of [specific] suggestive influence[s] during cross-examination of [a] fact witness."  Gov't Mot. at 117.

Testimony about a juror's own susceptibility to pretrial publicity is irrelevant, prejudicial, and inadmissible. Given the Defendants' clarification, however, this aspect of the Government's motion *in limine* is DENIED as moot.

### d. *Opinions Regarding How Memory Fades Over Time*

Next, the Government objects to Dr. Strange's "commonsense opinion[]" that "memory fades and weakens over time," arguing that such testimony is within the ken of the jury and therefore inadmissible. Gov't Mot. at 115–16. Defendants counter that "[t]here is a difference between testifying that memory weakens over time and testifying that memory overtime [sic] becomes more susceptible to suggestion," and "[t]he defense seeks to call Dr. Strange to testify to the latter." Def. Opp. at 86. Maybe so, but Dr. Strange's disclosure lists as a possible topic of testimony that "[m]emory retrieval is subject to . . . [f]orgetting[,]" as "[m]emory weakens over time." *See* Gov't Mot. at 103.

There are certain aspects of memory recall and formation, the nuance of which the Court is comfortable allowing Dr. Strange to testify to. The baseline notion that memory fades over time is not one of them; it is a matter common sense[12] and should be excluded on that basis. *See United States v. Shiraishi*, No. 17-00582 (JMS) (RLP), 2019 WL 1386365, at *5 n.7 (D. Haw. Mar. 27, 2019) (collecting cases). Accordingly, the Government's motion to exclude general testimony about how memory fades over time is GRANTED.

### e. *Opinions Regarding How Information Acquired Over Time Can Change How People Interpret Earlier Events*

Along similar lines, the Government argues that "the concept that information acquired over time can change how people interpret earlier events is well within the ken of the average

---

[12]    The Defendants seem to concede this, noting that "the principle that memory weakens over time may be a matter of common understanding." Def. Opp. at 86.

juror" and should thus be precluded. Gov't Mot. at 116 (alterations and internal quotation marks omitted). Defendants oppose, arguing that "the link between time elapsed and susceptibility to suggestion is not" a matter of common understanding. Def. Opp. at 86.

This is a closer call. The idea that information and experiences received later can have an impact on memories of earlier events is not far from the general notion that memory fades over time, which, as previously discussed, is well within the ken of the average juror. Still, to the extent Dr. Strange intends to discuss how information acquired over time can facilitate *memory reinterpretation* and support the position that memory is *malleable*, the Court deems this testimony sufficiently relevant, scientifically supported, and nuanced for an expert's view to be helpful to the jury. *See, e.g.*, Opinion & Order, *Maxwell*, No. 20-CR-330, Dkt. 516, at 15 (admitting expert evidence about the influence of suggestive activities on memory). Accordingly, the Government's motion to preclude testimony about how information acquired over time can change how people interpret earlier events is DENIED.

## IV.  The Government's Motion to Preclude Certain Testimony of Defendants' Proposed Expert Dr. Elie Aoun

Next, the Government argues that certain testimony from the Defendants' proposed expert toxicologist, Dr. Elie Aoun, should be precluded. In particular, the Government argues that "the Court should preclude testimony regarding the way that individuals can present when under the influence of alcohol, as it falls within the ken of the average juror, does not fit the facts of the case, and is likely to confuse the jury." Gov't Mot. at 120. Defendants counter, arguing that the way an inebriated individual "appear[s] to an outside observer[] is relevant to the question whether Defendants knew the intoxication level of any witness[] at the time they may have interacted with" her and that "the average person does not understand the science of blackout." Def. Opp. at 94–96. The Court agrees with Defendants. That "most jurors have

consumed alcohol, felt its effects, and observed the ways that alcohol affects," Gov't Mot. at

121, is no substitute for the highly relevant testimony of an expert toxicologist regarding the

(sometimes counterintuitive, *see* Def. Opp. at 94–96) effects of extreme alcohol consumption.[13]

Moreover, the Government's concern that the testimony does not fit the facts of the case because

there has been no evidence "by the defendants stating that they observed a victim presenting as

sober," Gov't Mot. at 121, is not particularly salient given that Dr. Aoun is being called as a

*rebuttal* witness. Thus, his testimony will be cabined to opinions that are applicable to evidence

already in the record.

The Government also moves to preclude "Dr. Aoun's categorical opinion that, '[i]n order

to perpetuate its effects, users of GHB need to re-dose frequently, every hour or hour and a half'

because it is not based in a reliable methodology." Gov't Mot. at 122. Defendants counter by

arguing that "Dr. Aoun's opinions regarding GHB are supported by the scientific literature," and

provide a citation to a 2023 article published on the National Library of Medicine's website.

Def. Opp. at 96. At the hearing on December 5, 2025, the Government acquiesced, at least

somewhat, that the literature cited in Defendants' opposition was not entirely inconsistent with

the general scientific consensus regarding GHB's toxicity. *See* Tr. of Dec. 5, 2024, at 149:9–

25. In all events, given that Defendants have provided some empirical evidence from a reliable

source that arguably supports Dr. Aoun's proposed testimony, and because Dr. Aoun is only

testifying as a rebuttal witness (and thus will only opine on GHB's toxicity if it becomes relevant

at trial), the Court is not inclined to outright preclude his testimony on this topic. Accordingly,

---

[13]    As Defendants rightly note, the Government's reliance on *Grayson v. Thompson*, 257 F.3d 1194 (11th Cir. 2001), is not compelling. Beside the fact that the Eleventh Circuit in *Grayson* was not considering the admissibility of expert testimony whatsoever, the court nonetheless mused that "detailed expert testimony regarding the effects of alcohol . . . may have been helpful to the jury." *Id.* at 1221; *see also* Def. Opp. at 95–96. The Government also cites *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008), which has nothing to do with testimony about the effects of alcohol consumption.

the Government's motion to exclude certain portions of Dr. Aoun's testimony is DENIED. Should it become relevant during trial, the Court directs Defendants to provide a basis for Dr. Aoun's opinions as to the categorical need for users to re-dose hourly to feel GHB's effects prior to any such testimony. *See id.* at 150:22–24.

Finally, the Government asks that the Court require Defendants to supplement their expert notice for Dr. Aoun because it "lacks sufficient disclosure of the actual opinions he will offer." Gov't Mot. at 123. Defendants have agreed to do so. Def. Opp. at 97. As such, the Court DENIES the Government's request as moot; Defendants are directed to submit a supplemental expert disclosure for Dr. Aoun as soon as practicable.

<u>CONCLUSION</u>

In sum, for the reasons stated herein:

- Defendants' motion to preclude the testimony of Dr. Lisa Rocchio is DENIED;

- Defendants' motion to preclude the testimony of Dr. Stacey Hail is DENIED;

- the Government's motion to preclude certain portions of the testimony of Dr. Deryn Strange is GRANTED in part and DENIED in part; and

- the Government's motion to preclude certain portions of the testimony of Dr. Eli Aoun is DENIED.

The Clerk of Court is respectfully directed to terminate the open motions at Dkts. 174, 188, and 195.

SO ORDERED.

Date:   December 12, 2025
        New York, NY

_____
        VALERIE CAPRONI
        United States District Judge