

250 Vesey Street
27th Floor
New York, NY 10281

wmhwlaw.com
T: 212-335-2030
F: 212-335-2040

February 1, 2026

**Via ECF**
Hon. Valerie Caproni
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: *United States v. Alon Alexander, Oren Alexander & Tal Alexander,*
24 Cr. 676 (VEC)

Dear Judge Caproni:

  We submit this letter on behalf of Defendants Tal Alexander, Alon Alexander, and Oren Alexander (together, the "Defendants") to request a mistrial due to the Government's mid-trial release of Jeffrey Epstein-branded materials, which has irreparably compromised the Defendants' right to a fair trial.

  On Friday, January 30, 2026, the United States Department of Justice and the United States Attorney's Office for the Southern District of New York released a massive tranche of so-called "Epstein files." Within that release were completely false, inflammatory, and wholly irrelevant materials accusing the Defendants of raping minors and falsely associating them with Jeffrey Epstein and Ghislaine Maxwell. The allegations against the Alexanders appeared in a chart alongside similarly-unverified and inflammatory claims against President Donald Trump and former-President Bill Clinton. This amplified the false allegations and ensured their place in the public spotlight. Just one tweet that repeated the false allegations has been viewed more than 17 million times.

  The Court should declare a mistrial for four reasons.

  *First*, the Government—the very same U.S. Attorney's Office trying this case—caused highly inflammatory negative publicity during trial by publicly releasing unverified allegations under the "Epstein files" banner. Most of the caselaw in this area deals with a third party publishing some discrete piece of information. Here, the very sovereign that has imprisoned the Defendants and put them on trial is the source of the prejudice. This rare and remarkable sequence of events makes this case different from many that have analyzed mid-trial publicity issues.

  *Second*, the Government included Attorneys'-Eyes-Only ("AEO") case materials *from this case* relating to ▅▅▅▅▅▅ in the public Jeffrey Epstein disclosure. These AEO materials have no connection whatsoever to Jeffrey Epstein except that a person mentioned in the AEO materials shared a last name with Jeffrey Epstein. This inexplicable disclosure by the Government created a false and prejudicial connection between ▅▅▅▅▅▅ and Jeffrey Epstein and removed critical trial safeguards, including the anonymity of a ▅▅▅▅ accuser. The AEO documents included a cover letter from attorney Evan Torgan to the Government—previously unseen by the defense—

that was published by at least one media outlet. The publication did not redact █████ name. The AEO materials also included an attachment titled ████████████████ created by ███████████ which detailed purported outcry witnesses and allegations pertinent to ███ ███.

*Third*, the release falsely associated the Defendants with Jeffrey Epstein—not just any accused sex trafficker, but without a doubt the single most notorious accused sex trafficker in history (who also happened to live in the same places as the defendants and who also happened to run in high-profile circles). The scarlet "E" has created a uniquely toxic stigma that cannot be neutralized through mid-trial curative instructions or voir dire.

*Fourth*, the Government's actions have placed the Defendants in a classic "trick box": The typical remedy here would be further inquiry of the jury. But here, because the prejudicial information is not actually about the defendants themselves, but a uniquely vilified non-party, any attempt to cure the resulting prejudice through further juror inquiry would itself amplify the harm and undermine the Court's prior assurances to the jury.

This disclosure did not occur in a vacuum. It occurred *during trial*. And it occurred in a media environment where any headline invoking "Epstein" guarantees saturated coverage, viral dissemination, and repetition—often long after the initial story is published and far beyond what any curative instruction can realistically resolve. The jury could well have followed every instruction from the Court (which have been repeated and are appreciated), and still have been exposed to Epstein stories—which should not have mentioned the Defendants, but because of the Government's conduct, they did. The prejudice is immediate, extreme, and incurable. The Government's actions have made a fair trial under these circumstances impossible and created a presumption of prejudice that no curative instruction can overcome.

