**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**24 Cr. 676 (VEC)**

UNITED STATES OF AMERICA

v.

ALON ALEXANDER
OREN ALEXANDER and
TAL ALEXANDER

Defendants.

# SENTENCING MEMORANDUM ON BEHALF OF ALON, OREN and TAL ALEXANDER


**AGNIFILO INTRATER LLP**
140 Broadway, Ste. 4530
New York, NY 10022
(646) 205-4350

By: Marc Agnifilo
Zach Intrater
Teny R. Geragos

*Counsel for Oren Alexander*

**BLACK SREBNICK**
201 South Biscayne Boulevard, Ste. 1300
Miami, FL 33131
(305) 371-6421

By: Howard Srebnick
Jackie Perczek
Jeanelle Gomez

*Counsel for Alon Alexander*

**GERAGOS & GERAGOS**
256 5th Avenue
New York, NY 10001
(213) 625-3900

By: Deanna Paul

*Counsel for Tal Alexander*

I. Preliminary Statement ..... 1

II. History and Characteristics of Alon, Oren and Tal ..... 5

A. The Alexander Family Was Built By Two Immigrant Parents Who Worked Their Whole Lives to Support Their Children ..... 6

B. Tal Is A Father, Brother, and a Person Who Brings People Together ..... 11

C. Oren Has Never Been Able to Father His Now 22 Month Child, Who Was Born During His Incarceration ..... 15

D. Alon is a Devoted Husband and Father to His Two Young Daughters ..... 18

E. Alon, Oren and Tal Have Spent Nearly Two Years in the MDC Brooklyn ..... 27

III. The Devastating Impact on the Brothers' Young Children and Families ..... 29

IV. The Proper Guidelines Calculation ..... 31

A. Vulnerable victim enhancement ..... 33

1. Re Drugging ..... 33

2. Re Minors ..... 34

3. Additional Enhancement for Involving a Large Number of Vulnerable Victims ..... 35

B. Use of Force Enhancement ..... 36

C. Impermissible Double Counting with Respect to Use of Force and Physical Restraint Enhancements ..... 36

D. Use of Computer Enhancement ..... 37

E. Alon's Chapter 4 Enhancement ..... 38

F. The PSR improperly alleges that Alon participated in a conspiracy through 2021. ..... 40

G. The PSRs improperly characterize allegations of surreptitious drugging as established fact ..... 41

H. Grouping Challenges ..... 46

I. The Court Should Sentence the Defendants Based Only on Offenses for Which Each Was Convicted ..... 51

1. Oren Alexander's Objections to the Grouping Analysis ..... 51

2. Alon Alexander's Objection to the Grouping Analysis ... 53

3. Tal Alexander's Objection to the Grouping Analysis ... 53

4. Defendants' Objection to the Application of 1B1.2(d) ... 54

a. 1B1.2(d) (Conspiracy Under the Guidelines) ... 55

5. Defendants' Objection to the Application of 1B1.3 (Relevant Conduct) ... 57

J. The PSR Improperly Includes Uncharged, Unreliable Conduct in Its Grouping Analysis ... 60

1. The Government Cannot Prove by a Preponderance of the Evidence that Oren, Tal or Alon Sex Trafficked Victims 4 and 5 ... 61

a. The 302s and Prior Statements Are Riddled with Material Inconsistencies ... 62

b. Victim-4 and Victim-5's Post-Incident Conduct Is Inconsistent with the Claimed Assaults ... 63

c. Documented Alibi Evidence Places Oren and Alon in Manhattan, Not the Hamptons ... 63

d. The "Jordan" Misidentification Confirms This Story Was Generated by Evan Torgan ... 64

2. The Government Cannot Prove by a Preponderance of the Evidence That Oren Raped Victim 9 ... 65

3. The government Cannot Prove by a Preponderance of the Evidence That Tal Sex Trafficked Victim 29 ... 66

4. The Government Cannot Prove by a Preponderance of the Evidence That Oren, Tal or Alon Sex Trafficked Victim-30 ... 68

V. The § 3553(a) Factors Support a Sentence Far Below the Advisory Range ... 69

A. Avoiding unwarranted sentencing disparities (§ 3553(a)(6)) ... 69

1. This case is distinguishable from *Paduch*, *Ray* and *Raniere* ... 80

2. New York State Case Sentences Are Substantially Lower than the Fifteen Years We are Requesting here ... 83

B. Nature and Circumstances of the Offense ... 84

1. The Misinformation Surrounding the Alexander Brothers ... 86

2. Lack of Evidence Allowed the Misinformation About Drugging To Continue .......... 88

3. The Testimony of the government's Adult Witnesses .......... 89

a. Katie Moore .......... 89

b. Kelly Hudson .......... 91

c. Ava Wells .......... 93

d. Bela Koval .......... 96

e. Lindsay Acree .......... 98

f. Rhonda Stone .......... 100

g. Maya Miller .......... 103

h. Isa Brooks .......... 104

C. Deterrence .......... 106

1. Specific Deterrence (§ 3553(a)(2)(C)) .......... 106

2. General Deterrence (§ 3553(a)(2)(B)) .......... 110

D. Kinds of Sentences Available and Conditions of Confinement (§ 3553(a)(3)) .......... 112

VI. The Court Should Not Treat Untested Third-Party Allegations Included in the Victim Impact Statements as Established "Victim" Facts .......... 113

VII. The Court Should Not Sua Sponte Recommend to the Bureau of Prisons That the Brothers Be Designated to Different Facilities .......... 117

VIII. This Court Should Not Order Restitution .......... 120

A. Applicable Law .......... 121

1. Causation and Burden of Proof .......... 121

2. Future Treatment Costs .......... 121

3. Statutory Limits on Recoverable Expenses .......... 122

B. Restitution should not be awarded because it was not charged in the indictment or decided by the jury beyond a reasonable doubt .......... 122

[redacted]

[redacted]

I. The Court Should Not Impose the Recommended $500,000 Fine ................................ 148

IX. Conclusion ........................................................................................................... 148

## I. Preliminary Statement

Alon, Oren and Tal Alexander, through their counsel, submit this Joint Sentencing Memorandum in advance of their Joint Sentencing on October 27, 2026. Alon, Oren and Tal admit that years and decades before being charged, they engaged in conduct that was, at times, insensitive toward the feelings of certain women at certain times, that was competitive with each other and others when it came to dating women, and that as a result, certain people maintained negative feelings and opinions about them. They apologize to the women they insulted or offended.

But Alon, Oren and Tal steadfastly maintain their complete innocence of these awful charges. At no time did Alon, Oren or Tal rape or sexually assault another person. At no time did Alon, Oren or Tal entice, harbor, or maintain a woman to have commercial sex. At no time did Alon, Oren or Tal administer a drug or other substance to a woman against her will or without her knowledge.[1] At no time did Oren intentionally make or distribute child pornography.[2] They are innocent of these charges, and they show honor and respect to our system of justice by vowing to fight for their innocence with all of their power for as long as is required, confident in the notion that one day they will be free to live out their lives with their children and families.

For the reasons set out below, Alon, Oren and Tal each ask for a sentence of fifteen years of incarceration. While this is the minimum sentence permitted by certain of the statutes of conviction, fifteen years of incarceration is the appropriate sentence given the convicted offense conduct, the defendants' history and characteristics, general and specific deterrence and sentences

[1] As we have made the Court aware since their arrest, Alon and Oren have each passed a polygraph examination related to this conduct. Tal, as discussed in the PSR, did not participate in a polygraph examination on the advice of counsel because his attorney was in New York and could not be present for the exam. Tal PSR ¶ 246.

[2] There is no way that Oren would have known or should have known that the individual he was with was 17 years and 10 months old. Nor could he have known that having sex with a female who is of legal age in the state of New York could be a strict liability offense of production of child pornography that carries with it a fifteen-year mandatory minimum.

in comparative cases. Most importantly, perhaps, is that—even accepting all of the government's conspiracy and Rule 413 allegations—Alon, Oren and Tal ceased any of the charged conduct as early as 2017 for Alon, 2016 for Tal, and 2021 for Oren. Even accepting the jury's verdict and assuming all the government's allegations are true—which they are not—there is no concern here with recidivism. Alon, Oren and Tal are dedicated husbands and fathers. Their lives have been dedicated to their families and children, even while incarcerated. For Alon, whose daughters are four and five, he is an incredible father and husband. His children miss him. They love him. And there is no concern that he would ever do *anything* to risk being apart from their lives. For Tal, his son was born October 2024, two months before his arrest. He has spent two years away from his child. The Court can rest assured that he would never do *anything* to risk being apart from his son, who he wants to father and care for. For Oren, his son was born on Christmas 2024, two weeks after his arrest. This Court can rest assured, he would never do *anything* to risk being apart from his son, whom he has only ever held in a federal prison.

The recommendation of the Probation Department of 195 years for Oren and 180 years for Tal and Alon is cruel, unprecedented, unprincipled and aggressively inconsistent with decades of research on the relationship between general deterrence and extended incarceration and with the first and overarching principle of the sentencing reform act that a criminal sentence be sufficient but not greater than necessary. For the reasons set out below, the sentencing calculation followed in the Pre-Sentence Investigation Report is errant for a number of reasons and the recommended sentences are, most respectfully, an affront to the fundamental congressional pronouncement on federal sentencing.

Fifteen years of incarceration is a very significant sentence that will deprive the defendants of their freedom for a long period of time as well as the Alexanders' young children of their fathers'

presence for virtually their entire childhood. It is hard to imagine a more powerfully punitive consequence than to condemn a new parent to miss the entirety of their children's childhoods. A fifteen-year sentence will also deprive Alon and Oren's wives of their husbands. It will deprive the Alexanders' parents of three of their four sons for what may be the rest of their lives. A fifteen-year sentence is a frightfully long and serious sentence. Fifteen years is the average amount of time a defendant spends in prison in the United States after being convicted in a state court of murder.[3] So, while the government will argue that fifteen years is insufficient because it is the lowest available sentence for Sex Trafficking, it is also the average time a convicted murderer spends in prison for the crime of intentionally taking the life of a fellow human being.

The Court has an eminently principled basis to sentence the defendants to a fifteen-year term of incarceration, which is sufficient, but not greater than necessary, to achieve the purposes of § 3553(a).

**First**, a fifteen-year sentence provides overwhelming specific deterrence to ensure that none of the brothers ever engage in the conduct alleged in the indictment. A fifteen-year sentence for Sex Trafficking, which is not eligible for First-Step Act reductions, means the defendants will not be released until they are well into their 50s. Given that for years before their arrest, the brothers led lives very different than what was portrayed at trial, their history demonstrates that they will not commit crimes in the future. A fifteen-year sentence therefore satisfies the statutory objectives of specific deterrence and protecting the public from any future crimes by the defendants.

**Second**, a fifteen-year sentence also provides powerful general deterrence and sends a message to the public that they should not commit either this crime or any crime. In fact, the

[3] U.S. Department of Justice – Office of Justice Programs – Bureau of Justice Statistics, Time Served in State Prison, 2016, published November 2018.

research establishes that the length of a prison sentence is far less relevant in achieving general deterrence than the likelihood of being caught.[4] Section 3553(a)'s familiar requirement that a court consider general deterrence is not a directive to coldly administer the highest punishment possible. Rather, as will be addressed further in this memorandum, it requires a judge to consider the vast research in this area, much of it by and in conjunction with the U.S. Justice Department, and to give a sentence consistent with that research.

**Third**, the history and characteristics of the defendants militates for a fifteen-year sentence. The three men that sat quietly and respectfully in Your Honor's courtroom were law-abiding family men. Indeed, by the time of the trial, the offense conduct was many years in the past. The statute requires that in addition to the offense conduct, that the Court also consider their devotion to their wives, children, and families and their other charitable acts and good deeds.

**Fourth**, as to the nature and circumstances of the offense, the defense contends this is as far from a heartland Sex Trafficking case as one can imagine and that the defendants should not be sentenced as though they forced women into prostitution, which despite persistent and thus far successful perversions of the recklessly drafted statute, was and will always be its original intent.[5] This is a statute to punish people who force women into prostitution, and for every day we continue to pretend it is not, we do a grave disservice to the rule of law.

The defense further contends that the evidence is remarkably weak on many critical points and that the defendants were convicted due to overwhelming prejudice that resulted from the admission of evidence over defense objection. While it is generally a fool's errand to quarrel with

[4] Daniel S. Nagin, Deterrence in the Twenty-First Century, Crime and Justice, Vol 42, August 1, 2013; U.S. Department of Justice, National Institute of Justice, Five Things About Deterrence, June 5, 2016 (The certainty of being caught is a vastly more powerful deterrent than the punishment).

[5] Sentencing is not the proper forum to argue that a particular statute does not fit certain conduct, and we do not make that argument here, as it would not be helpful to the Court in fashioning an appropriate sentence.

the evidence on sentencing day, this sentencing day is different. Today, we continue to fight with a brutally misused statute, we rail against the prejudicial evidence admitted over our objection time and again, and we fight against injustice. Today, the defense will argue that the nature and circumstances of the offense support a fifteen-year sentence.

**Fifth**, a fifteen-year sentence is required to avoid unwarranted sentencing disparities as will be shown by dozens of cases cited below. There is nothing wrong with a court being measured and reasoned in the face of prosecutors seeking life-ending draconian sentences, and many judges have demonstrated that measure and reason. We ask that of this Court.

**Sixth**, it cannot be said that a fifteen-year sentence fails to reflect the seriousness of the offense or respect for the law, especially when it is the same sentence served by the average murder defendant in the United States. This is a very serious case. We expect that eleven or so people will speak at sentencing and they will say stirring things. We welcome each of them to our courtroom, and we hope they say everything that they want to say. At the end, we will have a discussion about the proper sentence and we will convince Your Honor that a fifteen-year sentence, long and draconian as it is, is the right sentence.

## II. History and Characteristics of Alon, Oren and Tal

The pages that follow ask the Court to see Tal, Oren and Alon Alexander as human beings, not the monsters falsely portrayed in Court and in the media. We ask the Court to see these brothers as the people who have known them for decades see them: as sons of hardworking immigrants, as brothers, and—first and foremost—as fathers of very young children who need them. In part because of the ruling to preclude any "good act" evidence at the trial, very little of the Alexander brothers' actual life was demonstrated in court. Importantly, their actual MO—which was dating in New York City, Miami and the Hamptons, and the consensual sex that went along with that—

was precluded as evidence from this trial. Evidence of consensual relationships, consensual sex, etc. was not permitted at this trial. This section seeks to partially rectify that problem.

The letters submitted on Tal, Oren, and Alon's behalf offer an important, but necessarily incomplete, picture of their characters and relationships. Nearly two dozen additional individuals told the defense that they wanted to write letters but ultimately declined, fearing personal and professional repercussions. The Court should therefore not mistake the absence of additional letters for an absence of support; it reflects the chilling effect of the public harassment surrounding this case.

In determining a just sentence, the Court "must make an individualized assessment based on the facts presented," guided by "a broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *Gall v. United States*, 552 U.S. 38, 50 (2007). That command reflects a principle "basic to all the great religions, moral philosophies, and systems of justice": that "if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006).

### A. The Alexander Family Was Built By Two Immigrant Parents Who Worked Their Whole Lives to Support Their Children

To understand Tal, Oren and Alon, the Court must begin with the home in which they were raised. Their parents, Shlomo ("Shlomi") and Orly Alexander, have been married for roughly half a century. Oren PSR ¶ 244. Shlomi and Orly built their family, in their own words, from "almost nothing." Ex. 1, Letter of Orly and Shlomi Alexander at 3. They came to the United States from

Israel as young people "with very little," worked, and sacrificed to "buil[d] [their] home and [their] family step by step, year by year," while their children watched. *Id.* at 1. In 1982, Shlomi and Orly founded Kent Security Services, which Orly led as Chief Executive Officer until her brother, Gil Neuman, a co-founder, assumed that role; Shlomi built a career as a home builder. Oren PSR ¶ 244. Family friends who have known the couple for decades describe "hardworking Israeli's who moved from Israel to South Florida to start their new life together" and "worked diligently to build a future for their family". Ex. 2, Letter of Andrew and Debra Hirschl at 1.

The Alexander home was organized around family and faith. As Orly and Shlomi put it, "family comes first" was "not just words in our home" but "the way we tried to live our lives," together with lessons "to respect people, to work hard, to be responsible, to help others, and to give back to the community." Ex. 1, Letter of Orly and Shlomi Alexander at 1. As one close family-friend of decades, Ronit Rinder notes, "the relationship [the brothers] have with their parents is something rare." Ex. 3, Letter of Ronit Rinder at 1. Another family friend, Avi Berger, writes that "Shlomi and Orly always placed their sons at the center of their lives." Ex. 4, Letter of Avi Berger at 1. Orly Rahav, who has known the brothers their entire lives and calls Orly Alexander a "bosom friend," testifies that "the most important things for Orly are family, religious, and ethical values." Ex. 5, Letter of Orly Rahav at 1. She confirms, further, that such "ethical values are the example the whole family follows." *Id*. The brothers were raised in Bal Harbour, Florida, in a home the PSR describes as free of abuse or neglect, where their parents "emphasized the importance of education, charity and giving back to those in need." Oren PSR ¶ 246.

Religion was central. When Shlomi and Orly first arrived in Bal Harbour, there was a small Jewish community without a permanent synagogue, so neighbors rented hotel conference rooms for Rabbi Sholom Lipskar, an emissary from Brooklyn, New York, to establish a shul; the area

grew into a thriving Jewish community in which the family remain prominent members. Oren PSR ¶ 247. The brothers' paternal grandfather was a cantor who studied the bible and helped them read the Torah. As such, the brothers were "well versed in Jewish culture and values," with "[v]alues, love, and respect for others" serving as a lifelong "guidepost".[6] Ex. 2, Letter of Andrew and Debra Hirschl at 1. A longtime friend who danced with the family "down the streets of Surfside" when they dedicated a Torah at their shul recalls that "[t]here was always love in their home." *Id*. Shabbat grounded, and continues to ground, the family: from their earliest years on, they gathered each Friday night to observe and "[t]hey always invite a friend or two who has nowhere else to eat." Ex. 3, Letter of Ronit Rinder at 1.

The clearest window into the brothers' character is how they responded when their mother fell gravely ill. Orly Alexander was diagnosed with breast cancer in 2011 and has been in remission since 2013. Oren PSR ¶ 244. Family friends who witnessed that period describe sons who, though only in their mid-twenties living far from home in New York City, "rarely left her bedside, providing endless physical and emotional care" following her chemotherapy treatments. Ex. 6, Letter of Yoram and Zila Yunger at 2. Their longtime family dentist and his wife recall that the brothers "truly stepped it up" when Orly was diagnosed, "unselfishly and lovingly dot[ing] on her as she healed," their "love and concern never wan[ing]." Ex. 2, Letter of Andrew and Debra Hirschl at 1. A family friend of forty years in Israel, Sara Edelbaum, remembers that "all three of them stayed very close to her … car[ing] for her with endless love, devotion and loyalty." Ex. 7, Letter of Sara Edelbaum at 2.

[6] During the High Holidays a month ago, their grandfather passed away. Alon, Oren and Tal had not seen their grandfather in his last two years of life. When the Court considers the full measure of their punishment, both past and future, it must consider this as well.

Those who watched the brothers grow up describe children who never lost the values they were raised with, even as they became successful adults. Ms. Edelbaum has known Alon, Oren, and Tal "since they were three years old" and remembers that they "never g[ave] up precious time with their grandmother," to whom they "were and still are deeply attached." *Id.* at 1. Lee Volpper, a retired elementary-school principal who has known the brothers since birth, recalls "[t]he way they treated their grandmother and the love they showed her," and their consistently "respectful attitude towards the women" they knew. Ex. 8, Letter of Lee Volpper at 1. Their ninety-one-year-old grandmother, Rina Laviv, writes that the boys "are not simply my grandchildren" but "a part of my heart," and describes a lifetime of celebrating their birthdays, worrying over them when sick, and praying for them. Ex. 9, Letter of Rina Laviv at 1. When their grandmother lost her husband, the brothers "immediately flew from the United States to Israel to sit Shiva and comfort her," and on later visits made it "a priority to visit their grandmother at her senior living home, spending quality time with her with patience, warmth, and deep respect." Ex. 6, Letter of Yoram and Zila Yunger at 2.

That same instinct to give—quietly, and without expecting anything in return—animates dozens of letters from people across two countries. The brothers were raised to believe, as one family friend puts it, that "if you have the ability to help someone who needs it, you do it … not for recognition or because you expect something back," but "because there is value in doing good for another person." Ex. 10, Letter of Dotan Frenkel at 1. Daniel Hakakian, who has known the brothers for over a decade, adds on:

> I consistently saw a willingness among all three brothers to help the people around them. Whether it involved making a business introduction, providing a referral, bringing people together socially, or simply making an effort to include someone, they were generous with their time and relationships. Going out of their way to help others was something I came to see as a normal part of who they were.

Ex. 11, Letter of Daniel Hakakian at 1.

That generosity was borne out, too, in the way the brothers welcomed others into their own space. Longtime friend Tamir Harpaz explains that the brothers "worked hard day and night to have success of their own" with the explicit intention of "ma[king] sure that the people around them shared in their success by hosting friends and family in a very large and warm way." Ex. 12, Letter of Tamir Harpaz at 1. Niv Alexander, the oldest brother, remarks that his brothers' hosting efforts "w[ere] so impressive [they] changed my life." Ex. 47, Letter of Niv Alexander at 1. Chava Zweig is one such beneficiary of the brothers' warm hosting efforts. She sheds light on the outsized impact of their kindness:

> There was a period when I was by myself, and every weekend — every weekend — the boys invited me to dinner. They didn't have to. Nobody asked them to. They saw a woman alone and they made sure she had a place at the table, week after week. I will never forget that.

Ex. 13, Letter of Chava Zweig at 1.

The brothers and their family also "open[ed] their homes to nonprofit fundraisers" and "contribut[ed] time and resources to causes that mattered to them," supporting organizations including Friends of the Israel Defense Forces, Gift of Life, Lotus House, and Colel Habbad, as well as emergency and rescue units in Israel. Ex. 14, Letter of Patricia Cohen at 1, Ex. 15, Letter of Dolev Frenkel at 1; Ex. 16, Letter of Ruth Krongrad at 1; Ex. 7, Letter of Sara Edelbaum at 1. Following the October 7, 2023, Hamas attacks on Israel, the brothers were among those in South Florida who "organized an early gathering to raise funds and bring people together at a time when many in the community were frightened and grieving." Ex. 17, Letter of Linda Alexander at 2. One such effort—a Friends of the IDF dinner hosted by Oren and others—drew roughly 500 people and raised over $10 million. Ex. 2, Letter of Andrew and Debra Hirschl at 2. Oren co-chaired three

International Galas on the organization's behalf, and in so doing, "demonstrated his commitment and dedication to the organization and to the soldiers [the organization] supported." Ex. 18, Letter of Dina Ben Ari at 1. The brothers were also involved in feeding hospital workers at Mount Sinai during the pandemic—an effort primarily led by Tal, with Oren and Alon assisting in outreach efforts to support hospital workers "during such a difficult and uncertain time." Ex. 1, Letter of Orly and Shlomi Alexander at 1.

The brothers' cousin, Donna Neuman Wolf, cautions that it would be myopic to consider their generosity in strictly financial terms. Rather, "I have seen them give their time, their attention, their homes, and their support to others and to their communities," she writes. Ex. 19, Letter of Donna Neuman Wolf at 1. If a loved one is in a precarious state, the brothers step in, first and foremost, with "compassion, loyalty, and willingness." *Id.* In other words, they give all they have to offer. The brothers treat even their most casual acquaintances like family, and treat family as sacrosanct. Ex. 13, Letter of Chava Zweig at 1.

Against this backdrop, the letters share a single, consistent plea—not that the Court disregard the verdict, but that it "consider the whole of their lives" and "leave room" for the possibility that these men "can reflect, change, grow, and ultimately do something meaningful with the years that remain to them." Ex. 17, Letter of Linda Alexander at 2.

### B. Tal Is A Father, Brother, and a Person Who Brings People Together

For as long as he can remember, Tal wanted to be a father. In 2023, he married Ariel, and just two months before his incarceration, he experienced what a family friend described as "the most meaningful moment of his life—the birth of his son." Ex. 20, Letter of Irit Naymark; Sara Edelbaum at 2; Tal PSR ¶ 236. As his mother explained, Tal hoped to "be the hands-on dad he always wanted to be." Tal PSR ¶ 238; Ex. 1, Letter of Orly and Shlomi Alexander at 1. The arrival

of his son marked the beginning of a new chapter in Tal's life, one that was interrupted almost as soon as it began. His son was still an infant when Tal was taken into custody. The ordinary moments of fatherhood—holding his child, watching him grow, being present for the small milestones that make up a child's earliest years—have taken on an entirely different meaning.

Tal, the second oldest brother of the four, is 40 years old. The discipline and determination that would later characterize his professional life were evident from a young age. By his own account, Tal was a decent student and a serious athlete. Tal PSR ¶ 251. He was a member of his high school tennis team and was homeschooled part-time to accommodate his training schedule. *Id.* He graduated from Dr. Michael M. Krop Senior High School in 2004, and earned a Bachelor of Business Administration in Marketing from Hofstra University in 2008, completing his degree while working full-time. *Id.* at ¶¶ 251-52. At Hofstra, Tal played Division I tennis, balancing the demands of collegiate athletics with his education and work.

Tal also began volunteering with children while he was still young. His mother recalls that he had a particular interest in working with children with special needs and volunteered through Kesher, a school program where he became especially close with a set of twins. Ex. 1, Letter of Orly and Shlomi Alexander at 1. His relationship with the children continued well beyond the program; Tal spent time with them after school and remained in touch for years. *Id.* He and his brothers also volunteered as tutors in Miami's Liberty City neighborhood, working with children once a week while they were in high school. *Id.* These early experiences reflect Tal's deep-rooted commitment to helping others. As Niv puts it, Tal has always had a "big heart" and been "an emotional soul," qualities present well before his professional success and sustained throughout his adult life. Ex. 47, Letter of Niv Alexander at 1.

