# EXHIBIT 2

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

September 4, 2026

**BY EMAIL**
Ashley Geiser
U.S. Probation Officer Specialist
U.S. Probation Office, Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

**Re: *United States v. Alon Alexander, Oren Alexander, and Tal Alexander,* 24 Cr. 676 (VEC)**

Dear Ms. Geiser:

The Government respectfully submits this letter to respond to the objections raised by the defendants to the draft Presentence Investigation Reports ("PSR") in the above-captioned case.

**Institutional Adjustment**

**Paragraph 11 (Alon):** Alon acknowledges the PSR accurately reflects the disciplinary record. His continued objection to the conduct underlying the infraction merits no change to the PSR.

**The Offense Conduct**

**Paragraphs 15-24 (Oren/Alon), 16-25 (Tal):** The defendants' global objections to the PSR reflecting their conduct because they pleaded not guilty to the offenses of which they were convicted merit no change to the PSR. *United States v. Hourihan*, 66 F.3d 458, 465 (2d Cir. 1995) (a "guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the verdict").

**Conspiracy Overview**

**Paragraph 16:** The defendants' denials in the face of a jury verdict to the contrary merit no changes. Moreover, the messages in paragraph 16 are accurately quoted (with the typo correction noted by the Government) and reflect the commission of sexual assault.

**Paragraphs 12, 20, 116, 118, 129, and 131 (Alon):** As conceded by Alon, his objection about the length of the conspiracy is immaterial to the Guidelines calculation and thus should not be adopted. Additionally, Alon's argument conflates the idea of becoming a lesser participating member of a still active conspiracy with withdrawing from a conspiracy, and, as the Court already

established, simply getting engaged and married does not in and of itself constitute withdrawal. No change is warranted or needed.

**<u>The Victims</u>**

**Paragraph 17 (Oren/Alon); Paragraph 18 (Tal) – Defendants' Ages**: No changes should be made to these paragraphs to incorporate the defendants' ages. The defendants' ages are not in dispute, and their basic biographic information is listed in the introduction to each PSR. Paragraph 17 introduces the victims of the defendants' conduct by giving a quick overview of the date, location, and conduct. The defendants' ages are not relevant to this introduction of the victims and conduct. Additionally, the request to describe Victim-3 as almost 17 years old is irrelevant and should be rejected.

**Paragraph 17 (Oren/Alon); Paragraph 18 (Tal) – Drugging Victims:** The defendants' global objection to references that they drugged many of their victims should be rejected. The defendants are attempting to relitigate the argument they made to the jury, which the jury rejected and which is inconsistent with the evidence. *Hourihan*, 66 F.3d at 465. The jury found that the defendants sex trafficked multiple victims by force, fraud, and coercion, and further found that Alon and Oren sexually assaulted a victim by force, threat, or intoxicant. The evidence at trial showed the defendants' access to these drugs, motivation and intent to use them to engage in sexual assaults, the symptoms of drugging the victims experienced, and the defendants' pattern of conduct, among other things. The Government argued, and the jury apparently agreed, that many instances of force, fraud, or coercion, could be found in the defendants' use of drugs to incapacitate their victims. It bears noting that this issue was not ancillary but a central point of contention between the parties throughout the trial and the jury's verdict clearly supports inclusion of this language.

The defendants' additional objection as to Minor Victim-3 should be rejected because the evidence established that Tal and Alon Alexander worked together with David Rabello to drug and rape Minor Victim-3. (Tr. 2944-52).

The defendants' additional objection as to Victim-6 should be rejected because the testimony of Victim-6 showed an effect on the friend consistent with intentional drugging, and the actions of Tal after giving Victim-6 a drink further showed Tal's expectation that Victim-6 would similarly have been drugged. (Tr. 453-59).

The defendant's additional objection as to Victim-12 should likewise be rejected because the evidence at trial, including Victim-12's testimony and the testimony of a toxicologist, established that Victim-12's symptoms were consistent with drugging via a sedative hypnotic and were inconsistent with MDMA use. (Tr. 142-54).

**Paragraph 18 (Oren/Alon); Paragraph 19 (Tal):** The defendants' claims about Victim-9 do not alter Oren's conduct against her in the hotel room, which was testified about by multiple witnesses at trial. (Tr. 1881-82, 1888, 1894, 1909-1911, 2375).

The defendants' objections about Victim-30 also merit no changes. As already reflected in the PSR, Oren Alexander digitally penetrated and then had sexual intercourse with Victim-30 while she was unconscious. That is rape and sexual assault. Oren admitted to this conduct in text messages when he was confronted about it the morning after it happened. (GX B-124-1 at 25-26). The defendants' objections that the conduct should not be included because the evidence of the rape is memorialized in text messages from when it occurred, rather than being described in an interview years later, is meaningless. The evidence shows Oren committed this assault of a woman he had enticed to the Bahamas with promise of a luxury (if failed) concert experience.

The similar objection to paragraph 18(iii) should also be denied. Individual-1 testified about what she saw and heard. Additional testimony from the victim is not required.

**Paragraph 19 (Oren/Alon); Paragraph 20 (Tal)**: As an initial matter, the dismissal of Counts Six and Seven and/or Victim-4, Victim-5, and Victim-29 failure to testify has no bearing the defendants' objections. As to Victim-4 and Victim-5, these victims have described the assaults they were subjected to, which accounts are consistent with the other evidence at trial, including the defendants' use of drugs to incapacitate and rape victims, as well as the use of 88 Peconic Hills as a location to lure and assault victims in the summer of 2009. The defendants' claim of an alibi and that the charges were dismissed in response to the defendants noticing alibi witnesses is easily refuted, including by the fact that the defense investigator's improper conduct caused Victim-4 to stop participating in the trial process more than a month before the defendants gave any notice about an alibi.[1]

---

[1] There are many additional issues with the claimed alibi defense. In a letter dated December 30, 2025, the Government requested that the defense provide notice of any alibi witnesses for offenses occurring at "88 Peconic Hills, Southampton, NY 11968, on or about June 26-27, 2009." The defense initially provided notice for an alibi the night of June 27, 2009, but the rapes, if they occurred that particular weekend, would have occurred on the night of June 26 into the morning of June 27, 2009, so the alleged alibi would not have been inconsistent with any evidence that would have been presented at trial. Further, it was not until February 19, 2026—weeks *after* the Government informed the Court and the defense that it was unlikely to be able to proceed on Counts Six and Seven due to the conduct of the defense investigator—that the defense informed the Government for the first time it would call two of the defendants' ex-girlfriends in support of an alibi the night of June 26, providing as support a photograph of Oren and one of the ex-girlfriends that had been posted to Facebook on June 26, 2009, though it did not indicate the time it was posted or the time it was taken. And it is not even clear that this "alibi" would be an actual defense to the charges. To state the obvious, that a photograph was posted to Facebook on June 26 does not indicate that the events in question happened on that date, much less that they happened that evening, and much less that they preclude the commission of a rape. Further, even if Victim-4 had still been cooperative, a claimed alibi would not have prevented the Government from pressing forward with the charges. The Government would have thoroughly investigated the alibi and potentially presented evidence to combat it. The notice of an alibi does not limit the potential proof at trial, and the Government could have presented evidence at trial that the events in question

As for Victim-29, she too has described how, when, and where Tal assaulted her, and her description is consistent with the other evidence at trial, including the use of 26 On the Bluff and masturbating onto women the defendants were unable to sufficiently overpower to force vaginal intercourse.

**The Defendants' Pattern**

**Paragraph 20 (Oren/Alon); Paragraph 21(i) (Tal)**: As described before, there was ample evidence of the defendants' use of surreptitious drugging of their victims that was presented to and credited by the jury.

**Enticement Through Luxury Travel and Experiences**

**Paragraph 21 (Oren/Alon); Paragraph 22 (Tal)**: As described before, Oren admitted his assault of Victim-30 in text messages. It is irrelevant that Victim-30 was not interviewed. No such requirement exists. Further, it is inaccurate to add that Victim-30 never claimed to be raped, because she texted Oren the very next day that she woke up to Oren and another woman having sex with her and that they "both knew [Victim-30] did not want it." (GX B-124-1). A victim need not use the specific term "rape" for there to be evidence that she was raped, and no change in the PSR is necessary here.

**Paragraph 21, footnote 3:** The intent to entice women to Colorado for sex was readily established. To cite only one example, on January 24, 2017, Alon Alexander wrote in a text to Oren Alexander, Evan Albert, and Jonathan Albert: "But if you guys don't bring girls oren and i canceling and will ride just us and 2 girls getting Blowjibs [sic] entire way." (GX B-147; *see also generally* GX 1002).

**Surreptitious Drugging**

**Paragraphs 22-26 (Oren/Alon); Paragraphs 23-27 (Tal):** As described before, there was ample evidence of the defendants' use of surreptitious drugging of their victims that was presented to and credited by the jury. The defendants' objection is essentially that additional types of evidence were not also presented to the jury. That merits no change to the PSR.

**Paragraph 24 (Oren/Alon); Paragraph 25 (Tal)**: A conversation about use of tequila and Xanax to have sex is plainly a conversation about "past use of these drugs to secure sexual gratification." Moreover, whether the conversation about getting girls wasted to "bang em easier" and the use of tequila and Xanax to accomplish that goal happened around a discussion of playing beer pong is irrelevant and does not change the significance of what was said. No context is missing. The PSR properly attributes the messages in the conversation, which were admitted into evidence at trial, and no change should be made.

---

occurred anytime in or around June 2009, including on dates other than June 26-27, 2009, which is what the indictment alleged.

**Paragraph 26 (Oren/Alon); Paragraph 27 (Tal)**: The sequence of the videos is not reasonably disputed. Except for the video that Oren recorded of himself assaulting Minor Victim-8, which Oren recorded on his laptop, the photos and videos from that day were recorded on a digital camera that places them in sequence and gives the relative times they were taken. Between approximately 6:08 AM and 6:27 AM (the digital camera metadata was off by two hours and sunrise was around 6:15 AM), numerous photos and videos of Minor Victim-8 were taken in the bedroom, then the living room, and then back in the bedroom. (Time of day is discernable based on the sunrise happening during this time period, which is reflected in the images). In the final of those videos, Oren told Minor Victim-8 to take a pill. Then, 20 to 23 minutes later (6:48 to 6:50 AM), photos and videos show Minor Victim-8 on the bed still wearing a bra as the ambient light in the bedroom continues to increase. The video of the assault shows Minor Victim-8 with no bra, in a brighter bedroom, and then getting under the covers at the conclusion of the video without putting her bra back on as Oren says, "I think it's officially time to go to sleep." Given the changes to the lighting background, Minor Victim-8's state, and Oren's statement at the conclusion of the assault that it was then officially time to go to sleep, there is more than enough evidence to conclude that the assault video was the final video in the sequence.

The claim that "*during* the encounter," Minor Victim-8 got up and asked for more MDMA is wrong. Minor Victim-8 was not moving while Oren raped her, and there were periods of time where she was essentially comatose and others where she made only small movements or spoke unintelligibly. After she was assaulted, Minor Victim-8 got to her feet briefly. The contention that Minor Victim-8's ability to be on her feet a few seconds, before collapsing back on to the bed, suggests she consented to what was recorded on the video is wrong. (Jan. 16, 2026 Conf. Tr. at 46 (Court: "You lose on the argument that just because someone can stand up, that means they are not incapacitated from consenting to sex.").

As with Minor Victim-3, the request to include Minor Victim-8's age in months should be rejected as irrelevant. It is illegal to create child pornography using minors who are 17 years and ten months of age, and it is illegal to drug and rape victims of all ages.

**<u>Forcible Rapes</u>**

**Paragraph 27 (Oren/Alon); Paragraph 28 (Tal):** The defendants' denials of facts inconsistent with the evidence and jury verdict should not result in changes to the PSR. The defendants used brute force against their victims, including ones they had drugged and those they had not.

**<u>April 2009: Minor Victim-8 (Count 12)</u>**

**Paragraph 28 (Oren/Alon); Paragraph 29 (Tal)**: The video evidence from the bedroom established that Minor Victim-8 was visibly incapacitated and that Oren raped her. (GX D-121-1). In addition, as described above, the defendants' characterizations of the timeline are incorrect. Moreover, there is no reason to add Oren's age to this paragraph.

**Paragraph 29 (Oren/Alon); Paragraph 30 (Tal)**: The defendants object to the timeline, but as described above, the timeline is supported by the evidence, even if the original metadata was

incorrect. The defendants object to the inclusion of Ambien as the drug that incapacitated Minor Victim-8, but the video evidence demonstrates that Oren gave Minor Victim-8 a pill shortly before they went to the bedroom and that the pills were meant to cause her to go to sleep. (GX D-121-1, D-121-2). Perhaps most tellingly, when Minor Victim-8 mentioned MDMA after the rape, Oren's friend corrected her: "Ambien, Ambien, Ambien." (GX D-121-1).