### A. Applicable Law

In the typical case, the Second Circuit has prescribed a three-step process to determine whether a mistrial is warranted as a result of prejudicial publicity during trial. When potentially prejudicial publicity arises mid-trial, the district court must: (1) assess whether the publicity has a potential for unfair prejudice; (2) determine whether any juror has been exposed to the publicity; and (3) individually examine exposed jurors, outside the presence of others, to determine the extent of exposure and whether it has affected their ability to decide the case fairly. *United States v. Lord*, 565 F.2d 831, 838-39 (2d Cir. 1977). This framework was reaffirmed and applied in *United States v. Gaggi*, where the Second Circuit emphasized that the inquiry is fact-specific and that the district court must evaluate whether the particular publicity at issue can be neutralized through voir dire and curative instructions. *United States v. Gaggi*, 811 F.2d 47, 51 (2d Cir. 1987) ("[T]he trial judge must examine the special facts of each case to determine whether the jurors remained impartial.") (internal citations and quotations omitted); *see also United States v. Delance*, 694 F. App'x 829, 834-35 (2d Cir. 2017) ("We have established a simple three-step process that a district court may follow in order to determine whether a mistrial is warranted as a result of prejudicial publicity.") (internal quotations omitted).

But this is not a typical case. The Second Circuit's framework presupposes a form of prejudice that is *capable of being reliably identified and cured*—that is, discrete exposure to

external reporting that can be identified and neutralized through voir dire and curative instructions. Where inadmissible and highly prejudicial information reaches the jury, those tools may be inadequate to safeguard a defendant's Sixth Amendment rights. *See United Gaggi*, 811 F.2d at 51-53 (2d Cir. 1987); *Lord*, 565 F.2d at 838-39; *United States v. Williams*, 568 F.2d 464, 471 (5th Cir. 1978) ("We hold that the exposure of the two jurors to information regarding defendants' convictions at the first trial resulted in an unfair second trial," even where jurors were admonished to ignore everything not heard in court and two jurors who saw the prejudicial reporting said that they could disregard it). There is no case law dealing with a situation like this one, because there has been no case where the Government itself, while engaged in a trial of certain defendants, has publicly tied those defendants to the single most notorious person ever accused of the very same crimes for which the defendants are being tried.

### B.    The Government's Mid-Trial Release Has Caused Incurable Prejudice

On January 30, 2026, while this jury was empaneled and hearing evidence, the Government released an "explosive new tranche of documents" related to Jeffrey Epstein.[1] This release was not some ancillary administrative filing. It was a media event, containing the largest batch of Jeffrey Epstein files to date, including unverified allegations of rape and sex trafficking against prominent public figures. Most troublingly, these documents included a chart containing false, unverified, and sensational allegations against prominent public figures that were provided to the FBI's tip line. Among them were allegations from a 2019 FBI report that expressly referenced the Defendants and made claims that they sexually assaulted minors. Below are the cover email and relevant portion of the attached chart.

| At age 16, while modeling, caller attended 8 parties at Epstein's New York residence. On one occasion, caller reported she was sexually assaulted by Epstein. On another occasion, two twin brothers, Allen and Oren, lured caller and her friend upstairs but they escaped back downstairs. Caller stated Oren raped her best friend and a third brother, Tal, raped a 14 year old girl named Katie LNU. Caller named other individuals involved in "big orgy parties" with her, other young girls, and older Victoria's Secret models, including Bill Clinton and Donald Trump. | Allen, Oren, Tal (LNU, possibly identifiable as Alexander brothers) Epstein's "British Socialite" Bill Clinton Donald Trump Jeffrey Epstein |
|---|---|

---

[1] Farrah Tomazin, *Woman Told FBI Trump Abused Her at 13, Epstein Files Reveal*, DAILY BEAST (Jan. 30, 2026), https://www.thedailybeast.com/woman-told-fbi-trump-abused-her-at-13-epstein-files-reveal.