In 2009, Tal began working in real estate. Tal PSR ¶ 256. He entered the profession in the aftermath of the 2008 financial crisis, when the real estate market was struggling and opportunities were uncertain. In 2011, he joined Douglas Elliman and by 2012, he and Oren had built "the Alexander Team" at Douglas Elliman, a team of approximately twelve brokers that "consistently performed at the top of the company." *Id.* Over the ensuing decade, Tal and Oren transformed the business into one of the country's leading residential real estate teams. In 2022, Tal co-founded "Official," a real estate brokerage with offices across the nation. *Id.* at ¶ 255. The significance of Tal's career, for purposes of sentencing, lies not simply in the value of the properties he sold or the prominence of his clients, but in the years of sustained work and the many people whose livelihoods and careers were connected to it.

Those who worked alongside Tal describe more than a successful broker. They describe a disciplined and engaged professional who invested his time and energy in the people around him. Laurent Biron, who has known Tal for over 15 years and later worked on his projects, found him "sharp, dedicated, diligent, trustworthy and honest;" a man who "started his days early . . . and worked extraordinarily hard, while making himself available and accessible to the people around him." Ex. 21, Letter of Laurent Biron at 1. What stood out most, Laurent writes, was Tal's "remarkable ability to bring people together"—an "architect" who "could quickly see how the different pieces fit together, assemble the right people and get them working toward the same objective," and who "remained involved" and "cared about the result" rather than simply making an introduction and disappearing. *Id.* Tal has always recognized the talents of others and helped them succeed. He used his relationships to facilitate introductions and create opportunities, for professionals inside and outside the real estate industry. In their smaller, everyday interactions,

Biron knew Tal as "considerate and courteous, treating people with respect and behaving as a gentleman." *Id.* at 2.

Tal's generosity extended to friends and loved ones, often quietly and without expectation of anything in return. Another decade-long friend, Garry Braverman, writes, "I will never forget [Tal's] kindness and integrity when, during the COVID years, I needed financial help and Tal, without any hesitation, offered his help and assistance." Ex. 22, Letter of Garry Braverman at 1. Garry remembers not the scale of Tal's professional success, but that Tal was there for him when it mattered. During the pandemic, Tal also organized efforts to provide meals to hospital workers at Mount Sinai. His brothers joined him in the effort, which his mother recalls as an important way for them to support healthcare workers during an especially difficult period. Ex. 1, Letter of Orly and Shlomi Alexander at 1.

Drawing on his longtime relationship with Tal, Garry assesses that he "is capable of accepting responsibility, learning from difficult conversations, and making positive contributions to those around him." Ex. 22, Letter of Garry Braverman at 1. Laurent, among other loved ones, asks the Court to remember that the man before it is not only a convicted defendant but "a father to his son, and someone with a genuine ability and desire to bring people together and help them succeed." Ex. 21, Letter of Laurent Biron at 2. None of those facts erase what he stands convicted of, but neither should his conviction erase the rest of his life. The people who benefited from his kindness, his friendship, his mentorship, and his generosity are real. So, too, are the people who continue to love him and hope for his future.

### C. Oren Has Never Been Able to Father His Now 22 Month Child, Who Was Born During His Incarceration

Oren is thirty-nine years old and was born and raised Miami Beach. Oren PSR ¶ 244. He attended Dr. Michael M. Krop Senior High School, where he graduated in 2005 as a high-achieving student. While still in high school, he earned eighteen college credits through an after-school program. Oren PSR ¶ 262. He went on to earn a Bachelor of Arts in Business with a major in Finance, along with a real estate certificate, from the University of Colorado Boulder in 2008. Oren PSR ¶ 263. Oren graduated in three years while working part time in two different jobs. As a child he worked for approximately two years with a speech therapist to overcome a lisp—a small detail that captures a boy who applied himself to challenges. Oren PSR ¶ 264. He is fluent in both English and Hebrew and speaks some Spanish and Portuguese. Oren PSR ¶ 265.

Oren's work ethic was evident early: while still in college, he finished in three years, working part-time in the leasing office of a real estate development firm in Boulder. Oren PSR ¶ 270. After graduating, he built a career as a real estate broker at Douglas Elliman beginning in 2009, and, with Tal, formed "the Alexander Team," which consistently performed at the top of the company. Oren PSR ¶ 269. For those who knew Tal and Oren, this was not a surprise, because all three brothers consistently held jobs and were hardworking since the age of 14. In 2022, Oren co-founded the brokerage "Official" with Tal—a firm based in Miami with offices in Manhattan, the Hamptons, and Los Angeles that employed approximately twenty people and was profitable by its second year; Oren drew no salary, supporting his family with the money he had worked for prior. Oren PSR ¶ 268.

Those who know Oren describe a man devoted to his community, young Jewish professionals, Hillel Chabad, Jerusalem Foundation and Friends of Israeli Defense Forces. He is

instinctively generous. Michal Dagan, a close family friend of twelve years, writes that Oren "has always been a very positive influence in the Jewish community and in the Miami community," "generous with his time and resources," and someone who "has always tried to do the right thing and help others." Ex. 23, Letter of Michal Dagan at 1. Rabbi Zalman Duchman, who has known Oren since childhood at the Shul of Bal Harbour, describes a volunteer who gave his time to the charity Chillel Chabad, which provides food to those in need, "not … because there was publicity or personal advantage in doing so," but "because there was a need." Ex.24, Letter of Zalman Duchman at 1. The Rabbi attests, from firsthand knowledge, that Oren "extended meaningful help to a significant number of people quietly, without seeking credit and without receiving any personal benefit." Ex. 24, Letter of Zalman Duchman at 1. A younger family friend recalls watching Oren, at a charity event he hosted, "raise a significant amount of money for people in need," and describes him as "a role model of what it means to use what you have to lift other people up." Ex.15, Letter of Dolev Frenkel at 1. Dina Ben Ari, an officer with Friends of IDF ("FIDF"), describes that Oren served as the co-chair of the 2017, 2019 and 2023 International Galas for the non-profit. Oren, she writes, "was instrumental in bringing people together around this important cause" and creating support for the welfare and well-being of Israeli soldiers. Ex. 18, Letter of Dina Ben Ari at 1.

Oren met Kamila by chance in Las Vegas in 2017, and they began dating shortly thereafter. Oren PSR ¶ 248. They were engaged in 2022 and married on April 4, 2023, in Florida. Oren PSR ¶ 248. Kamila described Oren as a "caring, attentive, and devoted" husband who is "extremely family oriented"; the couple frequently spent time with his parents, siblings, and their families. Oren PSR ¶ 249.

The impact of Oren's arrest on his wife and infant son has been profound. Kamila was nine months pregnant when agents swarmed their home with firearms and took Oren into custody, and she has described the arrest itself as "traumatizing." Oren PSR ¶ 249. Despite experiencing a difficult birth alone, she brought their newborn son to meet Oren in Florida federal custody when she was just three days postpartum, because she knew that otherwise it could be months before Oren met him. Oren PSR ¶ 249. While Kamila has remained firmly by Oren's side the past two years, she has been forced to take on the role of a single mother. Before Oren's arrest, Kamila had a successful career as a freelance model; she has not obtained any significant work since because of the publicity surrounding the case. Oren PSR ¶ 250. She has also been forced to shut down her social media accounts after receiving threatening messages from strangers, change her telephone number, purchase a different car, and move, all because of harassment and press intrusion. Oren PSR ¶ 250. She has cut ties with many people she once considered friends, an experience she describes as isolating, particularly because her closest family lives in Brazil. Oren PSR ¶ 250.

Oren's son will be nearly two years old at the time his father is sentenced. He was born on Christmas Day, roughly two weeks after Oren was taken into custody. As a family friend movingly writes, "Oren did not even have the chance to be present at the birth of his son. His son never had the chance to know his father." Ex. 7, Letter of Sara Edelbaum at 2. The everyday life of a father, holding his child, comforting him, being present for the "ordinary moments that mean so much to a child," has been lost to Oren from his son's first days. Ex. 1, Letter of Orly and Shlomi Alexander at 3. His cousin, now a parent himself, writes that he has "an even greater appreciation for the fathers my cousins are," having "seen how much they love their children and how important being fathers is to them." Ex. 25, Letter of Ron Neuman at 1.

Since his arrest, Oren's parents have flown from Florida to New York to visit him weekly, and he speaks with his family daily. Oren PSR ¶ 244. The toll on his family has been severe: Oren has disclosed that people have approached his father while walking home from shul to ask about the case. Oren PSR ¶ 244.

### D. Alon is a Devoted Husband and Father to His Two Young Daughters

Alon is thirty-nine and, like his brothers, was born and raised in Miami. Alon attended Jewish day school through elementary school before transitioning to public school, but remained active in his Jewish community through the shul in Bal Harbour. Alon PSR ¶ 239. He later attended Dr. Michael M. Krop Senior High School, where he was typically a grade ahead in math and excelled. Alon PSR ¶ 258. He graduated in June 2005 and even before graduating, Alon was already taking college courses and had earned 12 college credits by the time he enrolled at the University of Maryland. Alon PSR ¶ 259. He graduated in December 2008 and started classes at New York Law School the following fall semester. Alon PSR ¶ 260. While Alon was in law school, his mom was diagnosed with breast cancer. Throughout her treatment, Alon remained close by her side while continuing his studies and earning his degree. Alon obtained his Juris Doctor on June 1, 2012, and later passed the New York State Bar Examination. He was admitted to practice in New York in October 2016. Alon PSR ¶ 262.

Alon became involved with his parents' company, Kent Security, when he was a teenager in high school, digging trenches for the wiring used to install security systems. Alon PSR ¶ 265. By the time he started law school, Alon had opened Kent's New York office and helped expand the company into providing security services to apartment and commercial buildings in New York. Alon PSR ¶ 265. He managed Kent New York while balancing his law school classes as a full-time student. As the PSR recounts, "[i]f something went wrong, he had to leave class to handle it."

Alon PSR ¶ 265. By the time Alon graduated from law school in June 2012, he was overseeing more than 300 Kent New York employees, after establishing their New York presence on his own. Over the years, Alon worked his way from digging trenches as a 16-year-old teenager to running a significant part of the Kent New York and making a name for himself. Alon opened new business ventures for Kent in Seattle, Los Angeles, and Washington, D.C., traveling frequently between the cities and managing the offices as they became established. He remained with Kent in the years that followed, eventually becoming President of the company, a position he held until his arrest. Alon PSR ¶ 265.

Colleagues who worked with Alon for decades describe him as a man of "kindness, integrity, loyalty, and genuine heart." Ex. 26, Letter of Irina Gegoutchadze at 1. Vivian Cheung, Kent's Financial Controller of twenty years, watched Alon "grow from a diligent student into the accomplished professional he is today." Ex. 27, Letter of Vivian Cheung at 1. She remembers "how hard he studied for his bar exam," and describes him as a senior executive who, despite his position being senior to hers, "never once let that distance define our working relationship," standing behind her "only when [her] records and [her] position were correct" because "he stands up for what is right." *Id*. Alon consistently "encouraged [the] company to invest more in recognizing and rewarding good employees," advocacy that led the company to raise the rewards it offered its team. *Id*. at 2.

Alon met his wife, Shani Alexander, in the summer of 2017 while he was celebrating his 30th birthday in Israel. They ran into each other several times by happenstance before Alon eventually asked Shani on their first date. Golan Zigron, Alon's father-in-law, recalls that Alon was "the first … guy [who] called me and ask[ed] me to go out with my daughter," and has "treated me in a gentlemanly and respectful manner" ever since. Ex. 28, Letter of Golan Zigron at 1. Shani

remembers the same about Alon from the very beginning. Before they went on their first date, "he treated me with the same respect, care, and gentleness he gives me today." Ex. 29, Letter of Shani Alexander at 1. Their relationship developed slowly, and Shani eventually moved to New York to be with Alon, where they began building a life together.

From the outset, family was important to Alon. He wanted Shani to meet his family early in their relationship and made the same effort to get to know hers. Alon proposed in March 2019, and when the pandemic began the following year, the couple moved to Miami where Shani lived with Alon and his brothers Tal and Oren. Alon and Shani married on May 25, 2020, in Miami after the pandemic forced them to abandon their plans for a wedding in Israel. Alon PSR ¶ 241; Ex. 28, Letter of Golan Zigron at 1. Even as those plans changed, Alon "contacted me [Shani's father] at the last minute and consulted with me about whether he would hold the wedding." *Id.* at 1. The couple purchased their first home together shortly after the wedding and, six months later, Shani became pregnant with their first daughter, who was born in May 2021. Their second daughter was born in September 2022. Sara Edelbaum, who has known Alon since he was only three years old, writes, "Alon married the woman he loved, and they have two daughters. From that moment on, his life was devoted to his family, and his family became his life." Ex. 7, Letter of Sara Edelbaum at 2. Another old friend, Yariv Gilat, echoes the sentiment, voicing that he has "personally witnessed" Alon's "devotion to his children." Ex. 30, Letter of Yariv Gilat at 1.

Fatherhood became a central part of Alon's life. He changed diapers, woke up at night, cooked for his daughters, made sure they ate well, read to them every night, and participated in their daily routines. As Shani explains, Alon "did not see these responsibilities as mine alone. He understood that we were raising our daughters and building our home together." Ex. 29, Letter of Shani Alexander at 2. "Watching [Alon] as a father," family friend Daniel Frenkel writes, "was

something special — devoted, present, the kind of parent who is truly there for his children." Ex. 31, Letter of Daniel Frenkel at 1. That remained true as the girls grew older. Alon attended every parent meeting at his daughters' school because, as Shani puts it, "[h]e does not only want to know the important milestones. He wants to be present for the daily details of their childhood." *Id.* at 2. Friends looked up to Alon and Shani as "an inseparable couple at school and kid's events." Ex. 32, Letter of Katherine and Judd Rosen at 1.

Every morning, Alon made his girls' breakfast, paying particular attention to making their food healthy and nutritious. Even now, while separated from his family, Alon continues to send Shani information he comes across about children's health and asks about what the girls are eating and how they are growing. Ex. 29, Letter of Shani Alexander at 3.

Faith was part of those everyday routines too. Before meals, Alon prayed. Shani remembers watching their daughters watch him pray: "It is such a simple moment, but to me, it is beautiful. They learn something from him without anyone having to explain it to them." *Id.* And every evening, Alon read the girls a bedtime story. As Shani describes it, Alon "never simply read the words." *Id.* Instead, he "turned bedtime into a performance," creating different voices for the characters, acting out the story, and doing whatever he could to make them laugh. *Id.* These are small things, but they show what fatherhood looked like in Alon's everyday life. Shani writes that "[f]or almost two years, our daughters have lived without these daily moments. They miss him and ask about him every day." *Id.*

Golan sees the same absence from a different perspective. He writes that he can "hear my granddaughter asking about her father in pain," a father "who acted as a great father while he was home and took care of their every need and gave them endless love," and describes his granddaughters "praying that their father will come home." Ex. 28, Letter of Golan Zigron at 2.

Others echo what Golan sees at home: a Kent Security colleague who met Alon's family describes "how truly happy, affectionate and caring he is with his daughters," and a family friend recalls that Alon spoke warmly of wanting "to grow their family further, so that his two daughters might one day have more siblings." Ex. 26, Letter of Irina Gegoutchadze at 1; Ex. 27, Letter of Vivian Cheung at 2. Before his arrest, Alon was, by every account, a dedicated, hands-on, everyday father to his two daughters. (*See* Ex. 31, Letter of Daniel Frankel at 1 ["[W]atching him [Alon] as a father was something special — devoted, present, the kind of parent who is truly there for his children."].)

Alon has a heart not only for his family, but for others as well. In high school, Alon and his brothers joined "I Have a Dream," where they tutored children in Liberty City once a week, every week. (*See* Ex. 1, Letter of Orly and Shlomi Alexander at 2.) As a junior in high school, Alon also volunteered at Mount Sinai Hospital in Miami Beach, helping in the administrative office and assisting visitors in the hospital's main lobby. *Id.* at 1.

That involvement continued when Alon moved to New York. Alon was involved with Chabad Young Professionals ("CYP") from 2009 to 2017, where he assisted with outreach efforts and helped grow the congregation and establish a more permanent presence in the community. *Id.* at 2-3. Among other things, Alon helped identify unused real estate spaces that could be donated to CYP for use during the holidays and later assisted CYP in securing a permanent home for its congregation. *Id.* His involvement was also personal: while living in New York, Alon met with CYP's Rabbi on a weekly basis. *Id.* at 3. During those same years, Alon became involved with Young Jewish Professionals, an organization dedicated to mentoring young Jewish professionals pursuing careers in real estate and other businesses throughout the New York area. "Alon would organize and host events and also introduced his clients to the organization to allow it to grow."

*Id.* at 2. In 2013, the organization honored Alon and his brothers in recognition of their contributions. *Id.*

Alon's service in New York extended beyond the Jewish community. Luis Gomez, a U.S. Navy veteran and former colleague of Alon, recounts an experience that exemplified Alon's character: volunteering with Alon at Holy Apostles Soup Kitchen in Manhattan. Ex. 33, Letter of Luis Gomez at 1.

> Alon volunteered his time with our team to help serve members of the community in need. What stood out to me was that this was not part of his normal professional responsibilities. He was simply there alongside the rest of us, giving his time and participating in an effort intended to help others.

*Id.* When Alon returned to Miami, he continued to serve his community. Shani remembers when Alon helped a new Chabad rabbi who had just moved to Miami Beach and was trying to build a community there. Ex. 29, Letter of Shani Alexander at 2. Alon brought him furniture to use in his space, "introduced people to the rabbi, and helped bring more families into the community." *Id.* When the rabbi's community grew and needed a new space, Alon helped him search for possible locations and, after a new space was secured, connected the Rabbi with contractors who could help renovate it. *Id.*

Alon became similarly invested in the neighborhood where he and Shani were raising their daughters. One neighbor, Eyal Kadosh, who has known Alon since 2021, writes: "From the time Alon moved into our neighborhood, he made a real effort to bring the neighbors together and make our community safer." Ex. 34, Letter of Eyal Kadosh at 1. Alon "encouraged the neighborhood to improve security and pushed for cameras to be installed throughout the area. He organized meetings so that neighbors could actually meet and know one another, and he created a WhatsApp group that allowed all of us to communicate and look out for each other." *Id.* Alon worked with

the City of Miami Beach to have the neighborhood recognized as an "official neighbor association." Ex. 1, Letter of Orly and Shlomi Alexander at 2. Perhaps most importantly, Alon took on less visible problems that, nevertheless, someone needed to handle:

> I remember that, after several car accidents had happened at the dead end of his street, Alon reached out to the city and worked to have new safety signage installed to prevent further accidents and help the safety of his community. He also volunteered on an ad hoc city committee for different projects for his area.

Ex. 1, Letter of Orly and Shlomi Alexander at 2.

Alon's involvement was not limited to helping from a distance. Eyal recalls an incident in which his gate was broken into while he was away and he feared someone was attempting to steal his car. Alon immediately called Eyal, confronted the intruders, and required them to leave. Ex. 34, Letter of Eyal Kadosh at 1. Alon "put himself in a potentially dangerous situation to help me." *Id.*

Another neighbor, Erez Maman, describes Alon as someone "who made a real difference in my life at a time when I needed help." Ex. 35, Letter of Erez Maman at 1. Erez recalls how difficult it was for him and his family to find their footing when they first moved into an unfamiliar neighborhood. *Id.* Alon quickly stepped in, easing the transition by introducing Erez to people with whom he could forge connections. "Moving into a house is one thing; feeling at home in a neighborhood is another." *Id.* Eyal also recalls Alon's efforts to bring the neighborhood together, and to look out for those around him: "Many of my memories of [Alon] involve helping neighbors, watching out for people's homes, communicating about security, and trying to create a neighborhood where people knew and protected one another." Ex. 34, Letter of Eyal Kadosh at 1.

Patricia Cohen describes Alon as "an informal leader whom his neighbors trusted." Ex. 14, Letter of Patricia Cohen at 1. Alon "coordinated landscaping, organized meetings, addressed

community concerns, assisted with storm cleanup, and even tackled the distinctly South Florida problem of an iguana infestation." *Id.* He, further, volunteered on a City of Miami Beach advisory committee focused on parks and recreation "simply because he wanted to contribute and be useful." *Id.*

Alon and his brothers also helped Daniel Hakakian when he and his family moved to Miami. The brothers "introduced us to people, included us socially, and regularly invited my family to join them and their family for Jewish holidays." Ex. 11, Letter of Daniel Hakakian at 1. This neighborly spirit "ma[de] Miami feel much more like home" and proved far from fair-weathered, enduring throughout the decade after the brothers entered Daniel's life. *Id.*

The same commitment to helping others carried into Alon's own family life. After Shani gave birth to their daughters, she felt lost because she could not immediately return to work, and Alon encouraged her to find a way to use that time to help others. Ex. 29, Letter of Shani Alexander at 2. As Shani recounts, "Alon introduced me to Lotus House, a women's shelter in Miami, where I began volunteering in the kitchen, sometimes weekly and sometimes twice a month," something Shani continued to do until the trial in this case. *Id.* Alon also drew Shani into Gift of Life Marrow Registry, an organization that connects patients battling blood cancer to matching donors. Alon himself gave the organization both his money and his time, chairing and organizing several events and encouraging his cousin, Ron, to become a match. *Id.* As Shani writes, Alon "wants the people around him to grow, to help, and to understand what they can give to others." *Id.*

Alon's generosity is a recurring theme in letters from people who witnessed his kindness when there was nothing for Alon to gain and no recognition to be had. His close friend Itamar Cohen recounts three moments he witnessed: Alon arranging for a kosher meal to be brought to a golf course so that Cohen, who keeps kosher, could eat; buying a new pair of golf shoes for a

young boy in a junior golf program who had none; and, at a Tel Aviv restaurant, quietly paying the bill for a table of Israeli soldiers, "without seeking any recognition." Ex. 36, Letter of Itamar Cohen at 1-2. "In each instance," Cohen writes, "nobody asked him to do anything. There was no audience he was trying to impress and no benefit to him. His instinct was simply to notice another person and do something kind." *Id.* at 2.

Jordan Steffy, who has known the brothers for over two decades, talks about a time when his non-profit organization, Attollo Prep, needed fundraising support. Ex. 37, Letter of Jordan Steffy at 1. Attollo Prep is dedicated to developing and creating opportunities for young adults, particularly students from underserved communities. *Id.* Alon did not hesitate to say yes. "[W]hat has stayed with me all these years was not simply that he agreed to give. It was what he said along with it. He told me that he was honored to support us and that he was proud of the work we were doing." *Id.* Jordan shares that when you are building something from the ground up, you inevitably have moments where you question whether the work truly has value. "Alon had a way of making me feel that the work we were doing mattered. There are relatively few people in life who make you feel that what you are building is important not just to you, but to your community and to society. He did that for me." *Id.*

Alon did the same for another friend, Guy Blachman, when Guy was starting his company in 2017. Ex. 38, Letter of Guy Blachman at 1. "Alon was one of our early investors" but "was more than a source of capital. He introduced us to clients, and whenever I asked for help, he gave it." *Id.* Guy, who has known Alon for over 15 years, also recalls a time when Alon helped someone in desperate need. Just three years ago, a friend of Guy's had a medical emergency involving one of his teenage sons. "I asked Alon for help, and he immediately made calls to a Miami hospital to make sure my friend and his son received the best care." *Id.* at 1.

These letters describe Alon across different stages of his life and through the eyes of people who know him in different ways: as a son, father, colleague, or neighbor. The details differ, but the thread running through them is consistent. From tutoring children in underserved communities as a teenager, to building a family and community of his own years later, Alon made a habit of finding ways to help the people around him.

**E. Alon, Oren and Tal Have Spent Nearly Two Years in the MDC Brooklyn**

Finally, the Court should weigh where and how these three men have spent the time since their arrests. Tal, Oren, and Alon were arrested in December 2024 and have been detained continuously since—Oren, Tal and Alon were held briefly at FDC Miami before being transported, by way of a Bureau of Prisons facility in Oklahoma, to the Metropolitan Detention Center ("MDC") in Brooklyn, where they arrived in January 2025 and have remained. By the time of sentencing, the brothers will have spent approximately two years in pretrial detention.

The conditions of that confinement are a proper and weighty sentencing consideration. As counsel has argued and courts have recognized, the MDC's conditions are "well documented" and harsh, marked by "inordinate periods of lockdown" and "violence." *See generally, United States v. Colucci*, 743 F Supp. 3d 452, 456 (E.D.N.Y. 2024) (describing the inhumane and violent conditions at the MDC). Pretrial confinement conditions of this kind "may in appropriate cases be a permissible basis for [a] downward departure[]" and, under § 3553(a), for a below-Guidelines sentence—a principle firmly established in this Circuit and applied even in serious cases with high advisory ranges. *See United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001). Courts have recognized that unusually harsh pretrial detention conditions are an appropriate factor for a court to consider in fashioning a just sentence. *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (noting that harsh conditions of pretrial confinement may warrant a lower

sentence). Every month the brothers have spent in these conditions has been materially harder than ordinary confinement, and the Court should weigh that reality in fashioning a sentence that is sufficient but not greater than necessary.

Though this Court said at the detention hearing that "Let me just say, to all of the . . . [']MDC is a horrible place, and it's awful, and they're going to be locked down forever,['] that's just not true anymore. All of those decisions that you read about were months ago. . . .[t]he number of defendants who are ending up in lock down for substantial periods of time are minimal," and that it was no longer as dangerous as it once was. (01/15/2025 Tr. at 125:6-21). This statement is not consistent with Oren, Alon or Tal's detention.

Counsel can attest that lockdowns have been a persistent part of life in their two years of incarceration. In the time they have been at the MDC, the brothers have been locked down for numerous days on end. Far from "minimal" periods of lockdown, these defendants have been in a facility for nearly two years and in counsel's experience, lockdowns have been regular. Just two weeks ago, they were locked down in their cell for 72 hours because of **twenty** stabbings in another unit. On Tuesday, September 15, 2026, there was another stabbing. The fear of violence in the facility is not some abstract concept. It is a persistent fear for all three, every day of their incarceration. There are multiple federal cases pending regarding stabbings, murders, and crimes planned and executed at the MDC which took place during the time the Alexander brothers have been incarcerated there.