The defendants are incorrect about the testimony of the CART agent. First, GX B-301 is an email that Oren sent to Ido Berniker with the Miami Passover video that depicted the assault. Oren sent this to Berniker at 7:08 PM on April 16, 2009. (Tr. 730-31, 837). Second, the file was saved in an Apple Time Machine backup of Oren's computer, not deleted, and the backup copy of the computer was saved on the external hard drive. (Tr. 733-34, 780). To the extent Berniker sent the video to Oren, that happened about ten minutes after Oren had originally sent it to Berniker. (Tr. 837-39).

**Paragraph 31 (Oren/Alon); Paragraph 32 (Tal)**: The file was not deleted from the hard drive. Multiple forensic tools were used to process the Time Machine backup copy of Oren's computer because of the inability of AXIOM to parse the backup copy, not because the file was deleted. (Tr. 797-98, 833).

**Paragraph 32 (Oren/Alon); Paragraph 33 (Tal)**: This paragraph relates to the circumstances of recovery of the hard drive and computer. No information about "last accessed" dates is relevant to the paragraph. In his residence history in the PSR at paragraphs 238-241, Oren did not report having resided at 432 Park Avenue. If any change is going to be made here, it should be made in his residential history as well.

**May 2009: Minor Victim-3 (Count 5)**

***88 Peconic Hills***

**Paragraph 33 (Oren/Alon); Paragraph 34 (Tal):** The defendants' request to include their ages should be denied as unnecessary. Alon and Tal's objection that they were not involved in renting the house is belied by the evidence, including their presence at the house and the email that Oren sent to Tal, Alon, and Lipman on April 21, 2009, with the subject line "HamptonShare-what do you guys think?" which is excerpted in paragraph 35. (GX B-303). In addition, that same day, Oren also sent Tal, Alon, and Lipman an email entitled "HamptonShare," which included a discussion of how much money they would have to collect from people who stayed at the house in order to cover their rent and deposit. (GX 2C-103; *see also* GX 2C-113 (discussing Oren and Tal paying "ten" thousand toward the house); GX 1008).

**Paragraph 34 (Oren/Alon); Paragraph 35 (Tal)**: This paragraph does not need to add Oren's job as that is not explanatory of his involvement in the house. Oren was not the broker for this house. He was the tenant.

**Paragraph 35 (Oren/Alon); Paragraph 36 (Tal)**: The evidence at trial clearly showed the defendants worked with party promoters, including Lipman, to bring minors to the Hamptons, including Minor Victim-3. The request to call the house a "share house" in this paragraph makes

no sense because the house is being described for its physical characteristics, of which "share house" is not one. We have no problem adding the subject line of the email, "HamptonShare-what do you guys think?" to the paragraph, which would introduce the concept of a share house in the paragraph.

**Paragraph 38 (Oren/Alon); Paragraph 39 (Tal)**: The defendants have identified no issue with the quote in this paragraph, and no change is warranted. The PSR already reflects accurately the relationship between Lipman, Kanevsky, and the defendants from the summer.

***Minor Victim-3***

**Paragraph 39 (Oren/Alon); Paragraph 40 (Tal)**: The requested information about Minor Victim-3's birthdate is irrelevant and should be rejected. The defendants drugged and forcibly raped this high school student. Their conduct is no better because she turned 17 within a week of being gang raped.

**Paragraph 41 (Oren/Alon); Paragraph 42 (Tal)**: The defendants were at the club when Minor Victim-3 and others arrived on the bus. Adding the word "already" so that the paragraph reads: "Everyone from the bus, including Minor Victim-3, Individual-1, and Individual-2, were at the club in the Hamptons where ALON ALEXANDER, OREN ALEXANDER, and TAL ALEXANDER already had a table," would address the defendants' objection and be accurate.

**Paragraph 42 (Oren/Alon); Paragraph 43 (Tal)**: The photograph of Minor Victim-3 was found on the hard drive in Tal's apartment and which also had many of Oren's other files saved to it. The paragraph could accurately be changed to read that "… one or more of ALON ALEXANDER, OREN ALEXANDER, and/or TAL ALEXANDER took a photograph of Minor Victim-3 sleeping partially clothed, without her knowledge." The defendants' request to add that Minor Victim-3 traveled to the house with Lipman is misleading because Minor Victim-3 testified traveling to the house with Lipman and one or more of the defendants. (Tr. 2925).

**Paragraph 43 (Oren/Alon); Paragraph 44 (Tal)**: The evidence at trial was that the defendants hosted a party that day. (Tr. 2943-44). Changing the sentence to read "Minor Victim-3 went inside because she was not feeling well and TAL ALEXANDER ~~followed~~ went into the house with her," would be accurate.

**Paragraphs 44-45 (Oren/Alon); Paragraphs 45-46 (Tal)**: The defendants' general objections to these paragraphs, which accurately reflect the evidence at trial, can be summarily ignored. The defendants' requests to add irrelevant facts to the paragraphs can also be rejected. Alon and Tal were convicted of sex trafficking Minor Victim-3. The statements in the PSR about the girl in the green bikini accurately reflect the testimony. (Tr. 2954).

**May 2011: Victim-1 (Count 2)**

**Paragraph 48 (Oren/Alon); Paragraph 49 (Tal)**: The defendants' objections to this paragraph are all contrary to the evidence introduced at trial and the jury's verdict and can be rejected.

Tal invited Victim-1 to the Hamptons to a rental house through Hana Boulos, who referred to Tal as her friend from Miami. (Tr. 2164, 2167-69). This practice of extending an invitation to one woman and telling her to bring a friend was a common way in which the defendants operated; they did the same, for example, with Victim-2, Victim-6, and Victim-12. Tal's current claim not to know Hana Boulos (which was not a theory advanced at trial) and attachment of a Facebook message does nothing to undermine or alter the record at trial.

The defendants' claim that Tal rented a different house later in the summer has no bearing on the facts that he also had lodging during Memorial Day weekend and that he invited Victim-1 to the house for the weekend. (*See* Tr. 2167-69).

Tal's further claim that the Long Island Rail Road was not the train that was used to travel from Manhattan to East Hampton is just silly. (*See* Tr. 3631-63 (testimony of Long Island resident describing the transportation options to get from New York City to the Hamptons)). And Tal's objection that Victim-1 likely misidentified her second attacker is irrelevant, since Tal was convicted of sex trafficking Victim-1 by force, fraud, or coercion.

Finally, Victim-1 has consistently described her first encounter with Oren as a sexual assault but did not testify about the assault because of the Court's Rule 412 ruling. The draft PSR is accurate; Oren assaulted Victim-1, and soon after, Tal falsely denied knowing Oren. This assault can be proven by a preponderance of the evidence.

**Paragraph 49 (Oren/Alon); Paragraph 50-51 (Tal):** The objection to the statement that Tal drugged Victim-1 with a sedative hypnotic drug is contrary to the evidence at trial and the verdict.

**Paragraph 51 (Oren/Alon); Paragraph 52 (Tal)**: The PSR's statement that Tal and the second attacker had Victim-1 demonstrate her strength and coordination is accurate. Under the circumstances of a victim who has been drugged and who is in the process of being assaulted by multiple attackers, the act of the attackers directing the victim pick up weights is reasonably understood to be for the purpose of having the victim demonstrate her current strength and coordination. The PSR is also correct that Tal used a camera to record the assault. The testimony at trial established that Tal and the second man shared a look, that Tal then left the room, and that he then returned with the tripod. (Tr. 2179-80). The suggestion that Tal's tripod was not connected to a camera is nonsensical. The evidence at trial, including the videos found on the hard drive at Tal's apartment, as well as additional videos on that hard drive that were not admitted into evidence, reflect the defendants' pattern of recording their assaults and sexual encounters, including without their victims'/partners' knowledge. The presence of the tripod and the pattern of recordings clearly support the inference that this assault was also recorded.

**Paragraph 52 (Oren/Alon); Paragraph 53 (Tal)**: The evidence at trial was that the two girls reported their own ages as fourteen years old. (Tr. 2282). There should be no change to the paragraph.

**January 2012: Victim-7 (Counts 10 and 11)**

**Paragraph 53 (Oren/Alon); Paragraph 54 (Tal):** As described before, there was ample evidence of the defendants' use of surreptitious drugging of their victims that was presented to and credited by the jury. With respect to Victim-7 in particular, she and her sister described Victim-7's sober state before going to the defendants' cabin. (Tr. 1372, 1539). After consuming the drink given to her by the defendants, Victim-7 experienced symptoms consistent with being drugged. (*See* Tr. 1274-79). With respect to force, Victim-7 testified that she regained consciousness on a bed in Alon and Oren Alexander's cabin with one of the twins on top of her, pinning her to the bed, and raping her. (Tr. 1377). She testified that Oren and Alon Alexander took turns raping her, and that she was unable to move or speak during the rape.

**Paragraph 55 (Oren/Alon); Paragraph 56 (Tal):** As stated above, there was ample evidence of the defendants' use of surreptitious drugging of their victims that was presented to and credited by the jury, including that the defendants drugged Victim-7 when they brought her to their cabin. Also, the defendants' request to include a reference to Victim-7 leaving with $400 is irrelevant. The jury concluded that the defendants sexually abused Victim-7—the proposed addition has no bearing on the defendants' conduct.

**Paragraph 56 (Oren/Alon); Paragraph 57 (Tal):** The defendants' submitted exhibits do not undermine the proposition that Victim-7 was not acting normally. At trial, Victim-7 testified that she left the defendants' cabin while "it was still dark out" and had to search for her friends for a long time. (Tr. 1381-82). She further testified that she was still "heavily under the influence of something and not in control" when she ultimately found her sister and friends. (*Id.*) Victim-7's sister also corroborated that Victim-7 was not acting normally, stated that she observed that Victim-7 had "incontrollable movements with her body, her demeanor, her presence, was extremely sloppy and messy, she wasn't engaging in any conversations really, and was acting in a way that I had never seen her before." (Tr. 1544-45). The defendants' proposed exhibits are still photos taken hours—or years—after Oren and Alon raped her, and do not undermine the testimony presented to, and accepted by, the jury.

**August 2014: Victim-6 (Counts 8 and 9)**

**Paragraph 60 (Oren/Alon); Paragraph 61 (Tal):** The evidence introduced at trial establishes that Tal drugged the drinks he gave to Victim-6 and Individual-5. Victim-6 testified that Individual-5 drank about half a glass of wine given to her by Tal and then acted in a manner that was inconsistent with having consumed half a glass of non-drugged wine and consistent with having been drugged with a sedative hypnotic. (*See* Tr. 455). Because Victim-6 poured out her own drinks, she was not similarly impacted. Tal's own conduct shows that he expected both women to be incapacitated from the drinks he provided, including that Tal asked Victim-6 if she had been drinking and later returned and was startled and surprised when Victim-6 was conscious and awake. (*See* Tr. 458-59).

**Paragraph 63 (Oren/Alon); Paragraph 64 (Tal):** This paragraph accurately describes Victim-6's testimony, and Tal was convicted of Counts 8 and 9. The jury credited this testimony, and no changes are warranted. The requested addition about the size of the bathroom is

unnecessary and unwarranted as the obvious aim is to undermine the credibility of Victim-6, but the jury has decided that issue already.

**Paragraph 64 (Oren/Alon); Paragraph 65 (Tal):** The requested addition is unnecessary and unwarranted as the obvious aim is to undermine the credibility of Victim-6, but the jury has decided that issue already.

**September 2016: Victim-2 (Counts 3 and 4)**

**Paragraph 65 (Oren/Alon); Paragraph 66 (Tal)**: All three defendants were convicted of sex trafficking Victim-2, and Tal and Alon's claim not to have assisted is contrary to the jury's verdict. Moreover, the evidence at trial showed that all defendants agreed to and did transport Victim-2 and Individual-6 to the Hamptons and harbored them there. Alon also aided the assault of Victim-2 by taking her to and leaving her in the room where Oren assaulted her, after Victim-2 was already under the effects of a sedative hypnotic drug.

**Paragraph 66 (Oren/Alon); Paragraph 67 (Tal)**: The evidence at trial established that Alon did match with Victim-2 on Raya. (Tr. 924-25).

**Paragraph 69 (Oren/Alon); Paragraph 70 (Tal):** The draft PSR is correct. Alon stopped Victim-2 from going down to her room, which she shared with others, and instead took Victim-2 to an unused room where Victim-2 would be away from her things and away from others. (*See* Tr. 965). The remainder of the paragraph accurately characterizes Alon's conduct and the symptoms that Victim-2 experienced. The PSR does not state that Alon gave Victim-2 an additional dose of a sedative hypnotic, though that inference is supported by the evidence. The description in the PSR is accurate and should not be changed.