3

> From: ███
> To: ███
> Subject: RE: NTOC Names
> Date: Thu, 07 Aug 2025 16:08:14 +0000
> Importance: Normal
> Attachments: ███NTOC_-_Alexander_Brothers.pdf
>
> Attached. Let me know if you need anything else
>
> From: ███
> Sent: Thursday, August 7, 2025 11:48 AM
> To: ███
> Subject: Re: NTOC Names
>
> Are you able to send me ███ full ntoc report ? We need to interview regarding the Alexander brother allegations
>
> Thank you
>
> ███
> Special Agent, Child Exploitation and Human Trafficking Task Force
> Federal Bureau of Investigation
> Office ███ | Mobile: ███

Shortly after this document was released on the DOJ website, the media seized on it and immediately disseminated it. For example, Jake Tapper, the lead Washington anchor at CNN, published the document on his Twitter account, which has 2.8 million followers.[2] As of February 1, over 17 million people had viewed just this one tweet displaying the report. Of course, that was just the tip of the iceberg in terms of further online dissemination of the report. Other media outlets followed with stories headlining that the Alexanders were named in the Epstein release.[3]

The media also reported on a separate document included in Friday's Epstein release, which is directly connected to the case on trial. In this document with the title "Alexander Brothers," and an attachment named ███" Evan Torgan, a personal injury lawyer in New York representing ███ wrote to an unknown recipient: "This is a memo from ███ detailing relevant contacts from that evening and beyond that she thought might be helpful. We have a few new clients that are interested in speaking with you."[4] This email is provided below. The attached memo, created by ███ included a list of potential witnesses, most of whom appear on either the Government or defense witness lists. At least one media outlet quickly reported on this document, even including ███ name in the article before removing it.[5]

---

[2] *See, e.g.*, Jake Tapper (@jaketapper), X post (Jan. 30, 2026), available at https://x.com/jaketapper/status/2017303445322059847 (last visited Jan. 30, 2026).
[3] *See, e.g., Alexander Brothers Named in Jeffrey Epstein Files*, THE REAL DEAL (Jan. 30, 2026), https://therealdeal.com/national/2026/01/30/alexander-brothers-named-in-jeffrey-epstein-files/.
[4] ███
[5] *Id.*



Unsurprisingly, the media coverage, fueled by the Government's release, immediately and explicitly connected these sensational allegations to the defendants. One article declared that an FBI file containing these claims was "linked to an investigation into the Alexander brothers, three wealthy Florida siblings who are currently on trial, accused of sex trafficking."[6] Another article confirmed an FBI Special Agent from the Child Exploitation and Human Trafficking Task Force wrote, "We need to interview regarding the Alexander brother allegations," cementing the connection in the public mind.[7]

We recognize and appreciate that the Court has admonished the jury on multiple occasions not to read news about the trial and to turn off push notifications on their phones to avoid receiving updates about the trial. These admonitions, however, do not serve as an adequate safeguard against this new story. Jurors need not read coverage specifically about this case to be exposed to the prejudice. Articles bearing headlines about the "Epstein Files" do not appear, on their face, to concern the Alexanders at all. Yet the articles frequently identify the defendants within the body

---

[6] Farrah Tomazin, *Woman Told FBI Trump Abused Her at 13, Epstein Files Reveal*, DAILY BEAST (Jan. 30, 2026), https://www.thedailybeast.com/woman-told-fbi-trump-abused-her-at-13-epstein-files-reveal.

[7] ███

of the reporting.[8] Exposure therefore occurs passively, without any affirmative effort by a juror to seek information about this trial.

During jury selection, this Court excused for cause prospective jurors who indicated that any association with Jeffrey Epstein would create bias. *See* Tr. of Jan. 20, 2026, 194-97; Tr. 216. Seated Juror #1 was assured this case had no connection to Epstein. *See* Tr. of Jan. 20, 2026, 26-28 (JUROR #1 (at sidebar): "I think in the news there has been too much about the Epstein case. It just, I don't know, just makes me think a certain way. And just hearing some of those testimonies just made me feel a little, not so good about it." … COURT: "So, the job of a juror is hard. Because part of it is putting aside that sort of thing. **These men have nothing to do with Jeffrey Epstein.**") (emphasis added).