For example, on May 20, 2025, Alon and Tal were "victims of an assault," according to an Inmate Investigative Report issued upon completion of an SIS Investigation. Ex. 39, Inmate Investigative Report (SIS Investigation into the May 20, 2025 assault on Alon and Tal at the MDC). The investigation concluded that a Housing Unit officer left a unit door unlocked, which

enabled another inmate to "sprint inside [the housing unit] and assault" Alon and Tal, beating them with closed fists. *Id.* at 4. The report recommended that Alon and Tal be separated from the offending inmate "due to safety concerns as well as to prevent future violence," and documented prior efforts by the offending inmate to extort and harass Alon and Tal. *Id.*

The brothers have sustained themselves in prison by holding onto the same pillars that have defined their lives: family and faith. The PSRs reflect that Oren, Alon and Tal have been housed in the same unit, which has given them "a sense of community"; they "pray together and eat their meals together daily" and meet with a rabbi twice per week, practicing their faith together every day. Oren PSR ¶ 12. Tal has said that observing the Sabbath together has given him "a small sense of normalcy." Tal PSR ¶ 13. All three brothers have completed a Bureau of Prisons parenting program while in custody, and their parents fly from Florida to New York to visit weekly for a 60-minute time slot. But no visiting room can substitute for the daily life these men have lost. Oren, who has never lived a day with his infant son outside a jail; Tal, taken from a newborn; and Alon, absent from two little girls who continue "praying that their father will come home." Ex. 28, Letter of Golan Zigron at 2; Ex. 7, Letter of Sara Edelbaum at 1. Their parents Orly and Shlomi, married more than half a century, plead simply that the Court "not … take away more of that family than is absolutely necessary" and give their grandchildren "the chance to grow up knowing and having their fathers". Ex. 1, Letter of Orly and Shlomi Alexander at 4.

## III. The Devastating Impact on the Brothers' Young Children and Families

This Court cannot assess a sentence without confronting what a lengthy term of incarceration means for four young children who need and miss their fathers and for the wives and grandparents who have carried that burden. The PSRs themselves, in Alon, Tal and Oren's own words, and those of the people closest to them, document that impact in granular detail.

Oren's son was born roughly two weeks after Oren's arrest, and Oren has never spent a day with him outside of custody. Oren PSR ¶¶ 248, 250. Oren's wife, Kamila, described the toll his arrest and subsequent case has taken: she was nine months pregnant when Oren was arrested, which was a "traumatizing" experience. The arresting officers were, in her words, "extremely rough with her, handcuffed her, and shoved a machine gun in her face." Oren PSR ¶ 249. Despite a difficult birth, she brought their newborn son to meet Oren in Florida state custody when she was just three days postpartum, because she knew he would otherwise not meet his father for months. For Kamila, she is "heartbroken that their son has only seen his father a handful of times while in prison." *Id.* Since the arrest, Kamila has effectively been a single parent: she has shut down her social media after numerous threatening messages from strangers, changed her phone number, bought a different car, and moved due to harassment and press intrusion, and has cut ties with many former friends. She has described this experience as isolating given that her family lives in Brazil. Oren PSR ¶ 250. As a trained and successful model, she has not obtained significant modeling work since the arrest because of the case's publicity, and has leaned on her in-laws, "especially [Alon's] wife, who fully understands how this experience has impacted her," for support. *Id.*

Tal's situation is, if anything, starker. His son was born roughly two months before Tal's arrest, and the surrounding publicity caused Tal and his wife to separate. Even so, Tal's only goal has been that he "wants to grow up focused on being the best father that he can be and remain an active influence in his son's life," Tal PSR ¶ 237. Tal has seen his son once while in custody, even though all he wants to do is "be the hands-on dad he always wanted to be." Tal PSR ¶ 238.

Alon's daughters are five and four years old, and he was, in his wife's words, "the best dad for his two kids" who "played an essential role in his minor daughters' lives prior to his arrest."

Alon PSR ¶¶ 80, 242-243. Shani describes the strain the case has placed on the family: "the publicity" surrounding the arrest and trial have been "extremely stressful and difficult" for her, even as she has continued to travel from Miami to New York weekly to visit her husband. PSR ¶ 244. Alon "has remained fully invested in his family's wellbeing," and his kids "need their father." PSR ¶¶ 243-244. Alon, as Probation puts it, "has a strong support network in his family and community and played an essential role in his minor daughters' lives prior to his arrest." PSR ¶ 80.

Notably, Probation identifies the defendants' parental responsibilities as a potential basis for a sentence outside the advisory range, stating that the Court may consider "the defendant's employment history and parental responsibilities to his minor son" as a factor warranting a sentence below the Guidelines. Oren PSR ¶ 299; Tal PSR ¶ 282 (parental responsibilities to his son).

The past two years have had a devastating impact on Orly and Shlomi, who have flown to see their sons weekly, while also trying to be good caregivers to their minor grandchildren and trying to keep their business afloat. They miss their children and dream of the day they can all be a family again around the Shabbat dinner table. Orly and Shlomi, and the brothers' other brother Niv, have suffered significant mental-health impacts from the case, including public approaches to his father outside of shul, with community support "few and far between." Oren PSR ¶ 244.

## IV. The Proper Guidelines Calculation

The Sentencing Guidelines calculation, as well as the astronomical sentencing recommendations of the Probation Department, are flawed for several reasons. We will deal first with the Guideline calculation and then discuss the recommendation of the Probation Department.

With respect to the Guidelines calculation, we have eight primary objections to the offense level computation set out in the PSR.[7]

**First**, vulnerable victim: The defendants have three objections to how this enhancement is treated in the PSR – drugging; minors; and "large number of vulnerable victims."[8]

**Second**, the defendants object to the use of force enhancement.

**Third**, the defendants object to the impermissible double counting of both use of force and restraint of victim.

**Fourth**, the defendants object to the use of computer enhancement.

**Fifth**, Alon should not receive an enhancement under § 4B1.5(b)(1).

**Sixth**, Alon should not have been characterized as participating in a conspiracy through 2021.

**Seventh**, the PSRs should not have included enhancements for surreptitious drugging.

**Eighth**, Probation has made a hash of the grouping analysis, and we provide an explanation of why below. Probation should not have found thirteen groups. Instead, there should be three groups for Alon and Oren, and four groups for Tal. Each defendant should be sentenced based only on the charges for which the jury found them guilty – their sentences should not be enhanced based on unreliable, uncharged allegations never tested by cross-examination.

The sentences recommended by the PSRs in this case go "far overboard." *United States v. Jenkins*, 854 F.3d 181, 188 (2d Cir. 2017). The "length of [the] sentence[s]" recommended are

---

[7] Defendants made these identical objections to the draft Presentence Investigation Report.

[8] The final PSR added twelve paragraphs that were not included in the draft PSR. These twelve paragraphs add two levels to twelve of the thirteen groups due to the offense involving a "large number of vulnerable victims.", including vulnerable victim and use of force. These paragraphs are: 136, 143, 151, 159, 168, 176, 183, 196, 204, 211, 218, 225 (Oren); Paragraphs 136, 143, 152, 160, 174, 181, 188, 195, 202, 210, 217 (Alon); Paragraphs 138, 146, 155, 169, 176, 183, 191, 198, 205, 212 (Tal).

"excessively punitive[,] [] needlessly harsh[,] . . . 'shockingly high' and "serve no valid public purpose." *Id.* at 187 (citing *United States v. Rigas*, 583 F.3d 108, 123 (2d Cir. 2009) and *United States v. McGinn*, 787 F.3d 116, 129 (2d Cir. 2015)). "Additional months in prison are not simply numbers. Those months have exceptionally severe consequences for the incarcerated individual. They also have consequences both for society which bears the direct and indirect costs of incarceration and for the administration of justice which must be at its best when, as here, the stakes are at their highest." *Id.* at 192.

We show in detail how Probation's recommendations are completely unhelpful to the Court in fashioning a sentence that comports with § 3553(a), because the absurd recommendations of the Probation Department would exacerbate the very sentencing disparities that § 3553(a) mandates the Court eliminate.

**A. Vulnerable victim enhancement**

**1. Re Drugging**

**Paragraphs 135, 142, 150, 158, 167, 175, 182, 195, 203, 217, 224 (Oren); Paragraphs 135, 142, 151, 159, 173, 180, 194, 201, 209, 216 (Alon), Paragraphs 137, 145, 154, 168, 175, 182, 190, 204, 211 (Tal):** The Alexanders object to this enhancement on two grounds:

**First**, there is impermissible double counting. Application Note 2 to §3A1.1 bars the enhancement where "the factor that makes the person a vulnerable victim is incorporated in the offense guideline." The base offense levels under USSG §2A3.1 are reached through cross-references triggered by conduct involving force or incapacitation under 18 U.S.C. §§ 2241-2242. Where the same drugging or incapacitation drives both the offense guideline and the vulnerability finding, the adjustment double counts and must be removed.

**Second**, the government's theory is that the Alexanders created the incapacitation, which is not a pre-existing victim "characteristic." Application Note 2 defines a vulnerable

victim as one "unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible." Each report grounds vulnerability in the defendants' alleged act of surreptitiously drugging, a condition manufactured by the offense itself is the crime, not a pre-existing trait supporting the enhancement.

By considering every victim a vulnerable victim, the PSR confuses the alleged crime and the alleged victim. By way of example, someone who is robbed at gunpoint is vulnerable because they have a gun pointed at them. But, that does not make them a vulnerable victim, which is based on the person's innate characteristics such as age, mental condition, etc.

**2. Re Minors**

**Paragraphs 210, 217 (Oren); Paragraphs 180, 187 (Alon); Paragraphs 197, 204 (Tal):** The Alexanders object to these paragraphs imposing a two-level victim-related adjustment as to Minor Victims 25 and 26 based on the conclusion that "the defendant knew or should have known that" they were 17 years old at the time of the alleged offense. First, the age of consent in Colorado, where the alleged offense occurred, was 17, and therefore their age did not make them legally incapable of consenting to sexual activity. The enhancement should not be imposed on the premise that their age, standing alone, rendered them particularly vulnerable. Both accusers were at a 21-and-over night club when they met the Alexanders on the night of the alleged assault, and Minor Victim-25 never testified that she disclosed her age to any of the Alexanders. The PSR and the government state that "As Minor Victim-26 testified that she disclosed her age to Alon Alexander prior to the offense, it is reasonable that the defendants should have known Minor Victim-25 was also a minor as they were together." But Victim 9 was also together with Minor Victim-25 and Minor Victim-26, and Victim 9 was not

a minor. So the fact that the three of them were together is not a basis to conclude that the Alexanders should have known all of their ages.

The Alexanders also object to all paragraphs in the PSR that characterize Minor Victim-25 and Minor Victim-26 as "minors" without acknowledging that both were 17 years old and had reached the age of consent under Colorado law, where the alleged conduct occurred.

Specifically, Paragraph 122 (Oren/Alon) and Paragraph 123 (Tal) state that four alleged victims were "minors," while Paragraphs 85–90 (Oren/Alon) and Paragraphs 86–91 (Tal) repeatedly characterize Minor Victims 25 and 26 as minors. The PSRs should accurately reflect that Minor Victims 25 and 26 were 17 years old at the time of the alleged conduct and were therefore not below the age of consent under Colorado law. Alon separately objects to the statement in Paragraph 122 that four witnesses against him were minors because, in addition to Minor Victims 25 and 26 having reached the age of consent, Minor Victim-8 did not testify to any allegations involving Alon.

**3. Additional Enhancement for Involving a Large Number of Vulnerable Victims**

**Paragraphs 136, 143, 151, 159, 168, 176, 183, 196, 204, 211, 218, 225 (Oren); Paragraphs 136, 143, 152, 160, 174, 181, 188, 195, 202, 210, 217 (Alon); Paragraphs 138, 146, 155, 169, 176, 183, 191, 198, 205, 212 (Tal):** The Alexanders object to an additional two-level enhancement pursuant to §3A1.1(b)(2). Although §3A1.1(b)(2) permits an additional increase where the offense involved a large number of vulnerable victims, the existence of 12 alleged victims does not establish that all 12 qualify as unusually vulnerable or that the enhancement applies to every offense group. Probation has already imposed a two-level vulnerable-victim

enhancement under §3A1.1(b)(1) in each group it alleges applies, and imposing an additional two-levels is impermissible double counting.

**B. Use of Force Enhancement**

The brothers are facing a use of force enhancement when the evidence does not have one photo of a bruise, any corroboration of injuries, or any hospital visits. We must start there.

**Paragraph 141 (Oren/Alon):** Alon and Oren object to a four-level enhancement for purportedly using force against alleged Victim-7 when she never testified the brothers used any physical force. In fact, Victim 7 testified that she did not physically resist or attempt to stop the alleged acts, and she never described being held down, restrained, or subjected to physical force. This is consistent with her pre-trial statements to the government; [redacted]

The Alexanders also object to Paragraphs 173, 194 (Oren/Tal); Paragraphs 193, 207 (Alon), which impose the force enhancement based on allegations by Victim-9 and Victim-4—none of whom testified at trial. The counts involving Victim 4 were also dismissed. Unproven allegations do not provide a sufficiently reliable basis for this enhancement. *See United States v. Juwa,* 508 F.3d 694, 700–01 (2d Cir. 2007).

**C. Impermissible Double Counting with Respect to Use of Force and Physical Restraint Enhancements**

**Paragraphs 133, 134, 156, 157, 164, 166, 173, 174, 188, 189, 201, 202 (Oren); Paragraphs 133, 134, 148, 150, 157, 158, 165, 166, 171, 172, 207, 208 (Alon); Paragraphs 135, 136, 143, 144, 151, 153, 160, 161, 166, 167, 188, 189 (Tal):** The Alexanders object to the PSRs' application

of a two-level victim-related adjustment under § 3A1.3 for physical restraint in addition to the four-level enhancement under § 2A3.1(b)(1) for use of force. This constitutes impermissible double counting.

Section 3A1.3 provides a two-level increase when a victim was physically restrained. The Guidelines expressly prohibit this adjustment "where the offense guideline specifically incorporates this factor." § 3A1.3 cmt. n.2. The physical-restraint adjustment cannot be added when the Chapter Two guideline already accounts for that conduct. *See United States v. Young*, 811 F.3d 592, 601 (2d Cir. 2016).

Here, the PSRs impose a four-level increase under § 2A3.1(b)(1) based on force as described in 18 U.S.C. § 2241. For each corresponding § 3A1.3 adjustment, the alleged physical restraint occurred during and as part of the sexual act itself—*i.e.*, the alleged victim was held down while the act was committed. *See* Alon PSR ¶ 134 ("Victim-2 was pinned down to the bed..."). This Court cannot rely on the same restraint as the force already counted under § 2A3.1(b)(1) to apply this enhancement. *See United States v. Joe*, 696 F.3d 1066, 1072 (10th Cir. 2012) (holding this constitutes impermissible double counting where the force underlying the sexual abuse necessarily involved physical restraint).

**D. Use of Computer Enhancement**

**Paragraph 165 (Oren); Paragraph 149 (Alon); Paragraph 152 (Tal):** The Alexanders object to the imposition of a two-level enhancement for using a computer to facilitate transportation of a minor for sexual conduct when there was no evidence that the Alexanders ever communicated with Minor Victim-3 using any electronic device. The Guidelines Commentary states this enhancement "is intended to apply only to the use of a computer . . . to communicate *directly* with a minor." § 2A3.1 cmt. n.4(B) (emphasis added). No evidence established the

Alexanders used a computer or any electronic device to communicate directly with Minor Victim-3. Trial evidence showed Mathew Lipman, not the brothers, directly messaged Minor Victim-3 inviting her to the Hamptons that weekend. There was no evidence that the Alexanders coordinated with or directed Lipman to do so, nor that the Alexanders knew that Minor Victim-3 was a minor when Lipman invited her, nor that Lipman would be inviting any minors, nor was this foreseeable to the Alexanders. [redacted]

**E. Alon's Chapter 4 Enhancement**

**Paragraph 225 (Alon):** Alon objects to a five-level enhancement under § 4B1.5(b)(1) because Alon is not a "repeat and dangerous sex offender against minors." Section 4B1.5 applies to offenders presenting "a continuing danger to the public." § 4B1.5 cmt. background. The facts here fall far outside the conduct this enhancement was designed to address.

This enhancement was created after the Protection of Children from Sexual Predators Act of 1998. *See* Pub. Law 105-314 (Oct. 30, 1998). Congress directed the Sentencing Commission to "increase penalties . . . in any case in which the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." *Id.* § 505. The legislative history makes clear the purpose was to protect children from habitual sexual predators and impose severe punishments on repeat offenders presenting significant recidivism risk.

The cases applying this enhancement illustrate its reach—typically defendants who repeatedly sexually abuse children and are caught soon after or while still engaging in that

behavior. *See, e.g., United States v. Broxmeyer*, 699 F.3d 265, 284-88 (2d Cir. 2012); *United States v. Santos*, No. 21-10381, 2022 U.S. App. LEXIS 11066 (5th Cir. Apr. 22, 2022); *United States v. Sanchez*, 30 F.4th 1063 (11th Cir. 2022); *United States v. McGrain*, 583 F. Supp. 3d 392 (W.D.N.Y. 2022).

The government has not alleged Alon engaged in any prohibited sexual conduct involving a person under 18 for nearly a decade. The only alleged instances occurred in May 2009 (Minor Victim-3) and January 2017 (Minor Victims-25 and 26, who were 17 years old, the age of consent in Colorado where the offense allegedly occurred). There is no evidence and no allegation of criminal activity by Alon in years or that Alon presents a *continuing* danger. Nearly a decade without any alleged misconduct involving a minor does not support treating Alon as the type of repeat offender presenting the continuing danger contemplated by § 4B1.5(b)(1).

Further, the alleged conduct underlying this enhancement is unreliable. Minor Victim-3 did not identify Alon as the person who assaulted her, and Minor Victims 25 and 26 were not minors and their testimony was not charged in any count of the Indictment and therefore was not the subject of a jury verdict. The conduct involving Minor Victims 25 and 26 should also not be considered separate occasions—the conduct occurred in one episode, in the same room, during the same gathering, among the same participants, within minutes of one another, as part of one encounter. *See Wooden v. United States*, 595 U.S. 360 (2022) (in an ACCA case involving multiple robberies in one night, the Court held that each robbery was not necessarily a prior "occasion" merely because the robberies were committed sequentially, one after the other); *id.* at 369 ("Proximity of location is also important; the further away crimes take place, the less likely they are components of the same criminal event. And the character and relationship of the offenses may make a difference: The more similar or intertwined the conduct giving rise to the offenses—the

more, for example, they share a common scheme or purpose—the more apt they are to compose one occasion").

Additionally, with respect to Minor Victim-25, her trial testimony was that when Alon touched her, she removed Alon's hand and Alon immediately complied. The encounter was a matter of seconds, "under a minute," as Minor Victim-25 testified. *See* Trial Tr. at p. 2508-09. This fleeting touch, which Alon immediately stopped on refusal, is not the type of conduct contemplated for punishment by this Guideline. The communication between them afterwards does not indicate anything non-consensual.

Finally, although § 4B1.5 cmt. n.1 defines "minor" as anyone under 18, Alon preserves his objection that Minor Victims-25 and 26 were both 17 at the time, and the age of consent in Colorado is 17. *See* Colo. Rev. Stat. § 18-3-402. Indeed, Minor Victim-26 testified that at the time of the alleged offense, she was only "a few days away" from turning 18; Minor Victim-25 was 17 years, 7 months old (her DOB is [redacted] per GX 1R-101).

**F. The PSR improperly alleges that Alon participated in a conspiracy through 2021.**

Alon objects to the PSR's assertion that he was involved in a conspiracy "between at least 2008 through at least 2021." Alon ¶¶ 16, 20, 116, 118, 120, and 131. That assertion is not supported by the conduct actually identified in the PSRs and by the government. The PSR does not identify any allegation of criminal activity by Alon after January 2017, nor does the government past 2018. Alon reiterates his pretrial arguments that he withdrew from the alleged conspiracy. As set out in detail in DE 226, Count 1 charges a conspiracy to commit sex trafficking, in violation of 18 U.S.C. § 1594(c). That offense has a five-year statute of limitations. 18 U.S.C. §3282(a). Even if the jury believed the accusers' allegations of a sex trafficking conspiracy (which Alon denies), the evidence still would have required that the jury acquit Alon because the conspiracy charged in Count 1 is

time-barred: Alon withdrew from the alleged conspiracy at least five years before the original indictment was returned on December 6, 2024, by taking sufficient, affirmative and overt steps inconsistent with the objectives of the alleged conspiracy no later than March 2019, when he abandoned the "single-life" and publicly announced his engagement to his future-wife Shani. Even assuming a finding that Alon joined the conspiracy charged in the Indictment, there is no evidence that his involvement continued beyond March 2019. ECF Nos. 380, 381, 382, 383. That position is supported by the government's interview of [redacted], [redacted]). *See Smith v. United States*, 568 U.S. 106, 112-13 (2013); *United States v. Nerlinger*, 862 F.2d 967 (2d Cir. 1988); *United States v. Goldberg*, 401 F.2d 644 (2d Cir. 1968); *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir. 1964).

### G. The PSRs improperly characterize allegations of surreptitious drugging as established fact

The Alexanders object to the PSRs' repeated characterization of the evidence as establishing that they "surreptitiously drugged" accusers. **Alon and Oren PSR ¶¶ 17–20, 22–26, 29, 49, 53, 55–56, 60, 65, 69, 75, 78–80, 85, 87–88, 95, 97; Tal PSR ¶¶ 18–21, 23–27, 30, 50–51, 54, 56–57, 61, 66, 70, 76, 79–81, 86, 88–89, 96, 98.** First, the act of drugging another person is not an element of any crime found by the jury. Second, no evidence was presented at trial establishing that any Alexander brother secretly administered drugs to any accuser. No accuser testified to personally witnessing any Alexander place a drug or substance in her drink. No accuser testified that a drink tasted different than normal. No toxicology evidence was presented to show anyone had ingested any type of illicit substance. No evidence was presented of drugs found during any search. No drug dealer testified. Rather, the evidence of alleged drugging consisted of

accusers' subjective beliefs that they felt unusually intoxicated after consuming alcohol or other substances. The PSRs should distinguish those allegations from facts actually established by the evidence.

Third, Alon and Oren voluntarily submitted to and passed polygraph examinations denying they had drugged female accusers. The examinations were conducted by an experienced retired FBI polygraph examiner who has administered more than 3,200 polygraph examinations throughout his career. Alon was asked whether he had ever had sex with a woman he knew had been secretly drugged, which he denied. Oren was questioned about the allegations involving Victim 2, including whether he had sex with her knowing she had been secretly drugged, which Oren denied. Both brothers passed their examinations, with Agent Orr finding "no significant reactions indicative of deception" in either examination. *See* Alon PSR ¶ 252; Oren PSR ¶ 257. Tal did not participate in the examinations on the advice of his attorney, who was based in New York and could not be present for the examination in Florida.

During the bail proceedings, the Court characterized Alon and Oren's polygraphs as a defense media ploy. DE #37 at 34. But polygraphs are used routinely by Homeland Security, the FBI, and many other federal agencies in employment, law enforcement, national security, and other areas. Polygraphs are also approved by the federal courts for use post-conviction "as a means to ensure that [defendants] are in compliance with the requirements of [their] supervision or treatment program" and to determine future danger (and therefore lack of risk of recidivism). U.S. Courts, Overview of Probation and Supervised Release Conditions, Chapter 3: Polygraph as a Sex Offender Management Tool, https://www.uscourts.gov/about-federal-courts/probation-and-pretrial-services/post-conviction-supervision/overview-probation-and-supervised-release-conditions/chapter-3-polygraph-sex-offender-management-probation-and. And the PSRs

specifically provide as a proposed condition of supervised release that the brothers undergo polygraph testing ("You shall abide by all rules, requirements, and conditions of the sex offender treatment program(s), including submission to polygraph testing . . .").

Accordingly, the Alexanders object to “The Victims,” paragraphs 17 through 19 of Alon and Oren’s PSRs and paragraphs 18 through 20 of Tal’s PSR, including all applicable subparts, to the extent they state as fact that the Alexanders drugged the accusers. They similarly object to Alon and Oren PSR ¶¶ 20 and 22–26 and Tal PSR ¶¶ 21 and 23–27 to the extent those paragraphs characterize the brothers as having engaged in “surreptitious drugging of victims” or otherwise state or imply that an Alexander brother secretly administered drugs to an accuser. No independent evidence established that any drug was administered, much less by an Alexander. The PSRs should distinguish between accusers’ beliefs and established factual findings.

We object to the following paragraphs based on the evidence concerning the particular accuser or event:

- **Alon and Oren PSR ¶ 17(ii); Tal PSR ¶ 18(ii):** The Alexanders object to the statement that Minor Victim-3 was drugged by the Alexanders; she never testified that any brother provided her with a drink or administered any drug.

- **Alon and Oren PSR ¶ 17(vi); Tal PSR ¶ 18(vi):** The Alexanders object because Victim-12 never testified that Alon provided her with a drink or administered any drug unbeknownst to her. To the contrary, Victim-12 testified she voluntarily consumed Molly that night, and drank alcohol before and while at the club.

- **Alon and Oren PSR ¶ 17(vii); Tal PSR ¶ 18(vii):** The Alexanders object to the statement that Tal attempted to drug Victim-6; Victim-6 testified only that her friend was not acting like herself after consuming a beverage.

- **Alon and Oren PSR ¶ 24; Tal PSR ¶ 25:** The Alexanders object to the characterization of the group-chat messages as reflecting “past use of these drugs to secure sexual gratification.” The messages were part of a larger conversation about how they used to play a drinking game called Beer Pong. The PSRs omit the messages immediately preceding the language on which they rely:

Alon: We have open bar and pool at hotel. We should think of some fraternity type games at hotel? Beer pong in pool floatie

Oren: Get a beer pong floatie

More importantly, the message the PSR relies upon was sent by Erik Yehezkel, not any of the Alexanders, and should not be attributed to the Alexanders. The Alexanders do not affirmatively agree with any part of Yehezkel's joke. Additionally, a photograph from Facebook from the trip that Yehezkel and Alon, Oren, and Tal were on shows that it was just a drinking game with their wives and friends. Ex. 42, Facebook photograph.