**Other Victims**

***June 2009: Victim-4 and Victim-5***

**Paragraphs 73-74 (Oren/Alon); Paragraphs 74-75 (Tal)**: The defendants' objections here are essentially the same as those to paragraph 19 that also relate to Victim-4 and Victim-5. These objections should be rejected for the same reasons that the ones in paragraph 19 fail.

***June 2012: Victim-12***

**Paragraph 75 (Oren/Alon); Paragraph 76 (Tal)**: Victim-12's testimony describing her symptoms and her contemporaneous messages describing her symptoms provide more than enough evidence to conclude that Victim-12 was drugged with a sedative hypnotic. (*See, e.g.*, Tr. 150-54; GX 1K-103). The expert and lay testimony at the trial, including from Victim-12, further showed that her symptoms were inconsistent with MDMA use.

**Paragraph 76 (Oren/Alon); Paragraph 77 (Tal):** As before, the defendants' requests to incorporate their own ages into the PSR are unnecessary. The victims' ages must be included because unlike the defendants, no other place in the PSR reflects their dates of birth.

**Paragraph 77 (Oren/Alon); Paragraph 78 (Tal)**: The description of relative ages was evidence at trial and is supported by the trial record. (Tr. 141). Victim-12 described why she believed she was the youngest person there, including that she was still in college and knew others, like the defendants, had careers. This statement is supported by evidence and should remain unchanged.

**Paragraph 78 (Oren/Alon); Paragraph 79 (Tal)**: The defendants have not identified any inaccuracy in the paragraph that merits a change. The record is clear that Tal did give Victim-12 a powdery substance and that it produced the symptoms described in the PSR, which are inconsistent with MDMA. (Tr. 143-45).

**Paragraph 79 (Oren/Alon); Paragraph 80 (Tal)**: Victim-12's description of her symptoms is consistent with those of the other victims who testified and is consistent with being drugged with a sedative hypnotic drug. The PSR correctly describes that Tal and Alon drugged a drink they gave to Victim-12. Tal and Alon had at least two opportunities to do so, including at the bar and at the table. (Tr. 147-48). Alon and Tal directly gave Victim-12 a drink, and a second drink was given to her. A man in a blue shirt handed Victim-12 that drink, but its origins were unknown. This evidence is not evaluated in isolation, and the clear pattern of conduct by the defendants, including Alon raping Victim-12 that very evening, further support the conclusion that the defendants drugged Victim-12.

**Paragraph 80 (Oren/Alon); Paragraph 81 (Tal)**: As noted above, ample evidence shows that Tal and Alon drugged Victim-12. Ample evidence also shows that Victim-12's symptoms were consistent with other victims' and with the known symptoms of drugging with a sedative hypnotic drug. Alon's denial of assaulting Victim-12 is contradicted by the evidence, as described below.

**Paragraphs 81-82 (Oren/Alon); Paragraphs 82-83 (Tal)**: The defendants' blanket denial of the conduct described in these paragraphs is refuted by a plethora of evidence, including Victim-12's testimony, (Tr. 151-59), her text messages at the time, (GX 1K-103), her immediate description of the assault to others, (Tr. 362), and the defendants' pattern of assaults.

**Paragraph 83 (Oren/Alon); Paragraph 84 (Tal):** The defendants' requests to change these paragraphs should be rejected. There is no relevance to either requested change. The suggestion that a Facebook photo update undermines the veracity or seriousness of the assault is wrong. (*See* Tr. 183-84). Equally wrong is the suggestion that Victim-12 tried to hide that she had voluntarily consumed a drug she believed to be MDMA. On the contrary, she immediately told a friend about this. (*See* GX 1K-103 ("i go up to ains and tal and they offered me some mali … molly? idk how to spell it haha.")).

***January 2017: Minor Victim-26, Minor Victim-25, and Victim-9:***

**Paragraph 85 (Oren/Alon); Paragraph 86 (Tal):** Minor Victim-25 and Minor Victim-26 both testified that they had been invited to an after party hosted by the defendants at a luxury hotel. (Tr. 1884-85, 2373-74). The promise of the after party never materialized, and instead the defendants took the high schoolers to a dark, empty hotel room, where they assaulted the girls.

The defendants' suggestion that Minor Victim-25 texted Victim-9 to leave "without the [other] guys" is also grossly misleading. In the messages, Minor Victim-25 asks Minor Victim-9 to come "without the guys," as seen in a screenshot of the messages below, and which is not included in the defendants' provided exhibits:




(DX 1552). The testimony at trial shows that Victim-9 was still in the bar with Oren at this time, so it is unclear what point the defendants are trying to make. (Tr. 1885, 2526-28). Regardless, the messages do not undercut the testimony that the defendants falsely promised a party at the hotel.

**Paragraph 86 (Oren/Alon); Paragraph 87 (Tal)**: No changes should be made to these paragraphs to incorporate the defendants' ages, as the defendants' ages are not relevant to their enticement and sexual assault of the victims. It is also not relevant that the defendants did not know Minor Victim-26, Minor Victim-25, or Victim-9 before the night of the assault, and as written, the PSR does not suggest otherwise.

**Paragraph 87 (Oren/Alon); Paragraph 88 (Tal)**: As stated above, there was ample evidence of the defendants' use of surreptitious drugging of their victims that was presented to and credited by the jury, including of these victims, who each experienced the symptoms of drugging after consuming drinks given to them by the defendants. (Tr. at 1881-83, 2370-71, 2374, 2376). There is also no evidence that Minor Victim-25, Minor Victim-26, or Victim-9 consumed marijuana the night of the assault. Minor Victim-26 specifically recalled that they could not get marijuana the night of the assault and were kicked out of the dispensary. (Tr. 2008-09). Minor Victim-25 recalled that the girls tried to get marijuana on two occasions in Aspen and similarly recalled the incident where the girls were kicked out of the dispensary. (Tr. 2400, 2533-34, 2540). And while Minor Victim-26 recalled that they smoked marijuana "while in Aspen" generally—a trip lasting several days—she never stated that they smoked the night of the assault. (Tr. 2400). But in any

event, the changes in the victims' mental states came after the drinks that were given to them, and not beforehand.

**Paragraph 88 (Oren/Alon); Paragraph 89 (Tal)**: As stated above, there was ample evidence of the defendants' use of surreptitious drugging of their victims that was presented to and credited by the jury, and Minor Victim-25's testimony likewise showed evidence of drugging.

**Paragraphs 85-90 (Oren/Alon); Paragraphs 86-91 (Tal)**: No changes should be made to these paragraphs. A person under 17 years old is a minor. Moreover, Colorado's age of consent laws have no bearing on sexual assault and rape by drugging, which is the conduct that was described by the victims and conduct that the jury repeatedly found that the defendants engaged in.

**Paragraph 89 (Oren/Alon); Paragraph 90 (Tal)**: No changes should be made to this paragraph. Minor Victim-26 testified that Alon instructed her to sit next to her, to lay down next to her, and to go to the bathroom. (Tr. 1888, 90). She also testified, in painful detail, how Alon "shov[ed] his fingers inside of [her], really hard, and really fast, and I could feel his nails scraping inside of me, and I could feel myself tearing, and it really hurt, and [being] so scared . . . so scared," before he then pushed her down onto the vanity. (Tr. 1891). Also, whether Alon removed Minor Victim-26's clothing "gently" is irrelevant to the fact that he violently digitally penetrated her, forced her head onto the sink, and raped her.

**Paragraph 90 (Oren/Alon); Paragraph 91 (Tal)**: No changes should be made to this paragraph. As stated in the PSR, Minor Victim-25 was in and out of consciousness in the hotel room. The evidence adduced at trial shows that Minor Victim-25 was unconscious for at least a portion of the time that Alon was assaulting her. (Tr. 1894 (Minor Victim-26) ("He was sticking his hands down her pants and she wasn't moving. And she wasn't talking.")). To the extent the defendants argue that Minor Victim-25 was allowed to leave the room, the PSR already reflects that Minor Victim-25 removed Alon's hand from her pants and that she and Minor Victim-26 left the room. That Minor Victim-25 texted with Alon a few weeks later in an attempt to get weed—which never materialized—is irrelevant.

***May 2017: Victim-30***

**Paragraph 91 (Oren/Alon); Paragraph 92 (Tal)**: Oren's recruitment of Victim-30 to the Bahamas was part of a joint effort to recruit women to the Bahamas, and the statement that Oren's enticement of Victim-30 happened "with the help of ALON ALEXANDER and TAL ALEXANDER" is accurate. The defendants' group chat "Fyre Puss" reflects the coordination among the group, including sourcing tents, sourcing drugs, arranging for travel, and managing accommodations on boats. (*See* GX 1009, C-109-1 to C-109-8).

**Paragraph 92 (Oren/Alon); Paragraph 93 (Tal)**: The defendants' various messages that are compiled in GX 1009 reflect the pooling of resources to transport women, host them for the festival, and house them on yachts.

**Paragraph 93 (Oren/Alon); Paragraph 94 (Tal)**: The defendants' various messages that are compiled in GX 1009 reflect the pooling of resources to transport women, host them for the festival, and house them on yachts.

***December 2009: Victim-20***

**Paragraphs 95 and 97 (Oren/Alon); Paragraphs 96 and 98 (Tal)**: Victim-20 testified about drinking a small amount of wine or champagne (two drinks), and then suffering the symptoms that are the telltale signs of drugging with sedative hypnotic drugs. (Tr. 3982-84). This testimony and the other evidence at trial, including the defendants' pattern of conduct, establishes the use of drugs in the drink to incapacitate and assault Victim-20.

***March 2016: Victim-13***

**Paragraph 101 (Oren/Alon); Paragraph 102 (Tal)**: The evidence at trial, including the testimony of Victim-13 and Individual-13, supports the PSR's statement that Alon forcibly raped Victim-13. (Tr. 3294-95). Alon's request to add to the paragraph that he was sharing the apartment with others is unnecessary.

**Paragraph 103 (Oren/Alon); Paragraph 104 (Tal)**: As described above, the testimony at trial shows that Alon forcibly raped Victim-13. The requested addition to the PSR that before he raped her Victim-13 was flirting with Alon is unneeded, irrelevant, and improperly suggests that Alon's conduct is mitigated because Victim-13 wanted it, asked for it, or deserved it.

***August 2016: Victim-29***

**Paragraph 105-109 (Oren/Alon); Paragraphs 106-110 (Tal):** No changes should be made these paragraphs. The defendants' complaint about the timing and nature of Victim-29 contacting the FBI was rejected by Judge Caproni, who ruled that Victim-29 could testify at trial. And for the reasons outlined in the Government's response to the defendants' objections to paragraphs 19, 73, and 74, the fact that Victim-29 did not testify at trial is not relevant. There are many reasons particular victims do not testify at a trial, and it is not true that Victim-29 did not testify because she was not credible.

Moreover, contrary to the defendants' argument, Victim-29's account was corroborated by evidence that was produced to the defendants, including text messages between Victim-29 and Tal, text messages between Victim-29 and her friends on the evening of the assault, Uber receipts following the assault, Victim-29's intimate knowledge of the layout of 26 On the Bluff (statements about the occupant of the 26 On the Bluff that were not released to the public), and corroboration from Victim-29's mother that Victim-29 called her to ask for help the night of the assault and that Victim-29 told her mother that she had "gotten into a bad situation" that night. (GX IT-103Tr, 104-TR, 109TR, 110) (not admitted).

Victim-29 voluntarily disclosed all communications between her and Tal after doing her own voluntary search of old phones in her possession. (3658-013-014). These messages that the defense references in this objection comprise two texts, sent four years after the assault, which

read, "Tal" and, "It's [Victim-29] You guys are partying ?" (3658-015). Tal never responded to these messages. Victim-29 does not recall sending these messages but nevertheless provided them of her own volition. The conduct regarding the assault on Victim-29 can be proven by a preponderance of the evidence, and the paragraphs should remain in the PSR.

The defendant's requested additions to the paragraph are unnecessary, redundant, and/or incorrect and should not be added. The PSR already reflects the victims who did and did not testify. (PSR ¶¶ 17-19).