The Government has now rendered that assurance meaningless. The publicity is, as the court in *United States v. Gotti* described with respect to a witness's prejudicial statements, "quintessentially prejudicial," as the statements served to "sway the minds of potential jurors without being subjected to the rigors of cross-examination." No. 04-CR-690 (SAS), 2004 WL 2757625, at *3 (S.D.N.Y. Dec. 3, 2004). Here, the prejudice is far worse, as it emanates from the Government itself, lending it an unearned air of authority.

The resulting publicity is a direct and foreseeable consequence of the Government's actions. Public association with Jeffrey Epstein has repeatedly produced irreversible reputational harm—even in the absence of any allegation of sexual misconduct. Senior business leaders and public figures have lost positions, stepped down from boards, or suffered lasting professional damage based solely on disclosed associations with Epstein.[9] That reality is a matter of public

---

[8] *See*, *e.g.,* Claire Healy & Julie Brown, *How Trump Is Named in the Latest Batch of the Epstein Files*, Miami Herald (Feb. 1, 2026), https://www.miamiherald.com/news/politics-government/article314517877.html; Farrah Tomazin, *Woman Told FBI Trump Abused Her at 13, Epstein Files Reveal*, Daily Beast (Jan. 30, 2026), https://www.thedailybeast.com/woman-told-fbi-trump-abused-her-at-13-epstein-files-reveal.

[9] For example, Les Wexner, the former Chairman and Chief Executive Officer of L Brands, experienced significant public and institutional backlash after the media focused on his past professional relationship with Epstein, who served as his financial advisor. Although Wexner was never accused of sexual misconduct and publicly severed ties with Epstein years earlier, news coverage of the relationship preceded Wexner's departure from executive leadership and his decision not to continue in board roles. *See*, *e.g.*, David Gelles, *Leslie Wexner, Victoria's Secret Mogul, Steps Down Amid Scrutiny of Epstein Ties*, NEW YORK TIMES (Mar. 3, 2020), https://www.nytimes.com/2020/03/03/business/leslie-wexner-victorias-secret-epstein.html; Gillian Tan & Michelle F. Davis, *Wexner's Epstein Ties Continue to Shadow L Brands Transition,* BLOOMBERG (Mar. 3, 2020), https://www.bloomberg.com/news/articles/2020-03-03/wexner-s-epstein-ties-shadow-l-brands-transition.

Similarly, Jes Staley, the former Chief Executive Officer of Barclays, was subjected to regulatory investigation over disclosures concerning his relationship with Epstein. Staley was never accused of sexual misconduct or involvement in Epstein's crimes, yet faced regulatory sanctions and professional consequences tied solely to the association. *See, e.g.,* Patrick Jenkins, *Jes Staley Fined and Banned Over Epstein Disclosures*, FINANCIAL TIMES (Oct. 12, 2023),

record. Jurors are members of the same public that has reacted to Epstein disclosures by presuming impropriety based on association alone.

As such, the nature of the publicity makes a fair trial under these circumstances impossible. Some media coverage, as anticipated, leads with inflammatory headlines about Epstein and other public figures, ensuring maximum public attention. The defendants are then named later in these articles, cementing a false association. No judicial instruction can effectively erase the prejudice caused by linking the defendants, in the middle of trial, to one of the most notorious accused sex offenders in modern history. And where the Government itself releases materials that falsely situate the defendants within the "Epstein files," it imports a stigma that cannot be cured by instructions, voir dire, or assurances of impartiality—particularly after the Court assured at least some jurors that the Alexanders "have no connection to Epstein."

C. **The Government Violated Its Duty to Ensure a Fair Trial Under Local Criminal Rule 23.1**[10]

The Government's primary duty is to see that justice is done. Inherent in this duty is the obligation to protect a defendant's Sixth Amendment right to a fair trial. The Government has violated this duty. Local Criminal Rule 23.1 explicitly prohibits lawyers associated with a prosecution from releasing "non-public information . . . if there is a substantial likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice."