- **Alon and Oren PSR ¶ 26; Tal PSR ¶ 27:** The Alexanders object to the PSRs' account of the April 16–17, 2009 events. First, the sequence of events cannot reliably be determined because the parties agree the metadata is incorrect. The government's narrative that Oren "raped" Minor Victim-8 "after" Ambien or that a video was created "before" the assault is not supported by trial evidence. "Ambien, Ambien, Ambien, Ambien" was mentioned after Oren said it was time to sleep—Ambien is a sleep drug. [redacted] Further, during the encounter, Minor Victim-8 got up from the bed and verbally asked for more MDMA, which supports that she was fully conscious and aware of what was occurring. The Alexanders also request that the PSR include that Minor Victim-8 was 17 years and 10 months old in April 2009, and Oren was 21 years old, and therefore she had achieved the legal age of consent in New York.

- **Alon and Oren PSR ¶ 29; Tal PSR ¶ 30:** The Alexanders object to the timeline set forth in these paragraphs because the parties agree the metadata is incorrect for all photographs and videos from this day. They also object to the recitation that "Ambien" was used to incapacitate Minor Victim-8 when she testified she had been on MDMA for hours. (*See* GX D-121-1-T.) Further, the government's CART agent testified the file "Miami Passover.mov" was sent from Ido Berniker to Oren and had been deleted from Oren's computer.

- **Alon and Oren PSR ¶ 49; Tal PSR ¶¶ 50–51:** Tal objects to the assertion that he drugged Victim-1's drink with "a sedative-hypnotic drug." No trial evidence established Victim-1's drink contained any such substance—she did not testify to it, nor was it established through an expert. There was no testimony that wine "caused" Victim-1's reported symptoms, only that she experienced symptoms after drinking wine.

- **Alon and Oren PSR ¶ 53; Tal PSR ¶ 54:** Alon and Oren object to the characterization of Victim-7's account in these paragraphs. Victim-7 did not testify she was forcibly raped. Alon and Oren also object to any characterization that Victim-7 was "drugged"—no evidence established that either administered a drug to her, placed any substance in her drink, or otherwise caused her to unknowingly ingest a drug.

- **Alon and Oren PSR ¶ 55; Tal PSR ¶ 56:** Alon and Oren object to the statement that Victim-7 "was offered a drink that she did not know contained a sedative-hypnotic drug."

No trial evidence established the drink contained any drug. Alon and Oren also request that the paragraph reflect that Victim-7 left the cabin with $400 more in cash than when she entered.

- **Alon and Oren PSR ¶ 56; Tal PSR ¶ 57:** The Alexanders object to the statement that Victim-7 "was not acting normally." Defense exhibit metadata shows Victim-7 was walking normally after leaving "the twins" and was dancing with other cruise passengers and able to maintain her balance in high-wedge heels. *See* DX 4256-M; GX 1F-110; GX 1F-111. Further, Victim-7 attended the Groove Cruise the following year and there are photos of her dancing and "acting" the same way. *See* DX 4236.

- **Alon and Oren PSR ¶ 60; Tal PSR ¶ 61:** The Alexanders object to the characterization that Tal handed Victim-6 and her friend "drinks which he had drugged." No trial evidence established Tal put a substance in either drink; Victim-6 observed only that her friend began acting unlike herself after consuming alcohol.

- **Alon and Oren PSR ¶ 65; Tal PSR ¶ 66:** The Alexanders object to the assertion that Alon and Tal "assist[ed]" in any sexual assault, recruited or transported Victim-2 to the Hamptons, or participated in leaving Victim-2 drugged and incapacitated.

- **Alon and Oren PSR ¶ 69; Tal PSR ¶ 70:** The Alexanders object to the statement that Alon "prevented Victim-2 from making it to the basement and took Victim-2 to an isolated room." Trial evidence showed Victim-2 was feeling unwell and Alon helped her to the nearest bedroom to prevent her from falling. Alon provided a glass of water and left. Victim-2 testified she was already feeling unstable before drinking the water. Alon objects to any implication that the water contained a drug—no trial evidence established that it did.

- **Alon and Oren PSR ¶ 75; Tal PSR ¶ 76:** Alon and Tal object to any assertion that they surreptitiously drugged Victim-12. To the contrary, Victim-12 testified she voluntarily consumed Molly that night.

- **Alon and Oren PSR ¶ 78; Tal PSR ¶ 79:** Tal objects to the statement that he gave Victim-12 a "powdery substance." Victim-12 testified that Tal and her friend Ainsley offered her Molly, which she knowingly and voluntarily consumed—consistent with text messages the government introduced.

- **Alon and Oren PSR ¶ 79; Tal PSR ¶ 80:** Tal and Alon object to the statement that Victim-12 consumed a drink they drugged. No evidence established either brother drugged Victim-12 or placed any substance in her drink. Victim-12 testified she felt a loss of control only after receiving a drink from an Asian man in a blue shirt. She also testified she consumed wine before arriving, had several alcoholic drinks at the apartment, voluntarily consumed Molly for the first time, and had additional alcohol at the nightclub. The symptoms she described do not establish surreptitious drugging by either brother.

- **Alon and Oren PSR ¶ 80; Tal PSR ¶ 81:** Tal and Alon object to the statement that the "drugged drink caused Victim-12's memory to cut out"—no evidence established Victim-12 consumed a drugged drink or that any drink caused her memory loss. Alon further denies the alleged sexual assault.

- **Alon and Oren PSR ¶ 85; Tal PSR ¶ 86:** Alon and Oren object to the assertions that they drugged these accusers and "enticed them to a hotel room with false promises of an afterparty." The evidence showed Alon and Oren were at a 21+ nightclub with a larger group including Minor Victim-26, Minor Victim-25, and Victim-9. Upon leaving, Minor Victim-25 texted to leave "without the [other] guys"—demonstrating the accusers knew they were leaving the larger group and coordinated to travel to the hotel with Alon and Oren.

- **Alon and Oren PSR ¶ 87; Tal PSR ¶ 88:** Alon and Oren object to the statement that they provided drinks "spiked with sedative-hypnotic drugs." No trial evidence established this. Minor Victims 25 and 26 testified they traveled from the East Coast to Aspen that day, on their own account, before meeting the Alexanders, and consumed alcohol and marijuana before arriving at the nightclub.

- **Alon and Oren PSR ¶ 88; Tal PSR ¶ 89:** Alon and Oren object to the statement that "[a]s a result of the drugs, Minor Victim-25 fell in and out of consciousness." No evidence established Minor Victim-25 was drugged or that any alleged loss of consciousness was caused by drugs administered by Alon or Oren. Her description of how she felt does not establish drugging or causation.

- **Alon and Oren PSR ¶¶ 95 and 97; Tal PSR ¶¶ 96 and 98:** Alon and Oren object to the statements that they drugged Victim-20 by putting a drug in her drink. No trial evidence established that the wine or champagne Victim-20 consumed contained any drug.

### H. Grouping Challenges

The Probation Department broke into groups the conduct it deemed relevant, as it must. For Oren, it found thirteen groups; for Alon, twelve groups; and for Tal, eleven groups. Some of the groups relate to conduct that was found by the jury. Other of the groups do not relate to conduct found by the jury. The defendants argue that each defendant can be sentenced only on conduct found by the jury. As a result, the first analysis of the groups found by the Probation Department will be to cleave those groups relating to conduct found by the jury from those groups related to conduct which was not.

**1. Grouping For Each Defendant**

As to Oren, there were three groups related to conduct found by the jury: Group 1 concerning Bela Koval; Group 2 related to Rhonda Stone; and Group 3 related to Amelia Rosen. Oren was not convicted of any other conduct corresponding to a group. Accordingly, Group Four through thirteen should not be counted.

As to Alon, there were three groups related to conduct found by the jury: Group 1 concerning Bela Koval; Group 2 concerning Rhonda Stone; and Group 3 (Alon's Group 3) concerning Isa Brooks. As indicated, two of the groups for Alon are the same as Oren's while the third one is different. Because Alon was not convicted of any other conduct corresponding to a group, Group Four through Twelve should not be counted.

As to Tal, there were four groups related to conduct found by the jury: Group 1 concerning Lindsey Acree; Group 2 concerning Bela Koval; Group 3 concerning Isa Brooks; and Group 4 concerning Maya Miller. Tal was not convicted of any other conduct corresponding to a group. Therefore, Groups Five through Eleven should not be counted.

**2. Adjusted Offense Levels For Each Group**

**a. The Bela Koval Group (Group 1 for Oren and Alon; Group 2 for Tal)**

In terms of the adjusted offense levels for each group, the defense contends that the appropriate adjusted offense level for the group related to Bela Koval (Group 1 for Oren and Alon; Group 2 for Tal) is a level 30. The base offense level is 30. We agree with the PSR on that point. The PSR (paragraph 133 – Oren's PSR) then provides for a four-level increase because "the offense involved conduct described in 18 U.S.C. § 2241. However, this is not true. The relevant statute is not § 2241 but § 2422, which involves coercion or enticement. Therefore, it is not necessarily the case that the jury found that the defendant committed a sexual act through force.

This is especially true here because the indictment charged that § 2422 would be violated if, among other things, a defendant committed New York Penal Law § 130.52, which is the crime of Forcible Touching, which does not have any requirement that force be used to commit a sexual act aside from sexual contact. Because the government did not ask for a special verdict sheet, there is no indication of which section of the New York Penal Law was violated. Accordingly, we object to the four-level increase. The defense also objects to the two-level increase for physical restraint. The defense also objects to the two vulnerable victim adjustments. The Probation Department's theory of vulnerable victim is that she was drugged. However, that is an alleged part of the offense, not an innate characteristic of the victim. The vulnerable victim enhancement is intended for people whose innate conditions, be they mental or physical, make them vulnerable. The enhancement does not apply to how the perpetrator goes about committing the crime. In other words, a bank teller facing a robber's gun would not be a vulnerable victim because he or she is helpless in the face of a gun. The same is true here. This was not a vulnerable victim within the meaning of the enhancements. Accordingly the adjusted offense level for the Bela Koval group is level 30.

**b. The Rhonda Stone Group (Group 2 for Oren and Alon)**

The defense agrees that the base offense level is 30. Because it is unclear if the jury found that sexual contact was through the use of force or because of the administering of a substance, the defense objects to the use of force enhancement, as not being proven to the jury. The defense also objects to the two adjustments related to the victim being vulnerable. As above, the vulnerable victim enhancement is focused solely on the physical or mental limitation of the victim, and not on how the crime was committed. Here, the administering of a substance was charged as part of

the offense, and cannot be confused with the mental or physical state of the victim. The adjusted offense level for this group is 30.

**c. The Amelia Rosen Group (Group 3 for Oren)**

This group is unique to Oren. The defense agrees that the base offense level is 32. There would be an increase of two levels (but not four levels) because there was the commission of a sexual act. The defense objects that a defendant drugged this person, as opposed to this person taking drugs of her own. The defense also objects that it was the defendant, as opposed to [redacted], who sent the image from Oren's computer. Undoubtedly, the video of [redacted] on the computer supports this factual account. The adjusted offense level for this group is 32.

**d. Calculation of the Final Adjusted Level for Oren**

Because these are the only three groups that correspond to the jury's verdict, the final offense level should be based on these three groups. Of the three, the highest group level is 32. Because each of the other two groups is equally serious to or 1-4 levels less serious than level 32, each of the two groups counts as one unit, for a total of two additional units. The table at 3D1.4 indicates that two units correspond to an increase of two-levels. This causes the final adjusted level for Oren to be a Level 34.

**e. Calculation of the Final Adjusted Level for Alon**

Because Oren and Alon have two of the same groups, specifically those related to Bela Koval (level 30) and Rhonda Stone (level 30), the only group that needs to be calculated is the one related to Isa Brooks.

The defense agrees that the base offense level is 30. Ms. Brooks testified that she was voluntarily drinking in the hot tub with someone other than one of the brothers. Her testimony is then very much confused about what happened and who was doing what. Therefore, we object to

a four-level force increase. We also object to a two-level computer enhancement. We also object to a vulnerable victim enhancement based on being drugged. Her testimony was clear that she drank hard alcohol voluntarily. The adjusted offense level for the Brooks group is a level 30.

With three groups all at level 30, the final adjusted offense level is a level 32.

**f. Calculation of the Final Adjusted Level for Tal**

Tal has four groups. He has the Bella Koval (level 30) group in common with the other two defendants. He has the Isa Brooks group (30) in common with Alon Alexander. The two groups that are unique to Tal are the Lindsey Acree group and the Maya Miller group.

The Lindsey Acree group (Group One for Tal, Group Four for Alon and Oren) involves a base offense level of 30. We object to the four-level increase for use of force. We object to physical restraint. We also object to the two vulnerable victim enhancements because there is no evidence that the witness suffered from physical or mental impairment. The final adjusted level is 30.

The Maya Miller group (Group Four for Tal, Group Eight for Oren, Group Five for Alon) has a base offense of 30. We object to the four-level force enhancement and enhancement for restraint for the reasons stated above. The final adjusted level is 30.

With four groups each at a level 30, the final adjusted offense level for Tal is level 33.

The defendants maintain that the final adjusted guidelines levels for the defendants is as follows: Oren – Level 34; Alon – Level 32, and Tal – Level 33. We believe this is the appropriate calculation because guilt and therefore sentencing exposure is individualized. Also, because this calculation does not involve the Court finding facts not found as part of the jury's verdict.

## I. The Court Should Sentence the Defendants Based Only on Offenses for Which Each Was Convicted

Defendants object to the PSR's guidelines calculation for all three defendants for several reasons that can be broken into three different subjects. First, the defendants object to the grouping analysis under guideline section 3D1.2. Second, defendants object to the application of guidelines section 1B1.2(d) concerning conspiracies. Third, defendants object to the application of 1B1.3(a)(1)(A) and (a)(1)(B) concerning relevant conduct.

Oren, Alon and Tal Alexander object to the grouping analysis found by the probation department. They will raise these objections in order.

### 1. Oren Alexander's Objections to the Grouping Analysis

Oren was convicted of six counts: Count One charging sex trafficking conspiracy, Count Three charging sex trafficking of Victim 2 (Bela Koval), Count Four charging inducement to travel to engage in unlawful sexual activity regarding Victim 2 (Bela Koval), Count 10 charging aggravated sexual abuse of Victim 7 (Rhonda Stone), Count 11 charging sexual abuse by physical incapacitation as to Victim 7 (Rhonda Stone) and Count 12 charging sexual exploitation of a minor in regard to Minor Victim 8 (Amelia Rosen). These six counts were grouped into three groups under USSG 3D1.2. Group One includes Counts One, Three and Four, corresponding to the activity concerning Bela Koval and a sex trafficking conspiracy related to Count three, substantive sex trafficking.

Group Two includes Counts One, Ten and Eleven. Oren objects to the formulation of this group because the crimes of aggravated sexual abuse (Count Ten) and sexual abuse by physical incapacitation (Count Eleven) do not involve substantially the same harm as sex trafficking

conspiracy (Count One). As a result, Group Two may include Counts Ten and Eleven but may not include Count One.

Group Three includes Count One (sex trafficking conspiracy) and Count Twelve (Sexual Exploitation of a Minor). Because these two counts do not involve substantially the same harm, Group Three can include only Count Twelve, but not Count One.

Oren objects to any sentencing calculation as to him that involves Groups Four through Thirteen, as he has not been convicted of any count that comprises any of those groups. USSG 3D1.2 is called "Groups of Closely Related Counts." The guideline section reads, in part, as follows: "All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule: (a) when counts involve the same victim and the same act or transaction. (b) when counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan…" Relevant to this analysis, § 3D1.2 relates solely to **COUNTS**. It does not relate to objects of a conspiracy, nor to overt acts of a conspiracy. It relates explicitly only to counts of an indictment. In terms of Oren, the six counts of conviction correspond solely to Groups One, Two and Three. None of the other Groups (Groups Four through Thirteen) relate in any way to a Count for which he was convicted.

The government will argue that the sex trafficking conspiracy in Count One justifies the thirteen Groups. However, in the absence of a special verdict sheet, that was not used in this case, there is no indication from the jury's guilty verdict on the sex trafficking conspiracy count that the defendants committed any particular crime as part of the conspiracy other than substantive sex trafficking counts for which they were convicted. Accordingly, Oren should be sentenced based on Groups One, Two and Three.

**2. Alon Alexander's Objection to the Grouping Analysis**

Alon was convicted of six counts: Count One charging sex trafficking conspiracy, Count Three charging sex trafficking of victim 2 (Bela Koval), Count Four charging inducement to travel of victim 2 (Bela Koval), Count Five charging sex trafficking of a minor concerning minor victim 3 (Isa Brooks), Count Ten charging aggravated sexual abuse of victim 7 (Rhonda Stone) and Count Eleven charging sexual abuse of victim 7 (Rhonda Stone). These six counts were grouped into three groups. Group One relates to Counts One, Three and Four. Group Two relates to Counts One, Ten and Eleven. Group Three relates to Counts One and Five. Alon objects to the formulation of Group Two because the crime of sex trafficking conspiracy does not involve substantially the same harm as the crime of aggravated sexual abuse. Also, for the same reasons as set forth by Oren, Alon objects to being sentenced based on Groups Four through Twelve in his PSR, at page 44. Accordingly, Alon should be sentenced only on Groups One, Two and Three.

**3. Tal Alexander's Objection to the Grouping Analysis**

Tal was convicted of seven counts: Count One charging sex trafficking conspiracy, Count Two charging sex trafficking of victim 1 (Lindsey Acree), Count Three charging sex trafficking of victim 2 (Bela Koval), Count Four charging inducement to travel of victim 2 (Bela Koval), Count Five, charging sex trafficking of minor concerning minor victim 3 (Isa Brooks), Count Eight charging sex trafficking of victim 6 (Maya Miller) and Count Nine charging inducement to travel of Victim 6 (Maya Miller). These seven counts comprised four Groups. Group One relates to Counts One and Two; Group Two relates to Counts One, Three and Four; Group Three relates to Counts One and Five; and Group Four relates to Counts One, Eight and Nine. Because each of the groups contain at least one sex trafficking count, Tal does not object to the formulation of any of these four groups. He does, however, object to being sentenced based on Groups Five through

Eleven. Rather, Tal Alexander argues that he must be sentenced based only on Groups One through Four.

**4. Defendants' Objection to the Application of 1B1.2(d)**

The guideline calculation as well as the Probation Department's sentencing recommendation of a 195-year sentence for Oren and 180-year sentences for Alon and Tal are driven by the sex trafficking conspiracy count – Count One of the Superseding Indictment – and purported relevant conduct related to that count. The PSR states that pursuant to both 1B1.2(d) and 1B1.3(a)(1), the defendants should be responsible for the sex trafficking of the following additional victims: Victim 1 (Group 4); Minor Victim 3 (Group 5); Victim 4 (Group 6); Victim 5 (Group 7); Victim 6 (Group 8); Victim 9 (Group 9; Victim 12 (Group 10); Minor Victim 25 (Group 11); Minor Victim 26 (Group 12) and Victim 30 (Group 13).

In this regard, under the Probation Department's analysis, this conspiracy count would permit the defendants to be sentenced based not on what the jury convicted them of, but rather on what the Court concludes were the contours and content of the conspiracy. In the absence of a special verdict form, which was not used, the jury's verdict sheds no light on the conspiracy's scope or content. In fact, the instructions to the jury explicitly allow them to find the defendants guilty of conspiracy without agreeing on the personnel in the conspiracy, its actual duration or its details. The jury was charged, for instance, that "to find that a defendant knowingly joined the conspiracy you need not find that the Defendant was fully informed of all the details of the conspiracy or knew all of its participants. He need know only one other member of the conspiracy." The jury was further charged, "a conspirator need not have been a member or actively participated in the conspiracy for the entire time that the conspiracy existed." Even as to the time period of the

conspiracy, the jury was charged the conspiracy lasted from "in or about 2008" to "in or about 2021."

Because the jury was instructed that it could find a conspiracy without agreeing on these details, a sentencing court cannot conclude a jury's guilty verdict on a conspiracy count means that it found that the illegal agreement had any particular scope or content. Indeed, this is precisely why special verdict forms are sometimes used, specifically so that the precise factual basis of a jury's verdict is explicit.

The Probation Department asks this Court to sentence the defendants based on conduct for which they were not convicted under two guidelines sections: under 1B1.2(d) (relating solely to conspiracy offenses) and 1B1.3 (related to relevant conduct). For the following reasons, neither guideline section allows for the wholesale finding that each defendant committed the crime of sex trafficking related to this uncharged conduct. The two guidelines sections will be examined in turn: first 1B1.2, then 1B1.3.

***a.*** **1B1.2(d*) (Conspiracy Under the Guidelines)***

Section 1B1.2(d) provides that "a conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." Note 4 of the commentary warns the trial court that "particular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the subject of the conspiracy." Because there was no special verdict, this case is precisely the type of case discussed in this note where the verdict does not establish which offenses were part of the conspiracy. The commentary goes on to state as follows: "in such cases, subsection (d) should only be applied with

respect to an object offense alleged in the conspiracy count if the court, were it sitting as trier of fact, would convict the defendant of conspiring to commit the object offense."

Through the Probation Department's analysis under USSG 1B1.2(d), it is asking the Court to act as a thirteenth juror and to conclude that the defendants committed certain acts as part of the conspiracy that the jury did not explicitly find. However, it is impossible based on this record for the court to "convict" the defendants of conspiring to commit the object offense. By use of the word "convict," the guideline commentary is clearly contemplating proof beyond a reasonable doubt. There is no principle in American jurisprudence that allows for a conviction except upon proof beyond a reasonable doubt. Indeed, any lower standard of proof for a criminal conviction would violate the constitution. There is simply no view of this baseless, speculative information, offered without the testimony of a witness, that it amounts to proof beyond a reasonable doubt of the crime of sex trafficking conspiracy.

The central role of the sex trafficking conspiracy in sentencing is clear in the Presentence Investigation Report ("PSR"). In justification of the 195-year sentence for Oren Alexander, the PSR states, "[a]ccording to USSG §1B1.2(d), 'a conviction on a count charging conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." Oren PSR at 77 (Sentencing Recommendation, Justification) (quoting USSG 1B1.2(d).) As a result of the conspiracy count, the PSR holds Oren responsible for the sex trafficking of the following people: Victim 1, Victim 6, Victim 12, Minor Victim 26, Minor Victim 25, Victim 9, Victim 30, Minor Victim 3, Victim 4 and Victim 5. Absent the conspiracy count, Oren would be responsible for the sex trafficking of a single person: Victim 2. The conspiracy count alone is responsible for Oren

being sentenced as though he conspired to commit sex trafficking against a total of eleven persons, instead of just one.

In this regard, the conspiracy count is responsible for the elevated guidelines calculation, pursuant to Guidelines Section 1B1.2(d), and Probation's astronomical sentencing recommendation. However, the Court, in fashioning an appropriate sentence under Section 3553(a), should not consider any substantive sex trafficking allegation unless it resulted in a conviction. There are several reasons for this. First, as noted, there is no indication that by convicting the defendants of conspiracy that the jury found the defendants committed any particular substantive sex trafficking offense aside from the ones for which they were convicted as a substantive count. Accordingly, the Court should sentence the defendants based only on the substantive conduct for which they were convicted and should not attempt to discern the scope of the conspiracy found by the jury. As noted, the Probation Department relies on Section 1B1.2(d)

**5. Defendants' Objection to the Application of 1B1.3 (Relevant Conduct)**

The PSR (¶ 131) stated that the defendants should be sentenced based on conduct relevant to the conspiracy in Count One. Relevant conduct under 1B1.3 is defined, in relevant part, as follows:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured or willfully caused by the defendant; and (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were – (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

For starters, (1)(A) and (1)(B) address different legal principles of assigning blame for conduct committed by others. (1)(A) is the sentencing equivalent of vicarious liability for particular crimes. Just as a person can be guilty as a principal or an accomplice, (1)(A) sets out the common-sense notion that someone can also be sentenced based not only on conduct he or she committed directly but on conduct the person aided and abetted.

(1)(B) goes beyond aiding and abetting and provides for sentencing liability in the case of jointly undertaken criminal activity. As a principle of sentencing, sentencing liability does not depend on a conspiracy being charged. However, here a conspiracy has been charged, specifically the sex trafficking conspiracy of Count One. The Probation Department takes the position, as undoubtedly will the government, that because of the sex trafficking conspiracy, all of the conduct that has not been charged in a substantive count is relevant conduct of the conspiracy.

However, the facts do not support this position. For instance, Lindsey Acree does not implicate Oren or Alon in any conduct whatsoever as part of what Probation alleges to be Group Four (in the Oren and Alon PSRs). There is no basis for sentencing culpability under (1)(A) or (1)(B). No facts have been alleged at trial or even proffered as part of the PSR to show by a preponderance that what Lindsey Acree alleges is within the scope of jointly undertaken activity or is in furtherance of it or is reasonably foreseeable. It bears emphasizing that in order to be considered as relevant conduct, all three requirements have to be satisfied by a preponderance of the evidence. Group Four should not be added to Oren or Alon's sentencing calculation.

Similarly, Minor Victim 3 (Isa Brooks) does not implicate Oren in any way. Therefore, as the conduct relevant to her comprises Group Five, Group Five should not be added to Oren's sentencing calculation.

As to Groups 6 and 7 [redacted] neither witness testified and as set forth in this memorandum, their statements to law enforcement show their accounts of these events are highly unreliable. Also, because the jury received no evidence about these individuals from any source, there is no argument that the jury's conspiracy verdict could have in any way encompassed actions directed at them. The groups corresponding to these people should not be factored into a sentencing analysis.