**Vent on Bitches Blog**

**Paragraph 110-114 (Oren/Alon); Paragraph 111-115 (Tal)**: These paragraphs accurately quote the Vent on Bitches blog posts that were admitted at trial and connect the blog posts to the defendants' conduct. The defendants' principal complaint is that they did not author the two posts that are quoted at length in the PSR, but the report does not claim that they were the authors of those specific posts. The paragraphs correctly connect the defendants to the blog through the act of sharing the blog and in Oren and Alon's partial authorship (at a minimum) of one of the blog posts that a depicted a photo Alon took of a woman after ejaculating on her face, which photo was found on the hard drive in Tal Alexander's apartment during the search in December 2024. The defendants further claim never to have authored anything on the blog, but that claim is contradicted by the evidence that they contributed to at least one post. Dylan Trussell's statements in an interview with the Government are not to the contrary, and to the extent they are inconsistent with the photo, email, and other recorded evidence showing Alon and Oren's involvement in the blog, they should not be credited. The Government does not object to removing Tal's name from the first sentence of paragraph 110 because the evidence at trial showed that Oren, Alon, and others contributed to and shared the blog. The remaining references to Tal, which note the parallels between his conduct and that of his co-conspirators are accurate and should remain.

**Arrests and Culpability**

**Paragraphs 117-133 (Original Objections) / Paragraph 118, 131 (Alon); Paragraph 120, 131 (Oren); Paragraph 117, 132 (Tal) – Relevant Conduct (Supplemental Objections):** Each defendant objects to being held responsible for the conduct of other defendants. (Def. Obj. at 13-14; Def. Supp. Obj. at 3-4). But this is appropriate under U.S.S.G. § 1B1.3, which defines relevant conduct. Under that guideline, for "jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy)," a defendant is responsible for "all the acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity," (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity," and "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]" U.S.S.G. § 1B1.3(a)(1)(B).

In assessing the scope of jointly undertaken criminal activity, courts look to, among other things, "any 'explicit agreement or implicit agreement fairly inferred from the conduct' of the defendant and other participants; 'whether the participants pool their . . . resources, or whether they work independently'; 'whether the defendant assisted in designing and executing the illegal

scheme'; and 'what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct.'" *United States v. Pica*, 106 F.4th 197, 201-02 (2d Cir. 2024) (quoting *United States v. Studley*, 47 F.3d 569, 575 (2d Cir. 1995)). The jury verdict in this case indicates that the defendants agreed to engage in jointly undertaken criminal activity, *i.e.*, a conspiracy to commit sex trafficking from in or about 2008 through in or about 2021, in which they worked together to entice victims to them and drugged and/or used force to rape or sexually assault the victims. The evidence showed that no later than the spring of 2009—when Alon and Tal together forcibly raped Minor Victim-3 (who was drugged) in the home they rented together with Oren—the defendants had agreed, either explicitly or at minimum implicitly, to engage in this conspiracy. U.S.S.G. § 1B1.3, app. n.3(B) (explaining that in determining the scope of a defendant's agreement, "the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others"). After this, the defendants engaged in a pattern of conduct involving collectively enticing women to them and using drugs and/or force to rape them. They often worked together to carry out this pattern, including by pooling their resources, drugging their victims, and carrying out the rapes together. For example, in 2011, Tal and Alon drugged Victim-12, and Tal watched as Alon forcibly raped her in the apartment they shared. Similarly, in 2016, the defendants invited Victim-2 to their house in the Hamptons and paid for her to travel there, where they drugged her prior to Oren raping her. And then in 2017, Oren and Alon targeted Minor Victim-25, Minor Victim-26, and Victim-9 at a bar in Aspen, gave them drugged drinks, invited them to a (fake) afterparty, and then sexually assaulted them in the same hotel room. From the defendants' conduct year after year, including the assaults they engaged in together, their agreement to engage in jointly undertaken criminal activity can be inferred.

Under the Guidelines, there is no requirement that each defendant intend for the others to carry out a particular sexual assault or even that the defendant have "direct knowledge" of the particular sexual assaults committed by the others in order for those assaults to fall within the scope of the jointly undertaken criminal activity. *See Pica*, 106 F.4th at 202 (holding that it was not necessary for a defendant to intend, or even desire, a victim to die in order for that victim's murder to constitute relevant conduct); *United States v. Nall*, 78 F. App'x 158, 159 (2d Cir. 2003) (rejecting the argument that "direct knowledge is a *sine qua no*n of acceptable proof of relevant conduct").[2]

---

[2] This is similar to the analysis often undertaken in drug cases, in which defendants enter into a drug conspiracy but are not aware of all the particular transactions, including the weight of the drugs involved, engaged in by their co-conspirators, yet are held accountable for the transactions that occurred after they joined the conspiracy under § 1B1.3. *See, e.g.*, *United States v. Rawls*, 523 F. App'x 772, 777 (2d Cir. 2013) (In the case of a narcotics conviction, "the defendant is accountable for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook."); *United States v. Snow*, 462 F.3d 55, 72 (2d Cir. 2006) ("The defendant need not have actual knowledge of the exact quantity of narcotics involved in the entire conspiracy; rather, it is sufficient if he could reasonably have foreseen the quantity involved."); *United States v. Davis*, 682 F.3d 596, 616 (7th Cir. 2012) ("Reasonable foreseeability refers to the scope of the agreement that [a defendant] entered into

Given their pattern of conduct, even where one or more of the defendants was not directly involved in a particular sexual assault, that sexual assault, often carried out via force or drugging, was within the scope of their jointly undertaken activity and was reasonably foreseeable to each of them. For example, Tal's invitation to Victim-6 to come to the defendants' house in the Hamptons, where he forcibly raped her by holding her by the neck after attempting to drug her, would have been foreseeable to Alon and Oren, who had worked with others to invite women and girls to their house in the Hamptons in the summer of 2009, where the defendants drugged and raped Minor Victim-3, Victim-4, and Victim-5, and who would two years later all work together to lure Victim-2 and her friend to the same house for the same reason. *See United States v. Egbert*, 562 F.3d 1092, 1097-98 (10th Cir. 2009) (holding defendants responsible under § 1B1.3 for assault against non-white victim committed by their co-conspirators where defendants were convicted of a conspiracy to interfere with civil rights with the purpose of injuring and intimidating non-whites and had committed an assault of a non-white victim that "followed the same pattern" two-and-a-half months earlier). The defendants' pattern of recording their assaults and sharing videos of the assaults with each other and with others, as described in the Vent on Bitches blog, furthers the conclusion that the assaults in which a particular defendant did not personally participate were nevertheless within the scope of the agreement and foreseeable to all defendants.

Where the defendants are held responsible under relevant conduct analysis for sexual assaults of victims they did not individually commit, they object to the enhancements applied to those groups. (Def. Obj. at 14). These enhancements are most commonly applied for the defendants' use of force and drugs with regard to the assaults. As discussed above, the defendants agreed to enter a conspiracy to sex traffic women using these methods—specifically, force and drugs—to carry out rapes and sexual assaults, and they engaged in a pattern of similar sexual assaults, together and independently, for a decade. As a result, each defendant should have known the other(s) would use force and/or drugs to sexually assault victims who were vulnerable, making the enhancements related to the use of force and drugging (*e.g.*, the use-of-force enhancement, the vulnerable victim enhancement, and the physical restraint enhancements, all of which are discussed in detail below) appropriate. *See United States v. Williams*, 428 F. App'x 134, 142 (3d Cir. 2011) ("Moreover, the Court expressly found that J.K. was vulnerable for any number of reasons and, citing Williams's connection to the conspiracy in general, deemed as reasonably foreseeable to him his partners' exploitation of large numbers of vulnerable victims and juvenile victims for sex trade via the use of force, coercion, threats, and fear.") (cleaned up); *United States v. Phipps*, 319 F.3d 177, 190-91 (5th Cir. 2003) (affirming application of cross reference to § 2A3.1 based on co-defendant's sexual assault of victim where defendant could have reasonably foreseen assault).

The defendants next object to Minor Victim-8, Victim-9, Victim-12, Minor Victim-25, and Minor Victim-26 being counted as victims for purposes of relevant conduct for Count One, arguing

---

when he joined the conspiracy, not merely to the drugs he may have known about. Furthermore, reasonable foreseeability does not require a showing that the defendant was involved in or even had direct knowledge of any particular transaction.") (internal quotation marks and citations omitted).

that all of the sex trafficking elements must be proven in order for their rapes or sexual assaults to count as relevant conduct. (Def. Obj. at 13). The defendants cite no authority for this proposition, and § 1B1.3 only requires acts to fall within the scope of jointly undertaken criminal activity (including acts in preparation for an offense or to avoid detection for an offense), not to satisfy all the elements of a substantive offense that was an object of the conspiracy. *See Pica*, 106 F.4th at 202 (district court properly found that a conspiracy to commit robbery included a murder committed during the robbery as relevant conduct). But even if the defendants were correct, the evidence presented at trial demonstrates that Victim-9, Victim-12, Minor Victim-25, and Minor Victim-26 were victims of substantive sex trafficking offenses. For example, for Victim-12, Tal invited Victim-12, through a friend, to an exclusive party at a celebrity's penthouse (a thing of value). After Victim-12 arrived that night, Alon and Tal drugged her, and Alon later forcibly raped her at their apartment when she was weak and at times incapacitated as a result of the drugs (force and fraud). Victim-12 never would have been in the defendants' apartment that night without the enticement of the celebrity's party. Similarly, after meeting Victim-9, Minor Victim-25, and Minor Victim-26 at a bar in Aspen, Alon and Oren provided the victims with drugged drinks, invited them to a supposed after party in their luxury hotel room (a thing of value), and then proceeded to rape and sexually assault the victims in the hotel room, including at times using force, while the victims were under the influence of the drugs (force and fraud). Without the invitation to the afterparty, the victims never would have been in the hotel room where they were sexually assaulted. As a result, even under the defense's incorrect standard, these victims should be counted.[1] Conversely, the assaults of Victim-7 (Counts Ten and Eleven) and Minor Victim-8 (Count Twelve) did not meet the elements of substantive sex trafficking offenses. Although the Government (and the Guidelines and caselaw) disagree with the defendants' claim that this necessarily brings those victims outside of relevant conduct analysis for Count One, the Government does not oppose the defendants' request to remove Victim-7 from the grouping analysis for Tal and Minor Victim-8 from the grouping analysis for Alon and Tal.

The defense also claims there is some "double-counting problem" by counting these individuals as victims of the sex trafficking conspiracy when the Court ruled they could testify as evidence of that conspiracy, but that claim does not make sense. The Court also allowed victims of substantive counts (e.g., Victim-1) to testify as evidence of the conspiracy, and there is no double counting problem with Victim-1 being counted as a victim for purposes of Count One.

The defendants also object to being held responsible for victims not charged in the indictment. (Def. Obj. at 14). But simply because victims were not named in the indictment does not mean there was not evidence presented at trial to demonstrate that they were victims of the sex trafficking conspiracy. That is the case, for example, for Victim-9, Victim-12, Minor Victim-25, and Minor Victim-26, as described above. And even where evidence related to the sexual assaults of certain victims was not presented at trial, that does not bar the Court from considering such evidence at sentencing. *See, e.g.*, *United States v. Young*, 609 F.3d 348, 357-58 (4th Cir. 2010) ("To the extent that Young suggests the government was estopped from establishing a higher drug quantity at sentencing because it elected not to present that evidence at trial, the argument is without merit."); *United States v. Shonubi*, 998 F.2d 84, 89 (2d Cir. 1993) (explaining, in context of drug weight, that the court "is not bound by jury findings or evidence presented at trial, but may consider any reliable proof" when making determinations about relevant conduct under the Guidelines).

**Victim Impact**

**Paragraphs 121-124 (Oren/Alon); Paragraphs 122-125 (Tal)**: There is no basis to omit any victim impact information from the PSR. "The sentencing court's discretion is largely unlimited either as to the kind of information it may consider, or the source from which it may come." *United States v. Eberhard*, 525 F.3d 175, 177 (2d Cir. 2008). This includes considering victim impact on victims that fall outside of the CVRA. *See United States v. Smith*, 967 F.3d 198, 216 (2d Cir. 2020).

**Paragraph 122 (Oren/Alon); Paragraph 123 (Tal):** The statements in this paragraph about the total number of victims who have been interviewed, the number who testified, and the number who were minors are accurate. This paragraph provides an accounting of various categories of victims, investigative efforts, and trial testimony and does not adjudicate any allegations, so no change is warranted or needed. The statement that four of the eleven testifying victims described that they were minors at the time of the assault is also accurate. The Colorado age of consent law has no applicability or relevance. Additionally, there is no need to make the change requested by Alon about Minor Victim-8 not testifying about his conduct because the paragraph does not suggest otherwise.