---

https://www.ft.com/content/7c8e9d7a-6a1c-4f3e-b9b4-epstein-staley-barclays; David Benoit & Margot Patrick, *Barclays CEO's Epstein Ties Trigger Regulatory Fallout*, WALL STREET JOURNAL (Nov. 1, 2021), https://www.wsj.com/articles/barclays-jes-staley-epstein-11635640200.

Other public figures experienced comparable fallout. Glenn Dubin, a hedge fund manager and investor, was subjected to public criticism and reputational harm after media coverage highlighted his social and financial connections to Epstein, despite the absence of any allegation or charge of sexual misconduct against him. *See, e.g.,* Matthew Goldstein, *How Epstein Moved Among the Rich and Famous*, NEW YORK TIMES (July 20, 2019), https://www.nytimes.com/2019/07/20/business/jeffrey-epstein-finance.html; Max Abelson, *Epstein's Social Circle Faces Reputational Fallout*, BLOOMBERG (Aug. 9, 2019), https://www.bloomberg.com/news/articles/2019-08-09/epstein-s-social-circle-faces-reputational-fallout. Likewise, Ehud Barak, a former Prime Minister of Israel, faced intense international scrutiny and reputational damage following public reporting that he had traveled with Epstein and maintained social contact with him, though Barak denied any involvement in Epstein's criminal conduct and was never accused of sexual misconduct. *See* David M. Halbfinger, *Ehud Barak's Ties to Jeffrey Epstein Draw Scrutiny*, NEW YORK TIMES (July 16, 2019), https://www.nytimes.com/2019/07/16/world/middleeast/ehud-barak-jeffrey-epstein.html.

[10] At the conclusion of the trial day on January 29, 2026, the defense conveyed to the Court at sidebar its concerns about extrajudicial statements in potential violation of Rule 23.1. To be clear, we were not referring to Government counsel but rather an intervening attorney in this matter and about an issue not addressed in this motion. We first learned of the issue serving as the basis for this motion on the following day. However, given the Government's violation, we respectfully request that the Court order the Government to refrain from publicly releasing any further non-public documents relating to the defendants as part of the ongoing Epstein disclosures or otherwise.

7

### 1. Inclusion of Documents Unrelated to Jeffrey Epstein

Most egregiously, the DOJ included in its public data dump at least two documents completely unrelated to Jeffrey Epstein but which are central to this case and under a protective order. These included (i) a cover letter from attorney Evan Torgan to the Government—previously unseen by the defense—that was published by at least one media outlet with ▮▮▮ name without redaction; and (ii) its attachment titled ▮▮▮ created by ▮▮▮ which lists outcry witnesses and allegations pertinent to ▮▮▮ This attachment was produced to the defense as 3500 material and designated AEO by the Government.[11]

Releasing these documents, which are subject to a protective order, under the banner of the "Epstein files" has now publicly and falsely branded the allegations in ▮▮▮ as being related to Jeffrey Epstein. The Government's failure to implement basic safeguards has manufactured a connection that is both false and irreparably prejudicial.

### 2. Inclusion of Allegations From the 2019 FBI Report

While the Government may argue that release of the documents related to ▮▮▮ was inadvertent, it cannot say the same regarding the 2019 FBI report. The report was produced to the defense as 3500 material on January 14, 2026.[12] The Government was aware not only of the report's existence but also that jurors raised Jeffrey Epstein as a concern during voir dire. Although Congress authorized the broader Epstein disclosure, the Government controlled the documents in its possession and was statutorily authorized to withhold the documents. Indeed, the Act provides that DOJ "may withhold or redact the segregable portions of records that would jeopardize an active federal investigation or ongoing prosecution, provided that such withholding is narrowly tailored and temporary." Public Law 119–38, § 2(b)(1)(C). As recently as yesterday, the Government has acknowledged its ability to hold back specific documents from the January 30, 2026 production. *See United States v. Epstein*, 19-CR-490 (RMB), ECF 99 (S.D.N.Y. Jan. 31, 2026) ("[T]he Department would, *with specifically identified exceptions*, produce identified documents, files, records, videos and images held by the Department related to the investigations of Jeffrey Epstein and Ghislane Maxwell as required by Epstein Files Transparency Act.") (emphasis added).