As to the group corresponding to Maya Miller (Group 8 for Oren, Group 5 for Alon), Ms. Miller did not implicate either Oren or Alon in any manner. Indeed, the evidence was undisputed that Oren was in Florida for the entire weekend that Ms. Miller says she was in the Hamptons *with Oren*.

As to the group corresponding to Rachel Smith (Group 9 for Oren, Group 9 for Alon, Group 7 for Tal), this person did not testify at trial. In the absence of the jury hearing any evidence from this person, there is no argument the jury's conspiracy verdict could have encompassed actions directed at them. The group related to this person should not be factored into the sentencing analysis.

As to the group corresponding to Katie Moore, (Group 10 for Oren, Group 6 for Alon, Group 8 for Tal), Ms. Moore's allegations were not charged as substantive counts. Ms. Moore never mentions Oren being present, or that she had ever met Oren or that he factored into the offense conduct in any way. While she most directly implicated Alon and to a far lesser extent Tal, her testimony was undermined, as shown in this memorandum, and should not be credited by a preponderance of the evidence.

As to the groups corresponding to Kayley Brown and Maylen Gehret (Groups 11 and 12 for Oren, Groups 7 and 8 for Alon, Groups 9 and 10 for Tal), the first relevant consideration is that

neither witness mentioned Tal at all. Indeed, the evidence is clear that Tal was not in Aspen during this trip, nor is there any evidence he so much as knew his brothers were going. The testimony of these witnesses, which is addressed elsewhere in this memorandum, does not remotely establish conduct that could be considered sex trafficking. Therefore, the groups corresponding to their testimony should not be factored into a sentencing calculation.

In terms of what conduct should be considered relevant conduct, the defense argues that the only conduct that should be considered as relevant conduct in light of the sex trafficking conspiracy are those actions corresponding to counts of which a defendant was convicted.

Specifically, that as part of the conspiracy, the "defendants worked together to entice victims to locations …and drugged and/or used force to sexually assault the victims." (PSR ¶ 116).

### J. The PSR Improperly Includes Uncharged, Unreliable Conduct in Its Grouping Analysis

We contest the factual conclusions in the Final PSR concerning Victim-4, Victim-5, Victim-9, Victim-29, and Victim-30.[9] None of these five individuals testified at trial or at a *Fatico* hearing or other proceeding. The government cannot establish by a preponderance of the evidence the allegations related to these five people are credible. The documentary evidence, which should be tested against cross-examination by the defense, shows such unbelievable stories that it cannot be held against Oren, Alon, and Tal.

The written record on which the government asks this Court to rely demonstrates affirmative, documented unreliability: internally inconsistent FD-302s with statements that shift across a dozen debriefings spanning more than a year, post-incident conduct entirely inconsistent with victimization, and, for two of the five, alibi evidence and undisputed facts that contradict the

[9] By describing these individuals as Victims for ease of the Court, we are not conceding that they are victims.

PSR. On this record, the Court cannot find any of these five allegations proven by a preponderance of the evidence, and each must be stricken from the PSR's factual findings, removed from the Guidelines computation, and disregarded at sentencing.

**1. The Government Cannot Prove by a Preponderance of the Evidence that Oren, Tal or Alon Sex Trafficked Victims 4 and 5**

The PSR alleges that in June 2009, Alon raped Victim-4 ([redacted] in a hot tub at 88 Peconic, and that Alon and Oren raped Victim-5 [redacted] the same night. Neither woman testified at trial because the government dismissed the counts arising from these allegations (Counts 6 and 7).[10] The PSR nonetheless asks this Court to treat these dismissed, untested allegations as established fact for guidelines purposes (Groups 6 and 7), applying a four-level force enhancement, a two-level physical-restraint enhancement, and a two-level vulnerable-victim enhancement to each.

Every one of those enhancements rests on the word of two women who, we contend, never met Alon, Oren, or Tal and whom we have been unable to cross-examine. Cross-examination would have explored several topics, including: First, Victims 4 & 5's statements to the FBI are demonstrably inconsistent, and their conduct before and after the alleged incidents is incompatible with the PSR's account. Apart from that, there are *no written communications* between these individuals and any of the defendants. Second, the defense's investigation uncovered that the promoter that Victims 4 & 5 said introduced Alon, Oren and Tal to them had no idea who they were. Third, the defendants have a complete alibi defense. Fourth, both alleged victims identified

[10] The government's suggestion that dismissal was driven by a defense investigator does not make sense—they could have called Victim-5 regardless of any supposed issue with Victim-4, yet they chose not to call either witness. The far more plausible explanation is that the defendants' documented alibi evidence would have been admitted and placed the Alexanders in Manhattan, not the Hamptons, on the night in question, and the fact that [redacted] had by then settled her civil claims against another person in relation to her claims, removing any financial incentive tied to that portion of her account.

an individual who has never met the brothers as being present in the Hamptons. For these reasons, the Court should find that the government has not met its burden.

***a. The 302s and Prior Statements Are Riddled with Material Inconsistencies***

The Court cannot find that Victims 4 and 5's allegations are credible by a preponderance of the evidence. Victim-4 and Victim-5 gave law enforcement *nine separate accounts* between December 2024 and January 2026. Plaintiffs' attorney Evan Torgan brought both women to the government for their first-ever interviews on the day after Oren, Alon and Tal were arrested. As little as a week earlier, Torgan had advised the government only that Victim-5 was a witness to Victim-4's assault, not that Victim-5 herself had been assaulted. (*See* 3544-001.) These accounts continue to evolve and conflict on central points with both individuals:

- <u>Location of the assault</u>. [redacted].
- <u>Who assaulted whom</u>. [redacted]
- <u>The claimed cry for help</u>. [redacted]
- <u>Voluntary intoxication, not surreptitious drugging</u>. [redacted]

### *b. Victim-4 and Victim-5's Post-Incident Conduct Is Inconsistent with the Claimed Assaults*

The conduct of both women in the days and weeks following the incident is irreconcilable with the PSR's account of a forcible, traumatic rape. Victim-4 claims to have accepted a Facebook friend request from Alon after the weekend and exchanged private messages with him that she claims to have since "deleted." She then voluntarily met up with "Jordan" (the same man she says had sex with her without her consent in the shower the weekend in the Hamptons) a second time, at his apartment, after he offered to replace her shoes. Victim-5, for her part, ran into the Alexander brothers again within weeks at a nightclub in Chelsea, left her own sister's birthday celebration and walked over to their table unprompted, and drank with them. She continued to see Mike Kanefsky, the man she told the government sexually assaulted her in the hot tub, socially multiple times that same summer. Neither woman called the police. Victim-5's only threat to call the police that night, by her own account and Victim-4's, was over a *missing cell phone*.

### *c. Documented Alibi Evidence Places Oren and Alon in Manhattan, Not the Hamptons*

The defense has produced a dated photograph, taken from Facebook, showing Oren in New York City on June 26, 2009, the same weekend the PSR alleges the Victim-4 and Victim-5 assaults occurred at 88 Peconic in the Hamptons. (*See* Ex. 41, Alexander_000038.) The photograph depicts Oren with Whitney[11] at the brothers' New York City apartment. Oren could not have assaulted an individual in Long Island when he was in New York City.

[11] This is the same Whitney Lane the defense intended to call at trial, yet the government prevented it.

### *d. The "Jordan" Misidentification Confirms This Story Was Generated by Evan Torgan*

If any single fact demonstrates that the Victim-4 and Victim-5 accounts cannot support a finding by a preponderance of the evidence, it is this: both women identified the same specific individual as a man who spent extended time with them the night of the alleged assaults and, in Victim-4's case, sexually assaulted her again two weeks later.

**That identification is impossible.** In separate interviews sessions the very day after the brothers' arrest, Victim-4 and Victim-5 each independently picked out a photograph of an individual named Jordan [redacted] as "Jordan." In 2009, Jordan [redacted] was **thirteen years old, a freshman in high school, living with his parents in Los Angeles**. He has never met Oren, Alon or Tal, was never in the Hamptons, and by his own account to defense counsel has no idea why he was ever contacted about this case. It is impossible that the Jordan that Victim-4 and Victim-5 identified—a grown man who supposedly did cocaine with the brothers, propositioned Victim-4 in a shower, exchanged phone numbers, and met her again in Manhattan two weeks later—was a thirteen-year-old middle schooler three thousand miles away.

This was not an innocent mistake. Victims-4 and 5 identified the photograph of Mr. [redacted] from government photobooks that did not originate from any independent investigative process. Instead, Laura Buck, a separate plaintiff who was not present in the Hamptons in June 2009 and has no connection to the Victim-4 or Victim-5 allegations, provided this photograph to law enforcement after she searched Facebook for a man named "Jordan."

Buck, Victim-4, and Victim-5 are all represented by the same civil attorney, Evan Torgan, who supplied the photograph to law enforcement. This photobook was then shown to Victims 4 and 5, which is the only plausible explanation for why three separate women, describing three

separate incidents, all represented by the same civil lawyer, misidentified the same uninvolved teenager. A story whose central corroborating character cannot possibly have existed as described is not a story the government can prove by a preponderance of the evidence.

Furthermore, the financial motive to fabricate is quite strong for Victim-4. On December 6, 2024, [redacted] she posted a video on YouTube. DX-3200. In this YouTube video, she laments that she "has no money" and "all she has is $10 [cash]" so she "can't even get a mimosa." Two months later, she filed a civil lawsuit. (3544-007.)

Therefore, the documentary evidence shows that the witnesses cannot agree on the room of the assault, the assailant, how the alleged assaults occurred, or the existence of an alleged cry for help; where both accusers resumed voluntary social and even romantic contact with their alleged attackers; and where documented alibi evidence places two defendants over 100 miles away. The government cannot meet its burden by a preponderance of the evidence. Groups 6 and 7 of the PSR, and every enhancement premised on them, should be stricken.

**2. The Government Cannot Prove by a Preponderance of the Evidence That Oren Raped Victim 9**

The PSR alleges that in January 2017, Oren sexually assaulted Victim-9 ([redacted]) in an Aspen hotel room after she and two friends were drugged at a nightclub.[12] Victim-9 did not testify at trial; the evidence concerning her came in solely through the testimony of Minor Victim-25 and Minor Victim-26, neither of whom witnessed what occurred between Oren and Victim-9 in any detail, and through Victim-9's own FBI interview notes, which are the sole first-hand account of the incident.

---

[12] Oren and Alon continue to deny that they drugged anyone anywhere.

The documentary record affirmatively undercuts any finding of nonconsensual conduct. Following the Aspen weekend, Victim-9 remained in friendly and flirtatious, personal contact with Oren for a period spanning more than two years. (*See* DX-4100.) [redacted] These messages include heart emojis and talk of traveling with one another. Most significantly, Victim-9 expressed a desire to introduce Oren to her mother, conduct flatly inconsistent with the PSR. *Id.* at 6.

The government cannot satisfy its burden beyond a preponderance of the evidence. Group 9 of the PSR, and the four-level force enhancement, two-level vulnerable-victim enhancement, and two-level enhancement under Section 3A1.1(b)(2) that depend on it, should be stricken.

**3. The government Cannot Prove by a Preponderance of the Evidence That Tal Sex Trafficked Victim 29**

The PSR alleges that in August 2016, Tal raped Victim-29 at 26 On The Bluff after a date at a Four Seasons popup restaurant event. First, Victim-29 did not testify at trial. The sole source for this allegation is Victim-29's own, multiply-amended account to the FBI, given across at least three separate interviews between February 3 and February 22, 2026, *after* she believed that Tal was somehow related to Jeffrey Epstein in the middle of the trial. By her own account, Victim-29 only remembers [redacted]" and counsel was not afforded enough time mid-trial, when we learned of this allegation, to sufficiently investigate her claims. On her 3500 material alone, the record cannot sustain a finding of nonconsensual conduct by a preponderance of the evidence.

First, Victim-29's own, contemporaneous account to the FBI establishes that she pursued and welcomed Tal's attention at every stage of the evening. She told her friend that she was very

excited to be there, and that Tal seemed sweet. None of this is consistent with a woman being lured to a rape.

The PSR relies on the fact that Tal locked the bedroom door after leading Victim-29 inside. But Victim-29's own account confirms that the lock operated from the inside and that nothing prevented her from leaving the room once she chose to: by her own telling, she "eventually . . . opened the door, got her things and left the house" and Tal did not follow her, call her, text her, or do anything to prevent her departure. A door that a person can unlock and walk through at will is not evidence of forcible confinement.

Victim-29's own first account to the FBI, given on February 3, 2026, described Tal holding her down with [redacted]

Finally, [redacted], [redacted], the government cannot carry its burden of proving the alleged rape of Victim-29 by a

preponderance of the evidence. The group of the PSR attributable to Victim-29, and every enhancement that depends on it, should be stricken.

**4. The Government Cannot Prove by a Preponderance of the Evidence That Oren, Tal or Alon Sex Trafficked Victim-30**

The PSR's inclusion of Victim-30 is the starkest illustration of why these five allegations cannot be sustained by a preponderance of the evidence. The government has repeatedly claimed that it has interviewed approximately seventy "credible" women in connection with this investigation.[13] Victim-30 is not one of them. At no point has any agent, prosecutor, or member of the prosecution team ever spoken with Victim-30 or any of the other individuals on the trip and asked what happened in the Bahamas in May 2017. The PSR's narrative concerning Victim-30 is built entirely on secondhand text messages, without the benefit of a single word from the person the government now asks this Court to find, by a preponderance of the evidence, was raped.

Critically, the relationship did not end with an accusation or a report to authorities. Victim-30 continued to communicate with Oren after the Bahamas trip and they remained close, meeting up many times after that trip. The government cannot ask this Court to find, by a preponderance of the evidence, that Oren raped a woman the government has never interviewed, who has never claimed to be a victim of any crime, and whose only documented post-incident conduct was to continue seeking out the person who supposedly raped her. Group 13 of the PSR, and the vulnerable-victim enhancement attached to it, should be stricken in its entirety.

[13] We continue to object to this recitation. There are several allegations of incidents when all three brothers were out of the country.

## V. The § 3553(a) Factors Support a Sentence Far Below the Advisory Range

"This is one of those cases in which calculations under the Sentencing Guidelines lead to a result so patently unreasonable as to require the Court to place greater emphasis on other sentencing factors to derive a sentence that comports with federal law." *United States v. Adelson*, 441 F. Supp. 2d 506, 506 (S.D.N.Y. 2006), aff'd, 301 F. App'x 93 (2d Cir. 2008). In this section, we demonstrate why the Guidelines calculation, especially the calculations arrived at by Probation, would lead to an absurd result.

### A. Avoiding unwarranted sentencing disparities (§ 3553(a)(6))

It is unusual to start a § 3553(a) analysis with avoiding unwarranted sentencing disparities, but the recommendations that Probation has arrived at require us to highlight this aspect of § 3553(a)'s mandate. Section 3553(a)(6) directs this Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). When the Court analyzes other sentences where the convicted conduct is similar to the conduct here, the Court must sentence Alon, Oren and Tal to the mandatory minimum sentence of fifteen years.

Before we ask this Court to review other sentences for conduct that was charged here (i.e., guilty pleas or convictions for drug-facilitated sexual assaults, sexual assaults, sex trafficking and Mann Act), we ask this Court to evaluate the result of the only other person that was charged in this matter: [redacted]. As this Court is aware, [redacted] is the other individual who, as one prosecutor put it, "raped a 17-year-old girl" (Tr. 65) or, as another put it, "aggressively put[] his fingers inside of" Ms. Rosen in April 2009 when she was "completely out of it" (Tr. 4756). For his role in raping and aggressively putting his fingers inside of Ms. Rosen, [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] Despite engaging in the same conduct that Oren is charged with, [redacted] has been able to escape the consequences that Oren faces—fifteen years. [redacted] while Oren, Tal and Alon have been in the MDC. We request, respectfully, that this Court directly ask the government whether they [redacted], as the Court is statutorily obligated to "avoid unwanted sentence disparities among defendants." 18 U.S.C. § 3553(a)(6). The government will then have to admit

[redacted] And, they will urge this Court to sentence Oren to at least fifteen years in jail for the same exact conduct.

Counsel understands that the production of child pornography statute requires a mandatory minimum sentence of 15 years. We ask the Court, however, to sentence Oren to no more than 15 years to run concurrent on the other charges. If the government does not view this conduct as appropriately serious to proceed with an indictment against the other co-conspirator that they arrested for sexual assault of the same accuser, then the Court should weigh this as a factor in favor of a 15-year minimum sentence.

Moreover, an examination of sentences in similar courts reveals a stark conclusion: the Probation Office's recommendations of 180 years for Alon and Tal and 195 years for Oren are absurd. Counsel have been unable to find any federal court in recent memory that has imposed anything approaching those terms for comparable sexual-assault conduct, even in cases involving allegations of violence, weapons, or pre-pubescent children—none of which are present here. Across the SDNY, EDNY and DNJ, the sentencing landscape shows sentences clustering at or even below fifteen years.

The most apt comparators are the drug-facilitated sexual assault cases, which involve the very mechanism of harm that was central to the government's theory against Oren, Alon, and Tal. In *United States v. Elkorany*, No. 20 Cr. 437 (NRB) (S.D.N.Y.), Karim Elkorany, a 39-year-old former United Nations communications specialist, pleaded guilty in the Southern District of New York to drugging and sexually assaulting thirteen women and drugging six additional women over the course of nearly two decades while working in international aid and foreign relations in the

United States, Iraq, and Egypt. *Id.*, ECF 68 at 6-28. Elkorany's conduct spanned seventeen years, did not seem to ever stop, and were committed domestically and abroad in order to ensure that his victims would be hesitant to contact law enforcement. *Id.* at 1. On top of it all, he then lied to the FBI about his drugging and raping of one of his victims. *Id.* at 2. This case included multiple real time doctor visits, reports to UN law enforcement, and repeated raping and sexually assault of the multiple women over a long period of time. *Id.* at 6-28. Elkorany's victims trusted him as "an acquaintance, a friend, a boss, a co-workers, and/or a romantic partner," and he abused that trust repeatedly: he gaslit victims who woke up with no memory of what he had done to them, falsely assuring one that she had been awake and telling another who had "passed out" in his apartment that he was "lucky" she had been with him—before drugging and assaulting her again. *Id.* at 32-36. He stalked and blackmailed one victim with nude photographs taken while she was unconscious, and he covertly installed keylogging software to monitor accessed victims' email accounts to monitor and control them. *Id.* at 33. He also destroyed evidence, directing a friend to flush pills down a toilet after one victim reported him to the UN, and then lied to FBI agents who questioned him about that victim. *Id.* at 610-2811. The government's investigation uncovered Elkorany's Google chats instructing a friend, step by step, how to drug a woman to incapacitate her—telling him to "slip her a couple pills" to make sure she "passes out" in her car and to remember that "silence means yes"—and separately explaining that crushed Valium could be hidden in a drink. Specifically "get a girl mildly drunk and surrepetitiously [sic] slip her a bunch of valium, i imagine she will be unable to consent or physically resist." *Id.* at 30-34.

This was calculated repeated conduct. It occurred to multiple people over a long period of time. Yet, Judge Naomi Reice Buchwald sentenced him to 180 months, the mandatory minimum in this case. Despite this conduct, despite the fact that Oren, Alon and Tal are the same age as

Elkorany and despite the victims and the defendant knowing each other, and despite Elkorany having multiple victims, the defendant received a *fifteen-year* sentence. It is hard to comprehend, when reading through the government's sentencing memorandum in Elkorany's case that there could be such a disparity in sentencing recommendations between the defendants here and Elkorany. Probation's recommendation here is 2,480 months for Oren. Two thousand, four hundred, and eighty months. Probation's recommended sentence would therefore be *thirteen times* longer for Oren than for Elkorany. This is not a serious recommendation, and the Court should discard it.

Similarly, in *United States v. Ephron*, No. 24 Cr. 418 (MMG) (S.D.N.Y.), a Manhattan man was convicted after trial of repeatedly and forcibly raping two teenage girls and distributing methamphetamine to them over a period of five days. ECF No. 196 at 4. Until the FBI found the minors, Ephron raped both minor victims repeatedly and plied them with alcohol, marijuana, and methamphetamine. *Id.* The government requested a fifty-year sentence. But the court imposed a term of twenty-five years (300 months). That case involved serial forcible rape of two minors and the furnishing of a controlled substance—conduct that is, by any measure, at least as aggravated as the conduct at issue here. A 2,480 month sentence for Oren would be *more than eight times* longer than Ephron's. Again, Probation's recommendation is just not serious or helpful to the Court.

In *United States v. Smith*, No. 25 Cr. 4 (PAE) (S.D.N.Y.), Judge Engelmayer sentenced Edward Gene Smith, a Harvard-educated former managing director at Citigroup, to 360 months (thirty years) after Smith pleaded guilty to drugging women with the intent to rape them, enticing a woman to travel to New York where he drugged and sexually assaulted her, receiving child pornography, and obstruction of justice. Smith's criminal conduct spanned nearly a decade, from

2015 through 2024, during which he used "promises of financial security to lure "young, foreign vulnerable women to his Central Park residence, incapacitated them with drugs, and sexually assaulted them while they were unconscious. ECF No. 233 at 1. He kept extensive notes planning how he would torture and punish his victims and surreptitiously photographed them while they were nude and unconscious. Investigators also recovered tens of thousands of files of CSAM depicting children, including toddlers and infants. *Id.* at 51. Smith's thirty-year term for a decade of drug-facilitated sexual assaults, child pornography, and obstruction of justice is barely *one-seventh* of the 2,480 months that Probation recommends for Oren. By any rational measure, if Smith's staggering pattern of conduct warranted thirty years, Probation's recommendation in this case is indefensible.

Even outside this Circuit, the pattern holds. In *United States v. King*, No. 23 Cr. 98 (BMM) (D. Mont.), James Kirby King, a former juvenile probation officer in Montana, was convicted after a bench trial of seventeen charges, including aggravated sexual abuse of children, aggravated sexual abuse by drugging, incest, sexual exploitation of children, attempted sex trafficking by force, fraud, or coercion, and child pornography offenses. ECF No. 154 at 3. King's crimes spanned approximately thirty years. *Id.* at 5. He molested his daughter repeatedly over *years* until she was able to escape—he drugged her starting at ten years old, which led to a suicide attempt at twelve years old. When she finally felt strong enough to tell a family member, the defendant sexually exploited his daughter *again*. *Id.* at 7. He exploited his position of trust as a juvenile probation officer and school worker to systematically target the children and families he was supposed to protect. He sexually abused his own biological child. One victim's first memory of molestation was at five years old; another, a fourteen-year-old girl, was given alcohol until she "went blank," after which King photographed her while she was unconscious. *Id.* at 13. He

produced child pornography by photographing and filming victims during abuse. As recently as October 2023, King attempted to sex traffic a victim through coercion. *Id.* at 26. Despite these staggering facts (three decades of abuse, child victims as young as five, incest, drugging, production of child pornography, and attempted sex trafficking), King received a sentence of 290 months (just over twenty-four years). Even this case, involving conduct orders of magnitude more depraved than anything alleged here, resulted in a sentence that is a small fraction of what Probation recommends for Oren, Alon, and Tal.

In another case in Washington D.C., a former U.S. government employee was sentenced to 30 years in prison for drugging and sexually abusing numerous women in multiple countries. The defendant, Brian Jeffrey Raymond, drugged and video recorded 28 victims while they were nude or partially nude, and he admitted to drugging two more. Many of the recordings show the defendant touching and manipulating the victims' bodies while they were unconscious and incapable of consent. Raymond deleted or attempted to delete explicit photographs and videos depicting the victims after learning about the criminal investigation.[14]

That disparity only deepens when measured against cases involving the sexual abuse and trafficking of *children* in this district—offenses that Congress and the courts have consistently treated as among the most serious in the federal criminal code. Case after case confirms that sentences for these gravely aggravated offenses fall well within the range the defense urges here:

In *United States v. Paschal*, No. 21 Cr. 331 (VSB) (S.D.N.Y.) Judge Broderick sentenced a defendant convicted *after trial* of sex trafficking a minor to 132 months (eleven years). There, the defendant operated a prostitution business out of his house in the Bronx for years, posted

---

[14] https://www.justice.gov/archives/opa/pr/former-us-government-employee-sentenced-30-years-prison-sex-offenses.

prostitution ads for the women working for him, and provided rooms in his own for women to engage in paid sexual encounters. ECF No. 133 at 1. He posted sexually explicit advertisements and arranged commercial sexual encounters over an extended period of time. After taking one victim to go to the hospital, he then arranged for her continued prostitution upon her release. *Id.* at 4-5. Probation seeks a sentence of more than *eighteen times* that for Oren, Alon and Tal.

In *United States v. Myrie*, No. 18 Cr. 527 (KMW) (S.D.N.Y.), Judge Wood imposed a sentence of 135 months (just over eleven years) for exploitation of an exceptionally vulnerable minor victim for personal gain. ECF No. 185 at 1. The defendant and his co-conspirators conspired to traffic multiple minor girls and adult women over the course of two years to further one another's sex trafficking business. *Id.* at 1-2. The defendant, for his part, enticed a minor victim using false promises of romantic interest, forced her to engage in prostitution, and then collected on the proceeds of the act. *Id.* at 2. Again, Probation wants more than *eighteen times* that for Oren.

In *United States v. Mitchell*, No. 24 Cr. 683 (VB) (S.D.N.Y.), Judge Briccetti sentenced a defendant to 135 months for the enticement and coercion of thirteen and fourteen year old victims over a span of years, conduct that continued even while the defendant was incarcerated. Does Probation think that Oren's conduct is *eighteen times* worse than that? And in *United States v. Davis*, No. 18 Cr. 685 (GBD) (S.D.N.Y.), a defendant who had actual sexual contact with a fifteen-year-old, filmed the abuse, distributed the recording, and possessed more than 3,700 images and 330 videos of child sexual abuse material received a sentence of 156 months (thirteen years) from Judge Daniels. Probation apparently thinks that Oren's case is nearly *sixteen times* worse than that. None of this adds up in any rational way.