**Offense Level Computation**

Using the group numbers from Oren's PSR, the defendants raise a number of objections to the offense level computation, which are outlined in the table below. (Def. Obj. at 14-16). In objecting to many of these enhancements, the defendants state that the enhancements are unsupported by the facts or the evidence; for others, they offer no reasoning at all for their objection. The Government thus treats these objections in the defense's "Offense Level Computation" section as factual objections, unless the defendants say otherwise. Many of these factual objections, including that the defendants did not use force (as to the use-of-force enhancement, pursuant to § 2A3.1(b)(1)) and/or did not drug certain victims (as to the vulnerable victim enhancement), should be rejected as attempts to relitigate arguments the defendants made to the jury, which the jury rejected and which are inconsistent with the evidence. *Hourihan*, 66 F.3d at 465. Nevertheless, the Government has outlined its responses to these factual arguments in the table below.

| **Group Number (Oren PSR)** | **Defense Objections** | **Government Response** |
|---|---|---|
| Group 1 (Victim-2) | Use-of-force enhancement | This enhancement is supported factually. As described more fully below, this enhancement involves "any form of physical violence, compulsion, constraint, or physical pressure directed against another person," which can be satisfied by rape. (*See* Tr. 5253; 5266-67 (jury charge)). After Victim-2 tried to tell Oren that "something's not right," he used his hands to pin her to the bed and keep her from escaping while he raped her. (Tr. 969). Victim-2 tried to push Oren off and struggled to free herself and escape, but |

| | | |
|---|---|---|
| | | Oren continued to pin her to the bed and continued to rape her. (Tr. 970-71). While raping her, Oren also pressed on Victim-2's abdomen, which caused her significant pain because of a recent surgery. (Tr. 972). |
| | Vulnerable victim enhancement | This enhancement is supported factually. As described more fully below, the vulnerable victim enhancement is applicable where a defendant drugs his victims, which makes the victims "physically and mentally more vulnerable." *See United States v. Altman*, 901 F.2d 1161, 1165 (2d Cir. 1990). The evidence showed Oren gave Victim-2 a spiked drink during a party that contained a sedative-hypnotic drug, which severely incapacitated her and left her feeling unstable, shaky, confused, and unable to control her body. (Tr. 962-63). Victim-2 then went inside and passed out in a bedroom, after receiving a glass of water from Alon, and when she awoke, she had "no control" over her body and had "lost the ability to move" her arms and legs. (Tr. 967). Oren raped her in this incapacitated state. (Tr. 968-71). |
| Group 2 (Victim-7) | Use-of-force enhancement | This enhancement is supported factually. After Victim-7 had lost consciousness as a result of a drugged drink, one of the defendants climbed on top of her and raped her. (Tr. 1377, 1517). Alon and Oren took turns raping her while positioned on top of her, forcing themselves inside of her. (Tr. 1374-79). The facts supporting this enhancement are discussed more fully below. |
| | Vulnerable victim enhancement | This enhancement is supported factually. After Alon and Oren invited Victim-7 to come to their cabin to get molly, they gave her a drink that contained a sedative hypnotic drug. (Tr. 1372-74). Victim-7 lost consciousness as a result and came to on her back one of the twins raping her. (Tr. 1374-79). Victim-7 recalls going in and out of consciousness while the rapes took place and has "no idea" how long she remained in the cabin or how long the rape occurred. (Tr. 1377-79). She testified that she felt "paralyzed" during the assault and that she didn't "think [she] physically |

| | | |
|---|---|---|
| | | could speak at that moment and get up." (Tr. 1378). Following the rape, Victim-7 struggled to get dressed and leave the cabin, and she was not acting normally. (Tr. 1544-45). |
| Group 3 (Minor Victim-8) | Vulnerable victim enhancement (unsupported that Minor Victim-8 was "drugged by defendants" rather than acting of her own volition) | The evidence demonstrates that when Minor Victim-8 was too incapacitated to make decisions of her own volition, Oren gave her another pill to make her go to sleep prior to raping her. (*See* GX D-121-2, D-121-1 (Oren asking Minor Victim-8, "Did you take that pill? You should've taken that pill," before going into the bedroom). But even if Minor Victim-8 acted on her own volition in taking the pills that night (she did not), the vulnerable victim enhancement still applies. As described more fully below, the enhancement is applicable when a victim is incapacitated or severely intoxicated—even where that state was not caused by the defendants. *See United States v. Talk*, 446 F. App'x 114, 124-25 (10th Cir. 2011); *United States v. Betone*, 636 F.3d 384, 388 (8th Cir. 2011). Here, the photographic and video evidence shows that over the course of the night, Minor Victim-8 became increasingly intoxicated and incoherent. (GX 1001). Prior to going into the bedroom where she was raped, her voice was slurred and nearly incomprehensible. (GX D-121-7). In the bedroom, Minor Victim-8 lay limply while Oren's friend digitally penetrated her, and she barely moved as Oren began to rape her after he lifted her limp legs. (GX D-121-1). |
| Group 4 (Victim-1) | Use-of-force enhancement | This enhancement is supported factually. First in the sauna, Tal grabbed Victim-1 by the neck, pinned her against a bench, and assaulted her. (Tr. 2175-76). Later in the gym, Tal and a second man picked Victim-1 up off the gym floor where she had collapsed, manipulated her body and bikini, and forcibly assaulted her at the same time. (Tr. 2180-81). |
| | Physical restraint enhancement | This enhancement is supported factually. As described more fully below, in assessing whether the physical restraint enhancement is appropriate, courts ask "(1) whether the restraint was physical, (2) whether there was restraint rather than just use |

| | | |
|---|---|---|
| | | of force, and (3) whether the action in question was constitutive of the [offense] or whether it was an additional physical restraint that facilitated the [offense].” *United States v. Taylor*, 961 F.3d 68, 79 (2d Cir. 2020). Here, Tal used more force than necessary to constitute aggravated sexual abuse. In the sauna, Tal grabbed Victim-1 by the neck, pinned her against a bench, and stood behind her, which had the effect of keeping her confined to the sauna. (Tr. 2175-76). In addition, in the gym, Tal and the second man “flopped” Victim-1 around and manipulated her—further restricting her ability to leave the gym—in order to assault her. (Tr. 2181). |
| | Vulnerable victim enhancement | This enhancement is supported factually. Tal gave Victim-1 a glass of wine that had been spiked with a sedative-hypnotic drug. (*See* Tr. 2172-73). The drugged wine made her lose control of her body, made her feel “heavy and slow,” and caused gaps in her memory. (Tr. 2172-73). As a result of the wine, Victim-1 had no strength and collapsed on the floor. (Tr. 2178). While being assaulted, Victim-1 was unable to control her body, to support her own weight, to speak, to defend herself, or to escape. (Tr. 2181). |
| Group 5 (Minor Victim-3) | Use of a computer enhancement (no evidence defendants used computer) | As explained more fully below, this enhancement is supported because the defendants’ co-conspirator, Matthew Lipman, digitally contacted Minor Victim-3 to invite her to the Hamptons. |
| | Vulnerable victim enhancement | This enhancement is supported factually. During a pool party, David Rabello, who was renting 88 Peconic with the defendants and Matthew Lipman, gave Minor Victim-3 one to two drugged mixed drinks. (Tr. 2944-45). The drinks made her feel woozy, gave her tunnel vision, and made her feel as if she had heightened senses. (Tr. 2945). After Tal and Alon began raping her, Minor Victim-3 could not stand or lift her head, her body felt very limp and heavy, and she went in and out of consciousness. (Tr. 2947-48, 2950). When she came to, Tal was holding down her arms as Alon, Rabello, and another man took turns raping her. (Tr. 2950-51). |

| | | |
|---|---|---|
| Group 6 (Victim-4) | Should not be counted (did not testify) | Victim-4 should be included. As outlined above, the Guidelines do not limit relevant conduct to victims who testify at trial. Victim-4 is a sex trafficking victim—like Minor Victim-3, she and Victim-5 were invited to the Hamptons by a party promoter during the summer of 2009 and took a bus to a club where they met the defendants and were invited back to 88 Peconic. They were given drinks, which caused them to lose consciousness for large portions of the night. During the night, Alon pinned Victim-4 to the corner of a hot tub and raped her. The defendants' claim that Victim-4 and Victim-5 decided not to testify in response to their alibi notice is wrong—the defense investigator's conduct caused Victim-4 to stop participating in the trial process more than a month before the defendants gave any notice about any alleged alibi. And the general weakness of the claimed alibi, described in response to paragraph 19 objections, further undercuts this claim. |
| Group 7 (Victim-5) | Should not be counted (did not testify) | Victim-5 should be included. Once again, the Guidelines do not limit relevant conduct to victims who testify at trial. Victim-5 is a sex trafficking victim—like Minor Victim-3, she and Victim-4 were invited to the Hamptons by a party promoter during the summer of 2009 and took a bus to a club where they met the defendants and were invited back to 88 Peconic. They were given drinks, which caused them to lose consciousness for large portions of the night. During the night, Alon and Oren raped Victim-5. The defendants' claim that Victim-4 and Victim-5 decided not to testify in response to their alibi notice is wrong—the defense investigator's conduct caused Victim-4 to stop participating in the trial process more than a month before the defendants gave any notice about any alleged alibi. And the general weakness of the claimed alibi, described in response to paragraph 19 objections, further undercuts this claim. |
| Group 8 (Victim-6) | Use-of-force enhancement | This enhancement is supported factually. As Victim-6 was crying, Tal turned her around, bent her over, and held her by the back of the neck and |

| | | |
|---|---|---|
| | | head as he pulled down her underwear and forced himself on her from behind. (Tr. 464). |
| | Physical restraint enhancement | This enhancement is supported factually. After chasing Victim-6 into a shower and closing the door behind him, Tal stood between Victim-6 and the door, making it difficult for her to escape. (Tr. 463). Once there, Tal turned her around, bent her over, and held her by the back of the neck—physically preventing her from leaving as he raped her. (Tr. 464). |
| Group 9 (Victim-9) | Should not be counted (did not testify) | Victim-9 should be included. Again, the Guidelines do not require that she testify in order for her assault to be relevant conduct. Multiple witnesses at trial testified about Oren's conduct against Victim-9 in the Aspen hotel room (Tr. 1881-82, 1888, 1894, 1909-1911, 2375), which is more than enough to find that she was a victim of the conspiracy. Like Minor Victim-25 and Minor Victim-26, the defendants gave Victim-9 drugged drinks, invited her back to their room at a five-star hotel for a supposed after party (a thing of value), and then sexually assaulted her. Minor Victim-26 testified that Victim-9 was standing in the room saying "she wanted to leave and that she didn't want to be there anymore, and that she—she—then she said, this is bad, this is bad, [she] [didn't] want to be here, [she's] leaving," and that she ran out of the room. (Tr. 1894). Minor Victim-26 also testified that she observed Victim-9 crying on the phone with her mother early the next morning and heard her say that "she didn't want to be there any more, and that she wanted to go home." (Tr. 1911). The context that Victim-9 was assaulted was clear from the testimony. Indeed, at sidebar about this matter, the Court stated, "Look, this is a smart jury and they were hanging on to every word this witness said, as the courtroom was. They've got that [Minor Victim-26] saw Oren assaulting [Victim-9]. (Tr. 1906-07). |
| Group 10 (Victim-12) | Physical restraint enhancement | This enhancement is factually supported. After coming to in Alon's bedroom, Victim-12 tried to leave a few times, but Alon pushed her back down on the bed and pushed her head to his groin in an |

| | | |
|---|---|---|
| | | attempt to force her to perform oral sex on him. (Tr. 152-54). Victim-12 fought back and actively tried to get away during the assault, but she was unsuccessful. (Tr. 154-55). Alon, who was much bigger and stronger than her, got on top of her and raped her, which prevented her from escaping. (Tr. 155-56).[3] |
| | Vulnerable victim enhancement | This enhancement is factually supported. While at a club, the defendants gave Victim-12 a drugged drink, which caused her to sway and lose control of her body and caused her memory to cut out. (Tr. 147-51). Alon raped her while she was blacked out as a result of the drink, and when she came to "like a switch flipped," she was naked in his bed and tried to leave, but he pushed her back down and she collapsed on the bed, feeling very weak because of the drugs. (Tr. 152-54). Alon continued to assault her, despite her telling him no and trying to get away. (Tr. 154-57). The defendants claim that the enhancement should not be applied because Victim-12 willingly ingested substances, but the substance she took was "molly," which Tal provided her, and which did not make her feel euphoric as molly would typically do. (Tr. 143-45). Even if she had taken molly willingly, and even if the molly is what caused her severe intoxication and black out, Alon nevertheless took advantage of a vulnerable victim. *See Talk*, 446 F. App'x at 124-25; *Betone*, 636 F.3d at 388. |
| Group 11 (Minor Victim-25) | Should not be counted (not charged; when she indicated she did not want to engage in sexual conduct, her | Minor Victim-25 should be included. Although Minor Victim-25 was not named in the indictment, she is a victim of the sex trafficking conspiracy and was permitted to testify as evidence of that conspiracy. As described above, the defendants gave Victim-9, Minor Victim-25, and Minor Victim-26 drugged drinks, invited them back to |