The Government could have—and should have—segregated or delayed the release of the inflammatory document until after trial. Nothing in the statute required dumping *this* document *during* trial. The Government's failure to conduct even a cursory review to shield this ongoing trial from such inflammatory publicity constitutes a violation of the letter and principles of Local Rule 23.1.

---

[11] The attachment titled ▮▮▮ is attached hereto as Exhibit 1.
[12] 3648-001 is attached hereto as Exhibit 2.

8

**D.      Passive and Unavoidable Exposure Renders Curative Inquiry Ineffective**

    **1.  The Government-Created Prejudice Here is Incurable**

There is no valid explanation for how AEO materials from a live criminal trial—wholly unrelated to Jeffrey Epstein and involving defendants who face life imprisonment—ended up on a DOJ website as part of a Jeffrey Epstein disclosure.

Ordinarily, a defendant seeking relief based on prejudicial publicity must demonstrate actual juror exposure and resulting bias. The Second Circuit has cautioned that cases in which prejudice is presumed are "very rare." *United States v. Sabhnani*, 599 F.3d 215, 233 (2d Cir. 2010). Nevertheless, the Circuit has recognized that presumed prejudice may arise where publicity is so inflammatory and pervasive that it threatens the fundamental fairness of the proceeding itself. *See Gaggi*, 811 F.2d at 51 (describing circumstances involving overwhelming public passion); *Marshall*, 360 U.S. at 312-13. In such circumstances, the law does not require the defendants to prove actual bias juror by juror, because the nature of the publicity renders that inquiry unreliable and incomplete. The association with Jeffrey Epstein is so uniquely inflammatory in modern culture that it triggers a presumption of prejudice, rendering individual questioning of jurors a useless formality.

The Second Circuit has also emphasized the "special responsibility" borne by prosecutors and the government to avoid conduct that risks prejudicing a pending criminal trial. *See*, *e.g.*, *United States v. Silver*, 948 F.3d 538, 552-53 (2d Cir. 2020) (recognizing prosecutors' duty to safeguard the fairness and integrity of proceedings). While most mid-trial publicity cases involve reporting by third-party media outlets, courts have recognized that publicity traceable to government action raises heightened constitutional concerns. When the source of the prejudicial material is the Government itself—particularly where the material carries the imprimatur of official release—the risk of juror influence is magnified, and the effectiveness of traditional curative measures is substantially diminished.

A mistrial is a drastic remedy, but it is the only just remedy here. The court in *Gotti* declined to issue a gag order, reasoning that less extreme remedies like a searching voir dire and emphatic jury instructions would suffice. That reasoning does not apply to this case for three critical reasons.

First, the source of the prejudice in *Gotti* was a third-party witness and media personality. Here, the prejudice was caused directly by the Government. The jury cannot be expected to ignore information that appears to carry the imprimatur of the DOJ itself.

Second, voir dire is no longer an option, as the jury is already empaneled. A mid-trial instruction to disregard the association with the most infamous accused sex offender of our time would be futile—akin to asking the jurors to "perform humanly impossible feats of mental dexterity." *Gotti*, 2004 WL 2757625, at *4. Moreover, any inquiry into whether jurors have read coverage concerning the Epstein disclosure would itself risk injecting additional prejudice. During voir dire, jurors raised concerns about potential similarities between this case and matters involving Jeffrey Epstein, and the Court provided clear assurances that it was not. To now question jurors about exposure to Epstein-related coverage would directly undermine those assurances and risk amplifying the very association the Court has already taken steps to prevent.