In another SDNY matter with three minor victims, *United States v. Merchant*, No. 18 Cr. 527 (KMW) (S.D.N.Y.), Judge Wood sentenced a defendant for sex trafficking of a minor to 196

months. In this case, the defendant sold a 14-year-old, a 16-year-old and a 17-year-old for sex and also plied them with Xanax and Molly. ECF No. 262 at 1-2. Probation wants a **YEAR** for each **MONTH** Merchant received – *twelve times* more time for Oren than Merchant. In *United States v. Thomas*, No. 23 Cr. 481 (NSR) (S.D.N.Y.), the defendant was convicted after trial of trafficking a minor from a residential facility for vulnerable and at-risk youth across multiple hotels in the Bronx and Brooklyn received 160 months (just over thirteen years) from Judge Román. ECF No. 93 at 1.

Another analogous case is, of course, *United States v. Maxwell*, No. 20 Cr. 330 (AJN) (S.D.N.Y.). Maxwell, convicted at trial, was sentenced to 240 months (20 years) in prison for a scheme to exploit and abuse multiple minor girls with Jeffrey Epstein over the course of a decade. Her victims, as young as 14 years old, were groomed and abused by Maxwell who actually participated in the sexual activity. She, too, like the defendants, were convicted of sex trafficking conspiracy and sex trafficking of a minor, as well as charges of conspiracy to entice minors to travel to engage in illegal sex acts, conspiracy to transport minors to participate in illegal sex acts. Like the defendants, she ceased all criminal conduct prior to arrest. This case—a highly publicized sex trafficking case involving a powerful individual—is most analogous in terms of a sentencing to this one. And here, Judge Nathan, still found it appropriate to sentence her to twenty years, rather than the 195 and 180 years recommended by Probation here.

This pattern is not confined to the Southern District. In the Eastern District of New York, *United States v. Goodman*, No. 12 Cr. 614 (MKB) (E.D.N.Y.), the defendant sexually abused a minor victim from the ages of twelve through fifteen, several times a week, for years. He also abused another victim—a relative of the first—for years. ECF No. 75 at 1. Judge Brodie sentenced him to 120 months. In *United States v. Robert Sylvester Kelly*, No. 19 Cr. 286 (AMD) (E.D.N.Y),

the defendant was convicted after trial for racketeering with predicate acts including illegal sex with minors, sexual exploitation of minors, bribery, coercion and forced labor. Judge Donnelly sentenced R. Kelly to 30 years for his conduct, which included sexual exploitation of several children, child pornography offenses, after he was convicted of abuse of more than ten victims. In *United States v. Bonifaz*, No. 14 Cr. 575 (RJD) (E.D.N.Y.), Judge Dearie imposed a sentence of 151 months (roughly twelve and a half years) on a defendant who sexually abused three girls aged twelve and thirteen, including assaulting one victim approximately weekly for an entire year.

In the District of New Jersey, the results are the same. In *United States v. Gray*,[15] Judge Sheridan imposed a sentence of 151 months for substantive sex trafficking of a minor involving recruitment, advertisement, motel-based prostitution, and commercial sexual exploitation. In *United States v. Butcher*, No. 24 Cr. 40 (MEF) (D.N.J.), Judge Farbiarz sentenced a defendant to 121 months (roughly ten years) for conspiracy to commit child sex trafficking in which a minor lived with the defendant in motels for approximately five months while advertisements were posted and customers arranged. Even in *United States v. Gilmore*, No. 21 Cr. 680 (RMB) (D.N.J.), which involved the trafficking of *three* minors over approximately seven months by a defendant who was *already a registered sex offender*, Judge Bumb imposed a sentence of 260 months (roughly twenty-one and a half years), a fraction of what Probation recommends here.

Additional comparators are summarized below:

***Southern District of New York***

| **Defendant** | **Sentence** | **Conduct** |
|---|---|---|
| Kemar Williams, No. 15 Cr. 888 (SHS) (S.D.N.Y.) (2017) | 42 months | Conspiracy to commit sex trafficking of minors; facilitated the prostitution of minor girls using physical |

[15] https://www.justice.gov/usao-nj/pr/camden-new-jersey-man-sentenced-151-months-prison-sex-trafficking-minor.

| | | |
|---|---|---|
| | | violence, weapons, coercion and intimidation |
| Toby Murchison, No. 22 Cr. 172 (VB) (S.D.N.Y.) (2023) | 60 months | Conspiracy to sex traffic a 16-year-old runaway; arranged commercial sex encounters, secured hotel rooms and received proceeds |
| Elfego Boyd, No. 13 Cr. 890 (RPP) (S.D.N.Y.) (2015) | 120 months | Sex trafficking of a 15-16-year-old; online ads, hotels, multiple customers, took proceeds |
| Joel Davis, No. 18 Cr. 685 (GBD) (S.D.N.Y.) (2021) | 156 months | Sexual contact with a 15-year-old, filmed and distributed the abuse, possessed 3,700+ CSAM images |

*Eastern District of New York*

| **Defendant** | **Sentence** | **Conduct** |
|---|---|---|
| Eduardo Cornejo, No. 16 Cr. 96 (BMC) (E.D.N.Y.) (2017) | 66 months | Former NYPD officer; conspiracy to sex traffic a 16-year-old girl |
| Christopher Arroyo, 1:16 Cr. 376 (JBW) (E.D.N.Y.) (2018) | 120 months | Targeted a 12-year-old online for years; coerced sexually explicit material, posted images publicly |
| Fausto Bonifaz, No. 14 Cr. 575 (RJD) (E.D.N.Y.) (2015) | 151 months | Sexually abused three girls aged 12-13; weekly assaults of one victim for a year |
| Hugo Hernandez-Velazquez, No. 19 Cr. 306 (WFK) (E.D.N.Y.) (2025) | 188 months | Sex trafficking young women from Mexico into romantic relationships through false promises of love and support, then forcing them to engage in prostitution. |

*District of New Jersey*

| **Defendant** | **Sentence** | **Conduct** |
|---|---|---|
| Stephen Bradley Mell, 2:18 Cr. 757 (BRM) (DNJ) (2019) | 84 months | Interstate travel to engage in sexual activity with a minor |

| | | |
|---|---|---|
| | | and receipt of images of child sexual abuse |
| Soauib Butcher, 2:24 Cr. 40 (MEF) (DNJ) (2025) | 121 months | Conspiracy to commit sex trafficking of a minor; minor housed in motels for five months, ads posted by co-conspirator |
| Semaj Gilmore, 1:21 Cr. 680 (RMB) (DNJ) (2024) | 260 months | Trafficked three minors over seven months; already a registered sex offender |

These cases, taken together, establish a clear and consistent sentencing norm. Across three federal districts and districts outside of the tristate area, spanning nearly a decade of sentencing decisions, and encompassing conduct that includes the serial sexual abuse of children, the commercial trafficking of minors, the use of violence and weapons, recidivism, and drug-facilitated assault, the exposed range of sentences falls overwhelmingly between ten and sixteen years. This is even so with conduct that is unquestionably more serious and egregious. For example, multiple minor victims (who do not appear as adults), incest, continued and prolonged sexual abuse of the same individual and producing pornography with them, corroborating evidence of drugging. Despite this, the median sentence among the comparators listed above is approximately 132 months—eleven years. Counsel understands that that sentence is less than the mandatory minimum in this case; however, it should be instructive to this Court as to how to sentence Oren, Alon and Tal.

**1. This case is distinguishable from *Paduch*, *Ray* and *Raniere***

The government will inevitably point to a handful of cases in which courts have imposed sentences far exceeding those catalogued above.[16] But each of those cases is readily

[16] Marc Agnifilo and Teny Geragos were trial counsel to Mr. Raniere, which was tried in the Eastern District of New York. Neither attorney took part in drafting this section.

distinguishable from this one, and an honest comparison only reinforces the conclusion that the sentences in those cases were driven by facts that are simply not present here.

In *United States v. Paduch*, No. 23 Cr. 181 (RA) (S.D.N.Y.), the defendant exploited a position of power and authority over his victims to prey on them repeatedly over the course of years. Critically, Paduch was a doctor, and his victims were patients, who were minor boys, among the most vulnerable class of victims recognized by the law. The duration, the abuse of trust, and the targeting of children set *Paduch* apart from the conduct at issue in this case, where the alleged victims were one-time encounters, the alleged victims were 17 years old or older, and there was no position of power or trust. This case does not have any of the aggravating hallmarks of *Paduch*.

*United States v. Ray*, No. 20 Cr. 110 (LJL) (S.D.N.Y.), is equally inapposite. In *Ray*, the defendant insinuated himself, for years, into the lives of young women who were friends of his daughter in college, effectively moving in with them at Sarah Lawrence College. What followed was a campaign of sustained, escalating violence and coercive control. Ray physically assaulted his victims, including kicking them. He exercised totalitarian dominion over their daily lives. Most disturbingly, he forced one of the college-aged women into prostitution and personally collected a portion of her earnings—wages that reached into the six figures. The evidence at that case included disturbing real-time videos of the abuse and coercion of the young women. The conduct in *Ray* involved an extraordinary combination of physical violence, forced commercial sex, and psychological subjugation that bears no resemblance to the facts of this case.

*United States v. Raniere*, No. 18 Cr. 204 (NGG) (E.D.N.Y.), is perhaps the starkest illustration of conduct that warrants the kind of extraordinary sentence the government seeks here, and even in that case, the sentence was 120 years, not *180* or *195*. Raniere was charged with and convicted of racketeering, sex trafficking, and attempted sex trafficking. He operated what

prosecutors described as a cult-like organization in upstate New York. The scope and depravity of his conduct were staggering. Among other things, Raniere systematically groomed and isolated his victims, in some instances causing them to be ostracized from their own families. When he was 50 years old, Raniere groomed a fifteen-year-old girl for sexual abuse, photographed the abuse (constituting the production of child pornography) and then engineered her continued presence in the United States, isolating her from her family, separating her from her sisters, and causing her to undergo multiple abortions. Evidence at trial showed that he impregnated and caused multiple abortions of both of her sisters, who he was also in sexual relationships with. One of the 15-year-old's sisters was forced to remain in her room for two years, and her travel documents were seized from her such that she was unable to have legal presence in the United States, or in Mexico, where she was from. Evidence at trial established that he controlled the caloric intake of numerous women, causing them to develop severe eating disorders and body dysmorphia. He caused women in a secret society to be branded with his initials without their knowledge or informed consent. And he required participants to submit to a so-called "seduction test," in which women were compelled to attempt to seduce him, with "collateral" (consisting of their most closely guarded personal secrets, true or untrue) held over their heads under threat of public release.

It is beyond question that the conduct in *Paduch*, *Ray*, and *Raniere*, each of which resulted in a substantially higher sentence than what the comparator cases cited above imposed, involved categorically worse facts and far more vulnerable victims. Those defendants operated regimes of sustained violence, exploitation, and psychological destruction. They targeted minors, engaged in commercial sexual exploitation, exercised coercive control over every aspect of their victims' lives, and, in Raniere's case, built an entire organizational apparatus designed to facilitate abuse. None of those features is present in this case. The sentences imposed in *Paduch*, *Ray*, and *Raniere*

reflect the unique depravity of those defendants' conduct and provide no basis for imposing a comparable sentence on Oren, Alon, and Tal Alexander.

### 2. New York State Case Sentences Are Substantially Lower than the Fifteen Years We are Requesting here

It is worth noting that state sentences for forcible sexual assaults are substantially lower than the fifteen years that we are requesting here. For example, in *People v. Luckette*, 126 A.D.3d 1044 (3rd Dep't 2015): the defendant was convicted after trial of first-degree rape for drugging and forcibly raping a seventeen-year-old victim. Facing a maximum of twenty-five years in prison, the court imposed an eight-year prison term to be followed by a 10-year period of post release supervision. In *People v. Yukitoshi:* a 2017 first-degree rape case where a Japanese businessman drugged and raped his employee in a Manhattan hotel. The defendant pleaded guilty to first-degree rape, sex abuse and facilitating a sex offense with a controlled substance and was sentenced to seven-and-a-half years in prison. In *People v. Jeffrey Smith*, 138 A.D.3d 628 (1st Dep't 2016): the defendant was convicted after trial of first-degree criminal sexual act, first-degree sexual abuse (two counts) and second-degree unlawful surveillance (forty-one counts), and was sentenced to an aggregate prison term of five years. Another notable case is *People v. Nieto*, 216 A.D.3d 1180 (2d Dep't 2023), where the defendant was convicted after trial of first-degree criminal sexual act and first-degree sexual abuse and sentenced to concurrent terms of fifteen years and five years. On appeal, the Second Department reduced the fifteen-year sentence in the interest of justice to a ten-year prison term, noting that the original sentence "was excessive." *Id.* at 1181.

This Court should accordingly look to the exposed sentencing range—and in particular to the fifteen-year benchmark established by cases involving comparable or substantially worse conduct—as the relevant measure of a just sentence. A sentence in that range would be consistent

with what other federal courts have actually imposed for serious sexual offenses, would avoid the gross disparity that Probation's recommendation would create, and would satisfy the parsimony principle by imposing a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2).

**B. Nature and Circumstances of the Offense**

The defendants were convicted of very serious offenses that Congress did not pass to apply to the conduct here. When Congress passed the Trafficking Victims Protection Act ("TVPA") on October 28, 2000, it made sure that every defendant convicted of the TVPA would be sentenced to fifteen years in prison. The rationale for the high mandatory minimum sentence was that international and domestic human traffickers posed a clear and present danger and had to be stopped. Passed by Congress within weeks of the United Nation's Convention against Transnational Organized Crime adopting its own protocol to prevent, suppress and punish trafficking in persons, the U.S. law and the U.N.'s protocol would work hand in hand to help United States and international law enforcement eradicate international human trafficking networks and to free the victims from the clutches of modern sexual slavery. Clearly economic in focus, the TVPA targeted commercial sex acts – sex for value – and specifically focused on people and organizations that forced, defrauded or coerced people (mostly women) into lives of prostitution against their will. These offenders who profited off the backs of innocent victims forced to enter and remain in lives of prostitution were the targets of this statute.

Because sex trafficking networks operated in diverse ways, the statute was written broadly. Just like the Racketeering statute thirty years earlier was broadly drafted to capture all the ways the Mafia, cartels, gangs and terrorist organizations structured themselves and all the different things they did to make money and wreak havoc, so too was the sex trafficking statute written

broadly to capture all the different ways people were forced, cajoled and convinced to have sex for money, or food, or clothing, or something of value. Because the trafficking of human beings, specifically through fear and force, and for the purposes of having sex for the commercial benefit of others, is among the most reprehensible endeavors imaginable, Congress did something with sex traffickers it did not do even for mobsters, terrorist and gang leaders – it ensured they would be sentenced to at least fifteen years in prison.

Alon, Oren and Tal do not remotely fit within the purview of what the sex trafficking statute was meant to punish. This is relevant at sentencing. In addition, that the statute is poorly drafted and unclear, which is precisely why the government is able to repeatedly misuse it, is likewise a relevant sentencing consideration. This is especially true where the vagueness of the statute allows a wide variety of conduct to be within its purview – some of it perhaps deserving of a fifteen year minimum sentence and some of it not deserving of punishment of that magnitude. This Court has rightly observed, several times during the trial, that the Sex Trafficking statute in particular is poorly drafted and terribly written. In particular, on February 27, 2026, during a charging conference, the parties discussed jury charges for the crime of sex trafficking. The Court made the following observations: "by the way, just for the record, I hate these statutes. They're the most poorly drafted." (Tr. 4193). Later, the Court stated, "look, this is a poorly written statute." (Tr. 4201). A few minutes later, the Court said, "It's terrible. This is the most horribly written statute." (Tr. 4219). These are not, and cannot be, idle remarks. There must be a consequence for a criminal statute that even the District Court recognizes is "poorly" and "terribly" written. Indeed, there is a remedy for convictions under statutes that are poorly drafted and horribly written, and that remedy is to give a lower sentence because the Court cannot have real confidence in a conviction under a statute of this type.

Oren was convicted of a child pornography production offense because he made a recording on his laptop of a person who was two months short of her eighteenth birthday. In terms of what his sentence should be for this offense, it is directly relevant that he had no way of knowing she was two months short of being eighteen. No evidence was introduced showing that Oren would have any idea that she was two months shy of eighteen, and, indeed, the circumstances of their interactions provided strong evidence that she was of age. The evidence, as the Court will recall, involved this woman making fun of the genitals of certain males in the room and certainly acting like she was well beyond eighteen years of age. Moreover, the circumstantial evidence indicates that they likely met at a 21+ club. While a defendant's knowledge of a person's age in this situation may not matter in terms of violating the statute,[17] it is certainly important in determining blameworthiness and sentencing. Indeed, not even the government knew that Ms. Rosen was 17 years and 10 months until two months before trial.

**1. The Misinformation Surrounding the Alexander Brothers**

This case was born from a groundswell of rumor and false information that has been following the brothers since High School. The genesis of this misinformation was a fake Miami Herald article from February 2, 2004, (DX 1803) posted on a blog, that purported to report that Oren and Alon had been acquitted after a rape trial at Miami-Dade County Superior Court. The fake article stated when Alon and Oren were sixteen-years old, they enticed a fifteen year old with alcohol and Xanax.

The article was a forgery. There was no actual Miami Herald article. There also was never a trial. It was all made up and published by someone who wanted to defame Oren and Alon. But

[17] The Court will recall that defense counsel raised a number of objections and charge requests related to this statute, and we do not repeat any of those arguments here.

the false and defamatory fake article had the desired effect, which was to ensure that rumors of drugging and sexual assault followed the brothers for the remainder of their lives. The falsehoods in the fake Miami Herald article were recirculated in media stories and repeated by countless people over the next two decades. It also influenced their memories of events and caused them to say and even believe things that are not true.

The Court itself witnessed direct evidence of the lasting impact of the fake Miami Herald article posted on a blog over 22 years ago. The government called Christopher Leveroni as a witness. Leveroni was an acquaintance of Katie Moore, who also testified. He stated that Ms. Moore had said certain things to him after a sexual encounter with Alon. Leveroni, who began his testimony right before the lunch break, testified before lunch that Ms. Moore told him that while she was in a bedroom with Alon that Oren walked in on them. Leveroni had previously told the government that it was Tal, not Oren, who had walked into the room. Leveroni stated that over the lunch break, he spoke with the prosecutors. After the lunch break, he changed his testimony. He said that Ms. Moore told him one of the brothers walked in (not specifically that it had been Oren). On cross-examination, Leveroni was asked why he testified before lunch that Ms. Moore told him that Oren walked into the room. His answer was important. He testified that he must have known the name Oren from the blog. The blog to which he was referring was the blog purporting to be the Miami Herald article that Oren and Alon had been acquitted of drugging and sexually assaulting a 15-year-old when they were 16-year-olds. The significance of this testimony is that he admitted that he was influenced by a blog he had read, and that because of the blog, he had falsely put Oren into a situation that did not involve Oren.

Leveroni was not the only witness impacted by press reporting about the brothers. Kelly Hudson testified that she met Oren in Acapulco in 2008. She testified she thought he was attractive

and she was interested in a romantic relationship with him. The two stayed in touch and met up again in Aspen in 2009. They skied, they drank alcohol, they went back to the family's condominium. The next morning, she called Oren and came back to the family condo because she said she left her underwear. For fifteen years, there was no issue raised. Two years before the trial, she was writing her thesis, and she saw a *New York Times* article about the Alexander brothers. The article caused her to run and tell her husband that she was drugged and raped by Oren fifteen years earlier. Of course, it is always possible that reading something fifteen years after the fact can cause someone to have repressed recollections of long-ago events. It is also possible that the article gave her the idea, for perhaps the first time, that rather than drinking too much, she had been drugged without her knowledge. What is clear, however, is that the news reporting led to a reaction for the first time fifteen years after the alleged occurrence.

**2. Lack of Evidence Allowed the Misinformation About Drugging To Continue**

Because of the 2004 fake Miami Herald article, the rumor that the Alexander brothers drugged women persisted for 22 years. The evidence at trial showed virtually every woman who testified had drank some alcohol. The centerpiece of the government's case is that the defendants surreptitiously drugged women. The Alexander brothers deny this completely and emphatically. Moreover, the Court should not credit this baseless testimony, which was not necessarily found by a jury. There is no count of the indictment that has surreptitious drugging as an element of the crime. Accordingly, the jury could have convicted the defendants of all counts and not found that they drugged anyone. As explained further below, the Court should not credit the uncorroborated testimony of drugging in sentencing the defendants.

### 3. The Testimony of the government's Adult Witnesses

The Court permitted testimony of conspiracy witnesses, statutory witnesses, and Rule 413 witnesses. The testimony of each contained changed stories, "curated" evidence, blatant inconsistencies, or impossible situations. Beyond the incredible evidence that the jury did hear, though, significant evidence was kept from the jury by the Court's rulings. But if the government is permitted to put before the Court material that has not been introduced at trial, so too should the defense be allowed to point the Court to real, tangible evidence that casts reasonable doubt on the credibility of the government's witnesses. We highlight some of this evidence below.

#### *a. Katie Moore*

The woman known to the jury as "Katie Moore" testified at trial. Katie Moore never took any kind of drug test after she met Tal and Alon Alexander. Katie Moore never went to a hospital after her encounter with Tal and Alon Alexander. No "date rape" drugs of any kind were ever found with or near Tal or Alon Alexander, on this occasion or any other occasion. No text messages – or any other kind of communication – from the time of Katie Moore's interaction with Tal and Alon Alexander have ever been introduced into evidence, or produced in discovery, that discuss drugs used in sexual assaults.

And what did Katie Moore know? Katie Moore testified that she had no memory of her encounter with Tal and Alon Alexander: "I have no idea, because my last memory is the just cut of standing in that little circle in the club the four of us, so I have no idea what transpired after that, what conversations were or were not had." (Tr. 228:2-5.) As the Court said, "Because she's blacked out, what would she know?" (Tr. 298:1-2.) Moore has no communications from the time period that relate to the encounter. ((Tr. 229:11-16.) "Q. Do you have any text messages with Ainsley about this evening in question? A. Unfortunately, no, I have -- Q. I'm sorry. A. Sorry. I

have one Facebook message with her where I sent her the blog post, but she never responded to it.")

Moore claimed that she was drugged by the Alexander brothers but there was no evidence of it aside from her own recollection. She didn't see anyone put anything into a drink of hers, let alone one of the Alexander brothers. The only drugging that can be attributed to Moore is the drugging she did herself – she took MDMA, or "Molly," consciously and willingly, the night she described to the jury. She mixed that MDMA with multiple alcoholic beverages, but Moore couldn't tell the jury how much she drank. (Tr. 239:9-13.) No one forced her to use the MDMA or drink the alcohol – let alone one or more of the Alexander brothers. (Tr. 236:18-237:2.) Of course, this MDMA could not have caused Moore to be "drugged," as she took it with several other people – including Tal Alexander – none of whom experienced the same effects that Moore described to the jury.

After her interaction with the Alexander brothers, Moore did not go to a hospital. She did not get a rape kit. No drug test. No call to the police. No call to a lawyer. The day after her encounter with Tal and Alon, Moore traveled to Rye, New York to see her boyfriend and then attended a big music festival. (Tr. 269-70.)

But in 2024, when the news of the Alexander brothers' arrests were made public, Moore hired a personal injury lawyer. The jury didn't get to hear the details of Moore's quest for money from the Alexander brothers, but the Court knows that it is true and should consider it.

Moore's testimony was incredible in other ways, too. She claimed, against the weight of common sense, that her memory of her interaction with the Alexander brothers has actually been getting better over time. ((Tr. 257:21-258:6) "Q. Now when you met with the government, you understood you had to provide accurate and complete information? A. Correct. Q. And your

memory a year ago would presumably be at least as good or perhaps even better than your memory would be today. A. I don't know about better than. I actually don't think my memory was better at that time. I think my memory is better now because of how much I've thought about this in the past year. Q. And so your memory has actually improved over time? A. Correct.") Even the government's experts had to admit that this is not how it goes.

As with everyone else in this case, the government never obtained Moore's phone. Instead, they just had Moore – herself – provide whatever material she wanted, and withhold whatever she wanted. ((Tr. 271:1-3) "Q. In terms of being able to reproduce your text messages, did you give the government access to your iCloud account? A. It wasn't asked." (Tr. 270:6-8); "Q. And you're saying the government didn't ask you for it, you did it yourself? A. Yes.")

One of the items that Moore did voluntarily produce was her profile picture from a social media account. As it turns out, Moore changed her profile picture – the very day after she claims she was raped – to an image of the night before. (Tr. 286-88.) In other words, the very first thing a visitor to her social media account would see was a picture of the night Moore claims she was raped. How much sense does that make? If someone undergoes a terrible, violative crime, why would they memorialize the night of that crime on their social media page?

But in the end, after "sort of my psychological processing," (about 12 years), Katie Moore was sure that she was raped by Alon, with no memory of the event, no text messages, no drug test, no police call, and no hospital visit. (Tr. 312:1.)

***b. Kelly Hudson***

The woman known to the jury as "Kelly Hudson" testified at trial as a Rule 413 witness. Kelly Hudson was 24 and working with college kids in Acapulco when she met the much

younger Oren Alexander. She had a "crush on" Oren, and wrote to him, "I wish you could come be my roommate in Costa" Rica, along with a smiley face. (Tr. 4003-04.)

In Acapulco, Hudson claimed that she saw Oren put "party drugs" in people's mouths. But she said explicitly that he was not doing anything without anyone's knowledge. ((Tr. 4004:5-9) "Q. You didn't think he was drugging women? A. I -- my interpretation was he was putting party drugs in girls' mouths and drinks. I didn't think he was drugging them without them knowing.")

Hudson invited Oren to visit her in Colorado, but when that wasn't working out, she invited herself to Miami to be with him: ((Tr. 4005:14-17) "Looks like I'll be in Colorado in August at the earliest. New plan. How about you meet me in Miami this summer and take me out to dinner. Good plan? Yes. I hope you're behaving yourself.")