[3] In raising this objection, the defendants note that there was no evidence Victim-12 was "tied, bound up, or locked up." But as explained in more detail below, the physical restraint enhancement is not limited to these three categories. *See United States v. Rosario*, 7 F.3d 319, 320 (2d Cir. 1993) (explaining that the Guidelines' "use of the modifier 'such as' in the definition indicates that the illustrations of physical restraint 'are listed by way of example rather than limitation'") (internal citation omitted).

| | | |
|---|---|---|
| | intentions were followed) | their room at a five-star hotel for a supposed after party (a thing of value), and then sexually assaulted them. The defendants also argue that Minor Victim-25 should not be counted because once she removed Alon's hand from her pants and left, Alon did not continue assaulting her—but this was only after Alon forced his hand down Minor Victim-25's pants and touched her vagina, as she laid not moving on the bed, going in and out of consciousness as a result of the drugged drinks. |
| Group 12 (Minor Victim-26) | Should not be counted (not charged; she did not state she did not want to engage in sexual conduct) | Minor Victim-26 should be included. Although Minor Victim-26 was not named in the indictment, she is a victim of the sex trafficking conspiracy and was permitted to testify as evidence of that conspiracy. As described above, the defendants gave Victim-9, Minor Victim-25, and Minor Victim-26 drugged drinks, invited them back to their room at a five-star hotel for a supposed after party (a thing of value), and then sexually assaulted them. The defendants also argue that Minor Victim-26 should not be counted because she did not state that she did not want to engage in sexual conduct. But whether Minor Victim-26 voiced her discomfort is irrelevant, given that the defendants drugged her. In addition, Alon should have known she did not want to engage in sexual conduct after, for example, he scraped inside of her with his nails during digital penetration, causing her to tear and bleed, and then proceeded to rape her from behind despite the fact she was bleeding on the floor. (Tr. 1891-92). |
| Group 13 (Victim-30) | Should not be counted (not interviewed; no evidence she was sexually assaulted or drugged) | Victim-30 should be included. Contrary to the defendants' claim, there is evidence that Victim-30 was sexually assaulted in Oren's own text messages admitting to the assault. During these texts, Victim-30 confronted him about what happened and said, "You have to ask someone before you have sex with them. I woke up to a dick inside of me," to which Oren responded, "It was my fingers first." (GX B-124-1 at 25-26). Admitting to both digitally and vaginally penetrating someone while they were unconscious is rape. Whether or not Victim-30 was drugged, it |

| | | |
|---|---|---|
| | | is clear she was unconscious and vulnerable at the time of the assault. |

Where the defendants raised additional legal arguments, including as to the use-of-force, physical restraint, vulnerable victim, and use of computer enhancements, the Government's responses are discussed below.

**<u>Double Counting for the Use-of-Force and Physical Restraint Enhancements</u>**

**Groups for Victim-1, Victim-2, Minor Victim-3, Victim-4, Victim-6, and Victim-12)[4]:** The defendants object to the application of the enhancement for use of force under 18 U.S.C. § 2241(a), pursuant to U.S.S.G. § 2A3.1(b)(1) (the "use-of-force enhancement"), and the physical restraint enhancement, pursuant to U.S.S.G. § 3A1.3, as double counting. In the Second Circuit, there is no double counting because of the Circuit's narrow interpretation of the physical restraint enhancement.

The Guidelines define "physically restrained" as "the forcible restraint of the victim such as by being tied, bound, or locked up." U.S.S.G. § 1B1.1 app. n.1(L); *see* U.S.S.G. § 3A1.3 app. n.1 (defining "physically restrained" by cross-reference to U.S.S.G. § 1B1.1). The Second Circuit has explained that "use of the modifier 'such as' in the definition indicates that the illustrations of physical restraint 'are listed by way of example rather than limitation.'" *United States v. Rosario*, 7 F.3d 319, 320 (2d Cir. 1993) (quoting *United States v. Stokely*, 881 F.2d 114, 116 (4th Cir. 1989)). In determining whether to apply the physical restraint enhancement, this Circuit examines "(1) whether the restraint was physical, (2) whether there was restraint rather than just use of force, and (3) whether the action in question was constitutive of the [offense] or whether it was an additional physical restraint that facilitated the [offense]." *United States v. Taylor*, 961 F.3d 68, 79 (2d Cir. 2020). Restraint is distinct from the mere application of force—"[m]ere physical contact with the victim does not inevitably amount to physical restraint." *Id.* at 78. The restraint enhancement addresses conduct that "depriv[es] a person of his freedom of physical movement." *Id.* (quoting *United States v. Herman*, 930 F.3d 872, 875 (7th Cir. 2019)). "In other words, restraint

---

[4] The defendants state that they object to the following paragraphs on double counting grounds: Paragraphs 133, 134, 146, 148, 154, 155, 161, 162, 167, 168, 205, and 206 (Oren/Alon); Paragraphs 134, 135, 147, 149, 155, 156, 162, 163, 168, 169, 206, and 207 (Tal). (Def. Obj. at 16). The Alon PSR paragraphs cited correspond to groups for Victim-1, Victim-2, Minor Victim-3, Victim-4, Victim-6, and Victim-12. The citations to the Oren and Tal PSR paragraphs correspond largely to different victims or other enhancements and appear to include typos. For example, both the Oren and Tal PSR paragraphs include citations to victim groups that do not even apply both enhancements at issue (*e.g.*, Minor Victim-8 (Oren paragraphs 146 and 148) and Minor Victim-26 (Oren paragraphs 205 and 206; Tal paragraph 207)). As a result, here and elsewhere in responding to the defendants' Guidelines objections, the Government responds to objections for the victim groups that appear to be the defense's true objections, and it refers to victim groups rather than paragraph numbers to reduce confusion. The Government reserves the right to respond to any other objection if it has not interpreted the defense's objections correctly.

is force that facilitates, as opposed to constitutes, the commission of the offense." *Id.* (quoting *Rosario*, 7 F.3d at 321). The Second Circuit, as well as some other circuits, have adopted this or similar multi-factor tests in order to "cabin[] the physical restraint enhancement to avoid excessive application." *Id.* (citing cases from the Third, Seventh, and Ninth Circuits).

Under the Second Circuit's approach, the use of force necessary to apply the physical restraint enhancement must be more than the force needed to commit the typical offense of aggravated sexual abuse. Under § 2241(a)—and therefore under § 2A3.1(b)(1)—a defendant must use some amount of force. As Judge Caproni explained in instructing the jury, the force element for aggravated sexual abuse requires proof that the defendants used "any form of physical violence, compulsion, constraint, or physical pressure directed against another person," and she noted that "[r]ape can satisfy the force requirement." (*See* Tr. 5253; 5266-67 (jury charge)); *see also United States v. Denjen*, 101 F. App'x 362, 364-65 (2d Cir. 2004) ("The requirement of force *may* be satisfied by a showing of . . . the use of such physical force as is sufficient to overcome, restrain, or injure a person.") (emphasis added) (quoting *United States v. Lauck*, 905 F.2d 15, 17 (2d Cir. 1990)). In other words, proving the force element does not require proof that a victim was physically restrained. *United States v. Johnson*, 492 F.3d 254, 258 (4th Cir. 2007) ("Under this definition the force element in § 2241(a)(1) may be satisfied without evidence of physical restraint similar to the examples (being tied, bound, or locked up) in the guidelines' definition of physical restraint. In other words, the 'use of force does not necessarily entail physical restraint.'") (quoting *Arcoren v. United States*, 929 F.2d 1235, 1248 (8th Cir. 1991)); *see id.* ("An offender's ability to commit forcible rape without resort to physical restraint" demonstrates "that unlawful restraint is not an element of § 2241(a) or specifically incorporated into the offense guideline [§ 2A3.1(b)(1)]."). Because the Guidelines contemplate double counting for the physical restraint enhancement only "where the offense guideline specifically incorporates this factor, or where the unlawful restraint of a victim is an element of the offense itself"—neither of which is the case here—there is no double counting problem. *See* U.S.S.G. § 3A1.3 app. n.2.

Although the Second Circuit does not appear to have addressed the potential double counting question for the use-of-force and physical restraint enhancements, at least one court in this Circuit has held there is no double counting, explaining that the "use-of-force adjustment reflects the violence and depravity of [the defendant's] sexual abuse," and "the restraint adjustment reflects [the victim's] helplessness." *United States v. Volpe*, 78 F. Supp. 2d 76, 85-86 (E.D.N.Y. 1999), *aff'd in part, dismissed in part*, 224 F.3d 72 (2d Cir. 2000). Similarly, based on the reasoning described above, the Fourth, Eighth, and Ninth Circuits have found there is no double counting when both enhancements are applied. *See, e.g.*, *Johnson*, 492 F.3d at 258 ("An offender's ability to commit forcible rape without resort to physical restraint leads us to conclude that unlawful restraint is not an element of the § 2241(a)(1) offense or specifically incorporated in the offense guideline. Accordingly, Johnson is not exempt from the two-level enhancement under guideline § 3A1.3 for his physical restraint of the victim."); *United States v. Begay*, 116 F.4th 795, 803-04 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 1933 (2025) ("Begay's position is that it duplicates an element of aggravated sexual abuse, so it 'double counts' the same conduct. We have encountered this double-counting argument before and rejected it. We do the same today.") (internal citations omitted); *United States v. Star*, 451 F. App'x 708, 709 (9th Cir. 2011) ("Restraint of the victim is

not an element of the offense of aggravated sexual abuse nor was it . . . incorporated in the aggravated sexual abuse offense Guideline applied here. *See* 18 U.S.C. § 2241; U.S.S.G. § 2A3.1.").

In support of their double counting argument, the defendants cite to a case from the Tenth Circuit—the only circuit the Government is aware of that has found there to be double counting when the use-of-force enhancement and physical restraint enhancements are applied. (Def. Obj. at 17). But unlike the Second Circuit, the Tenth Circuit has adopted a broad interpretation of the physical restraint enhancement. *United States v. Joe*, 696 F.3d 1066, 1071-72 (10th Cir. 2012) (specifically distinguishing the Second Circuit's approach to physical restraint as more limited than the Tenth Circuit's approach). As a result, in the Tenth Circuit, which has a much lower threshold for applying the physical restraint enhancement than the Second, Fourth, Eighth, or Ninth Circuits, the force inherent in an aggravated sexual abuse under 18 U.S.C. § 2241(a)(1) was necessarily sufficient to satisfy the use-of-force and physical restraint enhancements and resulted in double counting. *See id.* at 1072 (Tenth Circuit explaining that its "broad construction of 'physically restrained'" made it "impossible to commit the offense of aggravated sexual abuse under § 2241(a)(1) without also applying force that, in our circuit, constitutes physical restraint of the victim."). Given the Second Circuit's more limited application of the physical restraint enhancement as described above, the Tenth Circuit's double counting concern does not exist here. *Cf. id.* at 1071 (describing the Second Circuit's narrower application of the physical restraint enhancement).

The defense appears to specifically object to the application of these two enhancements to Victim-1, Victim-2, Minor Victim-3, Victim-4, Victim-6, and Victim-12. But for each of these victims, the defendants used more force than what was minimally necessary to satisfy § 2241(a), *i.e.*, they physically restrained the victims or prevented the victims from resisting or escaping in a manner that was distinct from the force inherent in rape, as described below:

- **Victim-1:** Beyond merely using this force to assault Victim-1, Tal restrained her in the sauna while he assaulted her there. Tal pinned Victim-1's head to the bench while he stood behind her. This deprived Victim-1 of the freedom of physical movement and kept Victim-1 confined to the sauna while Tal forcibly assaulted her. (Tr. 2175-76). After restraining and assaulting Victim-1 in the sauna, Victim-1 was further restrained in the gym as she was "being flopped around and then manipulated," by Tal and the second man, which kept her confined to the gym for that assault. (Tr. 2181).

- **Victim-2:** While Victim-2 struggled to free herself from beneath Oren and to stop the assault, Oren continued to pin her to the bed and kept assaulting and raping her. (Tr. 970-71). For much of the time that he was raping her, Victim-2 tried to actively resist and escape. Oren defeated Victim-2's attempts to resist by pinning her to the bed, including by using his hands to press down on her and on her abdomen, which caused significant pain to Victim-2 because of a recent surgery. (Tr. 972).

- **Minor Victim-3:** Minor Victim-3 was raped by Alon, Tal, Rabello and the fourth male, who took turns holding her arms down, preventing her from escaping. (Tr. 2949-51).