Third, jurors will naturally be reluctant to admit their exposure to the Epstein-Alexander materials, fearful that they could be criticized or even sanctioned for disobeying the Court's instruction to avoid any media reports about the Alexanders—even though they are not to blame, given the Court's assurance that Epstein and the Alexanders are not connected. It is too much to expect that jurors will be candid during voir dire if they fear reprisal for their honesty.

### 2. The Prejudice is Distinguishable from Second Circuit Precedent

While the Second Circuit sets a high bar for declaring a mistrial based on mid-trial publicity, this case falls well outside the line of decisions in which curative instructions were deemed sufficient. In those cases, the challenged publicity was collateral, attributable to third-party media reporting, or capable of being identified and neutralized through voir dire. None involved a mid-trial, Government-generated disclosure that falsely linked the defendants to a uniquely notorious criminal scandal while publicly releasing protected discovery from the very prosecution being tried.

In *United States v. Gaggi* and *United States v. Gigante*, the publicity arose from external events or third-party reporting, not affirmative Government action tied to the prosecution itself. In *Gaggi*, the Second Circuit affirmed denial of a mistrial only after multiple individualized voir dires established that no juror had been exposed to prejudicial information about the remaining defendants. 811 F.2d at 51-53. In *Gigante*, the article at issue was based on a leaked affidavit and largely overlapped with evidence already before the jury. 729 F.2d 78, 82 (2d Cir. 1984). Here, by contrast, the prejudice is direct and newly created—a DOJ publication during trial affirmatively and falsely associated the defendants with Jeffrey Epstein, injecting an extraordinarily inflammatory narrative into the case. *United States v. Elfgeeh*, 515 F.3d 100 (2d Cir. 2008), is likewise inapposite. There, the Second Circuit rejected a mistrial claim where inflammatory press coverage was not Government-generated and was promptly addressed through juror inquiry and instructions. 515 F.3d at 130-31. Here, the Government itself created the taint and publicly released materials subject to a protective order.

Finally, *United States v. Lord* underscores why a mistrial is required. In *Lord*, the Second Circuit reversed after the prosecutor improperly injected highly prejudicial, inadmissible information into the proceedings. The Court held that a mistrial should have been declared. 565 F.2d at 838-39. The Government's conduct here is more serious still. It unilaterally disseminated to the public a false association with an allegation currently on trial and Jeffrey Epstein, creating ongoing prejudice that cannot be contained by instructions or voir dire. Under these circumstances, this case falls outside the Second Circuit's jurisprudence, in which the taint from publicity can be cured and requires a mistrial.

Here, the prejudice is manifest: the story is of extraordinary public interest; it involves sexual allegations, minors, and globally infamous figures; it directly references the defendants by name during trial; and it falsely links unrelated allegations to Jeffrey Epstein. The defense should not—and cannot—bear the consequences of the Government's failure to implement basic safeguards to prevent cross-contamination between cases.

Dated: New York, NY
February 1, 2026

Respectfully submitted,

 /s/ *Milton L. Williams*
Milton L. Williams
Deanna M. Paul
Alexander Kahn
Walden Macht Haran & Williams LLP
250 Vesey Street, 27th Floor
New York, NY 10281
mwilliams@wmhwlaw.com
dpaul@wmhwlaw.com
akahn@wmhwlaw.com

*Counsel for Tal Alexander*


 /s/ *Marc Agnifilo*
Marc Agnifilo
Teny Geragos
Zach Intrater
Agnifilo Intrater LLP
140 Broadway, Ste. 2450
New York, NY 10005
marc@agilawgroup.com
teny@agilawgroup.com
zach@agilawgroup.com

*Counsel for Oren Alexander*


 /s/ *Howard Srebnick*
Howard Srebnick
Jackie Perczek
Black Srebnick
201 South Biscayne Blvd., Suite 1300
Miami, FL 33131
hsrebnick@royblack.com
jperczek@royblack.com

*Counsel for Alon Alexander*


cc: All counsel