After pursuing Oren across the continent and over the span of years, they met in Aspen in 2009. Hudson was drinking with a friend, and then "I remember drinking champagne from the bottle, yes." (Tr. 4029:2.) But with all that drinking, Hudson doesn't question whether her drink was tampered with. ((Tr. 4029:6-11) "Q. Obviously you didn't see anybody tamper with your drink. A. I wasn't watching my drink, but no, I did not see anyone. Q. You didn't see anything. Okay. And it didn't taste any different than you would expect it to taste; am I right? A. I don't remember it tasting any different.").

When she initially reached out to the FBI, Hudson didn't say she was drugged. And she told the FBI that, like Moore, she simply didn't remember anything. But her story changed later on: "Q. Now do you remember when—do you remember sending an email to the FBI when you initially reached out and you said that you didn't remember anything? A. I don't remember what I said in the email, but I do remember sending an email to the FBI. Q. Okay. And do you remember,

you said——you remember sending the email. You didn't say to the FBI that you were drugged, right? A. No. I probably didn't. I'm not sure what I said in the email." (Tr. 4033:12-21.)

Hudson's story not only changed, but was incredible in fundamental ways. Hudson claimed that the day after she was raped, she willingly got into her car alone – leaving her male friend behind – and went to pick up Oren and Alon, to go back to their parents' home. She got her effects and left again. (Tr. 4052-54.) How does this square with someone who was violently raped the day before by these very same men? Why drive to their home? Why pick them up? And why not bring a friend? The defense attempted to introduce a photograph of Oren and Hudson on the top of an Aspen ski run several months after Hudson claimed she was assaulted, but the Court precluded it.

Hudson never took any kind of drug test after her encounter with Oren and Alon. She never completed a rape kit after her encounter with Oren and Alon. No police; no hospital visit. No "date rape" drugs of any kind were ever found with or near Oren or Alon, on this occasion or any other occasion. No text messages – or any other kind of communication – from the time of Kelly Hudson's interaction with Oren and Alon have ever been introduced into evidence, or produced in discovery, that discuss drugs used in sexual assaults. And, just like with Moore (and everyone else), the government never got a search warrant or subpoenaed Hudson for information, so we will never know what evidence was there.

***c. Ava Wells***

The woman known to the jury as Ava Wells testified that she was sexually attracted to Alon, just based on his appearance. Wells initiated contact with Alon while Alon was in Israel. She pursued Alon, having seen on Facebook that he was in Tel Aviv. Hours before Wells claims she was assaulted by Alon, Wells sent Alon an unsolicited selfie of herself in a bikini, emphasizing

her physical appearance and proposing that they meet that evening. This was a private Facebook message exchange where Wells sent the photograph directly to Alon, a man she had not seen in several years. The photograph was provocative and sent to entice Alon and draw Alon's attention to Wells's body, while Wells proposed that the two meet.

After sending the messages and selfie to Alon, Wells and her female friend went to Alon's apartment in Tel Aviv. While there, Wells pursued Alon. She left her friend behind in the living room and voluntarily went with Alon into the bedroom, in plain view of Wells' friend and others who were present in the apartment. In the bedroom, Wells and Alon started making out.

Unlike with many of the other women the jury heard from, there are text messages between Alon and Ava Wells. Those texts reveal that Ava Wells was attracted to Alon and pursued him over the course of several years.

But Ava Wells did not provide all her text messages to the government initially. Instead, she picked and chose what to produce. She omitted messages that did not fit with her narrative. (Tr. 3352-53.) She deleted others so as to make her story fit her narrative. ((Tr. 3391-92) "Q. Okay. Now when you originally produced it to the government, you had redacted, meaning you had crossed out the "hahahahaha" at the end of that, right? A. Yes. Q. Okay. And so you were sort of really changing the text message when you sent it to the government, right? A. I wouldn't call that changing the text message. Q. Well, why would you delete that? A. This was a very strange situation to be in, and I was just trying to share things, and none of what happened was funny. Q. Nor is accusing someone of rape either, right? A. Completely agree."); ((Tr. 3393) "Q. And when you produced the text messages between you and Mr. Said, you also didn't provide a complete set for the government at the beginning, correct? A. Correct."); ((Tr. 3405) "So how did you decide what to redact? A. I was protecting other people's

names. Q. And when you redacted "hahaha," that was to protect someone else's name? A. Oh. I— I can answer that again. The haha, I said 'cause I didn't know what to do. I was, at the time— it wasn't funny.")

But the government never subpoenaed her and never got a search warrant for Wells's phone. They never secured all of the communications or photographs or videos that Wells had. They never obtained the metadata from her phone.

Beyond the phone, they could not get a police report, because Wells never filed one. They could not get a hospital record, or a drug test, or a rape kit, because Wells never went to the hospital, never got a drug test, never had a rape kit. Wells didn't go to the hospital after she was supposedly raped; instead she went to dinner with Alon. (Tr. 3387-90.)

And the jury never got to see the evidence, like the full video of Wells and Alon engaging in very consensual sexual contact in a bathroom, with Wells laughing and enjoying herself and wearing a costume, well after Wells claims she arrived at the apartment in Tel Aviv where she claimed she was assaulted.[18] Wells's timeline – the one she provided to the jury – just doesn't add up with the actual evidence – the video and the metadata that the jury never got to see. Wells claimed that very soon after arriving at the apartment, Alon brought her to a bedroom and raped her. But the video, of her and Alon kissing and nuzzling, was significantly after Wells got to the apartment. Same night, later in time.

[18] A shortened video, without sound, was admitted, despite the fact that the video we were seeking to admit was on Said Abulafya's iCloud, which the government had a search warrant for, and represented to the Court and counsel that they had searched for all material responsive to the warrant. Counsel specifically asked for all information from the iCloud related to the Tel Aviv trip. The government represented that they turned it all over. Little did we know, the video that counsel later obtained—and sought to introduce—with audio of Wells laughing, was on the iCloud and precluded.

***d. Bela Koval***

The woman known to the jury as "Bela Koval" testified at trial. Koval never took any kind of drug test after her encounter with Oren. Koval never went to a hospital after her encounter with Oren. No "date rape" drugs of any kind were ever found with or near Oren, on this occasion or any other occasion. No text messages – or any other kind of communication – from the time of Koval's interaction with Oren have ever been introduced into evidence, or produced in discovery, that discuss drugs used in sexual assaults. Koval did not leave the Hamptons and go to the hospital, or to the police station. She left the Hamptons and had milk and cookies in Said Abulafya's hotel room, with whom she spent the weekend.[19] She, of course, denied that this was the friend's hotel room. She posted the milk and cookies on Instagram. (DX 2500) ((Tr. 1074:7-13): "Q. What is this? A. This is the milk and cookies we received at the NoMo Soho. Q. Is this a photo of your Instagram page. A. Yes. Q. Is this a photo that you posted on your Instagram on September 6, 2016? A. Yes.").

In contrast with others, who claim that they couldn't remember much or anything, Koval remembered a lot – but her problem was that what she remembered did not comport with the actual evidence of her Hamptons weekend with the Alexander brothers. Koval maintained, for over a year, a narrative of events that was riddled with holes at trial. Koval maintained, for 15 months, that she was wearing a black swimsuit and a black lace coverup when she was assaulted. But the photographic evidence that the defense had to seek out proved that this narrative was false. (Tr. 1080:17-20): "A. I remembered the outfit. I gave my truthful testimony at the time. And now that I saw I had a different outfit, yes. It was a matter of fact that I realized, and I owned up to it

[19] Koval would not admit to this under oath.

that I must have changed my outfit."). But the swimsuit was no small matter. Though the jury did not see it, the Court can consider that Koval's 3500 contains detailed accounts that Koval spun for the government about the swimsuit, and the coverup, and how Koval knew it was at her ankles after the assault. None of that was true; Koval conceded as much on the stand.

Similarly, Koval's story about when she left the party and went indoors changed substantially from the time she started meeting with the government. Koval told the government, over the course of months of meetings, that she left the party at about 2 or 3 pm. But the photographic evidence showed her still at the party many hours later, into the evening. Again, it is not just the fact, it is how Koval provided detailed stories that ended up being just not true. The Court can consider this at sentencing.

Koval told the government, and the jury, that she took only took "baby sips" of drinks because of her health conditions. (Tr. 1134.) But the photographic evidence presented during cross examination showed that Koval had several drinks of rosé over the course of the evening of the party, and more drinks on the boat the day after the party. Indeed, Koval's friend was recorded on video on the boat saying, "rosé for days."

The boat trip itself was another important topic on which Koval's proffers to the government were completely false. In her meetings with the government, Koval repeatedly said that she "refused" to get on the boat, or stayed behind in the basement when others went out. (Tr. 1224.) But the photographic evidence proved that was wrong. When confronted with it, Koval changed her story and said that while she did go on the boat trip, she felt like she "had no choice." (Tr. 1226.) She was shown photographs of long stairs she descended, and she said she felt like she had no choice to walk down all the stairs. (*Id.*) She was reminded that she had to get on a dinghy with Oren to get to the boat, and she said she felt like she had no choice but to get on the dinghy.

(*Id.*) She was reminded that she had to wade in the water to get to the dinghy, and she said that she felt like she had no choice but to wade in the water. (*Id.*) None of this was credible, and the Court can and should take that into account. Koval also told an incredible story of her actions after she left the Hamptons. She and a friend stayed at the hotel room of one of the Alexanders' close friends, and their text messages show no rush to leave.

***e. Lindsay Acree***

Lindsay Acree testified at trial, offering an account that was remarkable not only for its allegations, but for the complete absence of evidence corroborating virtually any material aspect of her story. Acree claimed to have had encounters – less than a month apart – with both Oren and Tal, though the jury only heard of the encounter with Tal.

Yet after neither incident did Acree seek medical attention, go to a hospital, or undergo toxicology testing. No evidence established that she had been drugged on either occasion. Indeed, no so-called "date rape" drugs were ever recovered from Tal or Oren, or in connection with either alleged incident – or any other occasion. Nor were any contemporaneous text messages, emails, or other communications corroborating Acree's account introduced at trial or produced in discovery. The extraordinary allegation that Acree had these encounters with Tal and Oren twice, within a matter of weeks, rests entirely on her own uncorroborated assertions.

The deficiencies in Acree's account extend well beyond the absence of medical or forensic evidence. There is not even evidence establishing the basic circumstances that supposedly brought Acree and Tal together. Acree testified that she traveled to the Hamptons on Memorial Day weekend in 2011 at the invitation of Hana Boulos, that she "did not know who [Tal] was," and that she had no communications connecting Tal to the invitation. No evidence corroborated that Tal invited Acree, that Boulos knew Tal, or that Boulos was even with him that weekend. To the

contrary, *during* trial, Boulos sent Oren a Facebook message expressing bewilderment at having been implicated in the allegations: "getting pulled up in some ridiculous thing connected to you online for some rape with you and your brother ... What the fuck I don't know who this person is." Ex. 40, Boulos Facebook message to Oren. Thus, the very person Acree identified as the connection to the Hamptons gathering disclaimed knowing the person at the center of the accusation. And although Acree's account placed the alleged incident at a Hamptons residence associated with Tal, no witness testified – and no evidence established – that Tal rented the property that Memorial Day weekend. The only lease introduced at trial, brokered by the government's own witness, Raphael Avigdor, commenced on June 15, 2011, approximately three weeks *after* the alleged incident.

The circumstances under which Acree first publicized her allegations raise still further questions about their reliability. The alleged events occurred in May 2011. For the next 13 years, Acree took no action of the kind she would eventually pursue. It was not until 2024, after reading an article in *The Real Deal* about a civil lawsuit against the Alexander brothers, that she began taking steps to publicize her allegations. (Tr. 2199.) Shortly thereafter, at a social function, Acree happened to sit next to someone affiliated with *The New York Time*s and – rather than independently approaching law enforcement – Acree asked to be connected with a *Times* reporter. (*Id.*) After the *Times* subsequently published an article featuring her allegations, Acree decided it was time to sue Oren and Tal, which she did in 2025.

In this story about sexual assaults, Acree stated that she could not remember anything about the evening with Tal other than a slight memory of being pinned down at some point. (Tr. 2251.) When Acree's lawyer met with the government to do an attorney proffer, the lawyer stated that Acree could not remember anything about Memorial Day weekend in 2011, other than she felt like

she had sex. (Tr. 2255.) When Acree met with the government in 2024, she never told them that at one point during her assault, Tal supposedly left the room, and then returned with a tripod. (Tr. 2265.) But she did say all of those things on the stand at trial. Acree also remembered more details on the eve of trial than she had in any of her previous meetings with the government. (Tr. 2268-70.) These details were never raised in Acree's multiple interviews with the media or the multiple iterations of her civil lawsuit. The Court can and should take into account how these changes affect Acree's credibility.

***f. Rhonda Stone***

The woman known to the jury as "Rhonda Stone" testified at trial. Though Rhonda Stone now claims to have been drugged in some way on board the "Groove Cruise," a music festival at sea, she never took any kind of drug test after her encounter with Oren and Alon. Rhonda Stone never went to a hospital after her encounter with Oren and Alon. No "date rape" drugs of any kind were ever found with or near Oren or Alon, on this occasion or any other occasion. No text messages – or any other kind of communication – from the time of Rhonda Stone's interaction with Oren and Alon have ever been introduced into evidence, or produced in discovery, that discuss drugs used in sexual assaults.

Rhonda Stone admitted that she was drinking heavily and looking to buy MDMA while on the Groove Cruise. Indeed, the Groove Cruise was advertised as a 24-hour party, and the drinking and drugging continued at all hours. The bottom line is that Rhonda Stone really did not remember much at all of what happened on the Groove Cruise – which is understandable given the amount of intoxicants she had, but which is not helpful to a jury trying to determine whether there was consensual sexual activity or not.

For example, Stone testified that while she went to the Alexanders' cabin with $500, with which she wanted to buy MDMA, she left with $900. How did she leave the Alexanders' cabin with hundreds more dollars than when she arrived? She couldn't say. (Tr. 1403.) Her memory of the events had gaps, and those things she could remember were fuzzy. (Tr. 1411-12.) This was not a unique situation for Stone, though – she conceded that she has had numerous blackouts from alcohol. (Tr. 1432.) When she has blackouts, she has "a lot of drinks. A lot of shots." (Tr. 1437.)

When Stone went to the Alexanders' cabin, there were at least four people there, according to Stone: herself, a brunette woman, and Oren and Alon. At one point, the brunette woman kissed Stone, which Stone rejected by saying "no." The woman backed off and did not kiss Stone again. While Stone remembered saying "no" to the brunette, she did not remember saying "no" at any point to an Alexander. ((Tr. 1449.) "Q. Do you recall ever saying 'no' or 'stop' to the Alexander brothers? A. I don't know. Q. Do you ever, did you ever communicate to the Alexander brothers that you did not want to have sexual activity with them? A. I don't know."). At some point, someone handed her a drink, but Stone could not tell the jury who it was – one of the Alexander brothers or the brunette woman. (Tr. 1485-86.) After her interaction with the Alexader brothers, Stone spoke about her time with them to her sister and her friends – but never said anything about being assaulted, or anything at all happening against her will. Instead, she said that "I was stuck having sex with the twins," or "I fucked twins." (Tr. 1541.) At no point, however, did any witness testify that Stone said she was assaulted. No text message or email exists that indicates Stone thought she was assaulted at the time.

Not only Stone's words, but Stone's actions indicate that she did not think she was assaulted. Stone did not go to the security on the cruise ship after her encounter with the Alexanders. (Tr. 1453.) Stone did not go to the infirmary on the ship after her encounter with the

Alexanders. (Tr. 1452.) Instead, she went to the Lido deck and continued dancing, continued partying. Though her sister testified that Stone seemed strange and intoxicated, the Court and the jury saw photographs and videos of the Lido deck party, and Stone did not appear out of place – certainly not for the Groove Cruise.

Stone appeared in photographs from her time on the Groove Cruise both before and after her encounter with the Alon and Oren. She appeared essentially the same in photographs from before and after – in both, she often places a small tattoo of a mustache below the noses of the people or (in one case) statues she encounters. ((Tr. 1414) "Q. Okay. Is that some sort of——it's like a signature move that people put their finger under their nose and pretend to have a mustache or what is that? A. It was at that time, in my early 20s, yes.") In all sets of photographs, Stone appears to be smiling and dancing. ((Tr. 1421) "A. Yes, it appears on my——I'm smiling at my friend. Q. She's smiling back at you. A. Yes. Q. Everybody appears to be having a fun dance. A. Yes.") As with the other witnesses, Stone decided which photographs to share with the government; they never subpoenaed her phone or online accounts, and never served her with a search warrant. (Tr. 1469.) When the Groove Cruise docked in the Bahamas, Stone did not go to the U.S. Embassy to report a rape. (Tr. 1496.) After the Groove Cruise ended, Stone did not go to the hospital or to a police station or to the FBI. Instead, she became Facebook friends with Alon, and exchanged numerous Facebook messages with him. (Tr. 1456-58.) So she did not appear traumatized by her interaction with him. Nor did Stone appear traumatized by the Groove Cruise – instead, she went back the next year, with 30 of her friends. (Tr. 1459.) She danced, she drank alcohol, and she took MDMA. (Tr. 1459-60.) All of these actions indicate that she was not traumatized by her experience on the Groove Cruise in 2012. All of these actions indicate, instead, that she had a great time on the Groove Cruise in 2012. That is why she went back in 2013 with

more people, more drinking, more drugging, more dancing. That's what people do when they have a good time somewhere – they go back.

***g. Maya Miller***

The woman known to the jury as "Maya Miller" testified at trial. Maya Miller told the jury an incredible story of a violent rape by Tal in a bathroom shower while her "safety net" best friend stood getting ready in the *exact same bathroom*. Miller said that she was violently raped even though, *after* leaving Tal and going to New York City, she wrote to him (her violent rapist) that she was having a "fucking amazing time."

Miller never went to a hospital after her weekend with the Alexander brothers. Instead, she went to dinner at Serafina and Marea and high tea at the Plaza Hotel. No "date rape" drugs of any kind were ever found with or near Tal, Oren or Alon Alexander, on this occasion or any other occasion. No text messages – or any other kind of communication – from the time of Maya Miller's interaction with Tal and Oren Alexander have ever been introduced into evidence, or produced in discovery, that discuss drugs used in sexual assaults. Indeed, the only text messages or communications that were introduced were flirty and/or innocuous – including Miller's communications after she now says she was raped.

Miller claims now that the night before she was raped by Tal in the bathroom, she had a "womanly instinct" that "knew that there was something wrong." (Tr. 581.) She was so fearful that she stayed up all night and even piled all of her and her friend's suitcases in front of the door. (*Id.*) The next morning, though, Tal somehow managed to push all of the suitcases out of the way to barge into Miller's room. Miller's friend, according to Miller's testimony, was blow drying her hair at the time in the regular-sized bathroom. Miller, "in a neurological way, [] was straight trying to get to safety." (Tr. 585.) But her friend continued to blow-dry her hair. ((Tr. 585) "So you

didn't—you didn't interrupt her blow-drying her hair to tell her you were afraid that you were going to be sexually assaulted, right? A. I did not, sir.") Why didn't her friend need – in a neurological way – to straight get to safety too? And why didn't Miller yell, scream, pull her friend in front of her, do something – anything? Especially if she had been up all night and piling suitcases to prevent just this occurrence? Miller's testimony regarding her allegations just doesn't make any sense. Nor do Miller's actions after leaving the house where the Alexanders were staying. Miller testified that for the entire ride back to Manhattan, she did not say anything to her friend about her rape – the rape that began with the friend in the same bathroom and finished while the friend (who apparently couldn't tell anything was amiss) was in the bedroom. (Tr. 588.) Miller and her friend did not change their flights home but instead spent days sightseeing and eating out in Manhattan. (Tr. 589-92.) Miller did not talk to her friend, her "safety net," about what had happened while they were in Manhattan or on the flight back to Nevada. This narrative is simply incredible.

***h. Isa Brooks***

The woman known to the jury as "Isa Brooks" testified at trial. Brooks's testimony was no more reliable a basis for the government's sweeping allegations of a premeditated sex-trafficking conspiracy. The evidence did not establish that Tal or Alon recruited, enticed, or harbored Brooks for the purpose of engaging her in a commercial sex act. Indeed, the evidence concerning how Brooks came to be in the Hamptons undermined the government's theory at its very foundation. What the government portrayed as a calculated trafficking operation began with three young men, spending their first summer living in New York City, pooling their resources to rent a summer share house in the Hamptons.

Neither Tal nor Alon invited Brooks to the house, arranged her transportation, or even knew she existed before Memorial Day weekend in 2009. (Tr. 2921.) Brooks likewise had never

heard of them. (Tr. 2922.) Instead, Brooks testified that she traveled to the Hamptons at the invitation of Matt Lipman, a nightclub promoter whom she knew and liked. (Tr. 2914-15.) Lipman was himself a tenant of the house, was named on the lease, and paid his share of the rent. When Brooks arrived, she placed her belongings in Lipman's bedroom and slept in his bed. She testified that when she awoke in an embrace with Lipman the following morning, she was happy and didn't want to get out of bed. (Tr. 3058.) These were not the circumstances of a young woman lured to the Hamptons by Tal or Alon as part of a prearranged scheme to exploit her. They were the circumstances of a social invitation from a man Brooks already knew, liked, and wanted to spend time with. The government offered no evidence that Lipman's invitation was made at the direction of either Alexander brother or in furtherance of any trafficking agreement.

Nor did Brooks describe a house in which she was isolated, controlled, or directed by the Alexanders. To the contrary, she testified that the guests largely did their own thing; Brooks was free to come and go, which she did. Her recollections of the alleged encounter with Tal were themselves uncertain, filtered through alcohol consumption and the passage of 17 years. Brooks testified that she and Tal flirted and she was excited by the attention. (Tr. 3078-79.) Whatever conclusions the government asks the Court to draw from her account of what allegedly followed, those recollections do not establish that Tal or Alon had recruited or harbored Brooks with the preexisting purpose of causing her to engage in a commercial sex act. Nor did the government introduce evidence of any exchange, promise, or offer of anything of value in connection with sexual activity involving Brooks and either brother.

Brooks's conduct immediately following the alleged incident raises additional questions about the government's characterization of the weekend. After the alleged assault, Brooks got ready, applied her makeup, and returned to the very nightclub where Lipman was promoting,

accompanied by people from the Hamptons house. (Tr. 3085-87.) Upon leaving the Hamptons, she posted on Facebook that she "had a great weekend in the Hamptons" and was "taking a nap and doing it big for the birthday tonight." (DX-1427.) She then went out again to a club promoted by Lipman, attended by his roommate, and accompanied by her best friend – the same friend who had been with her in the Hamptons and whom Brooks described as "horrified" by the alleged assault. (Tr. 3111-16.) And before leaving for college approximately two weeks later, Brooks returned to Lipman's apartment, where she spent time with Tal. (Tr. 3123-25.)

While Brooks's subsequent social activities do not, standing alone, resolve whether an assault occurred, they do underscore the distance between the evidence actually presented and the elaborate, preconceived trafficking scheme the government alleged.

**C. Deterrence**

**1. Specific Deterrence (§ 3553(a)(2)(C))**

To achieve specific deterrence in this case, a sentence of 180 months is "sufficient, but not greater than necessary" to achieve the goals of sentencing. 18 U.S.C. § 3553(a). Both the evidence concerning recidivism and the circumstances of the Alexanders' lives before their arrest show that there is no reason to believe they will engage in the conduct like what was charged in this case, much less commit crimes after serving their sentences.

First, the Alexanders are all nearly 40 years old (Tal, 40; Alon, 39; Oren, 39) and will be well into their fifties by the time they serve complete even the mandatory minimum sentence of 15 years. The Second Circuit has repeatedly recognized that there is "widely available, definitive research demonstrating that recidivism substantially decreases with age." *United States v. Jenkins*, 854 F.3d 181, 192 (2d Cir. 2017) (citing U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 8,

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf). That research indicates that offenders with a Criminal History Category I between ages 36 to 40 have a 12.1% recidivism rate (Oren and Alon), as opposed to a 29.5% recidivism rate for Category I offenders under 21; and a 23.2% recidivism rate for Category II offenders between the ages of 36 to 40 (Tal), as opposed to a 35.6% recidivism rate for Category II offenders under 21. *U.S. Sentencing Comm'n, Measuring Recidivism 8: The Criminal History Computation of the Federal Sentencing Guidelines* 8, at 28. And for individuals over 50, which is the age the Alexanders will be upon completing a mandatory minimum sentence, the overall recidivism rate drops to just 9.5%. *Id.*

Age is not the only characteristic associated with lower recidivism. "Those with stable employment in the year prior to their instant offense are less likely to recidivate (19.6%) than are those who are unemployed (32.4%)." *Id.* at 12. The Commission's research similarly reflects a recidivism rate of only 8.8% for offenders with a low criminal history category who obtained a college education. *Id.* Taken together, these characteristics provide further support to conclude that the Alexanders are unlikely to commit any crimes upon release.

In *Jenkins*, the Second Circuit "disagree[d] with the district court's conclusion that Jenkins's lack of respect makes him 'a very high risk to reoffend'" and relied on these statistics in concluding that the sentence imposed was substantively unreasonable, recognizing that Jenkins, "who will be 63 when he is released from his lengthy prison sentence, will be a low—not a high—risk to reoffend since more than 90% of individuals in his age group do not reoffend." *Jenkins*, 854 F.3d at 192 (reversing sentence imposed by district court as unreasonable in a possession of child pornography case even though the defendant "refused to accept responsibility, offered false exculpatory testimony at his trial, and was disrespectful to the district judge." *Id.* At 191.). *See*

*also United States v. Hamilton*, 323 F. App'x 27, 31 (2d Cir. 2009) (reversing sentence imposed because "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Piggott*, No. 94-Cr-417 (SHS), 2022 U.S. Dist. LEXIS 5293, 8 (S.D.N.Y. Jan. 11, 2022) ("It is also well-established that recidivism decreases significantly with age.").

But the circumstances of this case provide an additional, and more specific, reason to conclude that the need for deterrence is low. Even accepting the government's allegations, none of the Alexanders is alleged to have engaged in criminal conduct in the several years preceding their arrests. The last alleged misconduct involving Alon occurred in 2018, Tal in October 2020, and Oren in October 2021. That means more than six years passed for Alon, four years for Tal, and three years for Oren before their arrests in December 2024, without any criminal conduct alleged against them. In these years, the Alexanders all married, had children, and led very different lives than what was portrayed during the trial.