- **Victim-4:** When Alon raped Victim-4, he pinned her in the corner of a hot tub and held the corner of the hot tub so that his arms were stretched over Victim-4, so that she could not climb out of the hot tub to escape. Victim-4 initially tried to push Alon off of her, but he was bigger and stronger than her. (3514-009 at 3).

- **Victim-6:** Tal chased Victim-6 into the shower, closed the door behind him, before turning Victim-6 around, bending her over, and holding her in place by the back of her neck—and physically preventing her from leaving—while he raped her. (Tr. 464). In addition, Tal positioned himself between Victim-6 and the door throughout the attack, preventing her from leaving while he raped her. (Tr. 463-64).

- **Victim-12:** When Victim-12 tried to leave, Alon pushed her back down on the bed and pushed her head to his groin in an attempt to force her to perform oral sex on him. (Tr. 152-54). When Alon raped her, he was also physically on top of her and prevented her from escaping, even as she actively tried to get away. (Tr. 152-56).

For these victims, both the use-of-force and physical restraint enhancements apply. *See Taylor*, 961 F.3d at 78 ("[R]estraint is force that facilitates, as opposed to constitutes, the commission of the offense."); *see also United States v. Davenport*, 910 F.3d 1076, 1083 (8th Cir. 2018) ("Here, holding down MD's wrists while thrusting constitutes physical restraint because it restricted her freedom of movement and prevented her from leaving."); *Johnson*, 492 at 257 (physical restraint enhancement was met where defendant gripped victim's arms and held her down while co-conspirator raped her); *United States v. Long Turkey*, 342 F.3d 856, 859 (8th Cir. 2003) (physical restraint enhancement was met where defendant held victim down by her arms and hair and pinned her beneath him during intercourse). For the reasons described above, there is no double counting concern.[5]

**<u>Vulnerable Victim Enhancement</u>**

**Groups for Victim-1, Victim-2, Minor Victim-3, Victim-4, Victim-5, Victim-7, Minor Victim-8, Victim-9, Victim-12, Minor Victim-25, Minor Victim-26, and Victim-30[6]:** The

[5] Alternatively, § 2A3.1(b)(1) could be applied based on the defendants' drugging or attempted drugging of each of these victims, rather than the defendants' use of force, eliminating any double counting argument with regard to the physical restraint enhancement.

[6] The defendants state that they object to the vulnerable victim enhancement in the following paragraphs: Paragraphs 135, 156, 163, 170, 176, 141, 148, 188, 195, 201, 207, 213 (Oren); Paragraphs 141, 149, 169, 181, 187, 193, 207, 200, 213 (Alon), Paragraphs 137, 144, 152, 165, 171, 177, 184, 190, 197, 203, 209, and 215 (Tal). For Oren and Tal, these cited paragraphs correspond to groups for Victim-1 (Oren objects to paragraph 156, but the vulnerable victim

defendants first object to the application of the vulnerable victim enhancement pursuant to U.S.S.G. § 3A1.1(b)(1) on the grounds that the enhancement double counts where the base offense level is calculated through a cross-reference to U.S.S.G. § 2A3.1, triggered by conduct involving force or incapacitation in violation of 18 U.S.C. §§ 2241 or 2242. (Def. Obj. at 17). But there is no double counting here.

While § 2242(2) "does include, as an element, the incapacity of the victim[,] . . . the Guideline provision used to calculate [the defendants'] base offense level" —§ 2A3.1—"does not." *United States v. Schoenborn*, 793 F.3d 964, 967 (8th Cir. 2015). "Instead, § 2A3.1 applies to all sexual abuse offenses under 18 U.S.C. §§ 2241 and 2242. This same guideline provision, with a base offense of 30, would also apply, for example, to a person convicted of sexual abuse through placing another in fear. *See* 18 U.S.C. § 2242(1)." *Id.* Application Note 2 to § 3A1.1 instructs courts not to "apply subsection (b) if the factor that makes the person a vulnerable victim is incorporated in the offense guideline." U.S.S.G. § 3A1.1, app n.2. By the text of the application note, this restriction applies only if there was already an enhancement under the Guidelines that explicitly counted for the victim's vulnerable characteristic, but "§ 2A3.1 does not incorporate an enhancement for a specific offense characteristic based on the incapacity of the victim." *Schoenborn*, 793 F.3d at 967. Consequently, as the victim[s'] vulnerability in this case was not accounted for in either the base offense level or a specific offense characteristic," there is no double counting, and application of the vulnerable victim enhancement is required. *Id.* at 167-168; *cf. United States v. Perez*, No. 20-1982-Cr., 2022 WL 1421408, at *3 (2d Cir. May 5, 2022) (holding no double counting in applying the base offense under § 2A3.1(a) and the use-of-force enhancement under § 2A3.1(b)(1) and explaining that "multiple adjustments may properly be imposed when they aim at different harms emanating from the same conduct" and that "the base offense level for the aggravated sexual abuse counts—which applies equally to aggravated sexual abuse under 18 U.S.C. § 2241(a) or § 2241(b) and to 'unaggravated' sexual abuse under § 2242, *see* U.S.S.G. App. A—recognized the baseline harm of the conduct of criminal sexual abuse while the use-of-force enhancement recognized the distinct harm of the use of force in the commission of that sexual abuse") (internal citations omitted).[7]

The defendants next contend that the vulnerable victim enhancement cannot be based on the defendants' surreptitious drugging of the victims, because that is "a condition manufactured by the offense itself," rather than a "pre-existing trait supporting the enhancement." (Def. Obj. at 17). That the defendants caused the vulnerability does not make them immune from the enhancement. As the Second Circuit has held, the enhancement is applicable where a defendant drugs his victims,

---

enhancement is applied to Victim-1 in paragraph 155), Victim-2, Minor Victim-3, Victim-4, Victim-5, Victim-7, Minor Victim-8, Victim-9, Victim-12, Minor Victim-25, Minor Victim-26, and Victim-30. Alon, however, does not object to the vulnerable victim enhancement for Victim-1 (paragraph 156), Victim-2 (paragraph 135), or Minor Victim-26 (paragraph 175).

[7] There may be other reasons in addition to being drugged, incapacitated, or intoxicated that certain victims were vulnerable. For example, Minor Victim-3, Minor Victim-8, Minor Victim-25, and Minor Victim-26 were all underage teenagers at the time the defendants sexually assaulted them, making them especially vulnerable.

which makes the victims "physically and mentally more vulnerable." *See United States v. Altman*, 901 F.2d 1161, 1165 (2d Cir. 1990). The enhancement also applies where a victim is incapacitated or severely intoxicated—even where that state was not caused by the defendants. *See United States v. Talk*, 446 F. App'x 114, 124-25 (10th Cir. 2011) (affirming application of vulnerable victim enhancement where "extreme levels of intoxication render an individual unable to defend himself"); *United States v. Betone*, 636 F.3d 384, 388 (8th Cir. 2011) (same where victim "was passed out, incapable of consenting and therefore vulnerable due to his physical condition"). All of the victims included here were drugged by the defendants or, at minimum, were in a state of incapacitation, unconsciousness, or extreme intoxication, and as a result, the vulnerable victim enhancement is applicable.

In their supplemental submission, the defendants also object to the vulnerable victim enhancement being applied for Minor Victim-25 and Minor Victim-26 because of their age. (Def. Supp. Obj. at 4). Specifically, they argue that because the age of consent in Colorado was 17, these women could not have been vulnerable. Colorado law is not relevant for this analysis. As has been stated numerous times in this submission, Minor Victim-25 and Minor Victim-26 were under 18 at the time they were assaulted and thus were minors (and vulnerable) for purposes the Guidelines. In addition, as to Minor Victim-25, the defendants argue that there was not evidence that they knew or should have known Minor Victim-25 was 17, so the enhancement should not be applied. Alon and Oren knew that Minor Victim-25 came to the club with her friends, Minor Victim-26 and Victim-9. (*See* Tr. 1876). At the club, Minor Victim-26 told Alon that she was 17, to which Alon responded that was "hot." (Tr. 1880-81). Given Minor Victim-26's age and the fact Minor Victim-26 and Minor Victim-25 were there together, Alon should have known that Minor Victim-25 was a minor, even if she did not specifically tell him her age.

**<u>Use-of-Force Enhancement</u>**

**Groups for Victim-7 and Minor Victim-26[8]:** The defendants object to the use-of-force enhancement for Victim-7 and Minor Victim-26, complaining that neither physically resisted, attempted to stop the acts, or was held down or restrained. (Def. Obj. at 17). But this kind of resistance or restraint is not required to satisfy the use-of-force enhancement. As Judge Caproni explained in instructing the jury, force for purposes of § 2241 (and therefore for the application of the § 2A3.1(b)(1) enhancement) involves "any form of physical violence, compulsion, constraint, or physical pressure directed against another person," which can be satisfied by rape. (*See* Tr. 5253; 5266-67 (jury charge)).

Victim-7's testimony demonstrates that the defendants used physical force, including physical pressure, in order to rape her. After Alon and Oren brought Victim-7 to their cabin and gave her a drugged drink, Victim-7 lost consciousness. (Tr. 1367-68, 1372-74). Victim-7 explained that when she came to naked in the cabin, one of the twins was on top of her and raping her. (Tr. 1377, 1517). She testified that she felt "paralyzed" during the assault and that she didn't "think [she]

---

[8] The defendants cite paragraphs 140 and 174 from Alon and Oren's PSRs and paragraphs 176 and 208 from Tal's PSR for this objection. While Alon's and Tal's citations map onto the use-of-force enhancement for Victim-7 and Minor Victim-26, the second Oren citation does not.

physically could speak at that moment and get up." (Tr. 1378). During the time when Victim-7 was immobilized from the sedative hypnotic drug, unable to speak, and blacking out from the effects same drug, Alon and Oren climbed on top of Victim-7 and forced themselves on to and inside of her. (Tr. at 1374-79). This encounter necessarily involved the defendants moving Victim-7's body by applying physical force to her. Moreover, during the assault, Alon and Oren took turns raping Victim-7 while positioned on top of her. The defendants' use of force therefore continued as they pressed themselves on to her body, which in combination with drugging, was calculated to overcome any potential resistance and prevent Victim-7's escape. During the assault, Victim-7 could not move or speak. This enhancement is appropriate based on Victim-7's drugging and the use of force to rape her.

As to Minor Victim-26, the Government agrees the use-of-force enhancement is not applicable. The four-level § 2A3.1(b)(1) enhancement is appropriate, however, based on the defendants' drugging of Minor Victim-26, which is conduct described in § 2241(b).[9]

**Groups for Victim-4, Victim-5, and Victim-9[10]:** The defendants next object to the use-of-force enhancement as to Victim-4 and Victim-5 because neither testified at trial, and the counts as to these victims were dismissed. (Def. Obj. at 17). As an initial matter, and as outlined above, the Guidelines do not require victim testimony at trial in order for an enhancement to apply. Furthermore, as described above with regard to paragraph 19, the reason these counts were dismissed was not that the victims were unreliable, but that the defense investigator improperly sought out information about Victim-4's family and minor children, causing her to no longer communicate with the Government. The defendants cannot be made immune from application of this enhancement because of the misconduct of their own investigator. With regard to Victim-4, the use-of-force enhancement is appropriate because the Government can prove that Alon pinned Victim-4 in the corner of a hot tub when he raped her, with his arms stretched over her so that she could not climb out, thus using force to constrain her. (3514-009 at 3). In addition, Alon used physical force, including through his size and strength, to overcome Victim-4's attempts to resist and push him off of her. (3514-009 at 3). As to Victim-5, the Government agrees that the use-of-force enhancement does not apply (though not for the reasons offered by the defense). Instead, the § 2A3.1(b)(1) enhancement is appropriate based on the defendants' drugging of Victim-5.

The defendants also object to the use-of-force enhancement as applied to Victim-9 because Victim-9 did not testify at trial. But, as noted above, the Guidelines do not require victim testimony in order for an enhancement to apply. The evidence at trial, presented primarily through the testimony of Minor Victim-25 and Minor Victim-26 (both of whom were present for Victim-9's assault), demonstrated that Oren used force when sexually assaulting Victim-9. After the defendants gave Victim-9 drinks that made her appear extremely intoxicated (Tr. 2372-73), they

[9] The § 2A3.1(b)(1) enhancement could also be applied to Victim-7 based on the defendants' drugging of her, rather than their use of force.