This gap is significant. The Alexanders did not change lifestyles because they had been arrested, indicted, placed under supervision, or confronted with an investigation. For years before their arrest, they were living in the community, working, and building families, with no misconduct alleged in the PSRs or by the government. In assessing the likelihood that they will commit any future crimes, what they actually did during those years matters.

The Second Circuit has recognized the particular significance of changes in conduct that occur before arrest and without the pressure of impending prosecution. *See generally United States v. Workman*, 80 F.3d 688, 701–02 (2d Cir. 1996) (affirming a downward departure based on the defendant's "apparently complete *pre-arrest* rehabilitation" and emphasizing that the rehabilitation "was not undertaken at the spur of impending prosecution for the crimes at issue . .

. . It was an independent (and quite impressive) effort") (citing *United States v. Maier*, 975 F.2d 944, 948 (2d Cir.1992) (emphasis in original); *United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020) ("[Congress] believed that rehabilitation is relevant to the question of whether a sentence should be reduced and that rehabilitation, when considered together with other equitable factors, could constitute 'extraordinary and compelling reasons' for a sentence reduction.") (quoting *United States v. Millan*, 91-CR-685 (LAP), 2020 WL 1674058, at *7 (S.D.N.Y. 2020)).

The same principle was applied in *United States v. Blumenthal*, No. 03 CR. 651 (RPP), 2003 WL 22888803, at *4 (S.D.N.Y. Dec. 5, 2003), where the court held that "[c]onsidering the Defendant's clear efforts at pre-arrest rehabilitation by physically removing himself from criminal activity, his change of lifestyle, his steady employment, and his completion of a university degree, the Court finds that under the case law, his efforts at rehabilitation do qualify as an extraordinary circumstance warranting a downward departure." The court emphasized that the defendant "cut his ties to a narcotics ring and physically removed himself from the environment on his own accord without the threat of impending prosecution." *Id.* Here too, the circumstances of the Alexanders' lives in the years preceding their arrests are important because they developed independent of any threat of prosecution. These were years in which each brother continued building a life that looked materially different from the allegations in this case.

Just as important is the family and professional support the Alexanders will have when they return home. The letters submitted to the Court describe a remarkably close family that has remained a constant source of support throughout the brothers' lives and remains so today. Each brother has also built a career and an established network, developed professional skills, and has work and family responsibilities waiting for them after release. The reputational harm to the

Alexanders has also been catastrophic, particularly given the widespread media attention surrounding this case, providing yet another reason to believe that they will not engage in any misconduct in the future. *See United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006), *aff'd,* 301 F. App'x 93 (2d Cir. 2008) ("With his reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct."). These circumstances reinforce what the Sentencing Commission's studies and the Alexanders' conduct in the years preceding their arrests already demonstrate: there is no likelihood that the Alexanders will commit any crimes in the future. *United States v. Scott*, 239 F. Supp. 3d 629, 635 (E.D.N.Y. 2017) ("[Defendant's] strong family support and good job prospects make recidivism unlikely.").

Thus, specific deterrence here does not require a sentence beyond the already substantial punishment Congress has mandated. Even at the mandatory minimum, each brother will spend fifteen years in prison and will return to the community well into his fifties—an age at which, statistically, the likelihood of future criminal conduct is substantially lower. Taken together, these circumstances show that a sentence beyond the mandatory minimum is not necessary.

**2. General Deterrence (§ 3553(a)(2)(B))**

While the goal of general deterrence undoubtedly calls for meaningful punishment, the mandatory minimum sentence already provided by Congress provides it. Section 3553(a) requires adequate deterrence, *not* the greatest punishment that might conceivably deter others. Indeed, the sentence must be "not greater than necessary" to effectuate the purposes of sentencing. The Second Circuit has made clear that where a lower sentence serves the statutory purposes as effectively as a higher one, the parsimony clause requires the lower sentence. *See United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) ("Plainly, if a district court were explicitly to conclude

that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher.").

"Research suggests that general deterrence is primarily a function of the certainty of punishment and not its severity." *United States v. Gallego*, No. 95-CR-0284 (LAK), 2025 WL 723237, at *5 (S.D.N.Y. Mar. 6, 2025) (citing Daniel S. Nagin, Deterrence in the Twenty-First Century: A Review of the Evidence, 42 Crime & Justice 199 (2013)). "The certainty of being caught is a vastly more powerful deterrent than the punishment [itself]." *Id.* (quoting National Institute of Justice, Five Things About Deterrence [June 5, 2016], https://nij.ojp.gov/topics/articles/five-things-about-deterrence#one). A 2016 publication by the National Institute of Justice (the "NIJ"), the research and evaluation agency of the Department of Justice, explains that short prison sentences may deter future crime, but that increasingly lengthy prison sentences produce "at best a very modest deterrent effect" and "increasing the severity of punishment does little to deter crime."[20] As indicated by the NIJ, "there is no evidence that the deterrent effect increases when the likelihood of imprisonment increases."[21] And Professor Michael Tonry has reached the same conclusion: "Imaginable increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[22]

Courts have relied on the distinction between "meaningful punishment" and "more punishment" when applying § 3553(a). *See United States v. Adelson*, 441 F. Supp. 2d 506, 514–15 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (recognizing that a meaningful, not

[20] National Institute of Justice, Five Things About Deterrence (June 5, 2016), https://nij.ojp.gov/topics/articles/five-things-about-deterrence#one.
[21] National Institute of Justice, Five Things About Deterrence (June 5, 2016) ("Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment.").
[22] Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28–29 (2006), https://scholarship.law.umn.edu/cgi/viewcontent.cgi?article=1504&context=faculty_articles.

necessarily longer, imprisonment was necessary for general deterrence, but emphasizing that "'necessary' is the operative word" under § 3553(a) and that the government had presented no evidence that a longer sentence was necessary to achieve that purpose); *United States v. Lawrence*, 254 F. Supp. 3d 441, 444, 446 (E.D.N.Y. 2017) (concluding that "imposing a long incarcerative sentence on [a defendant] in order to deter future gun violence by members of the community seems futile" after considering testimony from the defendant's expert witness on the effects of deterrence, who "concluded that there is no reliable evidence that appreciably longer periods of incarceration for violent crimes have a general deterrent effect on the population").

Here, fifteen years in federal prison sends an unmistakable deterrent message to the public. Neither the available research nor the purposes of § 3553(a) support imposing additional years simply to make an already severe punishment more severe. A fifteen-year sentence sufficiently serves the goal of general deterrence.

### D. Kinds of Sentences Available and Conditions of Confinement (§ 3553(a)(3)).

As argued above, a 15-year sentence is sufficient but not greater than necessary to achieve the goals of sentencing. Fifteen years in prison is a substantial sentence, and the kinds of sentences available and the conditions under which it will be served, both required considerations under 18 U.S.C. § 3553(a)(3), confirm that no additional time is necessary. First, Alon, Oren and Tal will serve nearly every day of that sentence because the crimes of conviction are not First Step Act eligible. Second, the conditions of confinement the brothers will face are categorically harsher than those for a white-collar offender serving the same term: because of the crimes of conviction, they will not be eligible for a camp or even a low-security facility, and will instead serve their sentences at higher-security institutions where, as described above, violence and extended lockdowns are a documented, daily reality. Indeed, as set forth in Section II.E above, the brothers have already

spent nearly two years at the MDC Brooklyn under conditions courts in this Circuit have recognized as harsh enough to warrant a below-Guidelines sentence, including prolonged lockdowns, repeated stabbings in their unit, and a documented assault on Alon and Tal that Bureau of Prisons investigators attributed to a security lapse. Third, upon release, all three men will be required to register as sex offenders, a status that will itself operate as a lasting form of punishment and restriction on where they may live, work, and travel long after their terms of imprisonment end. Taken together, the unavailability of early-release credit, the harsher security classification and conditions under which the sentence will actually be served, and the lifetime consequences of sex-offender registration all confirm that a 15-year sentence is already a severe and sufficient punishment, and that a sentence above the mandatory minimum is not necessary.

## VI. The Court Should Not Treat Untested Third-Party Allegations Included in the Victim Impact Statements as Established "Victim" Facts

Defendants do not contend that sentencing is confined to trial evidence or that the Court is categorically barred from receiving statements from persons who did not testify, but due process requires reliability when disputed factual allegations may affect a sentence. The Second Circuit has repeatedly held that factual matters used at sentencing must possess "some minimal indicium of reliability beyond mere allegation," and disputed conduct relied upon by the Court must be established by a preponderance of the evidence. *United States v. Juwa*, 508 F.3d 694, 700-01 (2d Cir. 2007); *see also United States v. Cossey*, 632 F.3d 82, 86, 88 (2d Cir. 2011). Most recently, in *United States v. Dralle*, the Second Circuit reiterated that where a defendant objects to the sentencing court's consideration of alleged uncharged conduct, the court must determine whether the government has proved that conduct by a preponderance of the evidence. 175 F.4th 374, 382-87 (2d Cir. 2026).

The government has submitted statements from accusers whose allegations were never adjudicated in this case. Some did not testify, nor did their allegations appear in the PSR. Several interacted with the government only once; one never met with the government; and at least in some instances, the government afforded a proffer agreement or was made aware of potential issues concerning extortion or other criminal conduct. Several have civil claims pending against the defendants. Yet the government asks the Court to receive their submissions under the affirmative label of "victim impact," without testimony, cross-examination, a *Fatico* hearing, or any other adjudication that defendants committed the conduct those individuals allege.

Defendants specifically object to the Court treating as established victim accounts the submissions of the following individuals. Defendants do not seek to exclude statements from persons whose victim status was established through the charged conduct or trial record; the objection is to treating these particular, contested submissions as proof that the declarants are victims of defendants or that the alleged conduct occurred.

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

None of these individuals' allegations are contained in the PSRs. One of them even accuses the brothers of an assault when they were out of the country at the time. Additionally, anyone who never spoke with the government prior to the trial's conclusion cannot meaningfully be investigated or rebutted given that the defense never heard their names prior to receiving the victim impact statement.

The Second Circuit's sentencing cases caution against leaping from allegation to sentencing fact. *See United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978); *Dralle*, 175 F.4th at 382-87. In *Dralle*, the Second Circuit faulted consideration of allegations that had not been incorporated into the PSR or subjected to the procedural safeguards ordinarily attendant to disputed

---

[redacted]

sentencing facts, emphasizing that once such conduct is disputed, the sentencing court must determine whether the government has established it by a preponderance of the evidence. *Id*. Here, the allegations at issue are even further removed from the ordinary sentencing process as they were not tried, not incorporated into the PSR, and in some instances come from anonymous individuals or individuals whom the defendants had never heard of prior to receiving the victim impact statements.

*Juwa* is instructive. There, the government submitted "victim impact statements" from the defendant's nephew and the nephew's mother concerning alleged sexual abuse that was not the federal offense of conviction. Defense counsel specifically objected that the nephew was not a victim of the federal offense. The district court ultimately declined to consider the victim-impact statements, and the Second Circuit separately held that allegations of additional sexual misconduct could not support sentence absent reliable substantiation by a preponderance of the evidence. 508 F.3d at 697-98, 700-02. The Court explained that even a formal indictment, standing alone, was insufficient: some "additional information, whether testimonial or documentary," was necessary to turn accusation into a sentencing fact. *Id.* at 701.

Additionally, because several declarants are pursuing parallel civil claims against defendants, a sentencing submission characterized as a "victim impact statement" (and particularly any judicial acceptance of the declarant as a "victim" or of the alleged conduct as fact) does not necessarily remain confined to the sentencing courtroom. Such a characterization may predictably be invoked in collateral litigation concerning the nature of the alleged conduct, the declarant's status, causation, damages, or the legal consequences that attach to that status. It would be inequitable to generate such potentially consequential findings through a sentencing process in

which the allegations were never charged, tried, included in the PSR, or tested through the procedures ordinarily used to resolve contested sentencing facts.

The appropriate course is therefore a limited one. The Court need not refuse to receive the submissions altogether, but it should make clear that receipt of any statement from an individual outside the adjudicated criminal case does not constitute a finding that the declarant is a "victim," that the allegations are true, or that defendants caused the asserted harm. If the government asks the Court to rely on any such allegation in determining sentence, the government should first establish the disputed facts by a preponderance of reliable evidence, with defendants afforded a meaningful opportunity to rebut them.

## VII. The Court Should Not Sua Sponte Recommend to the Bureau of Prisons That the Brothers Be Designated to Different Facilities

On October 7, 2026, the Court *sua sponte* ordered the parties to discuss whether the Court should recommend to the Bureau of Prisons that the three defendants be designated to different facilities. With respect to the Court's understanding regarding the BOP's practice to designate identical twins to different facilities and to not necessarily designate brothers to different facilities, that is counsel's understanding as well. When Oren and Alon were first brought to MDC, the legal department inquired as to whether Alon and Oren were identical twins. Counsel explained that they were fraternal twins, and the BOP kept all three brothers together. Therefore, with respect to that BOP regulation, it is irrelevant in this case. The Court can recommend that the brothers stay together.

To separate the three brothers would be unnecessarily punitive to Oren, Alon and Tal; it would be unnecessarily punitive to their parents and brother; and it would be unnecessarily punitive to their wives and children. In a case where the 40-year-old defendants are facing over

fifteen years in prison, the Court should recommend to the BOP that they be incarcerated in the conditions that will *least* affect their mental health.

The safety, mental health and wellbeing of individual prisoners and of a prison population are of paramount importance to the BOP. Indeed, this is a basic human right recognized by the United Nations and a host of other human rights organizations. *See* Basic Principles for the Treatment of Prisoners, United Nations Human Rights Office of the High Commissioner, General Assembly Resolution, December 14, 1990. The BOP and its highly experienced personnel are uniquely qualified and positioned to address the wide-ranging, complex and critical issues surrounding the mental health and safety of each prisoner, both from self-harm and from harm by others.

Evaluating an inmate's mental health risk and housing needs requires clinical expertise the Court does not have on this record. A study commissioned by the World Health Organization found that "suicide is often the single most common cause of death in correctional settings," that inmates have a higher suicide rate than their community counterparts." *Id*. at 3. "Sentenced prisoners have a rate of almost six times the rate of males out of prison in the general population." *Id.* The WHO Study continues, "there is also a strong association between inmate suicide and housing assignments," and that the stress on an inmate is caused by radical change. *Id.* at 6. A key factor in an inmate's suicidality is whether he has supportive resources, such as a trusted fellow inmate. *Id.* at 11.

Since their arrest, the one constant for Oren, Alon and Tal has been each other. That mutual support has helped them withstand the violence that is a daily reality at the MDC and separating them now would directly undermine the very thing that has kept them safe. As the Court is aware

from reviewing Oren, Tal and Alon's PSRs, their time in custody has been "extremely stressful." Oren PSR ¶12.

> [Oren] described his time in custody as "extremely stressful." He expressed gratitude that he has been housed in the same unit as his brothers because it has given him "a sense of community." They pray together and eat their meals together daily. The defendant typically practices yoga in the mornings and engages in additional exercise in the afternoons. He and his brothers meet with a rabbi twice per week but practice their faith together daily.
>
> Oren PSR ¶12.
>
> [Tal] disclosed experiencing threats of extortion from inmates while at the MDC and witnessing numerous gang altercations. [Tal] is now housed in a cell next to his brothers which allows them to "look out for one another." They regularly exercise, eat, and pray together. The defendant noted that they observe Shabbat together which has given him "a small sense of normalcy" and comfort.
>
> Tal PSR ¶13.
>
> [Alon] stated that the "mental mind game is incomprehensible" and has caused himself and his family an extraordinary amount of stress. [Alon] disclosed that inmates attempted to extort him and his brothers for money due to his successful career prior to his arrest which led to their transfer to a different unit at least once. He has witnessed numerous fights between inmates and has seen people with homemade weapons. The defendant stated that he tries to spend his free time playing basketball or backgammon, practicing yoga, and engaging in religious studies.

Alon PSR ¶12. All that Alon, Oren and Tal have to ensure each other's safety and mental health is each other. Additionally, it is important for the brothers to stay together because of the "production of child pornography" charge, which makes them a target in jail and increases the risk of danger to them. Having one's family's protection in jail is helpful to ensuring continued safety.

In addition, recommending that the brothers be separated would be punitive to their family. Alon, Oren and Tal's parents are growing older. Three out of their four children are going to be incarcerated for at least the next fifteen years. Separating them, which would require the family to

fly to different states every week just to see their family would be unnecessarily vindictive to them as well.

In conclusion on this point, placement of prisoners is a heartland BOP issue. The Court was not asked to recommend separation of the defendants, and it should not do so.

## VIII. This Court Should Not Order Restitution

The Court should decline to order restitution on the present record, or in the alternative should substantially reduce any award. The Mandatory Victims Restitution Act (MVRA), 18 U.S.C. §§ 3663A-3664, requires the government to prove, by a preponderance of the evidence, that each claimed loss was directly and proximately caused by the offense of conviction, that the amount is reliably established, and that each category of loss falls within the statute's enumerated types of compensable harm. *United States v. Goodrich*, 12 F.4th 219, 229-32 (2d Cir. 2021); *United States v. Gushlak*, 728 F.3d 184, 194-96 (2d Cir. 2013) (citing 18 U.S.C. § 3663A(a)(2)).

The submissions before the Court fail that standard in multiple respects across every alleged victim. The deficiencies go to the heart of whether any particular dollar of claimed loss was actually caused by defendants' conduct, whether the amounts are reliably established, and whether the projections are grounded in competent clinical evidence or are instead the product of lawyer arithmetic and anticipatory litigation strategy. The Second Circuit has made clear that estimation and approximation are permissible only when the underlying methodology is sound and the causal connection to the offense is established. *United States v. James*, 151 F.4th 28, 49-50 (2d Cir. 2025); *Gushlak*, 728 F.3d at 195-96; *United States v. Rivernider*, 828 F.3d 91, 115 (2d Cir. 2016). Neither condition is satisfied here for several of the requested amounts.

### A. Applicable Law

#### 1. Causation and Burden of Proof

The MVRA defines a compensable "victim" as a person "directly and proximately harmed as a result of the commission of [the] offense." 18 U.S.C. § 3663A(a)(2). The government therefore must establish both (1) cause-in-fact, meaning the defendant's conduct was a necessary factor in producing the loss, and (2) proximate cause, meaning the loss bears a sufficiently close, foreseeable connection to the offense. *Goodrich*, 12 F.4th at 229-32. Where the causal chain runs through media exposure, prosecution participation, civil litigation anticipation, or other independent intervening events, the government must establish that the claimed loss nonetheless remains directly and proximately attributable to the offense. *Id.* at 232

The government bears the burden of proving each claimed loss by a preponderance of the evidence. 18 U.S.C. § 3664(e); *Gushlak*, 728 F.3d at 194-96. Reasonable estimation is permissible, but the methodology must be sound and supported by the record. *James*, 151 F.4th at 49-50. Unsupported representations do not satisfy the government's burden. *Id.*

#### 2. Future Treatment Costs

Future medical, psychiatric, and psychological treatment expenses are compensable under § 3663A(b)(2)(A) where competent evidence establishes their necessity and provides a reliable basis for estimating their cost. *United States v. Kelly*, 128 F.4th 387 (2d Cir. 2025). *Kelly* upheld an award for future treatment where the victim was already receiving treatment and the record contained medical and testimonial evidence establishing its necessity, causal relationship to the offense, and projected cost. 128 F.4th at 427-28.

Similarly, *United States v. Sanderson*, affirmed an award supported by an affidavit from a social worker who "had worked extensively with the victim after the encounter at issue," assessed

her future treatment needs, and accounted for other sources of trauma. 515 F. App'x 16, 18 (2d Cir. 2013). *United States v. Pearson*, 570 F.3d 480, 486-87 (2d Cir. 2009), vacated and remanded where the record did not adequately explain the basis for projected future treatment costs. Moreover, even where a provider supplies a range, the court is not required to adopt the high end. For example, the *Raniere* court used the midpoint of an expert's projected range—an approach that presupposes the range itself is supported by competent evidence. *United States v. Raniere*, No. 18-CR-204 (NGG), 2021 WL 9696824, at *9 (E.D.N.Y. May 28, 2021).

#### 3. Statutory Limits on Recoverable Expenses

Section 3663A(b)(2) covers "necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care." Section 3663A(b)(4) separately permits recovery of "necessary child-care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense." After *Lagos v. United States*, 584 U.S. 655 (2018), § 3663A(b)(4) does not extend to expenses incurred in private investigations or civil proceedings. The government must identify the statutory basis for each claimed category of loss and establish that the expense falls within it.

### B. Restitution should not be awarded because it was not charged in the indictment or decided by the jury beyond a reasonable doubt

The Alexanders object to the imposition of any restitution because the amount of restitution was not charged in the indictment, submitted to the jury, or proved to the jury beyond a reasonable doubt. The Alexanders acknowledge that 18 U.S.C. § 3664(d)(5) and (e) provide for the Court to determine restitution on a preponderance of the evidence, at a hearing that may be held up to 90 days after sentencing. To the extent the MVRA (18 U.S.C. §§ 3663A and 3664) and USSG § 5E1.1 authorize the Court (rather than a jury) to find the facts that determine entitlement to restitution

and to fix the amount, defendants submit they are unconstitutional under the Fifth and Sixth Amendments.

Earlier this year, in *Ellingburg v. United States*, the Supreme Court unanimously held that restitution under the MVRA is criminal punishment: a penalty for a criminal offense that only a convicted defendant can be ordered to pay, imposed at sentencing alongside imprisonment and fines, with the government rather than the alleged victims as the adverse party. 607 U.S. 163, 168 (2026) ("the statutory text and structure of the MVRA demonstrate that restitution under that Act is criminal punishment").

Because restitution is criminal punishment for the offense of conviction, defendants submit that a jury, not the court, must find the facts supporting any restitution order, and do so beyond a reasonable doubt. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"); *Blakely v. Washington*, 542 U.S. 296, 303 (2004) ("the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant . . . In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings"); *Southern Union Co. v. United States*, 567 U.S. 343 (2012) (applying *Apprendi* to criminal fines); *Alleyne v. United States*, 570 U.S. 99 (2013) (holding that facts triggering a higher mandatory minimum sentence must be found by a jury).

On the jury's verdict in this case, the restitution this Court may impose is zero because every dollar above zero would rest on factual findings no jury has made—that is, that particular individuals suffered a loss, and that the offense of conviction caused it.

The Alexanders acknowledge that the Second Circuit held in *United States v. Reifler*, 446 F.3d 65, 114-20 (2d Cir. 2006), that *Apprendi* does not apply to restitution because, in the court's view, the Mandatory Victims Restitution Act "is an indeterminate system" with no prescribed statutory maximum. *Id.* at 118 ("Although it makes the imposition of restitution mandatory for a defendant convicted of a felony covered by the MVRA, *see* 18 U.S.C. § 3663A(a)(1) . . . , the MVRA fixes no range of permissible restitutionary amounts and sets no maximum amount of restitution that the court may order. Thus, we conclude that the *Booker–Blakely* principle that jury findings, or admissions by the defendant, establish the 'maximum' authorized punishment has no application to MVRA orders of restitution").

The Alexanders submit *Reifler* was wrongly decided. The government advanced that same argument in opposing certiorari in *Hester v. United States*, 586 U.S. 1104 (2019) (certiorari denied). Justice Gorsuch, joined by Justice Sotomayor, would have granted certiorari and rejected that argument:

> [T]he government argues that the Sixth Amendment doesn't apply to restitution orders because the amount of restitution is dictated only by the extent of the victim's loss and thus has no "statutory maximum." But the government's argument misunderstands the teaching of our cases. We've used the term "statutory maximum" to refer to the harshest sentence the law allows a court to impose based on facts a jury has found or the defendant has admitted. *Blakely v. Washington*, 542 U.S. 296, 303, 124 S. Ct. 2531, 159 L.Ed.2d 403 (2004). In that sense, the statutory maximum for restitution is usually zero, because a court can't award any restitution without finding additional facts about the victim's loss. And just as a jury must find any facts necessary to authorize a steeper prison sentence or fine, it would seem to follow that a jury must find any facts necessary to support a (nonzero) restitution order.

*Id.* at 1105 (Gorsuch, J., dissenting from denial of certiorari, joined by Sotomayor, J.). The government's backup argument opposing certiorari in *Hester*—that restitution is not a criminal penalty—is the same argument that Justices Gorsuch and Sotomayor would have rejected in *Hester* and that the unanimous Court in fact rejected in *Ellingburg*. For these reasons, the Alexanders object to restitution.

[redacted]

[redacted]

| [redacted] | [redacted] |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

[redacted]).

**1.** [redacted]

[redacted]

[redacted]

[redacted][25]

---

25 [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted][redacted] [redacted][redacted]

---

[redacted] [redacted]

[redacted] [redacted].

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

| [redacted] | [redacted] | [redacted] |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

| [redacted] | [redacted] |
| --- | --- |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

| | |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

**IX. Conclusion**

For the foregoing reasons, Alon, Oren and Tal respectfully request that the Court sustain the objections to the Guidelines calculation and Probation's recommendations set forth above, and impose a sentence of fifteen years of incarceration. Such a sentence is sufficient, but not greater than necessary, to satisfy the purposes sentencing.

Dated: October 9, 2026
New York, NY

Respectfully submitted,

Marc Agnifilo
Zach Intrater
Teny R. Geragos
AGNIFILO INTRATER LLP
140 Broadway, Ste. 4530
New York, NY 10022
(646) 205-4350

/s/
Howard Srebnick
Jackie Perczek
Jeanelle Gomez
BLACK SREBNICK
201 South Biscayne Blvd., Ste. 1300
Miami, FL 33131
(305) 371-6421

/s/
Deanna Paul
GERAGOS & GERAGOS
256 5th Avenue, 3rd Floor
New York, NY 10001
(213) 625-3900

cc: Counsel for the government (via email)