[10] The defendants cite paragraphs 186, 205, and 212 from the Alon and Oren PSRs and paragraphs 163, 170, and 189 from the Tal PSR for this objection. As with the prior objection, the Alon and Tal PSR citations correspond to the use-of-force enhancement for the named victims, but the Oren PSR citations do not.

took her back to their room, along with Minor Victim-25 and Minor Victim-26. Once there, Oren got on top of and assaulted Victim-9, something that both Minor Victim-25 and Minor Victim-26 observed. (Tr. 1894, 2375). Victim-9 managed to extricate herself from the bed, went to Minor Victim-26, and said that "she wanted to leave and that she didn't want to be there anymore," that "this is bad, this is bad, I don't want to be here, I'm leaving," and then ran out of the room. (Tr. 1894). Minor Victim-26 also testified that she observed Victim-9 crying on the phone with her mother early the next morning and heard her say that "she didn't want to be there any more, and that she wanted to go home." (Tr. 1911). While defense counsel objected to Minor Victim-26 providing additional testimony about the assault to the jury, the context was clear that "[Minor Victim-26] saw Oren assaulting [Victim-9]." (Tr. 1906-07). Oren's use of physical force and Victim-9's resulting attempts to physically resist make this enhancement appropriate.

**Use of a Computer Enhancement**

**Group for Minor Victim-3[11]:** The defense objects to the application of the use of a computer enhancement pursuant to U.S.S.G. § 2A3.1(b)(6)(B) on the grounds that Matthew Lipman, rather than the defendants, used a computer or electronic device to communicate with Minor Victim-3 about the weekend in the Hamptons. (Def. Obj. at 18). That Lipman—the defendants' co-conspirator—engaged in this communication rather than the defendants does not make the enhancement inapplicable. The defendants did not rent their home or plan their Memorial Day festivities on their own. They did so in conjunction with Lipman, a party promoter who worked with them to bring women and girls to the house the defendants and Lipman rented with Mike Kanevsky, David Rabello (one of Minor Victim-3's rapists), and James Ferraro. (*See* GX 1008; *see also* GX 2G-104-A (earlier draft of lease in Oren Alexander and Lipman's names), 2G-106-A (final version of lease in Kanevsky and Lipman's names), 2C-112 (Oren Alexander accepting changes to final lease)). As the defendants' co-conspirator, Lipman's conduct is relevant conduct for which the defendants are accountable. *See* U.S.S.G. § 1B1.3(a)(1)(B); *see also United States v. Smith*, 895 F.3d 410, 418 (5th Cir. 2018) (affirming computer-use enhancement where defendant was part of joint undertaking, even though defendant did not personally use the computer); *United States v. Pringler*, 765 F.3d 445, 455-56 (5th Cir. 2016) (same). In furtherance of the conspiracy, Lipman messaged Minor Victim-3, a sixteen-year-old, to invite her to the house for Memorial Day Weekend, where she would be raped by Tal, Alon, Rabello, and another of their friends. (Tr. 2917). In the messages, Lipman facilitated her travel, telling her that a bus would pick her up in Manhattan to take her to the house in the Hamptons for a party. (Tr. 2918). This is sufficient to apply the enhancement. *See Sandoval v. United States*, 455 F. App'x 6, 6-7 (D.C. Cir. 2012) (affirming computer-use enhancement for facilitation of travel where defendant "used a Palm Pilot device to arrange the logistics of the intended meeting"); *cf. United States v. Cramer*, 777 F.3d 597, 602-03 (2d Cir. 2015) (affirming computer-use enhancement where defendant began communicating with the minor victim via a computer but enticed victim to engage in prohibited sexual conduct through other means).

[11] The defendants cite paragraph 147 in the Alon and Oren PSRs and paragraph 148 in the Tal PSR for this objection. Paragraph 147 in the Alon PSR reflects the application of the use of a computer enhancement for Minor Victim-3's group; the paragraphs cited for the Oren and Alon PSRs do not.

It was foreseeable to the defendants that Lipman would invite women, including potential victims, to 88 Peconic for that weekend. Even before they rented the house, Oren emailed Alon, Tal, Lipman, and Rabello with a draft message to send out to people they wanted to come to the house that summer, which included their view that the "ratio"—*i.e.*, the number of men to women—was "very important." (GX 2C-103, B-304, 3F-140). Lipman then, fulfilling his party promoter role, blasted out Oren's message to multiple Facebook groups, including those for "Hamptons Share House" and "Hamptons 2009." (GX A-408, A-408-3; *see also* A-407-2 (explaining that Facebook group name was changed from "Hamptons 2009" to "Hamptons 2010" in or about February 2010); 2G-110 (Lipman inviting broker to join "Hamptons 2009" group)). Prior to Memorial Day Weekend, Lipman, along with Kanevsky, advertised the bus that would take Minor Victim-3 and at least two other high schoolers to the Hamptons that weekend. (GX A-409-1; Tr. 2920-21). And following that weekend, after he and Oren received noise complaints from neighbors (GX 2G-109), Lipman sent out additional Facebook messages to the groups, stating, among other things, that "[a]nyone who was there [Memorial Day Weekend] will vouch that a weekend at 88 Peconick will definitely go down as a summer highlight"; that they "still had rooms available on various weekends" at 88 Peconic; and that "if you take a room, the girls are included ;)." (GX A-407-3, A-408). Lipman's participation was key to making the sex trafficking scheme work during the summer of 2009.

Contrary to the defendants' argument, it was also foreseeable to the defendants that some of the women Lipman invited would be minors. They knew the scope of Lipman's outreach, (*see* GX 1008 (showing that Alon received Lipman's messages to the Facebook groups described above)), and given that large scope, it is unsurprising that minors were invited. Indeed, Minor Victim-3 was not the only minor on the bus to Memorial Day weekend. (Tr. 2921). As a result, the computer enhancement should be applied.

**<u>Defendant's Chapter Three Calculation</u>**

The defendants object to Groups 6, 7, 8, 11, 12, and 13 of Oren's PSR being counted at all. For the reasons described above in the Offense Level Computation section, these arguments should be rejected.

The defendants further calculate their Chapter Three totals, without the enhancements they objected to in the Offense Level Computation chart included above. For the reasons laid out in the Government's responses in that chart, as well as in the above sections concerning legal arguments about the use-of-force, physical restraint, vulnerable victim, and use of computer enhancements, these calculations should be rejected.

**<u>Chapter Four Enhancement</u>**

**Paragraph 221 (Alon):** Alon objects to the application of the enhancement for a pattern of activity involving prohibited sexual conduct with minors pursuant to U.S.S.G. § 4B1.5(b), which the PSR applies based on Alon's sexual assaults of Minor Victim-3, Minor Victim-25, and Minor Victim-26. (Def. Obj. at 18-20). First, Alon argues that his sexual assaults of Minor Victim-25 and Minor Victim-26 should not be considered "separate occasions" for purposes of this

enhancement because they occurred as part of one encounter. These two instances do constitute separate occasions because Alon first raped Minor Victim-26 in the bathroom and then sexually assaulted Minor Victim-26 in the bedroom of the Aspen hotel room he shared with Oren. *See United States v. Bullock*, 152 F.4th 108, 117-18 (2d Cir. 2025) (affirming application of similar pattern enhancement under § 2G2.2(b)(5) where the defendant sexually abused one victim in the pastor's office of a church and then abused a second victim in a classroom of the same church on the same day). But even if Alon's sexual assaults of Minor Victim-25 and Minor Victim-26 were considered a single occasion, that does not matter for purposes of applying this guideline. Application Note 4 explains that for purposes of the pattern enhancement, "the defendant engaged in a pattern of activity involving prohibited sexual conduct if on *at least two separate occasions*, the defendant engaged in prohibited sexual conduct with a minor." U.S.S.G. § 4B1.5, app. n.4(B)(i) (emphasis added); *see also United States v. Broxmeyer*, 699 F.3d 265, 284-85 (2d Cir. 2012) (explaining that "we need identify only two such occasions [of prohibited sexual conduct with minors] to uphold the district court's pattern finding" and holding that "'two' means two, not three"). Alon at minimum has two occasions of prohibited sexual conduct: (i) his rape of Minor Victim-3 on or about Memorial Day Weekend 2009, and (ii) his sexual assaults of Minor Victim-25 and Minor Victim-26 in Aspen in or about January 2017. As a result, the pattern enhancement must be applied.

Second, Alon claims that for purposes of this enhancement, Minor Victim-25 should not be considered because "under a minute elapsed" between him putting his hand in Minor Victim-25's pants and touching her vagina and Minor Victim-25 removing his hand. But a sexual assault that occurs quickly is still a sexual assault. The Government is aware of no authority—and the defense has cited none—supporting their proposed "under a minute" exception to the pattern enhancement.

Third, Alon argues that because the Government has not alleged that he has sexually assaulted a minor since 2017, he is not a "continuing danger" and the pattern enhancement should not be applied. Whether Alon has continued to engage in conduct with minors is unknown, and in any case is irrelevant, for the application of this enhancement, because under the text of the enhancement, and as the Second Circuit has held, the Probation Office "need identify only two such occasions" of prohibited sexual conduct with minors in order to apply the enhancement, and as described above, there are at least two (which Alon does not even appear to dispute). *Broxmeyer*, 699 F.3d at 284. Again, Alon does not cite any authority to the contrary.

Fourth, Alon claims that the conduct underlying this enhancement is "unreliable" because Minor Victim-3 misidentified Alon in a photograph and because Minor Victim-25 and Minor Victim-26 were not charged in any count of the indictment. Neither of these arguments is persuasive. First, as to Minor Victim-3, the jury found specifically that Alon sex trafficked Minor Victim-3—that is clearly sufficient to find her testimony reliable.[12] Second, as to Minor Victim-

[12] Alon refers to Minor Victim-3 misidentifying Oren as Alon in a photograph taken over fifteen years ago. It bears noting that even the defense's witness about this photograph, Danielle Epstein, who had dated Alon and spent substantial time with both Oren and Alon over the years, could not be certain that Oren was the individual in the photograph because, as she explained, Alon and Oren are twins. (Tr. 4705).

25 and Minor Victim-26, they are victims of the sex trafficking conspiracy in Count One, for which all of the defendants were found guilty. But even if they were not, the fact they were not named specifically in the indictment does not make their testimony unreliable, and the pattern enhancement can be based on occasions of prohibited sexual conduct "without regard to whether the occasion (I) occurred during the course of the instant offense; or (II) resulted in a conviction for the conduct that occurred on that occasion." U.S.S.G. § 4B1.5, app. n.4(B)(ii).

Finally, Alon argues that his sexual assaults of Minor Victim-25 and Minor Victim-26 should not count for purposes of the enhancement because each victim was 17 years old at the time. But as Alon himself notes, the enhancement applies to conduct with "minors," as defined as "an individual who had not attained the age of 18 years"—which is the case for Minor Victim-25 and Minor Victim-26. U.S.S.G. § 4B1.5 app. n.1.

**Criminal History Category**

**Paragraphs 227-228 (Tal):** As Tal acknowledges, these criminal history points are properly applied under the Guidelines. Therefore, no change should be made.

**Personal and Family Data**[13]

**Paragraph 248:** If Alon described himself as a "professional drinker" in the interview, as the quotation marks seem to reflect, no change is warranted.

**Paragraph 252:** If Alon described in the interview that this was until his arrest, no change is warranted.

**Paragraph 261 (Oren)**: If these properties have been sold, then the PSR should reflect Oren's assets from the sales.

**Paragraph 265(i):** Alon is welcome to provide a certified appraisal of the property for consideration, but valuing his asset as if it were an empty lot would inaccurately represent his assets.

**Paragraph 267:** Including ongoing litigation and civil attorneys' fees seems irrelevant to this section.

**Paragraph 279:** *Haverkamp* is the law of the Second Circuit, but it is an outlier decision among federal appellate courts. *See United States v. Lipsky*, No. 24-1351, 2025 WL 692345, at *2 (6th Cir. Mar. 4, 2025) (noting contrary positions of the Third, Ninth, and Tenth Circuits and declining to address the issue on plain error review but suggesting the majority view is correct

---

[13] The Government does not take a position on the objections the defendants raised to the following paragraphs: 232 (Oren); 233 (Oren/Alon) and 234 (Tal); 234; 236 (Oren); 241 (Oren/Alon) and 242 (Tal); 242; 244; 260; 264.

(“Lipsky cannot show plain error, and indeed it is doubtful he can show error at all [in applying the assessment on a per-count basis].”)).

**Paragraphs 282 (Oren/Alon); Paragraph 280 (Tal):** The Government will provide available supporting documentation for restitution claims to the Court and the defendants. The defendants' novel constitutional claim about restitution is contrary to the controlling law in the Second Circuit, and the Court can, and indeed must, order restitution.

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: /s
Kaiya Arroyo, Elizabeth A. Espinosa
Andrew Jones, Madison Reddick Smyser
Assistant United States Attorneys
(212) 637-2226/-2216/-2249/-2381